IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

SIERRA CLUB AND
NATIONAL PARKS CONSERVATION ASSOCIATION                    PLAINTIFFS

V.                            NO. 4:18-cv-00854-KGB

ENTERGY ARKANSAS, INC., ENTERGY
POWER, LLC, AND ENTERGY
MISSISSIPPI, INC.                                          DEFENDANTS

**ARKANSAS AFFORDABLE ENERGY COALITION'S COMBINED REPLY TO
RESPONSE OF SIERRA CLUB AND NATIONAL PARKS CONSERVATION
ASSOCIATION AND RESPONSE OF ENTERGY COMPANIES TO THE
COALITION'S MOTION TO INTERVENE**

Comes the Arkansas Affordable Energy Coalition, ("the Coalition"), by and through its

undersigned counsel and submits the following Combined Reply to the Response of the Plaintiffs

(Docket Entry 35) and to the Response of the Entergy Companies (hereinafter "Entergy") (Docket

Entry 36) to the Coalition's Motion to Intervene.

## I.

## INTRODUCTION

Both Plaintiffs and Entergy oppose the Coalition's intervention and base their arguments

primarily on the effects of their Settlement Agreement.  Plaintiffs and Entergy argue that the

Coalition's interest in the Settlement Agreement is so limited and tangential, and that the potential

effects of the Settlement Agreement on electric rates are so speculative and dependent on action

by other parties, that intervention is not warranted.  However, these arguments, based on the

Settlement Agreement, are of secondary importance as to whether the Coalition has standing or

1

has a right, or should be allowed, to intervene in this case. Intervention, like standing, must be determined based on the pleadings at the commencement of the action. *National Parks Conservation Association v. EPA*, 759 F.3d 969 (8th Cir. 2014). Consequently, whether the Coalition should be allowed to intervene must be decided based on the allegations in the Plaintiffs' Complaint.

In the *National Parks* case, the Eighth Circuit considered what information should be considered in ruling on a motion to intervene, and how a Court should view that information. The Court held that both intervention and Article III standing must be determined based on the allegations in the complaint and in the motion to intervene, and reversed the lower court's denial of intervention, to wit:

> A court ruling on a motion to intervene must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor. *See Tarek ibn Ziyad Acad.*, 643 F.3d at 1092; *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir.2009). This standard is identical to the standard applied to a typical motion to dismiss for lack of jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). When the allegations in the underlying controversy are relevant—for instance when a lawsuit ultimately targets the prospective intervenor's interests or rights—the court should focus its attention on the pleadings because "standing is to be determined as of the commencement of suit." *See id.* at 570 n. 5, 112 S.Ct. 2130. Viewing the complaint holistically, the court should assume the plaintiff will receive the relief it seeks and, from that assumption, assess the sufficiency of the prospective intervenor's motion. *See Tarek ibn Ziyad Acad.*, 643 F.3d at 1092; *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024–25 (8th Cir.2003); *accord Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 733–34 & n. 5 (D.C.Cir.2003) (examining the plaintiff's complaint to determine whether a prospective intervenor had standing); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1116 (10th Cir.2002) (analyzing the plaintiff's complaint to determine whether the prospective intervenors satisfied Rule 24(a)(2)'s impairment requirement).

759 F.3d at 973. Likewise, in ruling on the Coalition's Motion to Intervene in this case, the Court should focus on the Plaintiffs' Complaint, and assume that the Plaintiffs will get the relief they seek in the Complaint.

## II.

## ALLEGATIONS OF THE COMPLAINT

When the allegations of Plaintiffs' Complaint are considered, it is apparent that the Coalition has standing and should be allowed to intervene. The Complaint alleges that Entergy made physical changes or changes in the method of operation at Unit One of the Independence plant in 2009 (paragraphs 66-70), at Unit Two of the Independence plant in 2008 (paragraphs 71-75), and at Unit Two of the White Bluff plant in 2007 (paragraphs 76-80) without installing Best Available Control Technology ("BACT"). The Complaint alleges that these changes caused SO2 and NOx emissions to exceed the PSD significance level. (paragraphs 68, 73, and 78). The Complaint alleges that Entergy is operating White Bluff and Independence without "completing a permit application for a PSD permit, without such PSD permit, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements." (Complaint, paragraphs 83, 91, and 99). The Complaint seeks to enjoin Entergy from operating the White Bluff and Independence plants except in accordance with the Clean Air Act ("CAA") (Complaint, paragraph 106), which includes BACT, and asks the Court to order Entergy to obtain the required permits and to comply with the requirements of any permits obtained. (Complaint, paragraph 107). If the relief sought in the complaint is granted, the White Bluff and Independence plants will have to install control technology that meets the requirements of BACT.

In its Motion to Intervene, the Coalition alleges that the White Bluff and Independence plants are co-owned by several electric utilities that operate as public utilities in Arkansas and that if the relief sought by the Plaintiffs is granted, i.e., new requirements for emission controls under BACT, then under the provisions of Ark. Code Ann. §§ 23-4-501 and 504 the costs of that control

3

technology will be passed directly to Arkansas electric ratepayers that obtain power from those facilities, and the Coalition and its members will suffer significant injury through increased electric costs. (Motion, ¶15, p. 6).

## III.

## THE COALITION AND ITS MEMBERS HAVE STANDING BASED ON THE ALLEGATIONS IN THE COMPLAINT

The Coalition notes that Plaintiffs' Response does not challenge the Coalition's standing. Entergy, on the other hand, does challenge the Coalition's standing; however, Entergy's arguments are based primarily on the effect of its Settlement Agreement with the Plaintiffs, not the allegations in the Plaintiff's Complaint.

The requirements for Article III standing are (1) injury, (2) causation and (3) redressability. The injury must be to a legally protected interest that is concrete, particularized and either actual or imminent. There must be a causal connection between the injury and the conduct complained of. Finally, it must be shown that a favorable decision will likely redress the injury. *National Parks*, 759 F.3d at 974-975.

When viewed from the perspective of the allegations in the Complaint, the Coalition has standing, just like the public utility in the *National Parks* case. With respect to injury, in *National Parks*, the Court stated that,

> the technology the Environmental Groups seeks to impose on it could cost NSP <u>and its customers</u> more than $280 million . . . . Risk of direct financial harm establishes injury in fact. Unlike in *Metropolitan St. Louis Sewer District*, 569 F.3d at 836, where the potential intervenor's financial injury was contingent on several conditions, if the court here grants the Environmental Groups' relief, then NSP would ·unavoidably be harmed economically. . . . Even if the timing and extent of NSP's financial injury from the compelled installation of emission-control technologies on Sherco <u>remains to be determined</u>, NSP has still established standing. . . . [i]f the court grants the relief requested in the complaint, <u>the threat of</u>

4

> injury to NSP is real. NSP has adequately alleged a concrete, particularized, and imminent injury to a legally protected interest. [emphasis supplied]

*National Parks*, 759 F.3d at 975. Here, as explained in more detail below, the costs of the technology that Plaintiffs seek to impose on the White Bluff and Independence plants under the BACT requirements of the Clean Air Act will be passed on to the customers of Entergy and the other Arkansas public utility co-owners of the White Bluff and Independence plants under Arkansas law, even if the timing and extent of those costs remains to be determined. Furthermore, the threat of injury to those customers posed by the allegations in the Complaint is direct.

With respect to causation, the Court in *National Parks* stated:

> NSP can trace its injury to the EPA through the would-be court order if the Environmental Groups obtain relief. . . Because the EPA would be compelled to cause the alleged injury to [NSP] if the [Environmental Groups] prevail . . . NPS satisfies the causation element.

*Id.* Again, as in the *National Parks* case, if Plaintiffs obtain the relief they seek in the Complaint and additional costs for control technology to comply with BACT are imposed on the White Bluff and Independence Plants, then those costs would be passed on to the electric customers of those plants, thus satisfying the causation element.

Finally, with regard to redressability, the Court in *National Parks* stated:

> NSP's injury can be redressed. NSP seeks to prevent the Environmental Groups from obtaining an order imposing BART on Sherco. If NSP prevails, it avoids, or at least delays, the cost technology the Environmental Groups seek.

*Id.* Likewise, in this case, the Coalition in its proposed answer raises affirmative defenses to the Plaintiffs' Clean Air Act claims and seeks to prevent the Plaintiffs from obtaining the relief they seek, i.e., an order imposing BACT requirements on White Bluff and Independence, thereby avoiding or delaying the costs that will be incurred to install those controls. Consequently, when

the Coalition's motion is considered based on the allegations in the Plaintiffs' Complaint, the Coalition has standing.

Entergy cites *U.S. v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009) and *Burton v. Central Interstate Low-Level Radioactive Waste Compact Commission*, 23 F.3d 208 (8th Cir. 1994) in support of its argument. However, as explained further below, the *Metro St. Louis* case is not applicable because Arkansas state law allows public utilities such as EAL and the other co-owners of White Bluff and Independence to directly pass through the costs of any additional control technology to their electric customers. Furthermore, in *Metro St. Louis*, the proposed intervenor only sought to intervene as to the remedy; here the Coalition seeks to intervene to avoid the award of any relief requested in the Plaintiff's Complaint.

With respect to the *Burton* case, that case also is distinguishable, and it actually supports the Coalition's argument. There, in discussing the injury to the ratepayer, the Court correctly observed that "increased rates <u>may</u> constitute an injury that is traceable to the Commission's conduct" [emphasis supplied], contrary to Entergy's argument. 23 F.3d 208 at 210. The Court then stated the reason for denying intervention, i.e., that the ratepayer's complaint "does not suggest how enjoining the taxes would redress [her] injury. It does not allege, for instance, that state law obligates LES to base its rates in any way on LLRW disposal costs or that any action the court may take would affect LES's rates." *Id*. Unlike the *Burton* case, as explained below, under Arkansas state law, electric rates for customers of the co-owners of White Bluff and Independence would be affected if the Court granted the relief requested by Plaintiffs in their complaint, i.e., the imposition of additional BACT control technology requirements. If the Court does not grant that relief, then the injury to the Coalition members, i.e., the risk of increased electric costs due to BACT requirements, will be eliminated and redressed.

## IV.

## THE COALITION HAS A RIGHT TO INTERVENE UNDER FRCP 24(a)(2)

Under FRCP 24(a)(2) a court must permit anyone to intervene who (A) files a timely motion to intervene, (B) claims an interest relating to the property or transaction that is the subject of the action, (C) is situated so that disposing of the action may, as a practical matter, impair or impede the movant's ability to protect that interest, and (D) is not adequately addressed by the existing parties. *National Parks*, 759 F3d at 975.

### A. **Timeliness**

Neither the Plaintiffs nor Entergy contend that the Coalition's Motion to Intervene is not timely, consequently, this prong of FRCP 24(a)(2) is not in issue.

### B. **The Coalition's interest relating to the subject of the action**.

Both Plaintiffs' Brief (p. 9) and Entergy's Briefs (AG's brief at p. 16, Coalition brief at p. 4) argue that the Coalition's interest in avoiding higher electricity costs is insufficient to satisfy the requirements of FRCP 24(a)(2). Plaintiffs and Entergy rely primarily on *U.S. v. Metropolitan St. Louis Sewer District*, 569 F.3d 869 (8th Cir. 2009), however, that case does not apply here.

It is clear that economic interests in environmental compliance costs that affect public utility ratepayers is sufficient to satisfy both the cognizable interest prong of Rule 24 as well as the injury-in-fact requirement for standing under Article III. *National Parks Conservation Association v. E.P.A.*, 759 F.3d 969 (8th Cir. 2014). *See also, Burton*, 23 F.3d at 210 (increased rates may constitute an injury). The *National Parks* complaint sought EPA rulemaking which "would be limited to the narrow question of what technology to impose" on a coal-fired power

plant, in that case Best Available Retrofit Technology (BART) under the Clean Air Act.[1] Similarly, here, the Plaintiff's complaint seeks to establish Best Available Control Technology (BACT) on the White Bluff and Independence plants, either by direct order of the Court or in a permitting proceeding ordered by the Court. In both *National Parks* and in this case, the control technology would be very expensive, costing hundreds of millions or billions of dollars.

In *National Parks*, the Court looked at the plaintiffs' complaint and, viewed in the light most favorable to the proposed intervenor and assuming that the plaintiffs would get the relief they requested, determined that the lawsuit could result in a court order with substantive implications:

> The Environmental Groups' complaint seeks "to secure an order from the Court that directs EPA to issue RAVI BART for [the plant]" because "[t]he Department of Interior's certification triggered a mandatory, non-discretionary duty on behalf of EPA to promulgate modern pollution control limits ... for Sherco. Compl. at 1. In deciding whether to intervene, NSP was required to accept the possibility that the court could issue an order compelling the EPA to "issue RAVI BART for [the plant]."[2]

Likewise, in this case, the Coalition "was required to accept the possibility" that this Court could issue an order finding that the White Bluff and Independence plants were not operating in compliance with the CAA BACT requirements, and that the Court would issue an order that they do so.

The court in *National Parks* also instructed that a "risk" of financial harm constitutes a cognizable interest to support intervention as well as the injury-in-fact requirement of Article III standing.[3] Because the complaint sought to impose costly pollution controls on the power plant,

---

[1] *Id.* at 972.

[2] *Id.* at 974.

[3] *Id.* at 975.

estimated to cost the utility and its customers in that case $280 million, the Eighth Circuit found this risk of financial harm sufficient.  This was true "[e]ven if the timing and extent of NSP's financial injury" remained to be determined."[4]  The Court further stated, "if the Court grants the relief requested in the complaint, the threat of injury to NSP is real."[5] *See also, Kansas Public Employees Retirement System v. Reimer & Koger Associates, Inc.*, 60 F.3d 1304 (8th Cir. 1995); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.1*, 738 F.2d 82 (8th Cir. 1984) ("The rule does not require, after all, that appellants demonstrate to a certainty that their interests will be impaired . . . It requires only that the disposition of the action 'may as a practical matter' impair their interests.").

Likewise, in this case, if the Court grants the relief requested in the Complaint, i.e., imposing BACT requirements on White Bluff and Independence, the threat of injury to the Coalition and its members is real, because the costs of those BACT requirements may be -- indeed, likely will be -- recouped from the Coalition's electric ratepayer members through increased electricity costs.  It is undisputed that under Arkansas law, public utilities such as Entergy may pass on the costs of environmental compliance to ratepayers.  Ark. Code Ann. § 23-4-501 makes this pass-through certain by specifically authorizing utilities to pass on compliance costs to their customers.  Ark. Code Ann. § 23-4-501 provides in part:

> (a)(1) Upon a proper filing .... a public utility shall be permitted to recover in a prompt and timely manner all investments and expenses through an interim surcharge, if the investments or expenses:
>
>    * * *
>
> (D) Are incurred by the public utility to comply with legislative or administrative rules, regulations or requirements;

---

[4] *Id.*

[5] *Id.* (emphasis added).

(E) Relate to the protection of public health, safety, or the environment;

* * *

(G) Are any of the following:

(i) Mandatory . . . .[6]

Ark. Code Ann. § 23-4-504 further provides that "[t]he surcharge shall become effective immediately upon filing."[7] This unilateral rate surcharge will immediately and directly impact the Coalition's electric utility customer members.   The fact that the Arkansas Public Service Commission ("APSC") may review this special surcharge does not detract from the risk that the Coalition's members will be adversely affected.  The APSC may only modify the allocation of or "disapprove" the surcharge if it finds that it does not meet the limited requirements of Ark. Code Ann. § 23-4-501.[8]  Even then, a modification or "disapproval" does not eliminate the surcharge. If the APSC determines that the allocation of the surcharge should be modified, it *shall* fix and determine the appropriate allocation which *shall* be applied prospectively.[9]   If the APSC "determines that all or any portion of the proposed surcharge should be disapproved," the APSC "*shall* determine the just and reasonable amount of the surcharge to be charged … by the utility."[10] Thus, even if the APSC disagrees with the magnitude of the surcharge initially unilaterally imposed as a result of an order of this Court finding that addition emission controls are required at

---

[6] Ark. Code Ann. § 23-4-501 (emphasis added).

[7] Ark. Code Ann. § 23-4-504 (emphasis added).

[8] Ark. Code Ann. § 23-4-507(a).

[9] Ark. Code Ann. § 23-4-507(b)(1).

[10] Ark. Code Ann. § 23-4-507(c) (emphasis added).

White Bluff and Independence under BACT, at most the APSC could reduce the amount of the surcharge, not disallow it entirely.[11]

Other Arkansas statutes demonstrate the risk that the interest of Coalition members will be practically impaired by the relief sought in Plaintiffs' Complaint. As explained in the Coalition's Motion at paragraph 8, one of the co-owners of White Bluff and Independence is the Arkansas Electric Cooperative Corporation ("AECC"). The electric supplier for Coalition members Nucor Steel-Arkansas and Nucor-Yamato Steel Company is Mississippi County Electric Cooperative, Inc. ("MCECI") which is a member of AECC. Under Ark. Code Ann. §§ 23-18-318 and 319, customers of an Arkansas electric cooperative are also members of the cooperative. Under Ark. Code Ann. § 23-18-237, such cooperatives are to be operated without profit, but the "rates, fees, rents or other charges for electric energy . . . shall be sufficient at all times . . . to pay all operating and maintenance expenses necessary or desirable for the prudent conduct of its business . . ." Revenues not required for such purposes are to be returned to the members from time to time. Ark. Code Ann. § 23-18-327. Thus, the Coalition members who are customers of the cooperatives also are members of the cooperatives, and ultimately will have to pay through electric rates the operating and maintenance expenses attributable to the cooperatives' share of White Bluff and Independence.[12]

---

[11] Arkansas public policy is clear on this point: In response to an Arkansas Court of Appeals' decision, this statute was amended in 2015 to strengthen a utility's ability to recover regulatory health, safety and environmental costs from customers. *See McDaniel v. Ark. Pub. Serv. Comm'n*, 2014 Ark. App. 529, 444 S.W.3d 380 (2014), and the subsequent Act 1000 of 2015, available at http://www.arkleg.state.ar.us/assembly/2015/2015R/Acts/Act1000.pdf.

[12] AECC, and its members including MCECI, are responsible for a proportionate share of the costs of operation for White Bluff and Independence, under Ownership Agreements and other agreements for the operation of those plants. A copy of the White Bluff and Independence

In addition, both EAL and the Cooperative co-owners of White Bluff and Independence have abbreviated processes for recovery of the costs of compliance for the relief sought by Plaintiffs in the Complaint from ratepayers. *See* Ark. Code Ann. §§ 23-4-1102 and 1105 for electric cooperatives; *see*, Ark. Code Ann. § 23-4-1201, et seq., the Formula Rate Plan proceeding, for investor owned utilities. The cooperatives may obtain up to a five percent (5%) rate increase per year or eight percent (8%) over twenty-four months. Ark. Code Ann. §§ 23-4-1102 and 1106. Investor owned utilities such as EAL that choose to be regulated under a formula rate plan may obtain up to a four percent (4%) rate increase per year. Ark. Code Ann. § 23-4-1207(d). However, neither of those statutes would come in to play for purposes of this lawsuit if the Court were to deny the relief requested in the Complaint.

There is no doubt that Entergy or the other Arkansas co-owners of White Bluff and Independence could – and there is little doubt that they would -- seek to recover the costs of an order by this Court requiring additional emission controls under the Clean Air Act, based on the recent history of proceedings before the APSC. On March 27, 2009, in APSC Docket No. 09-024-U, Entergy sought a declaration that it was in the public interest to install scrubbers on the White Bluff plant under the Clean Air Act's Regional Haze Rule at a cost of approximately $1.04 Billion.[13] Installation of scrubbers on White Bluff is the same relief that Plaintiffs seek in this case, except that here Plaintiffs seek to do it as BACT under the Clean Air Act PSD program. APSC Docket 09-024-U was predicate for seeking rate recovery for the costs of those scrubbers.

---

Ownership Agreements as filed in Federal Energy Regulatory Commission Docket No. EL05-15-000 are attached hereto as Exhibits A and B, respectively.

[13] *See*, APSC Docket No. 09-024-U, Doc. 6, Petition for Declaratory Order, attached hereto as Ex. C.

On June 26, 2009, shortly after filing Docket 09-024-U, Entergy filed a petition pursuant to Ark. Code Ann. § 23-4-501 for an Interim Rate Schedule in APSC Docket No. 09-059-U to begin collecting Entergy's share of the $1.04 Billion scrubber costs for White Bluff under a "Government Mandated Surcharge Rider".[14] Ultimately, Entergy withdrew its petitions in APSC Dockets Nos. 09-024-U, and 09-059-U, but not before it had collected over $60,000.00 in rate surcharges.[15]

In APSC Docket No. 12-008-U, another Arkansas public utility, SWEPCO, obtained approval from the Arkansas Public Service Commission for installation of over $400 Million in environmental controls under the Clean Air Act MATS Rule at its Flint Creek coal-fired power plant in Gentry, Arkansas.[16] Subsequently, in a related Docket No. 15-021-U, SWEPCO obtained approval under Ark. Code Ann. § 23-4-501 to raise its electric rates to recover its environmental compliance costs for the Flint Creek plant and other SWEPCO facilities.[17]

AECC, one of the co-owners of the White Bluff and Independence plants, is also a co-owner of SWEPCO's Flint Creek plant. In APSC Docket No. 15-082-U, AECC and its member

---

[14] *See* APSC Docket No. 09-059-U, Doc. 1, Entergy's Notice Of Filing an Interim Rate Schedule Pursuant to Act 310 Of 1981, as amended, attached hereto as Ex. D.

[15] *See* APSC Docket No. 09-024-U, Order No. 21, attached hereto as Ex. E, and APSC Docket No. 09-059-U, Order No 5, attached hereto as Ex. F. The surcharges collected under Docket No. 09-059-U ultimately were refunded to Entergy's customers.

[16] *See* APSC Docket No 12-008-U, Doc. 3, attached hereto as Ex. G, and Order No. 14, attached hereto as Ex. H.

[17] *See* APSC Docket No. 15-021-U, Doc. 28, attached hereto as Ex. I, and Order No. 13, attached hereto as Ex. J.

cooperatives, one of which serves Coalition members Nucor Steel-Arkansas and NYS, obtained a rate increase to pay for their share of the cost of the Flint Creek environmental controls.[18]

In APSC Docket No. 15-034-U, another Arkansas public utility, Oklahoma Gas & Electric Company, obtained approval under Ark. Code Ann. § 23-4-501 for an Interim Rate Schedule to recover its environmental compliance costs for compliance with NOx emissions requirements under the Clean Air Act Regional Haze Rule.[19]

This Court has previously recognized that the interest of retail electric customers in avoiding increases in electric rates is sufficient for intervention as of right in litigation that might affect electric rates. In *Arkansas Power & Light Company v. Arkansas Public Service Commission*, 107 F.R.D. 335 (E.D. Ark. 1985), this Court allowed Coalition member Arkansas Electric Energy Consumers to intervene as of right in a lawsuit involving EAL's predecessor, Arkansas Power & Light Company. The Court held that retail consumers of electricity "clearly claim an 'interest' in the outcome of this litigation sufficient to satisfy the second requirement" of FRCP 24(a)(2). 107 F.R.D. at 339.

As in the *National Parks* and *Arkansas Power & Light Company* cases, the Coalition and its members have significant financial interests at stake in this matter. At the time the Coalition filed its Motion to Intervene, pending before the court was the Plaintiffs' Complaint requesting that the Court order Entergy to comply with the BACT requirements of the CAA at White Bluff and Independence. Thus, at the time the Coalition sought intervention, it was required to accept the likelihood that the court would issue an order compelling Entergy to comply with the Clean

---

[18] *See* APSC Docket No. 15-082, Doc. 13, attached hereto as Ex. K.

[19] *See* APSC Docket No. 15-034, Doc. 1, attached hereto as Ex. L, and Order No. 7, attached hereto as Ex. M.

Air Act BACT requirements under which the Coalition's electric consumer members ran the risk of being burdened with a substantial increase in electricity costs. The Coalition therefore has a legally protectable interest in avoiding these increased costs – an interest that could be impaired if it is not allowed to intervene.

As noted in the Coalition's Motion for Leave to File a Reply (Doc. No. 38), on January 10, 2019, in its Order No. 1, the Arkansas Public Service Commission granted both the Coalition and Entergy intervenor status in APSC Docket No. 18-079-U.[20] In that Order, the APSC affirmed that the "docket is open and the question whether to conduct such an investigation is pending." (Order, p. 6). The APSC further found that the Coalition "has an interest in the prudence of closing or changing White Bluff or Independence because of the potential effect on rates and on the demand for natural gas and low-sulfur coal. . . . These interests will be directly affected by the Commission's actions in this Docket."

As to the scope of Docket No. 18-079-U, the APSC found that Coalition members "also have a broader interest than just that of ratepayers, and this Docket is not a rate case or limited to rate case issues." (Order, p. 7). Finally, the APSC found that the Coalition's interests were not adequately represented by any other party, that is, neither by Entergy nor by the Attorney General's office. (Order, p. 7).

In addition to the allegations of the Complaint themselves, the APSC's Order further demonstrates the Coalition's direct interest in this case. Although Entergy has yet to file an answer or response to the Complaint in this case, as Energy states in its Response in Opposition to the State of Arkansas's Motion to Intervene:

> The Complaint alleges CAA violations at the White Bluff Steam Electric Station ("White Bluff") and the Independence Steam Electric Station ("Independence")

---

[20] A copy of the APSC's Order is attached hereto as Exhibit N.

and seeks civil penalties and imposition of Best Available Control Technology ("BACT") that would cost hundreds of millions of dollars or more to install and operate. . . Those costs may make operating White Bluff and Independence economically untenable.

(Doc. No. 34, pp. 2-3). The Coalition's interests relating to the subject matter of this case are clear.

## C. **The Coalition's interests are not remote or speculative and disposition of this case as a practical matter may impair or impede the Coalition's ability to protect those interests.**

Both Plaintiffs and Entergy contend that the Coalition's interest is too indirect, contingent and speculative to satisfy the requirement for intervention as of right under FRCP 24(b)(2). Again, Plaintiff and Entergy's arguments focus on the Settlement Agreement, not the Complaint. Disregarding the 2014 *National Parks* case, Plaintiffs and Entergy rely on an earlier case, *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009). However, that case is not applicable here.

*Metro. St. Louis* involved an enforcement action brought by the United States and the State of Missouri against an agency managing the City of St. Louis's sewer and wastewater system.[21] The complaint alleged that the agency discharged raw sewage into local waterways and otherwise violated its state-issued permits.[22] The plaintiffs sought monetary penalties for each violation and an injunction directing the agency to come into "permanent consistent compliance" with the Clean

---

[21] 569 F.3d 829.

[22] *Id.* at 832.

Water Act and to minimize the imminent and substantial risks to human health posed by the discharge of raw sewage.[23]

Missouri Industrial Energy Consumers ("Energy Consumers"), a general business trade association formed to address its members' concerns about utility services, moved to intervene in the action "as a neutral party for the limited purpose of participating in discussions, negotiations, mediations, hearings, trials and/or settlements" relating to the remedy. [24]   Energy Consumers prayed that the court enter an order "ensuring that the remedy is protective of the environment, compliant with the Clean Water Act, and will not unreasonably burden the [agency's] ratepayers."[25] The district court denied Energy Consumers' motion to intervene, concluding "that sewer rates would increase only if (1) the [agency] were found liable, (2) the court were to impose civil penalties or an injunction requiring significant infrastructure improvements, and (3) the [agency] were to decide to pass on the costs of compliance to ratepayers rather than raising capital in some other way."[26]

In affirming the denial of intervention, the Eighth Circuit agreed "that the possibility of increased sewer rates is not an imminent injury."[27] The Court based this determination on "[t]he constraints on the [agency's] ability to raise rates, combined with the [agency's] pursuit of indemnification from the state for the cost of complying with any judgments or consent decree

---

[23] *Id.* at 832.

[24] *Id.* at 832, 833.

[25] *Id.* at 833.

[26] *Id.* at 834.

[27] *Id.* at 835.

…"[28] Specifically, the agency was "constrained by its own charter from committing to raise fees as part of any enforceable consent decree, even if it were inclined to do so."[29] In addition, the agency had filed a counterclaim against the State of Missouri, alleging that because state law limits its ability to raise rates, the State of Missouri was liable for the entire cost of any judgment against the agency.[30] Because of these factors, this Court found that the possibility of increased sewer rates was "no more than a 'conjectural' or 'hypothetical' outcome" of the lawsuit contingent upon the occurrence of a sequence of events.[31]

In *Metro. St. Louis* the Court did not hold as a matter of law that a ratepayer's interest in utility rates is never legally protectable so as to support a Motion to Intervene. *See, e.g., Burton*, 23 F.3d at 210 ("increased rates may constitute an injury"). As explained above, under Arkansas law, any environmental compliance costs ordered by this Court as to White Bluff and Independence as a result of the allegations of the Complaint are recoverable from ratepayers pursuant to Ark. Code Ann. § 23-4-501 *et seq.* This is a significant distinction from *Metro St. Louis*, where the agency was legally prevented from passing along increased costs to its customers. Here, however, Entergy and the White Bluff and Independence co-owners may pass the costs of any order by this Court for additional control technology directly to ratepayers, and ratepayers will be impaired in making an argument to the Arkansas Public Service Commission that such technology was not required in the face of the Court's order.

---

[28] *Id.* at 835-836.

[29] *Id.* at 835.

[30] *Id.*

[31] *Id.* at 836, 840.

Furthermore, unlike *Metro St. Louis*, there is no counterclaim that Entergy has filed to get someone else to pay the costs if the Court were to grant the relief sought by Plaintiffs and require additional environmental controls as BACT; nor have the Plaintiffs or Entergy suggested that there is some other source of capital to pay for BACT compliance costs. As explained above, under Arkansas law, if the Court were to order additional environmental controls on White Bluff and Independence, the costs of compliance would be recoverable from ratepayers, and the Coalition and its members would have no practical ability to challenge this Court's decision in a rate-making proceeding. The Coalition need only show that its interest "may be impaired." *See Kansas Public Employees Retirement System v. Reimer & Koger Associates*, 60 F.3d 1304, 1308 (8th Cir. 1995).

In addition, in *Metro St. Louis*, the proposed intervenors only sought to intervene for the "limited purpose of participating in 'discussions, negotiations, mediations, hearings, trials and/or settlements' relating to the remedy." 569 F.3d at 834. Here, however, the Coalition seeks to intervene with respect to the Defendants' liability as alleged in Plaintiffs' complaint. Indeed, the Coalition's proposed Answer pleads the statute of limitations and failure to exhaust administrative remedies as affirmative defenses.[32] The PSD violations alleged in the Complaint occurred more than five years before Plaintiffs' Complaint was filed, and under *Sierra Club v. Otter Tail Power Company*, 615 F.3d 1008 (8th Cir. 2010), those claims are time-barred. Furthermore, Plaintiffs' Complaint is simply a collateral attack on the permits issued by the Arkansas Department of Environmental Quality for White Bluff and Independence.

---

[32] Entergy has not yet filed an answer or other responsive pleading.

It is clear that the multiple barriers in *Metro. St. Louis* which made the rate increases "no more than a 'conjectural' or hypothetical' outcome of" the lawsuit are simply not present here.[33] Thus, *Metro. St. Louis*, "where the potential intervenor's financial injury was contingent on several conditions," is distinguished from this case, where the Coalition and its members could "unavoidably be harmed economically" if the Court were to grant the relief sought by the Plaintiffs in their Complaint.[34]

### D. Plaintiffs do not argue that the Coalition's interests are adequately protected by any other party; Entergy does not adequately represent the interests of the Coalition and its members.

The Coalition notes that Plaintiffs do not argue that the Coalition's interests are adequately represented by any other party.

Entergy, on the other hand, argues that it represents the interests of the Coalition, and that therefore intervention is not warranted. However, Entergy's argument is misplaced. Entergy relies on the case of *South Dakota ex rel. Barnett v. U.S. Dept. of Interior*, 317 F.3d 783 (8th Cir. 2003). In that case, the Court noted that a proposed intervenor confronts only a "minimal burden of showing that its interests are not adequately represented by other parties", but that where an existing party "has an obligation to represent the interests of the party seeking to intervene" the intervenor has a heavier burden. *Id.*, at 785. In that case, a governmental party, the U.S. Interior Department, had specific statutory duties to protect the interests of the proposed intervenor, an Indian tribe, which had requested that the Interior Department place certain land in trust for the

---

[33] *Metropolitan St. Lewis Sewer Dist.*, 569 F.3d at 836

[34] *See, Nat'l Parks Assoc. v. EPA*, 759 F.3d 969 (8th Cir. 2014).

tribe's benefit pursuant to 25 U.S.C. § 465. *Barnett*, 317 F.3d at 785. Here, Entergy has cited to no statutory obligation that it has to represent the interests of the Coalition or its members.

Even if Entergy and the Coalition and its members have interests directed at a common legal goal, where the interests of Entergy and the Coalition are disparate, then intervention is appropriate. *U.S. v. Union Electric Co.*, 64 F.3d 1152 (8th Cir. 1995) (citing *Kansas Pub. Employees Retirement System v. Reimer & Koger Assocs.*, 60 F.3d 1304 (8th Cir. 1995)); *Sierra Club v. Robertson*, 960 F.2d 83, 85-86 (8th Cir. 1992). Furthermore, it is sufficient to show that representation "may" be inadequate. *Kozak v. Wells*, 278 F.2d 104 (8th Cir. 1960). The possibility that the interests of the applicant and the existing parties may diverge need not be great in order to satisfy this element. *Utah Ass'n of Counties*, 255 F.3d 1246, 1254 (10th Cir. 2001). *See also. Robertson*, 960 F.2d at 86; *Planned Parenthood of Minn.*, 558 F.2d 861, 870 (8th Cir. 1977) (intervention appropriate where the interests of proposed intervenor and current party, "while not adverse, are disparate," even though both sought same legal goal).

Here the interests of Entergy and the Coalition members are disparate. Coalition member Arkansas Electric Energy Consumers ("AEEC") represents Entergy's electric customers and is often adverse to Entergy's interests in regulatory and electric rate proceedings. Coalition members Nucor Steel – Arkansas and NYS are not Entergy's customers, but instead are customers of one of the co-owners of the White Bluff and Independence plants. Thus, there can be no presumption that Entergy represents their interests as ratepayers. Likewise, as to Coalition members Arkansas Gas Consumers and Energy Policy Network, Entergy has not purported to represent their interests.

A proposed intervenor cannot be required to look for adequate representation to one who is its opponent, even in the face of the presumption that that party and the proposed intervenor

have the same ultimate objective.[35]  For example, in *Mausolf*,[36] the Court found the presumption of adequate representation rebutted based on the well-documented history of disparate positions between the proposed intervenor and the government party.  Like in *Mausolf*, here the Coalition or its members have previously opposed Entergy's proposals under the Arkansas Regional Haze Rule regarding control technology needed at White Bluff and Independence, i.e., scrubbers, in proceedings before the Environmental Protection Agency, the Arkansas Department of Environmental Quality and the Arkansas Public Service Commission.

In addition, Entergy purports to represent multiple, conflicting interests in this litigation apart from the Coalition and its members, i.e., Entergy Arkansas, LLC ("EAL"), a public utility subsidiary of Entergy Corporation; Entergy Mississippi, LLC ("EML"), another public utility subsidiary of Entergy Corporation; Entergy Power LLC ("EPL"), a subsidiary of Entergy Corporation; the shareholders of Entergy Corporation, the parent company; and the other co-owners of the White Bluff and Independence plants.[37]  While the interests of the Coalition's electric consumer members may be in maintaining low electric rates, the interests of the shareholders of Entergy's parent company is in maximizing the return on investment.  In addition, the generation needs of the co-owners of the White Bluff and Independence facilities may differ.  EAL is part of a large multi-state utility company with a better capability to address its generation

---

[35] *See, e.g., Jansen v. City of Cincinnati*, 904 F.2d 336, 343 (6th Cir. 1990).

[36] *Mausolf v. Babbit*, 85 F.3d 1295 (8th Cir. 1996).

[37] These co-owners include Arkansas Electric Cooperative Corporation, and several Arkansas municipalities, etc. as shown in the White Bluff and Independence Ownership Agreements.

needs and satisfy its customer's demand than Arkansas Electric Cooperative Corporation or the municipal co-owners of the White Bluff and Independence plants.

Because of Entergy's conflicting interests in this litigation, any presumption that it adequately represents the interests of the Coalition and its members is rebutted. Entergy's interests as an investor owned public utility conflict with the narrower interests of the Coalition and its members. For example, in *Mausolf*, the Government was required to represent its citizen's recreational and conservationist purposes, which would "sometimes, unavoidably, conflict, and even the Government cannot always adequately represent conflicting interests at the same time."[38] Thus, the Eighth Circuit concluded, "the Government's interest in promoting recreational activity and tourism in the Park, an interest many citizens share, may be adverse to the Association's conservation interests, interests also shared by many."[39] The Court therefore concluded that the proposed intervenor rebutted any presumption that the Government would adequately represent its interests and reversed the district court's order denying intervention.[40]

The Coalition's interests are directly adverse to at least some interests which Entergy must balance on behalf of its public utility affiliates and parent, the co-owners of White Bluff and

---

[38] *Id.* at 1303.

[39] *Id.* at 1304.

[40] *Id. See also, South Dakota v. Ubbelohde,* 330 F.3d 1014, 1025 (8th Cir. 2003)(*parens patriae* presumption rebutted where Corps of Engineers would have to balance multiple interests); *WildEarth Guardians v. U.S. Forest Service,* 573 F.3d 992, 996-997 ("the government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor. Moreover, we have recognized that government policy may shift.") (Internal citations omitted).

Independence, and Entergy's shareholders.   Like in *Mausolf* and *Ubbelohde*, Entergy cannot protect these conflicting interests at the same time in this litigation.   For example, the Coalition in its proposed answer to Plaintiffs' Complaint has asserted significant defenses to the Complaint, including lack of subject matter jurisdiction, lack of standing, the statute of limitations and failure to exhaust administrative remedies.   Yet, Entergy has not even filed a response or answer to the Plaintiffs' Complaint, much less raise any of these defenses.   Consequently, Entergy does not adequately represent the Coalition's interests.

## V.

## NEITHER 42 U.S.C. § 7604(B)(1)(B) NOR FED. R. CIV. PROC. 24 PREVENTS THE COALITION FROM INTERVENING IN THIS CASE

In Section I.E. of its Opposition (p. 22) the Plaintiffs argue that the Coalition should not be allowed to intervene because 42 U.S.C. § 7604(b)(1)(B) of the Clean Air Act does not give the Coalition a statutory right to intervene in a citizens suit under the circumstances of this case. Sierra Club's argument overlooks the fact that there are two independent bases for intervention as a matter of right pursuant to Rule 24.   The first prong of Rule 24 requires the Court to permit anyone who "is given an unconditional right to intervene by a federal statute" to intervene. Fed. R. Civ. P. 24(a)(1). However, Rule 24(a)(2) provides an independent basis for intervention as a matter of right for anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Id. § 24(a)(2). It is pursuant to this second prong of Rule 24 that the Coalition seeks to

intervene. Accordingly, the Coalition is not required to satisfy the requirements of Rule 24(a)(1) to intervene in this case.

In any event, Sierra Club's generalized assumption that any person who seeks to intervene in a Clean Air Act suit in support of the Defendant's position intends to "inhibit enforcement" of the Clean Air Act does not apply to the Coalition. First, both *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009) and *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 674 F.2d 970 (3d Cir. 1982), which Sierra Club cites in support of its argument, construe intervention statutes that are not at issue in this case. In *Delaware Valley*, the proposed intervenors sought to intervene pursuant to 42 U.S.C. § 7604(b)(1)(B), which is inapplicable to this case because this matter was not brought by the EPA or the State. *See, Delaware Valley*, 674 F.2d at 972; 42 U.S.C. § 7604(b)(1)(B) (requiring intervention if the "Administrator or State has commenced . . . a civil action . . . to require compliance"). Similarly, in *Metropolitan St. Louis*, the proposed intervenors sought to intervene pursuant to 33 U.S.C. § 1365(b)(1)(B), a Clean Water Act statute which is even more distinguishable from this case because: (1) this matter is not a Clean Water Act case; and (2) the government is not the plaintiff. *See, Metro. St. Louis*, 569 F.3d at 837; 33 U.S.C. § 1365(b)(1)(B) (requiring intervention if the "Administrator or State has commenced . . . a civil or criminal action . . . to require compliance"). Second, in *Delaware Valley*, the proposed intervenors were state senators and state representatives who alleged that an order entered almost two years beforehand had deprived them of their right as legislators to debate and vote on the issues addressed by the order. *Delaware Valley*, 674 F.2d at 972. The legislators' basis for intervention had nothing to do with enforcement of the Clean Air Act but rather with enforcement of their right to vote. *See, id.* Unlike the legislators in *Delaware Valley*, the Coalition seeks intervention to address issues

important to its members that are directly related to the way the Clean Air Act may be enforced in this case.

The Clean Air Act's PSD provisions has five distinct purposes, two of which are "to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources" and "to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process." 42 U.S.C. § 7470 (3), (5). The Coalition seeks the ability to bring to the Court's attention the economic impact this case will have on its members, which include electric consumers that receive power from the White Bluff and Independence plants. (Doc. 26 at 3-5). Neither of the existing parties to this case represent the interests of the Coalition's members. (Doc. 26 at 5). Accordingly, allowing these members a voice will promote the careful evaluation of all the allegations of the Complaint as well as the potential consequences of the proposed Settlement Agreement. In this way, the Coalition's intervention will facilitate—not inhibit—the stated purposes of the Clean Air Act.


# VI.

# THE COALITION QUALIFIES FOR PERMISSIVE INTERVENTION.

The standard for permissive intervention is provided by Rule 24(b), which provides "[on] timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact [and] [i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the

original parties' rights."[41]  The Coalition has claims and defenses that share common questions of law or fact with the main action and the Coalition's intervention will not unduly prejudice or delay the adjudication of the rights of the original parties.

**A.**     **The coalition has claims and defenses that share common questions of law or fact with the main action.**

Since the time that the Coalition filed its Motion to Intervene, the Arkansas Public Service Commission has granted the Coalition status as an Intervenor in the APSC's Docket No. 18-079-U, *In the Matter of an Application by the Office of Arkansas Attorney General Leslie Rutledge for an Investigation into Entergy Arkansas LLC's Voluntary Settlement Agreement Affecting Electric Generating Plants.*[42]  That docket seeks an investigation into whether the settlement agreement in this case is prudent.   The Coalition will contend that the settlement agreement is not prudent because of the statute of limitations and other defenses available to Entergy to the claims brought by the Plaintiffs in this case that additional control technology is required at White Bluff and Independence in order to comply with BACT requirements of the Clean Air Act.[43]  Accordingly, regardless of whether the Coalition has a right to intervene under FRCP 24(a)(2), the Coalition has claims and defenses in APSC Docket No. 18-079-U that share common questions of law and fact with the issues in this case.   In addition, any future proceeding for rate recovery of the costs of compliance with any order entered in this case, or to establish the need for additional generation assets for Entergy or the other White Bluff and Independence co-owners to replace the lost

---

[41] Fed. R. Civ. P. 24(b)(2)(B) and (3).

[42] A copy of the APSC's Order granting intervention is attached hereto as Ex. N.

[43] These defenses are asserted by the Coalition in its proposed answer to the Plaintiffs' Complaint.

generating capacity of White Bluff and Independence will involve the prudence of Entergy's decision – an issue integrally connected to the questions of law and fact raised by the allegations in the Plaintiffs' Complaint.

Plaintiffs rely on *United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, No. 4:10-CV-2076 CAS, 2014 WL 4851801, at *3 (E.D. Mo. Sept. 29, 2014), for the proposition that the Coalition is not entitled to permissive intervention because it is merely stepping into the shoes of Entergy to defend the claims in the complaint and is not asserting its own claims or defenses. However, the *Titan* case is completely distinguishable from the facts here. In *Titan*, the Court denied intervention stating:

> The potential intervenors' personal injury claims against Titan in the underlying suit are completely distinct from the claims asserted by United Fire in this action against Titan. In fact, this analysis highlights the fundamental problem with movants' motion to intervene: movants seek to intervene to step into Titan's shoes and defend it against its insurer, United Fire, not to assert their own claims or defenses. However, intervention is for individuals seeking to become a party to a case, to prosecute their own claims against a defendant, or to defend themselves against the claims of a plaintiff.[1] *See, e.g., Arnold Crossroads, L.L.C. v. Gander Mountain Co.*, 751 F.3d 935, 937–38 (8th Cir.2014) (granting intervention where intervenor City alleged harm in connection with the same conduct set forth in the petition); Fed.R.Civ.P. 24(c). Generally, intervenors participate on equal footing with the original parties to the suit. Here, however, movants do not seek to litigate their substantive claims against Titan and seek no adverse ruling against Titan. Quite the opposite, movants want to assert Titan's claim against its insurer. Movants, whose interests are adverse to Titan in the underlying suit, seek to advocate on behalf of Titan in this declaratory judgment action. This is not an appropriate use of intervention.

Here, unlike the potential intervenors in Titan, the Coalition seeks to assert its own claims and defenses. The Coalition will assert the defenses of the statute of limitations and others to the claims brought by the Plaintiffs in this case that additional control technology is required at White Bluff and Independence in order to comply with BACT requirements of the Clean Air Act. The Coalition will assert these claims because if the Court grants the relief requested in the Complaint,

i.e., imposing BACT requirements on White Bluff and Independence, the threat of injury to the Coalition and its members is real, because the costs of those BACT requirements likely will be recouped from the Coalition's electric ratepayers through increased electricity costs.[44]

**B. The Coalition's intervention will not unduly delay or prejudice the adjudication of the original parties' rights.**

Allowing the Coalition to intervene will not unduly delay or prejudice the adjudication of the parties' rights. The allegations in the Plaintiffs' Complaint regarding violations of the BACT requirements under the Clean Air Act would have to be litigated and adjudicated in any event. No discovery has yet been done in the case, and in fact, Entergy has not even filed an Answer to the Plaintiffs' Complaint. Granting the Coalition intervenor status at this early stage of the lawsuit before the issues have been joined would not unduly delay or prejudice adjudication of the parties' rights with respect to the claims asserted in the Plaintiffs' Complaint. Moreover, because denial of a motion to intervene is immediately appealable, denial of the Coalition's motion to intervene would unnecessarily prolong the adjudication of the parties' rights.

Both Plaintiff and Entergy maintain that granting the Coalition will "unnecessarily delay the carefully planned proposed Settlement Agreement."[45] However, as discussed in Section I., *supra,* these arguments based on the Settlement Agreement are secondary to whether the Coalition has standing or should be allowed to intervene based on the allegations in the Complaint.

---

[44] *See* Ark. Code Ann. § 23-4-501.

[45] Entergy Response in Opposition, p. 11. *See also,* Plaintiffs' Statement in Opposition, p.33-34.

**CONCLUSION**

When the Coalition's Motion to Intervene is considered based on the allegations in the Plaintiffs' Complaint, it is clear that the Coalition has standing, and a right to intervene. The Coalition also should be granted permissive intervention. The Arkansas Affordable Energy Coalition prays that the Court grant its Motion to Intervene.

Respectfully submitted

JACKSON WALKER L.L.P.
100 Congress, Suite 1100
Austin, TX 78701
512/ 236-2000
512/ 236-2002 – Fax

Mark Walters
mwalters@jw.com
(pro hac vice motion pending)
Michael Nasi
mnasi@jw.com
(pro hac vice motion pending
Mark H. Allison
Ark. Bar No. 85001
mallison@ddh.law
Randall L. Bynum
Ark. Bar No. 89194
rbynum@ddh.law
DOVER DIXON HORNE PLLC
Suite 3700
425 West Capitol Avenue
Little Rock, AR 72201
(501) 375-9151
(501) 375-6484

ATTORNEYS FOR ARKANSAS
AFFORDABLE ENERGY
COALITION

By: _____

CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2019, I filed the foregoing with the Clerk of the Court, which shall send notification of such filing using the CM/ECF system to the following persons registered to receive such notice:


Richard H. Mays, Esq.
WILLIAMS & ANDERSON PLC
111 Center Street, Suite 2200
Little Rock, AR  72201
rmays@williamsanderson.com

George E. Hays, Esq.
P. O. Box 843
Bellevue, WA  98009
georgehays@mindspring.com

Naomi Kim Melver
P. O. Box 25
Greenbank, WA 98253
nmelver@gmail.com

John Peiserich, Esq.
G. Alan Perkins, Esq.
Micah L. Goodwin, Esq.
PPGMR Law, PLLC
101 Morgan Keegan Drive, Suite A
Little Rock, AR  72202
john@ppgmrlaw.com
alan@ppgmrlaw.com
micah@ppgmrlaw.com

Timothy K. Webster, Esq.
Sidley Austin L.L.P.
1501 K Street, N.W.
Washington, DC 20005
twebster@sidley.com

Debra J. Jezouit, Esq.
Baker Botts L.L.P.
1299 Pennsylvania Ave. N.W.
Washington, DC  20004
Debra.jezouit@bakerbotts.com

Kimberley Bennett, Esq.
Energy Services, LLC
425 West Capitol Avenue
Suite 28E
Little Rock, Arkansas 72201
Kbenne3@entergy.com

Susan Margaret Floyd, Esq
Entergy Services, LLC
639 Loyola Avenue, 22nd Floor
New Orleans, LA 70113
sfloyd@entergy.com

Sarah Tacker, Esq.
Senior Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Sarah.Tacker@ArkansasAG.gov