Richard H. Mays (State Bar No. 61043)
Williams & Anderson PLC
111 Center Street
Suite 2200
Little Rock, Arkansas 72201
Telephone: (501) 859-0575
Email: rmays@williamsanderson.com

George E. Hays (WA State Bar No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com

Naomi Kim Melver (WA State Bar No. 52463)
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| Sierra Club and National Parks Conservation Association,<br><br>                    Plaintiffs,<br><br>       v.<br><br>Entergy Arkansas, LLC, Entergy Power, LLC, and Entergy Mississippi, LLC,<br><br>                    Defendants. | Case No. 4:18-cv-00854-KGB<br><br>Brief in Support of Plaintiffs' Motion to Enter Settlement Agreement as a Consent Judgment |

**INTRODUCTION**

Plaintiffs Sierra Club and National Parks Conservation Association respectfully submit this motion seeking entry of the Parties' Settlement Agreement, [Doc. 11], as a Consent Judgment.  Counsel for Plaintiffs contacted counsel for Defendants, who state that Defendants support entry of the Settlement Agreement. Counsel for Plaintiffs also contacted counsel for the Proposed Intervenors, and they oppose this motion.

This case addresses alleged violations of the Clean Air Act and the Arkansas State Implementation Plan at Entergy's White Bluff and Independence coal-fired power plants, which are owned and operated by the Defendants, Entergy Arkansas, LLC, Entergy Power, LLC, and Entergy Mississippi, LLC (hereinafter "Entergy").

When entered as a Consent Judgment, the Settlement Agreement negotiated by the Parties will resolve this civil action.  The Settlement Agreement was negotiated by the parties in good faith and is fair, adequate, reasonable, and consistent with the goals and purposes of the Clean Air Act.

As required by statute, the United States has reviewed the proposed settlement, seeking "to ensure that the proposed consent judgment complies with the requirements of the relevant statute and is consistent with its purposes." [Doc. 28-1].  Having completed its review, the United States has informed this Court that it does not oppose entry of the settlement.  *Id*.

2

The Plaintiffs have reviewed the concerns raised by the Proposed Intervenors through their pleadings, [Docs. 17, 18, 26, 27, 41, and 42], and believe the points that they have raised do not show that the Settlement Agreement is unfair, unreasonable, or inadequate.  Indeed, the Proposed Intervenors ignore the environmental nature of this case and the benefits that the proposed Consent Judgment will deliver.

Therefore, the Plaintiffs request that the Court grant this motion and enter the Settlement Agreement as a final judgment by executing page 24 of the document, which was submitted as a proposed order.  [Doc. 11].

## BACKGROUND

As Plaintiffs previously explained, [Doc. 35, at 2 – 6], this is a citizen suit brought by Plaintiffs pursuant to 42 U.S.C. § 7604 against Entergy for alleged violations of the Clean Air Act and the Arkansas State Implementation Plan or "SIP."  The Complaint alleges that Entergy violated and continues to violate requirements of the Arkansas State Implementation Plan relating to the Clean Air Act's Prevention of Significant Deterioration (or "PSD") and Operating Permit programs by continuing to operate after making unpermitted major modifications at Entergy's Independence and White Bluff coal-fired power plants.  [Doc. 1, at ¶¶ 62-104].  Entergy estimates that to come into compliance with these alleged violations, it would have to apply Best Available Control Technology at a cost of

"hundreds of millions, if not billions, of dollars." [Doc. 34-1, at ¶ 13]. In addition, Plaintiffs estimate that Entergy would be subject to a civil penalty in the range of $139 million for these alleged violations. [Doc. 35, at 5].

This Settlement Agreement resolves a long-running dispute between Plaintiffs and Entergy regarding the pollution from Independence and White Bluff. For example, in 2010 and 2012, Plaintiffs petitioned EPA to object, on other grounds, to operating permits for these plants because of their excessive and unlawful pollution. Plaintiffs have also attempted to address the pollution from these plants by participating in the Regional Haze rulemaking process conducted by EPA. *Id*. at 6-7. This activity has included filing multiple sets of comments on proposed rules, filing a lawsuit to require EPA to issue regulations regarding Regional Haze for Arkansas as well as filing a Petition for Review regarding a federal implementation plan (or "FIP") issued by EPA for Arkansas. The Plaintiffs have also intervened in state and industry challenges to EPA's plan, *id.*, and filed Freedom of Information Act ("FOIA") litigation in order to compel EPA to turn over potential evidence of violations at Independence and White Bluff.

## TERMS OF THE SETTLEMENT AGREEMENT

The Settlement Agreement, [Doc. 11], calls for Entergy to do the following:

- Cease coal combustion at White Bluff by 2028 (¶ 9);

- Cease coal combustion at Independence by 2030 (¶ 12);

4

- Cease operations at the Lake Catherine Plant by 2027 (¶ 15);

- Limit sulfur dioxide emissions at all White Bluff and Independence units to 0.6 lbs/MMBtu to be calculated on a 30-day rolling average (¶¶ 10, 13);

- Operate low nitrogen oxide burners and over-fire air technology to control emissions of nitrogen oxides (¶¶ 11, 14); and

- Engage in the development of 800 megawatts of renewable energy generation projects (¶ 16).

In exchange for these commitments, Plaintiffs have given Defendants a comprehensive release, not only from the Clean Air Act violations alleged in the complaint, but also for any past or ongoing claims under any federal or state environmental statute, regulation, or common law.  This release also applies to Entergy's co-owners of the White Bluff and Independence plants as long as they do not object to this settlement.

In addition, the parties have endeavored, through this agreement, to resolve all of the disputes between them which have been contested in a variety of forums. This includes agreeing:

- Not to seek additional air pollution controls at Independence, White Bluff, or Lake Catherine (¶ 18);

- Not to challenge Regional Haze SIP revisions that would replace EPA's FIP that are consistent with the Settlement Agreement (¶ 17);

- To dismiss a petition for review in the Eighth Circuit regarding the Regional Haze FIP (¶ 19);

- Not to challenge State approvals necessary to implement Regional Haze SIPs that would replace the FIP (¶ 21-22);

- To dismiss a challenge to the Regional Haze Phase II SIP now pending before the Arkansas Pollution Control & Ecology Commission (*id.*);

- To withdraw a pending FOIA request to EPA regarding Independence and White Bluff and to not submit new ones (¶ 20); and

- Not to fund other parties to take steps from which Plaintiffs have agreed to refrain from by the terms in the Settlement Agreement.

## STANDARD FOR ENTRY

The standard of review for entry of the proposed Consent Decree is whether the settlement is fair, reasonable, and adequate. *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992); *United States v. Union Electric Co.*, 132 F.3d 422, 430 (8th Cir. 1997); *United States v. Exxonmobil Pipeline Co.*, Case No. 4:13-cv-00355 KGB (Slip. Op. Aug. 12, 2015, at 1) ("In considering whether to enter the proposed consent decree, the Court must determine whether the settlement is fair, reasonable, and adequate"). Moreover, the Court must

ensure that the settlement is consistent with the underlying statute.  *Id.*, *citing Union Electric*, 132 F.3d at 430.

The Eighth Circuit has observed that: "The law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990).  "[A] consent decree is not reviewed as a judgment on the merits," *Metro. St. Louis*, 952 F.2d at 1044, and courts view the facts in the light most favorable to a settlement, *see Patterson v. Stovall*, 528 F.2d 108, 112 (7th Cir. 1976).  In conducting their review, courts do not focus on individual components of settlements, but rather view them in their entirety in evaluating their fairness.  *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416, 425 (7th Cir. 1977); *Cotton v. Hinton*, 559 F.2d 1326, 1331-32 (5th Cir. 1977).  As this Court has noted: "it is not [the Court's] function to determine whether this is the best possible settlement that could have been obtained." *Exxonmobil Pipeline Co.*, Slip Op. at 1-2 (*quoting United States v. Akzo Coatings, Inc.,* 949 F.2d 1409, 1436 (6th Cir. 1991)).  Moreover, "the Court does not have the power to modify a settlement after it has been signed by the parties, but instead the Court must accept or reject the document as a whole." *Exxonmobil Pipeline Co.*, Slip Op. at 2 (*citing Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 630 (9th Cir. 1982)).

## DISCUSSION

A. <u>The Settlement Agreement Promotes the Purposes of the Clean Air Act</u>.

In enacting the Clean Air Act, Congress found that:

> [T]he growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation.

42 U.S.C. § 7401(a)(2).

Accordingly, one of the main purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In particular, with respect to the Prevention of Significant Deterioration program, the part of the Clean Air Act at issue in this case, the requirements:

> ["]are designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade," [R. Belden, Clean Air Act (2001), at 43]. See 42 U.S.C. § 7470(1) (purpose of PSD program is to "protect public health and welfare from any actual or potential adverse effect which in [EPA's] judgment may reasonably be anticipate[d] to occur from air pollution ... notwithstanding attainment and maintenance of all national ambient air quality standards").

*Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 470–71 (2004).

In this case, because the Settlement Agreement calls ultimately for the cessation of coal combustion from the Independence and White Bluff plants, the air quality in the State of Arkansas will improve substantially.  In 2017, Independence emitted 19,487 tons of sulfur dioxide and 8,695 tons of nitrogen oxides.  White Bluff emitted 23,212 tons of sulfur dioxide and 11,418 tons of nitrogen oxides.  [Doc. 35, at 3].  Together, the two plants account for 74% of the sulfur dioxide and 34% of the nitrogen oxides emitted by all stationary sources combined in the entire State of Arkansas.  *Id.*  "Sulfur dioxide derives primarily from fossil fuel combustion.  Best known for causing 'acid rain,' at elevated concentrations in the ambient air, $SO_2$ also directly impairs human health."  *Am. Lung Ass'n v. E.P.A.*, 134 F.3d 388, 389 (D.C. Cir. 1998).  Similarly, "Nitrogen oxides have a variety of documented adverse effects upon human health, including increased airway hyperresponsiveness (contraction of the bronchioles) in asthmatics and increased respiratory illness in children."  *Am. Petroleum Inst. v. E.P.A.*, 684 F.3d 1342, 1345 (D.C. Cir. 2012).  Nitrogen oxides are also a precursor to ozone pollution.  *Sierra Club v. U.S. E.P.A.*, 774 F.3d 383, 386 (7th Cir. 2014).  Curbing these sources of these pollutants will go a long way toward improving the health and welfare of the citizens of Arkansas and their environment, including the national parks and wilderness areas with air quality and visibility impaired by emissions from these sources.  Until coal combustion ceases

9

at these plants, the Settlement Agreement requires the plants to meet interim sulfur dioxide emission limits and to operate with low nitrogen oxide burners and over-fire air (already installed) to control nitrogen oxide emissions.

      B.    The Settlement Agreement is Fair, Adequate, and Reasonable.

The Settlement Agreement is fair because it was the result of good-faith negotiation between the parties. As the recitation of the Background of this matter shows, Plaintiffs and Entergy have been at odds over the high levels of emissions from White Bluff and Independence for almost a decade, leading both sides to engage in a variety of legal forums including Clean Air Act permitting and rulemaking proceedings. Almost a year ago, Plaintiffs opened a new chapter in the dispute between the parties by sending detailed notice letters, [Doc. 35, Attachment A], setting forth alleged violations of the Clean Air Act's Prevention of Significant Deterioration and Operating Permits programs, as well as the Arkansas State Implementation Plan. Rather than proceeding immediately to file a complaint, however, negotiations continued for almost a year, resulting in the Settlement Agreement now before this Court.

By resolving this matter via settlement, the Parties are saving significant resources of the parties and the Court. For example, in a case similar to this one brought by Plaintiff Sierra Club involving the Colstrip power plant in Montana, *Sierra Club v. Talen Montana, LLC*, No. CV 13-32-BLG-DLC-JCL (D. Mont.), a

case that was litigated for four years before settlement, the Defendants allegedly incurred roughly $18 million in fees and costs. *Id.,* (Doc. 320 at 2). Similarly, a Prevention of Significant Deterioration enforcement case brought by EPA and the Department of Justice against Ameren Missouri lasted six years before the Court issued a 195 page decision on the liability phase only. *United States v. Ameren Missouri*, No. 4:11 CV 77 RWS, Slip Op. (E.D. Mo. Jan. 23, 2017). The penalty phase is still on-going in that case.

In this case, the settlement was negotiated by experienced counsel on both sides. Plaintiffs' lead counsel is George E. Hays, a lawyer with over 30 years of experience, including twelve years at the U.S. Environmental Protection Agency working on air enforcement issues. Mr. Hays has litigated a number of Prevention of Significant Deterioration cases. In addition to the Colstrip matter mentioned above, Mr. Hays has litigated similar cases in federal district courts in Tennessee, Alabama, South Dakota, Texas, Oregon, and New Mexico. Similarly, the Defendants are represented by experienced counsel from three separate law firms. In addition, experienced in-house counsel for both the Plaintiffs and the Defendants were heavily involved in the negotiations. The Settlement Agreement thus reflects the Parties' careful and informed assessment of the relative merits of each other's positions, taking into account the costs and risks associated with litigating a case such as this one. *See, e.g.*, *United States v. Cannons Eng'g Corp.*,

11

899 F.2d 79, 87 (1st Cir. 1990) (recognizing facts that decree was negotiated at arm's length among experienced counsel).[2]

The Settlement Agreement is adequate and reasonable because, as discussed above, it imposes significant injunctive relief that will result ultimately in the cessation of harmful sulfur dioxide and nitrogen oxides emissions from White Bluff and Independence.  The Settlement Agreement does not call for Entergy to pay a civil penalty; instead, it yields other significant environmental benefits. First, it ensures that the Lake Catherine plant will cease operations, [Doc. 11, at ¶ 15], meaning that this aging plant, which does not have state-of-the-art controls for nitrogen oxides, will be removed as a major source of air pollution in Arkansas. Furthermore, because the Settlement Agreement calls for White Bluff and Independence to cease coal combustion, the Settlement Agreement will lead to the reduction in the emissions of carbon dioxide (19.8 million tons annually)[1] and a number of harmful air pollutants such as particulate matter, volatile organic compounds, sulfuric acid mist, mercury, cyanide, lead, hydrogen chloride, hydrogen fluoride, and methylene chloride.[2]  In addition, the Settlement

---

[1] Based on the amount of $CO_2$ emissions from both plants in 2018.  (https://ampd.epa.gov/ampd/).

[2] ADEQ Operating Air Permit No. 0263-AOP-R14 (Dec. 19, 2018) and ADEQ Operating Air Permit No. 0449-AOP-R13 (July 23, 2018).

Agreement calls for Entergy to develop 800 megawatts of renewable energy generation.  [Doc. 11, at ¶ 16].

      C.    <u>The United States Government Has Reviewed the Proposed Settlement and Does Not Oppose Its Entry</u>.

The Clean Air Act requires that the United States be notified of any proposed consent judgment:

> No consent judgment shall be entered in an action in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator.

42 U.S.C. § 7604(c)(3).[3]  Plaintiffs followed this requirement, and the United States received notice of the Settlement Agreement on November 26, 2018.

The government then reviewed the Settlement Agreement and wrote to the Clerk of this Court to notify the Court that it does not object to entry of the Settlement Agreement as a Consent Judgment.  [Doc. 28-1].  In stating its position, the government explained:

> In its review, the United States seeks to ensure that the proposed consent judgment complies with the requirements of the relevant statute and is consistent with its purposes.  *See Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525-56 (1986) (a consent decree should conform with and further the objectives of the law upon which the complaint was based). For example, if the defendant has been out of compliance with statutory or permit

---

[3] The Act imposes no other review or comment requirements for proposed consent judgments resolving citizen suits.

> requirements, the proposed consent judgment should require the defendant to come into prompt compliance and should include a civil penalty, enforceable remedies, injunctive relief, and/or a supplemental environmental project payment sufficient to deter future violations, or combinations of the above.

*Id*.  In stating its non-opposition to the entry of the agreement, the government noted that it had conducted "this review," and "accordingly notif[ied] the Court of that fact."  *Id.*

      D.    <u>The Concerns Raised by the Proposed Intervenors Do Not Justify Rejection of This Settlement Agreement as a Consent Judgment</u>.

In their motions to intervene, [Docs. 17 and 26], the Proposed Intervenors have neither demonstrated that the proposed Settlement Agreement is unfair, unreasonable, or inadequate nor shown that it fails to conform with the goals and purposes of the Clean Air Act.  *See Metro. St. Louis*, 952 F.2d at 1044; *Union Electric*, 132 F.3d at 430.  Indeed, the Proposed Intervenors never address the requirements of the Prevention of Significant Deterioration Program of the Clean Air Act, Entergy's alleged violations of those requirements, or the environmental benefits that the Settlement Agreement will provide.  Rather, they appear to object to the Settlement Agreement based mostly on speculation and conjecture over the

possible impacts the Settlement Agreement might have on electricity rates and the price of natural gas and coal.[4]

The focus of the state of Arkansas ("the State"), ex rel. Arkansas Attorney General Leslie Rutledge ("Attorney General"), by and through the Consumer Utilities Rate Advocacy Division ("CURAD") in its effort to intervene is the impact the outcome of this case might have on electricity rates, while completely ignoring the benefits to public health and the environment that the Settlement Agreement will irrefutably deliver.  Neither the Settlement Agreement nor the complaint, however, address or involve the issue of the cost of electricity in any way.  CURAD merely speculates that the Settlement Agreement may result in increased costs.  [Doc. 18, at 5].  However, CURAD does not address that the Settlement Agreement does not call for either Independence or White Bluff to retire or switch fuels for almost a decade and no one knows what the nature of the electricity market in Arkansas will be at that time.

Moreover, while CURAD acknowledges the potential financial liability faced by Entergy if this case is not settled and instead litigated to judgment, [Doc.

---

[4] Note that while both CURAD and the Arkansas Affordable Energy Coalition attempt to recast their interests as fears over the costs of Entergy applying Best Available Control Technology in their reply briefs, *see* [Doc. 41 at 5-6; Doc. 42 at 5], as described below, both of their original briefs focused on speculative fears over the Settlement Agreement only.

41, at 16], CURAD fails to acknowledge Entergy's sensible decision to avoid those hundreds of millions, if not billions in costs, [Doc. 34-1 at ¶ 13], by agreeing to resolve this matter through the cessation of coal combustion at these aging units. As for the impact the settlement may have in the future on electricity rates, it is the Arkansas Public Service Commission, not Entergy or this Court, that has control over electricity rates in Arkansas.  How that body may address the issue of rates in the future is entirely uncertain.  CURAD also fails to mention that several of the requirements in the Settlement Agreement mirror requirements already imposed by the State of Arkansas itself.  *See* [Doc. 34-1 at ¶ 32; Doc. 35 at 29-31].

Finally, CURAD asserts that there are "misrepresentations" in the Settlement Agreement, [Doc. 18, at 5], yet it specifies none, and Plaintiffs know of none.  CURAD also contends that the Settlement Agreement somehow "undermines" the "SIP."  Yet the Settlement Agreement does not and could not impact any regulations issued by the Arkansas Department of Environmental Quality; indeed, here Plaintiffs are actually enforcing the State Implementation Plan, [Doc. 1, at ¶¶ 81-104], and the Settlement Agreement is fully consistent with that Plan.

The objections of the Arkansas Affordable Energy Coalition (hereinafter "the Coalition") are similarly indirect and hypothetical.[5]  In addition to speculative contentions regarding the future cost of electricity and reliability, [Doc. 27, at 4], the Coalition also asserts, without support, that the Settlement Agreement would put "upward pressure on natural gas prices and transmission costs to deliver natural gas," even though Entergy's latest Integrated Resource Plan does not say that it intends to convert either White Bluff or Independence to gas firing.  [Doc. 34-1, at ¶ 36].  Also unsupported is the Coalition's contention that the cost to replace the capacity at White Bluff and Independence could be $2.7 to $3 billion.  *Id*. at ¶ 37. However, the Coalition's unsubstantiated economic and reliability speculations and purported interests in the outcome of this litigation are contingent upon the occurrence of a sequence of events over the next 10 years,[6] where the effect on

---

[5] *Cf. Arkansas Power & Light Co. v. Arkansas Public Service Com'n*, 107 F.R.D. 335, 342 (E.D. Ark. 1985) ("To adopt the arguments of this nature advanced thus far would grant to every man, woman or child with any financial connection to [the power plant], or to any recipient of [the power plant's] electrical output, the 'right' to intervene in this action.")

[6] Note that both of the Proposed Intervenors' indirect fears over Entergy's potential environmental compliance costs to install BACT are also still contingent upon the "occurrence of a sequence of events," e.g. 1) Entergy is found liable, 2) the Court requires Entergy to install BACT, 3) Entergy decides to install BACT versus shutting down the plants, and 4) the APSC approves of the rate increase and does not reduce it any way.  *See* [Doc. 42 at 17; Doc. 41 at 21].

future electricity rates is "anybody's guess." *See Metro. St. Louis*, 569 F.3d at 839-40; [Doc. 35, at 20-21].

In summary, the concerns raised by the Proposed Intervenors are collateral and speculative.  They neither address the environmental goals and fundamental purpose of the Clean Air Act nor the environmental benefits that the Settlement Agreement will deliver.  Consequently, the issues raised by the Proposed Intervenors do not warrant withholding consent to the Settlement Agreement.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant the motion to enter the Settlement Agreement, [Doc. 11], and ENTER the Settlement Agreement as a Consent Judgment.

Respectfully submitted this 25th day of January, 2019,

s/George E. Hays
George E. Hays (WA Bar. No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com

s/Naomi Kim Melver
Naomi Kim Melver (WA Bar No. 52463)
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com

s/Richard H. Mays
Richard H. Mays (Arkansas Bar No. 61043)
Williams & Anderson PLC
111 Center Street, Suite 2200
Little Rock, Arkansas 72201
Telephone: (501) 859-0575
Email: rmays@williamanderson.com

*Counsel for Plaintiffs Sierra Club and*
*National Parks Conservation Association*