# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

SIERRA CLUB, *et al.*,                                                                      PLAINTIFFS

v.                                              **Case No. 4:18-cv-00854**

ENTERGY ARKANSAS LLC, *et al.*,                                                  DEFENDANTS

## <u>ORDER</u>

Before the Court are motions to intervene filed by prospective intervenors the State of Arkansas (the "State"), *ex rel.* Arkansas Attorney General Leslie Rutledge ("Attorney General"), by and through the Consumer Utilities Rate Advocacy Division ("CURAD"), and the Arkansas Affordable Energy Coalition ("Coalition") (Dkt. Nos. 17, 26).  Plaintiffs Sierra Club and the National Parks Conservation Association ("NPCA") oppose CURAD and the Coalition's motions to intervene (Dkt. No. 35). Defendants Entergy Arkansas LLC ("Entergy Arkansas"), Entergy Power LLC ("Entergy Power"), and Entergy Mississippi LLC ("Entergy Mississippi") also oppose CURAD and the Coalition's motions to intervene (Dkt. Nos. 34, 36).  CURAD and the Coalition filed replies in further support of their motions (Dkt. Nos. 41, 42).

The Court acknowledges that time has passed since these motions, as well as other pending motions, were filed (*see* Dkt. Nos. 44, 45, 46).  The Court is aware of a matter involving the same parties instituted after this lawsuit at the Arkansas Public Service Commission ("APSC"), Docket No. 18-079-U.  For the following reasons, the Court directs the parties to brief further specific issues identified in this Order.  The Court will set a briefing schedule and hearing on the pending motions, after consultation with the parties.  The Court has under advisement the pending motions.

# I. Background

Plaintiffs Sierra Club and the NPCA filed this action against Entergy Arkansas, Entergy Power, and Entergy Mississippi under the citizens suit provisions of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, to enforce the national ambient air quality standards ("NAAQS") provisions of the CAA and its implementing regulations (Dkt. No. 1). Plaintiffs allege that defendants violated the CAA and its implementing regulations because power plants located in Independence County, Arkansas (the "Independence" plant), and Jefferson County, Arkansas (the "White Bluff" plant), underwent "major modifications" without obtaining prevention of significant deterioration ("PSD") permits or modified Part 70 permits for such major modifications (Dkt. No. 1, ¶¶ 81-104). Plaintiffs assert that this Court has subject matter jurisdiction over the claims pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331 (Dkt. No. 1, ¶ 2). Plaintiffs set forth their claims in a 50-page complaint, explaining the regulatory, legal, and factual basis for their claims. They seek injunctive and declaratory relief and civil penalties and, according to plaintiffs, all of which plaintiffs claim are authorized pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 7413, 7604(a) (*Id.*). Plaintiffs maintain that, to the extent required by 42 U.S.C. § 7604(b), plaintiffs sent notices of intent to sue for violations of the CAA on January 10, 2018, and February 8, 2018, to defendants and all government officers required to receive such notice by 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2 (*Id.*, ¶ 4).

## A. NAAQS Requirements

The NAAQS are regulated and enforced by a variety of federal and state statutes and regulations. As relevant here, each state is required to classify areas within their boundaries as attainment, nonattainment, or unclassifiable with respect to certain pollutants, including $SO_2$ and $NO_2$. Each state must adopt a state implementation plan ("SIP") that creates a prevention of

significant deterioration program ("PSD program") and submit that SIP to the Environmental Protection Agency ("EPA") for approval; if the EPA does not approve the proposed SIP, then the EPA may propose a federal implementation plan ("FIP"). Under the CAA, PSD programs must prohibit the construction of a "major emitting facility" in attainment or unclassifiable areas unless such a facility has been issued a PSD permit and employs the "Best Available Control Technology" ("BACT"). Separately, Title V of the CAA, 42 U.S.C. §§ 7661-7661f, established an operating permit program ("Part 70 Operating Permit program") for certain sources, including "major sources" and any source required to have a permit under a PSD program. 42 U.S.C. § 7661a(a). Title V is implemented primarily by the states under EPA oversight. *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1012 (8th Cir. 2010). "In states with EPA approved programs, Title V permits are issued by the state permitting authority but are subject to EPA review and veto." *Id.* The EPA has approved a SIP submitted by Arkansas containing a PSD program and a Part 70 Operating Permit program. 40 C.F.R. § 52.172.

### B.      Regional Haze Requirements

In 1999, the EPA promulgated the Regional Haze Rule, which calls for state and federal agencies to work together to improve visibility in national parks and wilderness areas. 40 C.F.R. pt. 51. To implement the Regional Haze Rule, the EPA directed the states to submit a Regional Haze SIP meeting the requirements of the Regional Haze Rule. 40 C.F.R. § 51.308(b). Arkansas submitted a Regional Haze SIP to the EPA on September 23, 2008, and August 3, 2010, along with supplementation on September 27, 2011. 40 C.F.R. § 52.173(a). In March 2012, the EPA partially approved and partially disapproved of the proposed Regional Haze SIP. *Id.* In response, the EPA then finalized a Regional Haze FIP for Arkansas. *Promulgation of Air Quality Implementation Plans; State of Arkansas; Regional Haze and Interstate Visibility Transport*

*Federal Implementation Plan*, 81 FR 66332-01 (September 27, 2016). Public utilities filed a petition for review of the Regional Haze FIP at the Eighth Circuit Court of Appeals, where certain portions of the Regional Haze FIP remain stayed. *State of Arkansas, et al. v. EPA, et al.*, No. 16-4270 (8th Cir. 2016).

The stakeholders—including plaintiffs and defendants—then began negotiating the content of a revised Regional Haze SIP that would replace the contested Regional Haze FIP. During this process, defendants filed comments indicating that they intend to cease combusting coal at White Bluff by the end of 2028 and that they "anticipated ceasing to combust coal at the Independence units by the end of 2030." (Dkt. No. 34-1, at 66). The comments also explained that the "Lake Catherine Unit 4 will retire by the end of 2025 . . . ." (*Id.*, at 68).

As part of the Regional Haze SIP replacement process, Entergy Arkansas entered into an Administrative Order with the Arkansas Department of Environmental Quality ("ADEQ") in August 2018. This Order requires Entergy Arkansas to, among other things, permanently cease coal-fired operation at White Bluff no later than the end of 2028 (*Id.*, at 79). The Administrative Order also requires Entergy Arkansas to meet certain $SO_2$ emission requirements at Independence and White Bluff (*Id.*). On August 8, 2018, Governor Hutchinson transmitted a Revised Regional Haze SIP to the EPA, in which the SIP recognizes the "planned retirement of Entergy Lake Catherine, the planned cessation of coal-fired operations at Entergy White Bluff by the end of 2028, and the planned cessation of coal-fired operations at Entergy Independence by the end of 2030." (*Id.*, at 146).

### C.    Claims And Proposed Settlement Agreement

Plaintiffs allege that, at the times relevant to this complaint, Independence County and Jefferson County have both been classified as attainment or unclassifiable for $SO_2$ and $NO_2$ (Dkt.

No. 1, ¶¶ 30-31).  Plaintiffs further allege that, from September 14, 2008, to November 4, 2008, and from February 28, 2009, to April 17, 2009, defendants made modifications to the Independence plant without obtaining a required PSD permit or a modified Part 70 permit (*Id.*, ¶¶ 66-75).  Plaintiffs also allege that from September 14, 2007, to November 18, 2007, Entergy Arkansas made modifications to the White Bluff plant without obtaining a required PSD permit or a modified Part 70 permit (*Id.*, ¶¶ 76-80).

In their complaint, with respect to the Independence plant, plaintiffs allege that physical changes and changes in the method of operation at Unit 1 of the Independence plant occurred during the 2009 Independence Unit 1 Outage (*Id.*, ¶¶ 66-67).  Plaintiffs maintain that these changes resulted in post-project significant emissions increases and significant net emissions increases for $SO_2$, a major modification occurred for that pollutant, that defendants did not obtain a PSD permit for that major modification, and that defendants are operating the Independence plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements (*Id.*, ¶¶ 68-69).  Plaintiffs also allege that defendants did not obtain a modified Part 70 permit prior to commencing work on the modification described, yet are still operating the Independence plant without that modified Part 70 permit, which plaintiffs allege would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements (*Id.*, ¶ 70).  Plaintiffs make these same allegations with respect to a 2008 Independence Unit 2 Outage at the Independence plant with respect to a major modification for $SO_2$, a PSD permit for the major modification, and a modified Part 70 permit (*Id.*, ¶¶ 71-75).

With regard to the White Bluff plant, plaintiffs allege that changes occurring during the 2007 White Bluff Unit 2 Outage resulted in post-project significant emissions increases and significant net emissions increases for $NO_x$, a major modification occurred for that pollutant, that defendants did not obtain a PSD permit for that major modification, and that defendants are operating the White Bluff plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements (*Id.*, ¶¶ 76-79). Plaintiffs also allege that defendants did not obtain a modified Part 70 permit prior to commencing work on the modification described, yet are still operating the White Bluff plant without that modified Part 70 permit, which plaintiffs allege would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements (*Id.*, ¶ 80). For relief, plaintiffs seek, in part, a declaration that defendants have violated the CAA and an injunction barring defendants from operating the Independence and White Bluff plants except in accordance with the CAA and the Arkansas SIP (*Id.*, ¶¶ 105-106).

The Eighth Circuit Court of Appeals examined the background of the CAA, its requirements, and the federal and Arkansas state laws that provide avenues for various challenges to the CAA's regulatory scheme in *Nucor Steel-Arkansas v. Big River Steel, LLC*, 825 F.3d 444 (8th Cir. 2016). The Court notes that, here, plaintiffs allege ongoing violations by defendants under 42 U.S.C. § 7604(a)(1) at the Independence and White Bluff plants.

On the face of their complaint, plaintiffs' set forth the relevant provisions of the Arkansas SIP, PSD program, and Title V program (Dkt. No. 1, ¶¶ 43-54). The Eighth Circuit recognizes that § 7604(f), which defines "emissions standard or limitation," encompasses the provisions of

the Arkansas SIP. *Nucor*, 825 F.3d at 449-50. As a result, plaintiffs assert multiple claims against defendants for violating the CAA and its implementing regulations (Dkt. No. 1, ¶¶ 81-104).

Defendants did not answer the complaint. Instead, shortly after the complaint was filed, the parties filed a proposed Settlement Agreement with the Court (Dkt. No. 11). The proposed Settlement Agreement includes the following commitments: (1) Entergy Arkansas shall permanently cease the combustion of coal at White Bluff by the end of 2028; (2) Entergy Arkansas shall permanently cease the combustion of coal at Independence by the end of 2030; (3) Entergy Arkansas shall permanently cease all operations of existing units at Lake Catherine; (4) defendants shall commence development of 800 megawatts of renewable energy projects by the end of 2027; (5) none of the parties shall challenge the provision of any Regional Haze plan regarding White Bluff, Independence, or Lake Catherine; (6) and Sierra Club shall voluntarily dismiss its administrative proceeding regarding Arkansas' Regional Haze SIP (*Id.*, ¶¶ 9, 12, 15-17, 21). Plaintiffs filed notice of a 45-day review and comment period (Dkt. No. 16). That notice also stipulated that, following the conclusion of the 45-day review and comment period, plaintiffs intended to work with defendants to review and take into account any comments submitted by the federal government and thereafter move the Court to enter the Settlement Agreement (*Id.*). Defendants then filed notice of a letter from the United States Department of Justice regarding the proposed Settlement Agreement (Dkt. No. 28). That letter notified the Court that the United States had reviewed the proposed Settlement Agreement and Consent Judgment in this action and did not object to its entry by this Court (*Id.*).

### D. Proposed Intervenors

The State of Arkansas, by and through the CURAD, filed a motion to intervene in this action (Dkt. No. 17). The Coalition, which is made up of "electric consumers, and associations of

consumers, that receive electric power from the White Bluff and Independence plants," also moved to intervene (Dkt. No. 26, at 3). The Coalition also includes the Arkansas Natural Gas Consumers, Inc., "whose members are large, industrial consumers of natural gas in Arkansas." (*Id*., at 4). According to the Coalition, its purpose "is to advocate for and take action to ensure an affordable and reliable energy supply in the State of Arkansas." (*Id*., at 5). The proposed intervenors both move for intervention as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2). Both parties also seek permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

In its motion to intervene, CURAD states that it seeks "intervention in this matter (a) to correct misrepresentations present in the proposed Settlement Agreement; (b) to inform the Court how and why the Settlement Agreement usurps state regulatory authority over Entergy Arkansas, Inc. . . . including its assets, and its rates; and (c) to protect Arkansas utility ratepayers from the adverse effects of the Settlement Agreement." (Dkt. No. 17, at 3-4). In its motion to intervene, the Coalition also claims that "[t]he Settlement Agreement will result in significant economic harm to the members of the Coalition . . . ." (Dkt. No. 26, at 5). Specifically, the Coalition claims that "costs resulting from the early retirement or fuel conversion of White Bluff and Independence will be passed on directly to Arkansas ratepayers, including members of the Coalition," "[t]he Coalition's electric consumers would be harmed if the White Bluff and Independence plants are forced to cease operations or convert to another fuel source before the end of their effective operating life because electric service would become more expensive and less reliable," "[t]he Settlement Agreement would also reduce the demand for coal, and likely would increase the demand for natural gas, since natural gas currently is the least cost fuel to replace the firm generation capacity of White Bluff and Independence," and "large, industrial consumers of natural

gas in Arkansas" "would be harmed if White Bluff and Independence switched their fuel source to natural gas, because that would cause an increase in demand for natural gas and gas transmission capacity in the state, putting upward pressure on natural gas prices and transmission costs to deliver natural gas." (Dkt. No. 26, at 3-5). In their replies, both CURAD and the Coalition assert that this Court's focus should be on the allegations in plaintiffs' complaint as it examines whether to permit intervention (Dkt. Nos. 41, at 3; 42, at 2).

CURAD and the Coalition seek to intervene not as plaintiffs but instead as defendants in this action. Essentially, CURAD and the Coalition propose stepping into the shoes of defendants. "[T]he Attorney General in her proposed answer raises affirmative defenses to the Plaintiffs' CAA claims and seeks to prevent the Plaintiffs from obtaining the relief they seek (*i.e.*, imposition of additional controls at White Bluff and Independence based on BACT and the costs that will be incurred to install those controls)." (Dkt. No. 41, at 8). Likewise, the Coalition seeks to raise issues, "including but not limited to[] whether this Court has subject matter jurisdiction over Plaintiffs [sic] claims, whether the Plaintiffs have standing, whether the Defendants have the authority to enter into the Settlement Agreement with the Plaintiffs without approval of other regulatory authorities, whether the Settlement Agreement is in the best interest of the Coalition members who obtain electric power from the White Bluff and Independence plants, and whether the Plaintiffs have a proper factual or legal basis for the claims asserted in the Complaint." (Dkt. No. 26, at 5-6).

## II.    Discussion

For the following reasons, the Court is skeptical of whether either proposed intervenor has Article III standing to intervene based on alleged rate increases or economic harms, but the Court has not firmly resolved this issue and would like to hear further from the parties, to the extent they

wish to brief further this issue. At this stage of the litigation, the Court is less certain with respect to CURAD's Article III standing based on its allegations related to a usurpation of the State's regulatory authority. Further, consideration of those issues results in the Court's raising on its own motion concerns about the Court's subject matter jurisdiction in this case. As a result, the Court directs the parties to brief further certain issues and declines to examine at this point the factors that dictate permissive intervention or intervention as a matter of right. Before reaching those issues, the Court wants to satisfy itself as to its subject matter jurisdiction and as to the proposed intervenors' Article III standing.

### A. Summary Of Standing Arguments

CURAD argues that it has Article III standing because "[t]he State has a recognized interest in protecting consumers from unnecessary rate increases," and "[t]he State, through CURAD . . . represents Arkansas ratepayers in front of the [APSC] and the Federal Energy Regulatory Commission ('FERC')." (Dkt. No. 18, at 5). CURAD also states that "Arkansas seeks intervention as a sovereign State with a duty to protect the interests of its utility ratepayers." (*Id.*, at 3).

The Coalition argues that it has Article III standing because its members include entities who are "indirect members in a cooperative association that co-owns the affected power plants." (Dkt. No. 27, at 11). The Coalition argues that these members will suffer an adverse financial impact if the power plants "prematurely cease operations or cease the combustion of coal." (*Id.*).

Defendants argue that neither CURAD nor the Coalition have standing. As to CURAD, defendants argue that the alleged economic injury to Arkansas ratepayers is not a "concrete and particularized" injury that is "actual or imminent." (Dkt. No. 34, at 7-8). Defendants also argue that the alleged economic injury is not "fairly traceable" to the defendants' conduct (*Id.*, at 10-11). Defendants further argue that the economic injury alleged by CURAD cannot be redressed by the

relief sought by CURAD (*Id.*, at 11-12). Defendants assert that CURAD cannot establish standing based upon alleged misrepresentations in the proposed Settlement Agreement or the alleged usurpation of the State's regulatory authority (*Id.*, at 12-13). Finally, defendants assert that CURAD does not have standing based upon the *parens patriae* doctrine (*Id.*, at 15).

Defendants argue that the Coalition has failed to establish standing in its own right or as an association (Dkt. No. 36, at 2). Defendants further argue that none of the Coalition's members has demonstrated standing in his or her own right, so the Coalition is not entitled to associational standing (*Id.*).

### B.  Legal Standard

The Eighth Circuit has explained that, when ruling on a motion to intervene, the Court typically "must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor." *Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014); *see also Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) (citing *A.C.L.U. of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1092 (8th Cir. 2011)). "In the Eighth Circuit, a prospective intervenor must 'establish Article III standing in addition to the requirements of Rule 24.'" *Nat'l Parks Conservation Ass'n*, 759 F.3d at 974 (quoting *U.S. v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009)). "When the allegations in the underlying controversy are relevant . . . the court should focus its attention on the pleadings because 'standing is to be determined as of the commencement of the suit.'" *Id.*, at 973 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n. 5 (1992).

To establish Article III standing, a plaintiff must satisfy three requirements: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotes and citations omitted).

Typically, this Court construes "a motion to intervene in favor of the prospective intervenor, accepting all material allegations as true." *Liddell* (citing *Tarek ibn Ziyad Acad.*, 643 F.3d 1092). The Court accepts "as true the movants' allegations of injury, causation, and redressability, unless the pleading reflects a 'sham' or 'frivolity.'" *Liddell*, 894 F.3d at 965 (citing *Kozak v. Wells*, 278 F.2d 104, 109 (8th Cir. 1960)).

Here, however, defendants challenge the standing of the proposed intervenors. The standard this Court applies to a standing challenge depends upon whether the standing challenge is "facial" or "factual." Standing is a matter of subject-matter jurisdiction, and standing is a prerequisite for intervention. *See Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 422 (8th Cir. 1999). "In a facial attack, the court merely [needs] to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015) (alteration in original) (internal quotation omitted). "Conversely, in a factual attack, the existence of subject matter jurisdiction [is challenged] in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*, at 914-15 (alteration in original) (internal quotation omitted). As a result, in a factual attack, the nonmoving party does "not enjoy the benefit of the allegations in its pleadings being accepted as true by the reviewing court." *Id.* at 915. In the context of a Federal Rule of Civil Procedure

12(b)(1) motion, the Eighth Circuit explained that a challenge to standing should be treated differently "than a 12(b)(6) motion, which is governed by Rule 56 when matters outside the pleadings are considered . . . ." *Osborn v. U.S.*, 918 F.2d 724, 729 (8th Cir. 1990). Further, where the issue in dispute is the trial court's jurisdiction, "there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The Court determines that the challenge to standing here is factual, given the type of materials all parties put before the Court in the limited record developed to date in this case. Therefore, the Court will consider matters outside the pleadings when resolving the standing question.

### C. Standing Based On Alleged Economic Interest And Injury

#### 1. Injury-In-Fact

For the following reasons, the Court is skeptical of whether CURAD or the Coalition can establish a cognizable injury-in-fact to support Article III standing with respect to alleged economic interests and injuries. However, the Court invites any party to brief further this issue.

#### a. CURAD

CURAD asserts that the State of Arkansas, which it is statutorily authorized to represent before the APSC, "has a recognized interest in protecting consumers from unnecessary rate increases." (Dkt. No. 18, at 5). CURAD further asserts that the "Settlement Agreement attempts to usurp the state regulatory authority of the APSC and vest such authority in the federal district court." (*Id.*, at 6).

According to *Spokeo, Inc. v. Robins*, Article III standing requires a "concrete" injury, rather than a "conjectural or hypothetical" one. 136 S. Ct. 1540, 1548 (2016) (citing *Lujan*, 504 U.S. at 560). A plaintiff must establish that he has suffered "'an invasion of a legally protected interest'

that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560). An injury is "particularized" if it affects the plaintiff "in a personal and individual way," while "concreteness" requires that an injury be "de facto," or in other words, the injury must actually exist. *Id.* (internal quotes and citations omitted). The Supreme Court has acknowledged that not all violations of a statute constitute a "concrete" injury, as a "bare procedural violation, divorced from any concrete harm," is not a justiciable harm. *Id.* at 1549.

The Eighth Circuit Court of Appeals held in *United States v. Metropolitan St. Louis Sewer District* that an association of sewer and wastewater utility ratepayers did not have standing because those ratepayers' interests in a utility system were not sufficiently concrete or particularized to establish an Article III injury-in-fact. 569 F.3d at 835. In *Metropolitan St. Louis Sewer District*, an association of businesses moved to intervene in an enforcement action filed against a sewer district by the United States and the State of Missouri under the Clean Water Act. *Id.* at 832. The association's members "expressed concern that the [sewer district] would increase sewer rates" and "asserted interests in a reliable and viable sewer system and in the quality of the local environment." *Id.* at 834.

As relevant here, the Eighth Circuit noted that the association was "properly situated to assert the utility related economic interests of its members" but agreed with the district court "that the possibility of increased sewer rates is not an imminent injury." *Id.* at 835. The Eighth Circuit also noted that the sewer district could not commit to raise rates "as part of any enforceable consent decree" because the sewer district "must propose a rate increase to the Board of Trustees and the Rate Commission," and those entities could reject the proposed rate increase. *Id.* Furthermore, the Court noted that the sewer district was pursuing indemnification against the State of Missouri

for the entire cost of any judgment. *Id.* Based upon these facts, the Eighth Circuit found that "a rate increase is no more than a 'conjectural' or 'hypothetical' outcome of this lawsuit." *Id.* at 836 (citing *Lujan*, 504 U.S. at 560). Finally, the Eighth Circuit found that the requested relief and possibility of harm to the association were too contingent to confer standing because there was no evidence that a potential consent decree would affect the discharge permits of the association's members. *Id.* at 837.

In *Burton v. Central Interstate Low-Level Radioactive Waste Compact Commission*, an elector and a ratepayer of Nebraskan utilities sued an interstate commission on the grounds that the commission unlawfully taxed public utilities and had adopted bylaws and rules that violated an interstate compact and the plaintiffs' constitutional rights. 23 F.3d 208, 209 (8th Cir. 1994). The elector and ratepayer alleged that they were injured because, as electors of the utilities, they had a "direct and vested interest in the economic well-being of those public power entities" and that the "illegal taxes" imposed by the interstate commission "diminishe[d] the total revenues" of the utilities, which meant that the electors and ratepayers were "less well off." 23 F.3d at 209 (internal quotes and citations omitted).

The district court dismissed the complaint for lack of standing. The Eighth Circuit agreed. As to the appellants' allegation that the taxes imposed by the interstate commission affected the plaintiffs, the Eighth Circuit held that standing "requires more than Appellants' nebulous claims that they are less well off . . . ." *Id.* at 209 (internal quotation omitted). The Eighth Circuit also found that, to the extent appellants asserted that the commission's bylaws and rules caused them to sustain "real and direct economic injur[ies]," the appellants merely "alleged that the bylaws and rules affect some undefined interest of theirs in an uncertain way." *Id.* at 210 (alteration in original).

The Eighth Circuit reached the opposite conclusion regarding a utility's standing to intervene in a CAA action in *National Parks Conservation Association*. 759 F.3d at 975. There, environmental groups filed a citizen suit against the EPA to force the EPA to promulgate pollution control limits for the Sherburne County power plant, which was owned by North States Power Company ("NSP"). *Id.* at 972. NSP estimated that it would cost more than $280 million to install technology that would satisfy the pollution control limits sought by the environmental groups. *Id.* at 975. The district court denied NSP's motion to intervene. The Eighth Circuit reversed, finding that "if the court here grants the Environmental Groups' relief, then NSP would 'unavoidably be harmed economically.'" *Id.* (quoting *Metro. St. Louis Sewer Dist.*, 569 F.3d at 836).

In *Sierra Club v. McCarthy*, Judge Leon Holmes granted the State of Arkansas' motion to intervene and denied a motion to intervene filed by private parties. No. 4:14CV00643-JLH, 2015 WL 5006069 (E.D. Ark. Aug. 24, 2015). In that case, the Sierra Club sued the EPA to compel it to issue a Regional Haze FIP for Arkansas. *Id.*, at *2. According to the Sierra Club, the State of Arkansas had failed to promulgate timely a Regional Haze SIP, and the EPA had failed to promulgate timely a Regional Haze FIP. *Id.*, at *1. The Sierra Club and the EPA submitted a proposed consent decree to the Court that provided that the EPA would either approve a Regional Haze SIP or promulgate a Regional Haze FIP by December 15, 2015. *Id.* The proposed consent decree was published in the Federal Register, and the State of Arkansas requested, and received, an extension of time to submit comments to the proposed consent decree. *Id.* After the EPA announced it could not meet the December 15, 2015, deadline, it informed the Court that it would enter into negotiations with the State of Arkansas and the Sierra Club regarding a new deadline for final action. *Id.* Judge Holmes permitted the State of Arkansas to intervene under Rule 24(b)(2) governing permissive intervention because "[t]he issue that ultimately will be decided in this

litigation is the deadline by which the EPA must promulgate a federal implementation plan or approve a state implementation plan," and therefore the State of Arkansas' defense was based upon a statute that "is jointly administered by the State and the EPA." *Id.*, at *2. Further, Judge Holmes noted that the State of Arkansas has "an interest in assuring that the rule-making process is adequate" and in "protecting its ratepayers from unnecessary rate increases that may occur as a result of the proposed federal implementation plan." *Id.*, at *3.

Here, CURAD asserts that the State of Arkansas has a "recognized interest in protecting consumers from unnecessary rate increases" and that the State of Arkansas has a duty to act on behalf of Arkansas consumers when utilities petition for increased rates (Dkt. No. 18, at 5). In its motion to intervene, CURAD cites to the proposed Settlement Agreement submitted by plaintiffs and defendants for the Court's consideration (Dkt. No. 17, at 1-2). CURAD also argues, however, that the Court can consider only the complaint when assessing standing in this matter (Dkt. No. 41, at 3). The Court will examine allegations CURAD makes with regard to both the complaint and proposed Settlement Agreement.

With respect to the complaint, CURAD asserts:

> The Complaint seeks to enjoin Entergy from operating the White Bluff and Independence plants except in accordance with the CAA, which includes BACT, and asks the Court to order Entergy to obtain the required permits and to comply with the requirements of any permits obtained. If the relief sought in the complaint is granted, the White Bluff and Independence plants will have to install control technology that meets the requirements of BACT. The costs of that control technology will be passed directly to Arkansas' electric ratepayers that obtain power from those facilities.

(*Id.*, at 5). With respect to the proposed Settlement Agreement, CURAD asserts that it "contains mutual promises by Sierra, NPCA, and Entergy which will result in the early closure of three of Entergy's electric generating assets" and that "[r]ate recovery for costs associated with such commitments is the exclusive jurisdiction of the APSC." (Dkt. No. 18, at 5-6).

All parties appear to agree that, under Arkansas law, generally, the APSC has authority to approve or deny any rate proposal. The APSC has general jurisdiction over utility rates, and "[e]very public utility shall notify the secretary of the Arkansas Public Service Commission in writing of its intention to file an application for a general change or modification in its rates," Ark. Code Ann. § 23-4-401(a), and "no public utility shall place any rate increase into effect until a final decision and order is made by the commission," Ark. Code Ann. § 23-4-409. The APSC must approve any rate increase proposed by a utility in Arkansas (Decl. of Kurtis W. Castleberry, Dkt. No. 34-1, ¶ 33). *See* Ark. Code Ann. § 23-4-409 ("[N]o public utility shall place any rate increase into effect until a final decision and order is made by the commission.").

In support of its argument regarding increased rates resulting from this lawsuit or the proposed Settlement Agreement, CURAD cites the Court to Arkansas Code Annotated §§ 23-4-501, 23-4-504 (Dkt. No. 41, at 13-15). The law CURAD cites is part of an overall process for rate setting under Arkansas law. Arkansas Code Annotated § 23-4-501 provides, in relevant part:

> (a)(1) Upon a proper filing with the Arkansas Public Service Commission, a public utility shall be permitted to recover in a prompt and timely manner all investments and expenses through an interim surcharge, if the investments or expenses:
>
>> (A) Are not currently being recovered in existing rates;
>>
>> (B) Are reasonably incurred;
>>
>> (C) Were not reasonably known and measurable at a time that allowed for a reasonable opportunity for the inclusion and consideration of the investments or expenses for recovery in the public utility's last general rate case;
>>
>> (D) Are incurred by the public utility to comply with legislative or administrative rules or requirements;
>>
>> (E) Relate to the protection of the public health, safety, or the environment;
>>
>> (F) Cannot otherwise be recovered in a prompt and timely manner; and

(G) Are any of the following:

(i) Mandatory;

(ii) A condition of continued operation of a utility facility; or

(iii) Previously approved by the commission.

(2) The interim surcharge shall be effective until the implementation of new rate schedules in connection with the next general rate filing of the public utility in which such investments or expenses can be included in the public utility's base rate schedule.

Ark. Code Ann. § 23-4-501(a)-(b). This statute appears to allow a utility like Entergy to cause a rate increase by imposing an immediate surcharge on consumers to recover costs that meet each of the requirements above. *See* Ark. Code Ann. § 23-4-504 ("The surcharge shall become effective immediately upon filing."). The Court notes that the requirements for a surcharge under § 23-4-501(a) are cumulative—all of them must be met. *See McDaniel v. Ark. Public Serv. Comm'n*, 2014 Ark. App. 529 (2014) (examining this statute in an appeal taken by the Attorney General with respect to an energy company's temporary rate surcharge).

Later sections of the same subchapter make plain that the APSC retains authority even over this surcharge. The APSC "shall enter upon an investigation concerning the reasonableness of the surcharge within thirty (30) days after filing and upon reasonable notice to the utility." Ark. Code Ann. § 23-4-505. Further, after its investigation and a hearing, "the Arkansas Public Service Commission may modify or disapprove all or any portion of the surcharge" by making findings that any of the requirements set forth in Arkansas Code Annotated § 23-4-501 are not met. Ark. Code Ann. § 23-4-507. During its investigation, the APSC "may require reasonable security to assure the prompt payment of any refunds that may be ordered." Ark. Code Ann. § 23-4-506. As a result, the APSC retains ultimate decision-making authority to decide if any surcharge under this subchapter is imposed or refunded. Even after the APSC rules, that determination is subject to

challenge in Arkansas state courts. *See, e.g., McDaniel*, 2014 Ark. App. 529 (Attorney General appealed orders of the APSC approving energy company's temporary rate surcharge and approving resulting rate schedule).

For a rate increase to occur as a result of plaintiffs' lawsuit or the proposed Settlement Agreement, it appears to the Court that at least the following would need to happen: (1) plaintiffs' lawsuit or the proposed Settlement Agreement would have to cause a need for a rate increase, which is assumed by the proposed intervenors but is not guaranteed or conclusively established by the record before the Court; (2) Entergy would have to either submit an application for a rate increase to the APSC or impose an immediate surcharge; (3) Entergy would have to seek APSC approval for the rate increase or immediate surcharge; (4) the APSC would have to approve the rate increase or immediate surcharge; and (5) the APSC's determination then would be subject to review in Arkansas state courts. The Court confesses that the parties likely are more familiar with this regulatory law, and the Court invites any party to brief further these issues.

### b.     The Coalition

The Court also is skeptical of whether the Coalition has organizational standing—either on its own behalf and in a representative capacity on behalf of its members—in this action. To sue on its own behalf, an organization must suffer a direct injury. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (granting standing to a nonprofit organization devoted to equal housing opportunity where it sued a landlord for illegally steering minorities from homes, on the grounds that the alleged practice had a tangible drain on the organization's resources); *see also Smith v. Pacific Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) ("[An organization] must therefore satisfy the requirement for individual standing: a demonstration of concrete and particularize injury giving [the organization] a personal stake in the outcome of the controversy."

(internal quotations omitted)).  Such injury must be an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision." *Duhe v. City of Little Rock, Arkansas*, No. 4:14-CV-580-KGB, 2017 WL 1536231, at *8 (E.D. Ark. April. 27, 2017), *aff'd sub nom. Duhe v. City of Little Rock*, 902 F.3d 858 (8th Cir. 2018), *cert. denied sub nom. Duhe v. City of Little Rock, Ark.*, 139 S. Ct. 1178 (2019) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)).  "[T]he fear of possible injury . . . [is] insufficient to satisfy the requirement of the standing doctrine that plaintiffs," including organizations, "demonstrate a judicially cognizable injury." *Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir. 1989).  "'[C]onclusory allegations' about an injury are insufficient to establish standing."  *NHH Investor Grp. v. DFH Watford, LLC*, No. 4:15-CV-027, 2015 WL 12867309, at *2 (D.N.D. Oct. 8, 2015) (quoting *Assoc. Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 685, 687 (8th Cir. 1979)).

The Coalition asserts that it, as well as its members, "will suffer significant injury through unnecessary increased electric costs and decreased reliability, unnecessary increased natural gas costs and decreased reliability, and decreased demand for coal." (Dkt. No. 26, at 6-7).

The Coalition also argues that it members have alleged an injury-in-fact that supports standing for the members in their own right, and therefore the Coalition has standing to join this action on behalf of its members.  An association has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 470 (8th Cir. 1985) (quoting *Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  The injury-in-fact requirement "serves

to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973).

The Coalition argues that its members have standing because they are "customers of the Entergy Defendants and of the other co-owners of the White Bluff and Independence plants," "members of the electric cooperatives that have an indirect ownership interest in the plants," and "natural gas consumers that would be adversely affected by the increased demand for natural gas and natural gas transmission in the State of Arkansas . . . ." (Dkt. No. 26, at 6). The Coalition also argues that its members "will suffer significant injury through unnecessary increased electric costs and decreased reliability, unnecessary increased natural gas costs and decreased reliability, and decreased demand for coal." (*Id.*, at 6-7).

To the extent the Coalition relies on alleged "unnecessary increased electric costs," the Court understands that to refer to higher rates. For the reasons previously explained, the Court is skeptical of this argument. Neither plaintiffs' complaint nor the proposed Settlement Agreement say anything about proposed rate increases, and any increase in electrical rates is contingent upon approval by the APSC. *See* Ark. Code Ann. § 23-4-409.

Similarly, neither plaintiffs' complaint nor the proposed Settlement Agreement say anything about converting the White Bluff or Independence power plants to use natural gas, so any conjecture regarding the effect of plaintiffs' complaint or the proposed Settlement Agreement on natural gas prices seems speculative. The same holds true for the Coalition's assertion that plaintiffs' complaint or the proposed Settlement Agreement will affect electrical service reliability or demand for coal; any such outcome is contingent upon a myriad of factors that do not appear to be controlled by the relief plaintiffs seek in their complaint and that may change over the decade-

long scope of the proposed Settlement Agreement. Furthermore, the Court questions why such injuries, even if they were not speculative, are not of the type shared by the general public, which means that the alleged injuries to the Coalition's members may not be sufficiently particularized to establish an injury-in-fact. The Court is not firm in its resolution of these issues, however, and the Court invites any party to brief further these issues.

### 2. Causation

Any attempt to link higher rates to this lawsuit again seems to the Court to depend on the APSC, which must approve any rate increase. To the extent CURAD asserts an injury or individual members of the Coalition assert an injury due to the proposed cessation of coal combustion at the White Bluff and Independence plants, the Court questions whether such an alleged injury may in fact be caused by the Regional Haze SIP drafted by the State of Arkansas and the ADEQ's Administrative Order. The Court notes that the Regional Haze SIP submitted by the State of Arkansas to the EPA in August 2018 recognizes "the planned retirement of Entergy Lake Catherine, the planned cessation of coal-fired operations at Entergy White Bluff by the end of 2028, and the planned cessation of coal-fired operations at Entergy Independence by the end of 2030." (Dkt. No. 34-1, at 146). The ADEQ's recent Administrative Order requires, among other things, Entergy Arkansas to comply with $SO_2$ emission limits at the White Bluff and Independence plants and cease coal combustion at White Bluff by December 31, 2018 (*Id.*, at 49, 111-12). The Court is continuing to study these issues, however, and invites any party to brief further these issues.

### 3. Redressability

In support of its motion to intervene, CURAD states that "[t]he harm caused by this Settlement Agreement can be redressed by allowing the State to intervene in this case and represent

its own interests before the Court." (Dkt. No. 18, at 4). Thus, the relief sought by CURAD appears to be intervention to allow CURAD to participate in proceedings that may affect ratepayers. As to the Coalition, based on its motion to intervene, it appears that the relief it seeks is the prevention of the approval of the proposed Settlement Agreement (Dkt. No. 26, at 5).

To the extent the relief sought by the proposed intervenors is intended to prevent an increase in electricity rates and natural gas prices or a decrease in coal demand or grid reliability, as already discussed, electricity rates are set by the APSC. Natural gas and coal prices are set by a complex world-wide commodities market, and grid reliability is affected by technological advances that are difficult to predict. Further, as discussed above, the cessation of coal combustion at White Bluff is already required by the ADEQ's binding Administrative Order, and the SIP proposed *by the State* contemplates the cessation of coal combustion at the White Bluff and Independence plants (Dkt. No. 34-1, at 82, 146). The Court does not understand that it is being asked to enjoin or otherwise rule on the Administrative Order or the proposed Regional Haze SIP. The Court is continuing to study these issues, however, and invites any party to brief further these issues.

### D. Proposed Intervenors' Interest In Alleged Usurpation Of State Regulatory Authority

To the extent CURAD in its motion to intervene seeks a remedy to the alleged usurpation of the State's regulatory authority, not to its alleged economic injuries, the Court is not certain it understands fully CURAD's position with respect to this asserted interest. To the extent this alleged interest is tied to utility rates, for the reasons explained, the Court is skeptical that a concern over rates gives the proposed intervenors' Article III standing. To the extent CURAD seeks to intervene on a regulatory basis separate from utility rates, the Court is less certain. For the following reasons, the Court has concerns with respect to CURAD's argument regarding alleged

usurption of state regulatory authority. The Court directs CURAD or any party that wishes to do so to explain further this asserted interest in the context of requested intervention in a brief to be filed with the Court.

### 1.    Subject Matter Jurisdiction

The proposed intervenors in their proposed answers intend to assert statute of limitations and laches defenses (Dkt. Nos. 17, at 8-26; 26, at 22-32). Although no party makes it plain, it appears to the Court that the allegations in plaintiffs' complaint are substantially similar to the allegations raised in *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010). Based on the analysis in *Otter Tail*, the Court has concerns regarding subject matter jurisdiction. As a result, it directs plaintiffs and defendants to brief the Court with respect to subject matter jurisdiction consistent with the terms of this Order.

In *Otter Tail*, plaintiff Sierra Club sued Otter Tail claiming that three modifications at its Big Stone Generating Station, a 450-megawatt coal fired power plant triggered PSD and NSPS obligations that Otter Tail violated. *Id.* at 1012. Sierra Club filed suit in 2008 under the CAA's citizen suit provision, 42 U.S.C. § 7604(a), seeking assessment of civil penalties against Otter Tail as well as declaratory and injunctive relief. *Id.* at 1013. In its complaint, Sierra Club cited to a 1995 switch to subbituminous coal at the plant that Sierra Club claimed significantly increased Big Stone's emission of nitrogen oxides and particulate matter, meaning that Otter Tail was required to obtain a PSD permit before making the change. *Id.* at 1012. Sierra Club then cited to a 1998 modification to Big Stone's boiler, which Sierra Club contended increased the plant's emission of sulfur dioxide and nitrogen oxides. *Id.* Sierra Club also cited to a 2001 physical and operational modification at Big Stone to allow it to supply steam to a nearby ethanol plant. *Id.* Otter Tail applied to the South Dakota Department of Environmental and Natural Resources

("DENR")—the agency responsible for administering South Dakota's Title V program—for an amendment to its Title V permit to allow the ethanol plant project. DNER invited public comment on the permit application, but Sierra Club did not participate in the permitting process. *Id.* After evaluating the proposed project and concluding that it did not involve modifications that triggered NSPS or PSD requirements, DENR approved the amended permit. Sierra Club sought to challenge in its lawsuit the ethanol plan project, contending that it did trigger NSPS and PSD obligations. *Id.*

The district court concluded, and the Eighth Circuit agreed, that Sierra Club's PSD civil penalty claims were barred by the five year statute of limitations in 28 U.S.C. § 2462, as the last modification was begun in 2001 and because the court concluded that the CAA's PSD provisions imposed upon operators only a one time obligation to obtain a permit before construction or modification of a facility, as opposed to imposing ongoing conditions on its operation. *Id.*, at 1013. Further, the district court concluded, and the Eighth Circuit agreed, that although 28 U.S.C. § 2462 does not apply to equitable relief, Sierra Club's claims for equitable relief were foreclosed under the concurrent remedy doctrine because its civil penalty claims were time barred. *Id.*

The district court also concluded, and the Eighth Circuit agreed, that the court lacked subject matter jurisdiction over the NSPS claim because Sierra Club essentially sought to bring a collateral attack on the terms of Otter Tail's amended Title V permit rather than Otter Tail's compliance with the permit, which claims should have been raised in the administrative proceedings during the permitting process. *Id.* "Since judicial review of issues that may be raised through that process is vested exclusively in the courts of appeals, the district court . . . lacked jurisdiction over the NSPS claim." *Id.*

26

In *Otter Tail*, the Eighth Circuit acknowledged that other courts of appeals have reached different conclusions with respect to the question of the application of and timeliness of claims regarding the PSD permit and BACT. *Id.*, at 1014 (citing *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth. (Nat'l Parks 6th Cir.)*, 480 F.3d 410, 418-19 (6th Cir. 2007) (finding that PSD regulations in Tennessee SIP impose ongoing duties to obtain a PSD permit and apply BACT); *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth. (Nat'l Parks 11th Cir.)*, 502 F.3d 1316, 1323-25 (11th Cir. 2010) (finding no ongoing obligations in Alabama SIP)). In that action, the EPA as *amicus curiae* argued, along with the Sierra Club, that the "CAA and PSD regulations should be interpreted as establishing operational duties because the purpose of the PSD program is to limit emissions on a continuous basis and because PSD permits impose requirements on the operation of the facilities they govern." *Id.* at 1017. Although the Eighth Circuit acknowledged that some district courts had taken the approach the EPA and Sierra Club advocated, the Eighth Circuit rejected the argument and declined to give deference to the agency's interpretation. *Id.* at 1017-18.

Given this authority, and in the light of plaintiffs' claims here, the Court has concerns regarding its subject matter jurisdiction to hear plaintiffs' claims to the extent any such claim may be construed as a collateral attack on the Title V permit or any other type of permit at issue. It is not clear from the face of plaintiffs' complaint whether such issues are implicated. The Court directs the parties to brief the Court with respect to these issues.

### 2. Statute Of Limitations Defense Under The CAA

Further, the Court acknowledges the proposed intervenors' concerns regarding the limitations defense that may exist based on the holding in *Otter Tail* as to plaintiffs' other claims

in this case. The proposed intervenors have cited little, if any, authority with respect to these concerns. Neither plaintiffs nor defendants have addressed these concerns in their filings.

The Court acknowledges that, generally, the statute of limitations is an affirmative defense that must be raised in a defendants' answer or is deemed waived. Fed. R. Civ. P. 8(c). There may exist business or strategic reasons defendants here might wish to settle litigation as oppose to raise an affirmative defense that, although available under controlling Eighth Circuit law, appears to be subject to a circuit split and that may not be so easily resolved without protracted litigation. Resolution of the circuit split may also have consequences for plaintiffs and defendants in other jurisdictions in which they operate.

Although the Court has reviewed the issue, the Court finds no authority which alters the nature of the statute of limitations affirmative defense in CAA cases. The Court directs the parties, if they wish to do so, to brief the Court with respect to this issue. Specifically, the Court directs the parties to brief whether plaintiffs' claims may be time-barred under controlling Eighth Circuit case law and whether, even if so, defendants should be permitted to waive such a defense under the CAA when public interest is involved.

## III. Intervention

At this stage of the litigation, until the Court satisfies itself as to these other issues, the Court declines to examine the factors that dictate permissive intervention or intervention as a matter of right.

## IV. Conclusion

For these reasons, the Court directs the parties to brief further specific issues identified in this Order. The Court will set a briefing schedule and hearing on the pending motions, after consultation with the parties. The Court has under advisement the pending motions.

So ordered this 30th day of September, 2019.

Kristine G. Baker
United States District Judge