Richard H. Mays (State Bar No. 61043)
Williams & Anderson PLC
111 Center Street
Suite 2200
Little Rock, Arkansas 72201
Telephone: (501) 859-0575
Email: rmays@williamsanderson.com

George E. Hays (WA State Bar No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com

Naomi Kim Melver (WA State Bar No. 52463)
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| SIERRA CLUB and NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>ENTERGY ARKANSAS, INC., ENTERGY POWER, LLC., and ENTERGY MISSISSIPPI, INC.<br><br>Defendants. | Civil Action No. 4:18-cv-854-BRW<br><br>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      This Complaint commences a civil action against Entergy Arkansas, Inc., Entergy Power, LLC, and Entergy Mississippi, Inc. for violations of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401–7671q, at the Independence Steam Electric Station ("the Independence plant") located in Newark, Arkansas and the White Bluff Steam Electric Station ("the White Bluff plant") located in Redfield, Arkansas.

## JURISDICTION AND VENUE

2.      This court has subject matter over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of the Clean Air Act) and 28 U.S.C. § 1331 (federal question statute).  This action seeks injunctive and declaratory relief and civil penalties and is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment) and 42 U.S.C. §§ 7413, 7604(a) (Clean Air Act).

3.      Plaintiffs demand a trial by jury on all issues so triable.

4.      To the extent required by 42 U.S.C. § 7604(b), Plaintiffs sent notices of intent to sue for violations of the Clean Air Act set forth in this Complaint on January 10, 2018 and February 8, 2018 to Defendants and all government officers required to receive such notice by 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2.

2

5.     Venue is properly vested in this Court pursuant to 42 U.S.C. § 7604(c), because the Independence and White Bluff plants are located in the Eastern District of Arkansas.

## PARTIES

6.     Plaintiff Sierra Club is an environmental organization with a long history of service to the residents and communities of Arkansas.  Sierra Club's national headquarters are located at 2101 Webster St., Suite 1300, Oakland, CA 94612.

7.     Sierra Club has been working to protect communities, wild places, and the planet since 1892.  With more than 775,800 members throughout the United States, including 3,080 members in Arkansas, Sierra Club is the nation's largest, grassroots environmental organization.  Sierra Club is dedicated to the protection and preservation of the natural and human environment.

8.     Plaintiff National Parks Conservation Association ("NPCA") is a national not-for-profit corporation headquartered at 777 6th Street, NW, Suite 700, Washington, D.C. 20001.  NPCA has over 397,633 members nationwide, including 2,164 in Arkansas.  NPCA's mission is to protect and enhance America's national parks for the use and enjoyment of present and future generations.

9.     Since NPCA was established in 1919, it has advocated for protection of the natural environment (including air quality) in and around the national parks,

and it has educated decision makers and the public about the importance of preserving the parks. NPCA works to convince officials in the Executive Branch and members of Congress to uphold the laws that protect the public's use and enjoyment of the parks and to support new legislation to address threats to the parks. NPCA also litigates to uphold these laws. Furthermore, NPCA assesses the health of the parks and the adequacy of park management to better inform the public and advocate for the parks.

10. Entergy Arkansas, Inc. is a domestic, for-profit corporation, incorporated in Arkansas, and located at 425 West Capitol Avenue, Little Rock, AR 72201. At all times relevant to this Complaint, Entergy Arkansas, Inc. was and is an owner or operator of the Independence and White Bluff plants.

11. Entergy Arkansas, Inc. is a "person," as that term is defined in Section 302(e) of the Act, 42 U.S.C § 7602(e).

12. Entergy Power, LLC is a domestic, for-profit corporation, incorporated in Delaware, and located at 425 West Capitol Avenue, Little Rock, AR 72201. At all times relevant to this Complaint, Entergy Power, LLC was and is an owner or operator of the Independence plant.

13. Entergy Power, LLC is a "person," as that term is defined in Section 302(e) of the Act, 42 U.S.C § 7602(e).

14.     Entergy Mississippi, Inc. is a domestic, for-profit corporation, incorporated in Mississippi, and located at 308 East Pearl Street, Jackson, MS 39201.  At all times relevant to this Complaint, Entergy Mississippi, Inc. was and is an owner or operator of the Independence plant.

15.     Entergy Mississippi, Inc. is a "person," as that term is defined in Section 302(e) of the Act, 42 U.S.C § 7602(e).

## PLAINTIFFS' INJURIES

16.     The Independence plant is a stationary electric utility generating station located in Independence County, Arkansas.

17.     The White Bluff plant is a stationary electric utility generating station located in Jefferson County, Arkansas.

18.     Each plant consists of two coal-fired electrical generating units and associated equipment, and each plant has a nameplate capacity of 1700 megawatts.

19.     As a result of their coal combustion, both plants release into the atmosphere significant amounts of air pollution, including sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$"), carbon dioxide ("$CO_2$"), carbon monoxide ("CO"), mercury ("Hg"), and particulate matter ("PM").  Under Clean Air Act regulations, fossil fuel-fired steam electric plants such as the Independence and White Bluff plants are considered "major stationary sources" if they have the potential to emit more than 100 tons per year of any air pollutants.  40 C.F.R. § 52.21(b)(1)(i).  In

2017, the Independence plant emitted 19,487 tons of sulfur dioxide ("$SO_2$") and 8,695 tons of nitrogen oxides ("$NO_x$").  In 2018, the Independence plant emitted 24,242 tons of $SO_2$ and 7,690 tons of $NO_x$.  In 2017, the White Bluff plant emitted 23,212 tons of $SO_2$, 11,418 tons of $NO_x$, 457 tons of $PM_{10}$, and 263 tons of $PM_{2.5}$. In 2018, the White Bluff plant emitted 22,255 tons of $SO_2$ and 6,908 tons of $NO_x$.

20.     Individually and collectively these pollutants contribute to acid rain, regional haze, formation of ground level ozone or smog, formation of fine particulate matter, and pollution of surface waters.

21.     $SO_2$ pollution is "a medically recognized threat to human health." *Ohio Power Co. v. U. S. Entvl. Prot. Agency*, 729 F.2d 1096, 1097–98 (6th Cir. 1984).  It forms sulfates, sulfuric acid mist, and other chemical derivatives that aggravate respiratory illness, contribute to acid deposition, fall to earth as acid rain, and impair visibility.

22.     $NO_x$ contributes to acid rain, diminishes water quality, impairs visibility, and causes ground-level ozone, or smog, which triggers serious respiratory problems.  $NO_x$ emissions also contribute to nitrogen dioxide ($NO_2$) concentrations, and elevated $NO_2$ concentrations can worsen asthma symptoms. Further, $NO_x$ emissions exacerbate atmospheric ozone depletion, and cause eutrophication of water bodies.

23.     Particulate matter emissions vary in size and include fine particles (PM$_{2.5}$, or particles 2.5 micrometers or smaller in diameter) and coarse dust or soot (PM$_{10}$, or particles less than 10 micrometers in diameter). Breathing particulate pollution causes premature death, heart attacks, strokes, birth defects, asthma attacks, lung damage, Sudden Infant Death Syndrome and low birth weight. Particle pollution is especially dangerous for the elderly, children, and those with respiratory illnesses.  Particulate pollution also causes haze, impairs visibility, and alters nutrient balances in waters and soils.   Fine particulate matter causes or exacerbates many respiratory illnesses that can cross from the lungs into the human bloodstream and can cause injury to other organs in the body, including damage to the brain and nervous system.

24.      The plants' particulate matter emissions contain many toxic heavy metals, including mercury.  Mercury emissions from the plants pollute waterways and deposit onto plants, land, and structures.  Mercury is a potent neurotoxin linked to negative biological effects on human health, including effects on fetuses, developmental delays in children, retardation, and autism.  Mercury does not dissipate in the environment; rather, it bioaccumulates in fish and wildlife populations and persists indefinitely.

25.     As shown, in part, by declarations attached to this Complaint as Exhibit A, Plaintiffs' members, staff, and volunteers live, work, recreate, own

property, and fish in the areas most affected by the Independence and White Bluff plants. Illegal air pollution from these plants injures Plaintiffs' members, staff, and volunteers' aesthetic, recreational, environmental, spiritual, economic, educational, and health interests in these areas. Poor air quality injures human health, fish and wildlife, vegetation, visibility, water quality, cultural resources, including national parks and wilderness areas, and property in areas used by Plaintiffs' members. Unless the relief requested herein is granted, the violations of the Clean Air Act by these plants will continue to injure human health, fish and wildlife, vegetation, visibility, water quality, cultural resources, and property in areas used by Plaintiffs' members.

26.     As shown, in part, by declarations attached to this Complaint as Exhibit A, Plaintiffs' members, volunteers and staff are aware of the health and environmental impacts associated with the air pollution from the Independence and White Bluff plants and are concerned about harm to their health and the surrounding environment, including the public lands and natural resources they own, use, and enjoy.

27.     As shown, in part, by declarations attached to this Complaint as Exhibit A, the illegal and excessive discharges of pollution from the Independence and White Bluff plants injure Plaintiffs' members' diverse interests. These interests include, but are not limited to: 1) breathing air free from the plants'

excessive pollutant emissions, 2) enjoying the natural ecology of the region free from air pollution-related impacts, including hiking, viewing and photographing plants and wildlife at places including the Arkansas River and the Buffalo National River, 3) viewing Arkansas scenery including along the Arkansas River and at Clean Air Act designated Class I areas including the Upper Buffalo Wilderness and the Caney Creek Wilderness, 40 C.F.R. § 81.404, that are unimpaired by pollution from the plants, or by the smog, haze, and other aesthetic damage caused (in whole or in part) by the plants' emissions, 4) preventing excessive health care costs and other economic damages caused by or contributed to by the plants' pollutant discharges, 5) enjoying the region's cultural and spiritual resources that are susceptible to air pollution-related impacts, and 6) benefiting from economic resources that Plaintiffs' members reasonably fear will be adversely impacted by pollution from the plants.  Plaintiffs' members' interests have been and, unless the relief requested herein is granted, will continue to be, adversely affected by Defendants' violations of the CAA.

## LEGAL BACKGROUND

28.    The Clean Air Act is designed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  Section 101(b)(l) of the Act, 42 U.S.C. § 7401(b)(l).

9

*The National Ambient Air Quality Standards*

29.     Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of the United States Environmental Protection Agency ("U.S. EPA") to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408.  The primary air quality standards are requisite to protect the public health with an adequate margin of safety, and the secondary air quality standards are requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.  42 U.S.C. § 7409(b).

30.     Pursuant to Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, U.S. EPA has identified $SO_2$ and $NO_2$ as criteria pollutants and has promulgated air quality standards for these pollutants. 40 C.F.R. §§ 50.4, 50.5, 50.11, and 50.17.

31.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the air quality standards for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the air quality standard for a particular pollutant is termed an "attainment" area with respect to such pollutant.  *Id*. at § 7407(d)(1)(A)(ii).  An area that does not meet the

10

air quality standard for a particular pollutant is termed a "nonattainment" area with respect to that pollutant.  *Id*. at § 7407(d)(1)(A)(i).  An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to that pollutant and, under the Clean Air Act, is viewed the same as an attainment area. *Id*. at § 7407(d)(1)(A)(iii).

32.     The Independence plant is located in Independence County, Arkansas. At the times relevant to this complaint, Independence County has been classified as either unclassifiable/attainment or unclassifiable for $SO_2$ and unclassifiable/attainment for $NO_2$.  40 C.F.R. § 81.304.

33.     The White Bluff plant is located in Jefferson County, Arkansas.  At the times relevant to this complaint, Jefferson County has been classified as unclassifiable/attainment for $SO_2$ and $NO_2$.  40 C.F.R. § 81.304.

*Prevention of Significant Deterioration*

34.     Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the air quality standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to

11

permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

35.    PSD is intended to "protect, preserve and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores and other areas of special national or regional natural, recreational, scenic or historic value." 42 U.S.C. § 7470.  These protected areas have the best air quality in the country attaining or exceeding the minimum levels mandated by the NAAQS, which establish standards to protect public health and welfare.  The cleanest air is found in Class I areas. To preserve the pristine air quality in these public lands, the PSD permitting program affords Class I areas with the highest level of protection from major industrial sources of pollution.

36.    As part of the PSD program, Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the "construction" of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165, and the facility employs the "Best Available Control Technology" ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.

12

37.     Section 169(2)(c) of the Act, 42 U.S.C. § 7479(2)(c), defines "construction" as including "modification" (as defined in CAA Section 111(a)). "Modification" is defined in CAA Section 111(a)(4), 42 U.S.C. § 7411(a)(4), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

38.     Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input that emit or have the potential to emit 100 tons per year or more of any air pollutant to be "major emitting facilities."

39.     Section 169(3) of the Act, 42 U.S.C. § 7479(3) defines BACT, in pertinent part, as

> [A]n emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility .... In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 ... of this title.

40.     CAA Section 165(a)(3), 42 U.S.C. § 7475(a)(3), allows issuance of a PSD permit only if "the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction

or operation of such facility" will not compromise compliance with applicable air quality standards.

41.     Pursuant to CAA Section 110, 42 U.S.C. § 7410, each State must adopt and submit to the U.S. EPA for approval a State Implementation Plan ("SIP") that includes, among other things, regulations to prevent the significant deterioration of air quality under CAA Sections 161-165, 42 U.S.C. §§ 7471-7475. Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program.

42.     Pursuant to CAA Section 302(q), 42 U.S.C. § 7602(q), an applicable implementation plan is the implementation plan, or most recent revision thereof, which has been approved by U.S. EPA pursuant to CAA Section 110, 42 U.S.C. § 7410, or promulgated by U.S. EPA pursuant to CAA Section 110(c), 42 U.S.C. § 7410(c), and which implements the relevant requirements of the Act.  Upon U.S. EPA approval, SIP requirements are federally enforceable under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23.

43.     A state may comply with CAA Section 161, 42 U.S.C. § 7471, by having its own PSD regulations approved by U.S. EPA as part of its SIP, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.  If a state does not have a PSD program that has been approved by U.S. EPA and incorporated

into the SIP, then the U.S. EPA federal PSD regulations set forth at 40 C.F.R. §

52.21 shall be incorporated by reference into the SIP.  40 C.F.R. § 52.21(a).

### The Title V Operating Permit Program

44.    Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating

permit program for certain sources, including "major sources" and any source

required to have a PSD permit. A "major source" for purposes of Title V is

defined, among other things, as a source with a potential to emit greater than 100

tons per year of any criteria pollutant.  42 U.S.C. § 7661(2)(B); *id.* § 7602(j).

45.    Pursuant to Section 502(b) of the Act, 42 U.S.C. § 7661a(b), on July

21, 1992, the U.S. EPA promulgated regulations implementing the requirements of

Title V and established the minimum elements of a major source operating permit

program to be administered by any air pollution control agency.  57 Fed. Reg.

32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

### The State of Arkansas' PSD and Title V Programs

46.    The State of Arkansas' State Implementation Plan contains elements

that make up its PSD program, including Regulation 19, Chapter 9, and Regulation

26. *See* 72 Fed. Reg. 18,394 (Apr. 12, 2007), 66 Fed. Reg. 51,312 (Oct. 9, 2001),

and 80 Fed. Reg. 11,573 (Mar. 4, 2015).

47.     The State of Arkansas' Part 70 Operating Permit program, which implements Title V of the Clean Air Act, contains elements included in its State Implementation plan in Regulation 26.  *See* 66 Fed. Reg. 51,312 (Oct. 9, 2001).

48.     The Arkansas PSD program, as codified in the SIP, incorporates by reference U.S. EPA's definition of "major source."  Reg. 19.903(D).  Major sources of air pollution include fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input that have the potential to emit 100 tons per year or more of any air pollutant.  40 C.F.R. § 52.21(b)(1).

49.     The Arkansas PSD program, as codified in the SIP, incorporates by reference U.S. EPA's definition of "major modification."  Reg. 19.903(D).  A "major modification" is "any physical change in, or change in the method of operation of, a major stationary source that would result in a significant emissions increase and a significant net emissions increase of a regulated NSR pollutant from the major stationary source."  40 C.F.R. § 52.21(b)(2).

50.     The Arkansas PSD program, as codified in the SIP, in part at Regulation 19.904(A), incorporates by reference the following applicability procedures to determine if a project is a major modification.  Projects at existing emission units require a pre-project comparison between "projected actual emissions" and "baseline actual emissions" to determine if the project would result in a "significant emissions increase."  40 C.F.R. §§ 52.21(a)(2)(iv)(b) and (c).  If a

16

project would result in a "significant emissions increase" and the project would also result in a "significant net emissions increase" considering all contemporaneous emission increases and decreases at the plant, then the project is considered a "major modification."  40 C.F.R. §§ 52.21(a)(2)(iv)(a), (b)(2), (b)(3), (b)(23).  The regulations further provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase."  40 C.F.R. § 52.21(a)(2)(iv)(b).

51.   The Arkansas PSD program, as codified in the SIP at Regulation 19.903(D), incorporates by reference the following definition from 40 C.F.R. § 52.21(b)(23): "Significant" means "in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emission that would equal or exceed any of the following rates: ... Nitrogen oxides: 40 [tons per year]; Sulfur dioxide: 40 [tons per year]."

52.   The Arkansas PSD program, as codified in the SIP at Regulation 19.904(A), incorporates by reference the following requirements from 40 C.F.R. § 52.21(j)-(p): BACT "shall apply" to the air pollutants triggering PSD review as "major modifications."  In addition, each application for a permit for construction or major modification must include, among other things, consultation with implicated federal land managers and an analysis of ambient air quality and the

17

impact of the construction or major modification on air quality, visibility, soils and vegetation.

53.    Under the Arkansas State Implementation Plan, the requirement to obtain a Part 70 permit applies to all major sources.  Reg. 26.302(A).

54.    A major source for the purposes of Part 70 includes any "major stationary source" as defined in 42 U.S.C. § 7602.  40 C.F.R. § 70.2; 42 U.S.C. § 7661(2)(B).

55.    42 U.S.C. § 7602(j) defines major stationary source to include: "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant."

56.    Furthermore, under the Arkansas State Implementation Plan, "No part 70 source shall begin construction of a new emissions unit or begin modifications to an existing emissions unit prior to obtaining a modified part 70 permit."  Reg. 26.301(C).

57.    Moreover, under the Arkansas State Implementation Plan, "No part 70 source may operate unless it is operating in compliance with a part 70 permit."  *Id.* at 26.301(A).

*New Source Performance Standards*

58.    Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of EPA to publish a list of categories of stationary

18

sources that emit or may emit any air pollutant. The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.

59.     Clean Air Act Section 111(b)(1)(8), 42 U.S.C. § 7411(b)(1)(B), requires the Administrator of EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories. "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source.  42 U.S.C. § 7411(a)(2).

60.     Pursuant to Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), EPA has promulgated NSPS Subpart D, 40 C.F.R. §§ 60.40 - 48, which applies to fossil-fuel-fired steam generating units of more than 73 megawatts that commenced construction or modification after August 17, 1971, such as the White Bluff plant.

*Opacity*

61.     The standard for particulate matter (PM) in NSPS Subpart D provides in pertinent part that "no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility any

gases that . . . [e]xhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity." 40 C.F.R. § 60.42(a)(2).

62.    Furthermore, pursuant to Section 3(b) of Permit # 0263-AOP-R7 (the "White Bluff Title V Permit") issued August 9, 2012 to Entergy Arkansas, Inc. by the Arkansas Department of Environmental Quality ("ADEQ"), and renewed on January 22, 2015 (R8), September 25, 2015 (R9), May 10, 2016 (R10), and November 8, 2017 (R11), opacity from White Bluff units SN-01 and SN-02 "shall not exceed 20 percent except for one six-minute period per hour of not more than 27 percent opacity and as except as provided by 40 C.F.R. §§ 60.8 and 60.11."

63.    Also, pursuant to Section 6 of the White Bluff Title V Permit, as renewed on January 22, 2015 (R8), September 25, 2015 (R9), May 10, 2016 (R10), and November 8, 2017 (R11):

> The permittee shall not cause to be discharged to the atmosphere from the boilers any emissions which exhibit an opacity greater than 20 percent when firing coal or No. 2 fuel oil. The opacity shall not exceed 20 percent (6-minute average), except for one 6-minute period per hour not to exceed 27 percent. Opacity exceedances shall be reported in accordance with Specific Condition #7.

*Enforcement Provisions*

64.    The Clean Air Act provides a cause of action for "any person" to file suit against any other person who is alleged to have violated or be in violation of an emission standard or limitation under the CAA. 42 U.S.C. § 7604(a)(1).

65.     Additionally, the Act provides a separate cause of action by any person against any other person who constructs any new or modifies any existing major facility without the required permits.  42 U.S.C. § 7604(a)(3).

66.     The Plaintiffs and Defendants in this case are all "persons" within the meaning of the Clean Air Act.  42 U.S.C. § 7602(e).

67.     An "emission standard or limitation," within the meaning of 42 U.S.C. § 7604(a)(1), is defined in 42 U.S.C. § 7604(f)(4).

68.     An "emission standard or limitation" includes "any . . . standard . . . under any applicable [s]tate implementation plan" and "any requirement to obtain a permit as a condition of operations."  42 U.S.C. § 7604(f)(4).

69.      The Court is authorized to order injunctive relief as well as civil penalties in amounts up to $37,500 per day per violation for violations occurring after January 12, 2009 until November 2, 2015, and up to $99,681 per day per violation for violations occurring after November 2, 2015 and for which penalties are assessed on or after February 6, 2019.  42 U.S.C. §§ 7413(b) and 7413(e); 40 C.F.R. Part 19.4.

70.      Penalties are paid to the United States Treasury, except that the Court may authorize that penalties up to $100,000 be paid into a beneficial mitigation project fund used to enhance the public health or environment.  42 U.S.C. § 7604(g)(2).

## FACTUAL BACKGROUND

71.     The Independence plant is a "fossil fuel-fired steam electric plant of more than 250 million British thermal units per hour heat input" with a potential to emit more than 100 tons per year of $SO_2$ and $NO_x$.  Therefore, the plant constitutes a "major stationary source" within the meaning of Reg. 19.903(D) and 40 C.F.R. § 52.21(b)(1)(i)(a) and is a "major emitting facility" within the meaning of Section 169(1) of the Act, 42 U.S.C. § 7479(1).

72.     The White Bluff plant is a "[f]ossil fuel-fired steam electric plant[] of more than 250 million British thermal units per hour heat input" with a potential to emit more than 100 tons per year of $SO_2$ and $NO_x$.  Therefore, the plant constitutes a "major stationary source" within the meaning of Reg. 19.903(D) and 40 C.F.R. § 52.21(b)(1)(i)(a) and is a "major emitting facility" within the meaning of Section 169(1) of the Act, 42 U.S.C. § 7479(1).

73.     The Independence plant is a "major source" under 42 U.S.C. § 7602 because it emits or has the potential to emit more than 100 tons per year of $SO_2$ and $NO_x$, and therefore it is a major source under Arkansas' Part 70 program.  *See* 40 C.F.R. § 70.2; 42 U.S.C. § 7661(2).

74.     The White Bluff plant is a "major source" under 42 U.S.C.  § 7602 because it emits or has the potential to emit more than 100 tons per year of $SO_2$ and

$NO_x$, and therefore it is a major source under Arkansas' Part 70 program.  *See* 40 C.F.R. § 70.2; 42 U.S.C. § 7661(2).

75.     From on or about February 28, 2009 to April 17, 2009 ("2009 Independence Unit 1 Outage"), Defendants undertook a planned outage at Unit 1 at the Independence plant.

76.     During the 2009 Independence Unit 1 Outage, Defendants made a number of physical changes and/or changes in the method of operation at Independence Unit 1 including, but not limited to, replacement of the economizer in the boiler.

77.     The physical changes and/or changes in the method of operation at Unit 1 during the 2009 Independence Unit 1 Outage caused emissions of $SO_2$ for at least one 12-month period beginning on or after April 2010 that exceeded baseline actual emissions for any consecutive 24-month period within the 5-year period immediately preceding commencement of the 2009 Independence Unit 1 Outage by an amount greater than the applicable PSD significance level.

78.     Because the physical changes and changes in the method of operation at Unit 1 during the 2009 Independence Unit 1 Outage resulted in post-project significant emissions increases and significant net emissions increases for $SO_2$, a major modification occurred for that pollutant.  Defendants did not obtain a PSD permit for that major modification and they are operating the Independence plant

23

without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements.

79.     Moreover, Defendants did not obtain a modified Part 70 permit prior to commencing work on the modification described in the previous paragraph, yet they are operating the Independence plant without that modified Part 70 permit, which would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements.

80.     From on or about September 14, 2008 to November 4, 2008 ("2008 Independence Unit 2 Outage"), Defendants undertook a planned outage at Unit 2 at the Independence plant.

81.     During the 2008 Independence Unit 2 Outage, Defendants made a number of physical changes and/or changes in the method of operation at Independence Unit 2 including, but not limited to, replacement of the economizer in the boiler.

82.     The physical changes and/or changes in the method of operation at Unit 2 during the 2008 Independence Unit 2 Outage caused emissions of $SO_2$ for at least one 12-month period beginning on or after June 2009 that exceeded baseline

24

actual emissions for any consecutive 24-month period within the 5-year period immediately preceding commencement of the 2008 Independence Unit 2 Outage by an amount greater than the applicable PSD significance level.

83.     Because the physical changes and changes in the method of operation at Unit 2 during the 2008 Independence Unit 2 Outage resulted in post-project significant emissions increases and significant net emissions increases for $SO_2$, a major modification occurred for that pollutant.  Defendants did not obtain a PSD permit for that major modification and they are operating the Independence plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements.

84.     Moreover, Defendants did not obtain a modified Part 70 permit prior to commencing work on the modification described in the previous paragraph, yet they are operating the Independence plant without that modified Part 70 permit, which would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements.

85.     From on or about September 14, 2007 to November 18, 2007 ("2007 White Bluff Unit 2 Outage"), Defendant Entergy Arkansas undertook a planned outage at Unit 2 at the White Bluff plant.

86.     During the 2007 White Bluff Unit 2 Outage, Defendant Entergy Arkansas made a number of physical changes and/or changes in the method of operation at White Bluff Unit 2 including, but not limited to, replacement of the economizer in the boiler.

87.     The physical changes and/or changes in the method of operation at Unit 2 during the 2007 White Bluff Unit 2 Outage caused emissions of $NO_x$ for at least one 12-month period beginning on or after April 2009 that exceeded baseline actual emissions for any consecutive 24-month period within the 5-year period immediately preceding commencement of the 2007 White Bluff Unit 2 Outage by an amount greater than the applicable PSD significance level.

88.     Because the physical changes and changes in the method of operation at Unit 2 during the 2007 White Bluff Unit 2 Outage resulted in post-project significant emissions increases and significant net emissions increases for $NO_x$, a major modification occurred for that pollutant.  Defendant Entergy Arkansas did not obtain a PSD permit for that major modification and they are operating the White Bluff plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed

by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements.

89.     Moreover, Defendant Entergy Arkansas did not obtain a modified Part 70 permit prior to commencing work on the modification described in the previous paragraph, yet they are operating the plant without that modified Part 70 permit, which would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements.

## CLAIMS FOR RELIEF

### Plaintiffs' First Claim for Relief

### Modifying and Operating the Independence Plant Without Obtaining a PSD Permit for a Major Modification at Unit 1

90.     Plaintiffs reallege all preceding paragraphs as if set forth herein.

91.     Defendants made a major modification at Independence Unit 1 for $SO_2$, described in Paragraphs 66 and 67 that caused the significant emissions increase and significant net emission increase described in Paragraph 68.

92.     For the major modifications described in the preceding paragraph, Defendants constructed and are operating the Independence plant without completing a permit application for a PSD permit, without such PSD permit, and without complying with the conditions that would be imposed by such permit,

including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements, thereby violating Regulation 19 of the Arkansas SIP and Clean Air Act.

93.     Unless restrained and penalized by an order of this Court, these and similar violations of the PSD provisions of the Act and Arkansas SIP will remain ongoing.

**Plaintiffs' Second Claim for Relief**

**Modifying and Operating the Independence Plant Without
Obtaining a Modified Part 70 Permit**

94.     Plaintiffs reallege all preceding paragraphs as if set forth herein.

95.     Defendants made a major modification at Unit 1 for $SO_2$ discussed above in the First Claim for Relief.

96.     With respect to $SO_2$, Defendants violated Regulation 26.301(A) and (C) of the Arkansas SIP by operating Independence without a Part 70 permit modified to address the major modification discussed above in the First Claim for Relief.

97.     Unless restrained and penalized by an order of this Court, these and similar violations of Regulation 26.301(A) and (C) of the Arkansas SIP will remain ongoing.

## Plaintiffs' Third Claim for Relief

### Modifying and Operating the Independence Plant Without Obtaining a PSD Permit for a Major Modification at Unit 2

98.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

99.   Defendants made a major modification at Independence Unit 2 for $SO_2$, described in Paragraphs 71 and 72 that caused the significant emissions increase and significant net emission increase described in Paragraph 73.

100.   For the major modifications described in the preceding paragraph, Defendants constructed and are operating the Independence plant without completing a permit application for a PSD permit, without such PSD permit, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements, thereby violating Regulation 19 of the Arkansas SIP and Clean Air Act.

101.   Unless restrained and penalized by an order of this Court, these and similar violations of the PSD provisions of the Act and Arkansas SIP will remain ongoing.

## Plaintiffs' Fourth Claim for Relief

### Modifying and Operating the Independence Plant Without Obtaining a Modified Part 70 Permit

102.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

29

103.   Defendants made a major modification at Unit 2 for $SO_2$ discussed above in the Third Claim for Relief.

104.   With respect to $SO_2$, Defendants violated Regulation 26.301(A) and (C) of the Arkansas SIP by operating Independence without a Part 70 permit modified to address the major modification discussed above in the Third Claim for Relief.

105.   Unless restrained and penalized by an order of this Court, these and similar violations of Regulation 26.301(A) and (C) of the Arkansas SIP will remain ongoing.

### Plaintiffs' Fifth Claim for Relief

**Modifying and Operating the White Bluff Plant Without Obtaining a PSD Permit for a Major Modification at Unit 2**

106.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

107.   Defendant Entergy Arkansas made a major modification at White Bluff Unit 2 for $NO_x$, described in Paragraphs 76 and 77 that caused the significant emissions increase and significant net emission increase described in Paragraph 78.

108.   For the major modifications described in the preceding paragraph, Defendant Entergy Arkansas constructed and is operating the White Bluff plant without completing a permit application for a PSD permit, without such PSD permit, and without complying with the conditions that would be imposed by such

30

permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements, thereby violating Regulation 19 of the Arkansas SIP and the Clean Air Act.

109.   Unless restrained and penalized by an order of this Court, these and similar violations of the PSD provisions of the Act and Arkansas SIP will remain ongoing.

### Plaintiffs' Sixth Claim for Relief

### Modifying and Operating the White Bluff Plant Without Obtaining a Modified Title V Permit

110.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

111.   Defendant Entergy Arkansas made a major modification at Unit 2 for $NO_x$ discussed above in the Fifth Claim for Relief.

112.   For the major modifications described in the preceding paragraph, Defendant Entergy Arkansas violated Regulation 26.301(A) and (C) of the Arkansas SIP by operating White Bluff without a Part 70 permit modified to address the major modification discussed above in the Fifth Claim for Relief.

113.   Unless restrained and penalized by an order of this Court, these and similar violations of Regulation 26.301(A) and (C) of the Arkansas SIP will remain ongoing.

## Plaintiffs' Seventh Claim for Relief

### Violations at the White Bluff Plant of the Opacity Standard in 40 C.F.R. § 60.42(a)(2)

114.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

115.   At the White Bluff plant, Defendant Entergy Arkansas has violated the opacity standard in 40 C.F.R. § 60.42(a)(2) at least 323 times, as detailed in Exhibit B, attached to this Amended Complaint.

116.   Unless restrained and penalized by an order of this Court, these and similar violations of 40 C.F.R. § 60.42(a)(2) will remain ongoing.

## Plaintiffs' Eighth Claim for Relief

### Violations of the Opacity Standard in the White Bluff Title V Permit

117.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

118.   At the White Bluff plant, Defendant Entergy Arkansas has violated the opacity standard in Sections 3(b) and 6 of the White Bluff Title V Permit, as renewed on January 22, 2015 (R8), September 25, 2015 (R9), May 10, 2016 (R10), and November 8, 2017 (R11) at least 323 times, as detailed in Exhibit B, attached to this Amended Complaint.

119.   Unless restrained and penalized by an order of this Court, these and similar violations of the White Bluff Title V permit will remain ongoing.

32

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

120.  Declare that Defendants violated and are violating the Clean Air Act;

121.  Permanently enjoin Defendants from operating the Independence and White Bluff plants except in accordance with the Clean Air Act, the Arkansas SIP, the New Source Performance Standards, and their Title V Permits;

122.  Order Defendants to submit required permit applications, obtain required permits, comply with the requirements of any permits obtained, and submit correct compliance certifications;

123.  Order Defendants to remediate the environmental damage and ongoing impacts (including the injuries to Plaintiffs' members as set forth above) resulting from its violations;

124.  Assess civil penalties against Defendants in the amount of $37,500 per day per violation for violations occurring after November 12, 2009 until November 2, 2015, and up to $99,681 per day per violation for violations occurring after November 2, 2015 and for which penalties are assessed on or after February 6, 2019.  42 U.S.C. §§ 7413(b) and 7413(e); 40 C.F.R. Part 19.4;

125.  Order that, pursuant to 42 U.S.C. § 7604(g)(2), $100,000.00 of the civil penalties assessed against Defendants be used in beneficial mitigation projects

to enhance public health and the environment (including enhanced air quality

monitoring) in the areas where Plaintiffs' members live, work and recreate and that

are adversely impacted by Defendants' illegal emissions;

126.   Retain jurisdiction of this action to ensure compliance with the

Court's Order;

127.   Award Plaintiffs their costs of litigation, including reasonable attorney

fees, pursuant to 42 U.S.C. § 7604(d); and

128.   Grant such other relief as the Court deems just and proper.

Dated this 17th day of December, 2019

Respectfully submitted,


s/ Richard H. Mays
Richard H. Mays
Williams & Anderson PLC
111 Center Street, Suite 2200
Little Rock, Arkansas 72201
Telephone: (501) 859-0575
Email: rmays@williamanderson.com
Arkansas Bar No. 61043

s/ George E. Hays
George E. Hays
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com
WA Bar. No. 53874

s/ Naomi Kim Melver
Naomi Kim Melver
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com
WA Bar No. 52463

*Counsel for Plaintiffs Sierra Club and*
*National Parks Conservation Association*

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.

Dated this 17th day of December, 2019

Respectfully submitted,

s/ Richard H. Mays
Richard H. Mays
Williams & Anderson PLC
111 Center Street, Suite 2200
Little Rock, Arkansas 72201
Telephone: (501) 859-0575
Email: rmays@williamanderson.com
Arkansas Bar No. 61043

s/ George E. Hays
George E. Hays
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com
WA Bar. No. 53874

s/ Naomi Kim Melver
Naomi Kim Melver
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com
WA Bar No. 52463

*Counsel for Plaintiffs Sierra Club and
National Parks Conservation Association*

# Exhibit A

## DECLARATION OF JACK STEWART

I, Jack Stewart, hereby declare:

1. I am over eighteen (18) years old, am competent to testify and have personal knowledge of the matters set forth herein.

2. I am a retired teacher in the International School Education system and have lived near Jasper, Arkansas next to the Buffalo National River for the past 20 years.

3. I am currently an active volunteer member of the National Parks Conservation Association ("NPCA") and have been a member off and on for the past 20 years.  NPCA has the same interest in preserving the unique Buffalo National River and surrounding Park and wilderness areas as I do.  I also hold volunteer leadership positions in one other national nonprofit environmental organization, and two local nonprofit groups dedicated towards protection of the Buffalo National River area.

4. My property abuts the Buffalo National River Park boundary on three sides.  I bought my property 20 years ago after repeated visits to the area because it borders the National Park and has good areas to hike within walking distance of my property.  I visit the Buffalo National River Park to go walking in nearly every day of the year because it is adjacent to my

1

property, and I will continue visiting the Park nearly every day for as long as I live here.

5. Jasper, AR is located approximately 102 miles from the Independence coal-fired power plant. I am concerned about the air pollution coming from that and other coal-fired power plants in the area. I've noticed decreased visibility from my property looking out at mountain ridges in the distance over the years. I've also noticed decreased visibility when I go walking or for longer hikes into the Buffalo National River Park in the Eastern direction of the Independence plant. The views of the river and mountains in the distance, such as when I am looking at the bluffs above the river, have become less clear, and the hazy conditions are worsening. I notice this especially during bird migration events when the wind conditions are favorable, and the birds gather along the ridges of the bluffs above the river. Then it is particularly noticeable that the visibility is impaired. I am concerned because my ability to view the natural scenery in the park and from my property has been diminished because of air pollution that reduces visibility and air quality.

6. I have read news reports online and in newspapers about the bad air pollution in the area for several years. I am concerned about the effect of the pollution on my property and in the Buffalo National River area where I

go walking nearly every day. I am concerned about the air quality and visibility at my home, and that pollution may be impairing my family's ability to breath clean air. I worry about decreased value in my property having to regularly clean off a small layer of dark dust that collects on top of my solar panels that I believe comes from coal-fired power plants in the area. I am also concerned about potential harm to local wildlife along the Buffalo National River and in the region.

7. I have read warnings about eating local fish due to possible contamination from pollution online. I've seen a sign warning of mercury contamination to not eat the fish at Johnson Hole near Clinton, which is approximately 52 miles away from where I live and 58 miles from the Independence power plant. I also understand that there is a mercury warning at Gray's Lake, which is approximately 32 miles from the White Bluff power plant. Because of mercury in fish warnings, I am much more careful about the source of the fish that I eat, and have reduced my consumption of local fish as a result. Fried local fish is popular here. Being nearby the Southern United States, a lot of people eat it and serve it regularly around my town and surrounding areas. But I've definitely cut back eating the local fish since learning about the mercury warnings. I've learned that pollution from coal-fired power plants in the area can contribute

3

towards mercury contamination in the fish.  If the local fish are contaminated, I am also concerned for the health of larger mammals in the area, and for the health of myself and my family.

8.  Reducing air pollution from the Independence and White Bluff coal-fired power plants will have a positive impact on my ability to view the natural scenery in the Buffalo National River area and will improve views of nearby mountain ridges at my property.  My aesthetic and recreational interests would be improved at the park, while I would have less apprehension for my property and health interests at home, including lessening my concern about eating local contaminated fish.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Jasper, Arkansas, on DATE: _November 4, 2018_

_____
Jack Stewart

## DECLARATION OF ROBERT ALLEN

I, Robert Allen, hereby declare:

1. I am over eighteen (18) years old, am competent to testify and have personal knowledge of the matters set forth herein.

2. I live in Dover, Arkansas, approximately 87 miles from the White Bluff coal-fired power plant and 98 miles from the Independence coal-fired power plant. I have lived in Arkansas since 1980.

3. I am a retired chemist and professor of chemistry. I have taught organic chemistry, environmental chemistry, and toxicology at Arkansas Tech University in Russellville, Arkansas in the past. I am an active member of Sierra Club, and have been a member for the past 20 years. I am also on the Executive Committee of Sierra Club's Arkansas Chapter and have served in that capacity since 2010. I became a member of Sierra Club because I support and believe in its activist stance on environmental issues. I am proud that Sierra Club takes action to improve the environment in Arkansas and around the country. I am also a member of a few other environmental non-profit organizations.

4. One of my favorite things about living in Arkansas is the many opportunities for outdoor activity that we have here. Part of the reason I moved to Arkansas was to be near the Buffalo National River and to spend

1

more time outdoors.  I visit the Buffalo National River area at least six times per year where I enjoy camping, hiking, and canoeing, among other activities.  In 2007 I went on a 10-day camping trip up and down the Buffalo National River, and I go canoeing there regularly to get away from the rest of the world.  The last time I was there was a little over a month ago in order to conduct an informal algae survey studying nutrient problems in the water.

5.  When I visit the Buffalo National River area I have seen hazy conditions and worsening visibility up and down the river.  From just about anywhere along the bluffs beside the river, such as at Big Bluff, Jim Bluff, Red Bluff, and other lookout points, I have seen haze at some point.  I am very concerned about the impacts of haze pollution on the Buffalo National River area.  This haze and reduced visibility lessens my enjoyment and causes me to have concern about air pollution in the area.  To stand on the bluffs above the river and to admire the magnificent views of the meandering river below is an important and unique part of my experience when I visit the Buffalo National River area.  I find it disturbing that haze in the area decreases visibility and my ability to take in the scenic views from the nearby bluffs, lessening my enjoyment of the area.  Despite the haze, I plan to continue to visit the Buffalo National River and to engage in outdoor

activities there. However, if haze pollution persists and visibility continues to worsen, I will be less likely to visit and enjoy this area as often in the future.

6. I also visit Hot Springs National Park regularly, about 2 times per year. There, I enjoy the natural hot springs of the park and hiking to nice lookout points on the trails above the urban area. I have noticed that the views from these outlook spots were clearer in the past. I have observed hazy conditions in this area, obscuring panoramic views that I can't see as well as I used to be able to. This decreased visibility lessens my enjoyment of Hot Springs National Park. However, I plan to continue to visit the park in the future, but with perhaps fewer hikes to enjoy the scenic views as long as visibility continues to worsen.

7. I understand that air pollution causes or contributes to haze that diminishes visibility in the Buffalo National River and Hot Springs National Park. I share Sierra Club's strong interest in protecting these parks and other natural areas in Arkansas from haze pollution.

8. As a retired chemistry professor, and through many years of volunteering with the Sierra Club, I know that the same pollutants that cause visibility impairment, such as sulfur dioxide, nitrogen dioxide, and particulate matter, are also harmful to public health. I know that sulfur

dioxide and nitrogen oxide pollution from fossil fuel burning power plants also react in the atmosphere to form particulate matter, which can penetrate deep into the lungs and cause respiratory and cardiovascular problems. Nitrogen oxide pollution from power plants also contributes to the formation of smog and ground-level ozone pollution, which causes a number of adverse impacts to human health and the environment. As a result, I am often concerned about the impacts of pollution from Arkansas power plants on my own health, and the health of my family and friends in the area. I have a few friends that have asthma who live in Dover or nearby, and I am concerned about the impact of air pollution upon their health. Because of my public health concerns, I avoid prolonged exposure in areas adjacent to power plants in Arkansas.

9. I am also concerned about the impact on local fish populations from coal-fired power plants in Arkansas, and am concerned for those who eat contaminated fish. I have learned that burning coal can contribute towards mercury contamination in fish. I am aware that there are mercury warnings to not eat the fish at Johnson Hole, Gray's Lake, and Lake Ouachita, which are within 70 miles of the Independence or White Bluff coal-fired power plants. I enjoy fishing a few times during the summer at various local spots and in wilderness areas, but avoid fishing at locations with mercury in fish

warnings. Even though I go fishing a few times during the summers, I don't eat many local fish, preferring to catch and release. The possibility of mercury contamination is always in the back of my mind whenever I go fishing or consider eating local fish.

10.     Reducing air pollution from coal-fired power plants in the area will benefit me and other Sierra Club members who use and enjoy the Buffalo National River and Hot Springs National Park by improving the views, and by helping to protect human health from air pollution and fish contamination. Hiking, camping, canoeing, fishing and other outdoor activities in the parks and other wilderness places in the area would be more enjoyable for me with no haze pollution from these plants. Because I am concerned about the impacts of air pollution on my health, on local fish populations, and on my aesthetic and recreational enjoyment of these protected parks, I support Sierra Club's efforts to require reductions in pollution from the Independence and White Bluff power plants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dover, Arkansas, on DATE: _Oct 29, 2018_

_Robert W. C_____
Robert Allen

5

## DECLARATION OF DON CASTLEBERRY

I, Don Castleberry, hereby declare:

1. I am over eighteen (18) years old, am competent to testify and have personal knowledge of the matters set forth herein.

2. I live in Maumelle, Arkansas, adjacent to and Northwest of Little Rock, Arkansas and have lived in the Little Rock area for the past 25 years. My house in Maumelle is located approximately 80 miles from the Independence coal-fired power plant and 32 miles from the White Bluff coal-fired power plant.

3. I am a member of the National Parks Conservation Association ("NPCA"). I joined in 1996 because I was very impressed with the work NPCA does to protect national parks. I retired from the National Park Service after 32 years of serving in such roles as Superintendent, Regional Director, and Associate Director of Operations. I transitioned from government work to become a Board member for NPCA from 1994 until 2001. Today, I continue to work closely with NPCA's Southeast Regional Office, particularly on issues involving my home State of Arkansas. NPCA represents my interest in restoring the clear views and clean air in our country's national parks and wilderness areas. I have been personally involved in the protection of this region since the late 1960's.

1

4. I am also a member of Sierra Club because I support and believe in its environmental work. The Sierra Club represents my interest in taking action to improve the environment in Arkansas and around the country. My interest in protecting the environment relates to my former work as a National Park Service employee.

5. As a retired National Park Service employee, I still regularly visit both the Buffalo National River and Hot Springs National Park to visit friends and former co-workers to give informal advice. I visit the Buffalo National River approximately three times per year. The last time I was there was about 6 months ago when I spoke with the Superintendent and Assistant Superintendent for the park. I enjoy a combination of informal park discussions with outdoor activities such as hiking, canoeing, floating down the river, and conducting casual photography while I am up there.

6. When I visit the Buffalo National River area I frequently see hazy conditions when viewing vista points such as at Buffalo Point and other high points along the river. I am aware that some of this haze is caused by air pollution from human-made sources—specifically from Independence, and other coal-fired power plants in the area. This haze causes me to have concern for the state and well-being of the park's natural environment and lessens my enjoyment of the park. However, I intend to

2

continue to visit the Buffalo National River to hike, canoe, take pictures, and visit informally with friends and Park Service employees for as long as I live in Arkansas.

7. I visit the Hot Springs National Park more frequently -- approximately every six to eight weeks. My last visit there was 2 months ago. I visit with friends, former coworkers and the Park Superintendent for informal park discussions at Hot Springs National Park, along with enjoying recreational activities at the Park. I visit the unique natural hot springs, and I take my boat to go boating in the park's lakes. I see hazy conditions at Hot Springs National Park as well, and while not present all of the time, some parts of the year it is obvious, such as when viewing from the observation tower at the high point of the park. The park has two mountains with a meandering drive up to a popular observation tower with dramatic views. From this point hazy conditions and pollution are readily visible. The visible haze lessens my enjoyment at Hot Springs National Park. However, I intend to continue visiting Hot Springs National Park to boat, to enjoy the hot springs and to visit with friends and Park Service employees into the future on a regular basis for as long as I am physically able.

8. I have an academic and professional science background in geology

and hold a Master's degree in Environmental Management from Indiana University, where I've served as an adjunct lecturer for classes made up of elected public officials.  I understand the general composition of air pollution and how pollution impacts entire ecosystems.  I have read, specifically, how it can be detrimental to water and wildlife.  I am concerned by the hazy conditions and reduced visibility that I have seen at both Buffalo National River and Hot Springs National Park.  I am concerned about the impacts of haze pollution in the Parks and for my own aesthetic and recreational enjoyment of those parks.

9.  I am also concerned about the pollution in Maumelle, Arkansas where I live.  Haze and reduced visibility is especially apparent when at the Interstate 430 bridge connecting Maumelle to Little Rock.  At this vista point I can see visible air pollution over Little Rock and Maumelle and up the river looking West to Pinnacle Mountain State Park.  I notice when Pinnacle Mountain is clear or obscured from hazy conditions.  As a result, I can sometimes see the pollution here in my town, only 32 miles from the White Bluff coal plant.  For 10 years, from approximately 1998 to 2008, I served on the Pulaski County Planning Commission that includes planning for Maumelle, Little Rock, and other towns in the county.  I became alarmed during meetings of the County Board when the Mayor of Little Rock

announced that local pollution limits were exceeded.  This happened at least 5 times while I was there in the room.

10.      Given that I have heard direct warnings about the level of pollution where I live, I have public health concerns for myself, my family and friends who all live in the area.  I understand that haze-causing pollution from power plants, such as sulfur dioxide, nitrogen oxides, and particulate matter, are harmful to human health.  I know that sulfur dioxide and nitrogen oxides can increase asthma and can form particulate matter that further aggravates respiratory and heart diseases and can even cause premature death.  I am especially concerned for my daughter and granddaughter who both live nearby in Maumelle, and who have worsening allergies.  I believe that the pollution in the area that they breathe everyday does play a role in their overall health.  I am concerned about the air quality in Maumelle because of its proximity to the Independence, White Bluff, and other coal-fired power plants in the area.  I am concerned that the pollution from the plants may be impairing my family's ability to breathe clean air.

11.      Improving the air quality in the region that I live in will have a positive impact on my family's health, my recreational interests and informal work in the Buffalo National River and Hot Springs National Park, and my ability to view the scenic vistas and landscapes at those parks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Maumelle, Arkansas, on DATE: _10 - 27 - 2018_

Don Castleberry

6

## DECLARATION OF JANET NYE

I, Janet Nye, hereby declare:

1.      I am over eighteen (18) years old, I am competent to testify, and have personal knowledge of the matters in this declaration.

2.      I was raised in Little Rock, Arkansas.  I graduated from Hall High School in 1975, and I have lived in Maumelle since 1987.  I also own a second home in Gilbert, Arkansas, located less than a quarter of a mile from the Buffalo National River ("BNR").  My second home in Gilbert is located approximately 76 miles from the Independence power plant.

3.      I am a member of the National Parks Conservation Association ("NPCA").  I joined NPCA in 1990 because I am passionate about the National Parks and realized that NPCA is a strong advocate in protecting those parks.  These natural environments are what fill my soul.  I go to National Parks to renew my spirit, enjoy creation, and satisfy my curiosity about the natural world.  I depend on these parks for their beauty, and to immerse in their ecosystems, inspire my creativity, and connect with other visitors.

4.      Twenty years after joining NPCA, I enhanced my support and became a Trustee for the Parks because I wanted to make a stronger impact for NPCA's ongoing work regionally to protect the air quality, wildlife, and

water within the Parks and surrounding areas.  The mission of NPCA is to protect and enhance America's national parks for the use and enjoyment of present and future generations.  Since NPCA was established in 1919, it has advocated for protection of the natural environment, including air quality, in and around the national parks and other federal lands.  NPCA is a nationally recognized not-for-profit Section 501(c)(3) and (c)(4) membership-based public interest organization, and represents my interest in restoring the vistas and clean air in Arkansas' National Parks and wilderness areas.

5.     Because my second home in Gilbert is only a quarter mile from the boundary of the BNR, I regularly visit the river at least one to two times per month to hike, paddleboard, canoe, birdwatch, and identify wildflowers in the Spring.  I intend to continue visiting the river for the rest of my life.

6.     One of the things I love to do is hike the Buffalo River Trail.  It is designed to maximize views from the tops of bluffs above the river.  What is special about the bluff lines is the panoramic views they afford of the river valley below.  The river doesn't travel straight through the valley; it meanders, and the overlooks allow you to appreciate the variety of the BNR with its mix of sightlines, wildlife, recreation, and history.

7.     Unfortunately, sometimes my enjoyment of these vistas is diminished by hazy conditions.  In areas where the view is particularly

2

expansive, the haze makes the visibility poor.  It really bothers me when I hike up to an overlook only to find the vista obscured by haze.  It concerns me what effect these polluted conditions are having on the flora and fauna.

8.    I am aware that some of this haze is caused by air pollution from human-made sources.  I am concerned about the effect of this pollution on the wildlife and ecosystem of the BNR.  I want to be able to look out from the cliffs and see clearly expansive views looking up and down the river.  I want clear views, and to ensure that the flora and fauna, and the water and soil, have a healthy environment needed to sustain this area for generations to come.

9.    I plan to live in Arkansas permanently and improving the air quality in the BNR region will have a positive impact on the ability of myself and my family to enjoy the natural environment and scenic views of the BNR.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed in Maumelle, Arkansas, on DATE:  _11- 1- 18_

_____
Janet Nye

3

# Exhibit B

## EXHIBIT B

| Quarter Ending | Pollutant | Unit | Max Value | Date of Violation | Start Time | End Time | Duration of Violation (min) | Number of 6 min events |
|---|---|---|---|---|---|---|---|---|
| *Violations of 40 CFR § 60.42(a)(2) and Special Conditions 3(b) and 6 of Permit # 0263-AOP-R7* | | | | | | | | |
| 3-31-13 | Opacity | Unit 2 | 33 | 3/23/13 | 7:42 | 7:47 | 6 | 1 |
| 3-31-13 | Opacity | Unit 2 | 34 | 3/23/13 | 8:00 | 8:11 | 12 | 2 |
| 3-31-13 | Opacity | Unit 2 | 22 | 3/23/13 | 8:36 | 8:41 | 6 | 1 |
| 3-31-13 | Opacity | Unit 2 | 31 | 3/23/13 | 9:42 | 9:47 | 6 | 1 |
| 3-31-13 | Opacity | Unit 2 | 25 | 3/23/13 | 13:06 | 13:11 | 6 | 1 |
| 3-31-13 | Opacity | Unit 2 | 25 | 3/23/13 | 18:42 | 18:47 | 6 | 1 |
| 6-30-13 | Opacity | Unit 1 | 53 | 6/2/13 | 7:36 | 8:05 | 30 | 5 |
| 6-30-13 | Opacity | Unit 1 | 41 | 6/2/13 | 8:18 | 8:23 | 6 | 1 |
| 6-30-13 | Opacity | Unit 1 | 22 | 6/2/13 | 9:36 | 9:41 | 6 | 1 |
| 6-30-13 | Opacity | Unit 1 | 64 | 6/2/13 | 22:06 | 22:35 | 30 | 5 |
| 9-30-13 | Opacity | Unit 1 | 29 | 7/7/13 | 2:12 | 2:17 | 6 | 1 |
| 9-30-13 | Opacity | Unit 1 | 42 | 7/7/13 | 2:42 | 2:47 | 6 | 1 |
| 9-30-13 | Opacity | Unit 1 | 22 | 7/7/13 | 3:06 | 3:11 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 25 | 8/8/13 | 14:30 | 14:41 | 12 | 2 |
| 9-30-13 | Opacity | Unit 2 | 21 | 8/8/13 | 16:24 | 16:29 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 26 | 8/8/13 | 17:48 | 17:53 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 21 | 8/8/13 | 20:48 | 20:53 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 23 | 8/9/13 | 15:52 | 15:47 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 21 | 9/14/13 | 20:12 | 20:17 | 6 | 1 |
| 9-30-13 | Opacity | Unit 2 | 21 | 9/14/13 | 20:42 | 20:47 | 6 | 1 |
| 12-31-13 | Opacity | Unit 2 | 37 | 10/7/13 | 15:00 | 15:17 | 18 | 3 |
| 12-31-13 | Opacity | Unit 2 | 40 | 10/7/13 | 15:24 | 16:05 | 42 | 7 |
| 12-31-13 | Opacity | Unit 2 | 22 | 10/7/13 | 16:12 | 16:41 | 30 | 5 |
| 12-31-13 | Opacity | Unit 1 | 47 | 10/10/13 | 22:00 | 22:11 | 12 | 2 |
| 12-31-13 | Opacity | Unit 1 | 30 | 10/10/13 | 22:18 | 22:23 | 6 | 1 |
| 12-31-13 | Opacity | Unit 1 | 33 | 10/10/13 | 22:36 | 22:41 | 6 | 1 |
| 12-31-13 | Opacity | Unit 1 | 23 | 10/10/13 | 23:48 | 23:59 | 12 | 2 |
| 12-31-13 | Opacity | Unit 2 | 29 | 10/31/13 | 5:12 | 5:17 | 6 | 1 |
| 12-31-13 | Opacity | Unit 1 | 36 | 11/16/13 | 19:00 | 19:11 | 12 | 2 |
| 12-31-13 | Opacity | Unit 1 | 52 | 11/16/13 | 22:06 | 22:29 | 24 | 4 |
| 12-31-13 | Opacity | Unit 2 | 48 | 12/6/13 | 14:30 | 14:35 | 6 | 1 |
| 12-31-13 | Opacity | Unit 2 | 29 | 12/9/13 | 15:42 | 15:47 | 6 | 1 |
| 12-31-13 | Opacity | Unit 1 | 28 | 12/12/13 | 13:06 | 13:11 | 6 | 1 |
| 12-31-13 | Opacity | Unit 1 | 50 | 12/12/13 | 19:36 | 19:53 | 18 | 3 |
| 12-31-13 | Opacity | Unit 1 | 26 | 12/12/13 | 20:30 | 20:35 | 6 | 1 |
| 3-31-14 | Opacity | Unit 1 | 29 | 2/14/14 | 9:24 | 9:29 | 6 | 1 |
| 3-31-14 | Opacity | Unit 1 | 73 | 2/14/14 | 9:36 | 10:11 | 36 | 6 |
| 3-31-14 | Opacity | Unit 1 | 38 | 2/14/14 | 10:18 | 10:35 | 18 | 3 |
| 3-31-14 | Opacity | Unit 1 | 24 | 2/14/14 | 10:42 | 10:59 | 18 | 3 |
| 3-31-14 | Opacity | Unit 1 | 61 | 2/14/14 | 11:06 | 11:59 | 54 | 9 |
| 3-31-14 | Opacity | Unit 1 | 26 | 2/14/14 | 12:06 | 12:11 | 6 | 1 |

## EXHIBIT B

| Quarter Ending | Pollutant | Unit | Max Value | Date of Violation | Start Time | End Time | Duration of Violation (min) | Number of 6 min events |
|---|---|---|---|---|---|---|---|---|
| 3-31-14 | Opacity | Unit 1 | 28 | 2/14/14 | 13:06 | 13:17 | 12 | 2 |
| 3-31-14 | Opacity | Unit 1 | 37 | 2/14/14 | 17:06 | 17:35 | 30 | 5 |
| 3-31-14 | Opacity | Unit 1 | 21 | 2/14/14 | 20:18 | 20:23 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/8/14 | 17:48 | 17:59 | 12 | 2 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/9/14 | 0:42 | 0:47 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/9/14 | 12:06 | 12:11 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/9/14 | 12:36 | 12:41 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/9/14 | 16:30 | 16:35 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/9/14 | 20:30 | 20:35 | 6 | 1 |
| 3-31-14 | Opacity | Unit 2 | 21 | 3/11/14 | 12:06 | 12:11 | 6 | 1 |
| 6-30-14 | Opacity | Unit 2 | 68 | 4/25/14 | 12:00 | 12:29 | 30 | 5 |
| 6-30-14 | Opacity | Unit 2 | 29 | 4/25/14 | 12:36 | 12:59 | 24 | 4 |
| 6-30-14 | Opacity | Unit 1 | 36 | 5/4/14 | 1:42 | 2:05 | 24 | 4 |
| 6-30-14 | Opacity | Unit 1 | 38 | 5/4/14 | 6:12 | 6:23 | 12 | 2 |
| 6-30-14 | Opacity | Unit 1 | 40 | 5/4/14 | 6:36 | 6:53 | 18 | 3 |
| 6-30-14 | Opacity | Unit 1 | 32 | 5/12/14 | 9:48 | 9:53 | 6 | 1 |
| 6-30-14 | Opacity | Unit 1 | 33 | 5/12/14 | 10:48 | 10:53 | 6 | 1 |
| 9-30-14 | Opacity | Unit 1 | 32 | 9/8/14 | 20:12 | 20:17 | 6 | 1 |
| 9-30-14 | Opacity | Unit 1 | 31 | 9/8/14 | 20:36 | 20:41 | 6 | 1 |
| 9-30-14 | Opacity | Unit 1 | 21 | 9/8/14 | 20:48 | 20:53 | 6 | 1 |
| 9-30-14 | Opacity | Unit 1 | 22 | 9/8/14 | 21:24 | 21:29 | 6 | 1 |
| 9-30-14 | Opacity | Unit 1 | 37 | 9/16/14 | 10:36 | 10:59 | 24 | 4 |
| 9-30-14 | Opacity | Unit 1 | 33 | 9/16/14 | 12:12 | 12:41 | 30 | 5 |
| 9-30-14 | Opacity | Unit 1 | 21 | 9/16/14 | 13:12 | 13:17 | 6 | 1 |
| 12-31-14 | Opacity | Unit 2 | 27 | 10/6/14 | 18:24 | 18:41 | 18 | 3 |
| 12-31-14 | Opacity | Unit 2 | 23 | 10/6/14 | 19:42 | 19:47 | 6 | 1 |
| 12-31-14 | Opacity | Unit 2 | 24 | 10/6/14 | 20:12 | 20:17 | 6 | 1 |
| 12-31-14 | Opacity | Unit 2 | 64 | 11/24/14 | 18:42 | 19:41 | 60 | 10 |
| 12-31-14 | Opacity | Unit 2 | 23 | 11/24/14 | 19:48 | 19:53 | 6 | 1 |
| 12-31-14 | Opacity | Unit 1 | 38 | 11/29/14 | 10:18 | 10:23 | 6 | 1 |
| 12-31-14 | Opacity | Unit 1 | 37 | 11/29/14 | 10:42 | 10:53 | 12 | 2 |
| 12-31-14 | Opacity | Unit 1 | 49 | 11/29/14 | 11:00 | 11:17 | 18 | 3 |
| 12-31-14 | Opacity | Unit 1 | 27 | 11/29/14 | 11:24 | 11:47 | 24 | 4 |
| 12-31-14 | Opacity | Unit 1 | 23 | 11/29/14 | 18:42 | 18:47 | 6 | 1 |
| 12-31-14 | Opacity | Unit 1 | 21 | 11/29/14 | 20:24 | 20:29 | 6 | 1 |
| 12-31-14 | Opacity | Unit 1 | 22 | 11/29/14 | 20:42 | 20:47 | 6 | 1 |
| 12-31-14 | Opacity | Unit 1 | 24 | 11/29/14 | 20:54 | 20:59 | 6 | 1 |
| 3-31-15 | Opacity | Unit 1 | 26 | 1/3/15 | 17:24 | 17:29 | 6 | 1 |
| *Violations of 40 CFR § 60.42(a)(2) and Special Conditions 3(b) and 6 of Permit # 0263-AOP-R8* | | | | | | | | |
| 3-31-15 | Opacity | Unit 1 | 24 | 2/2/15 | 10:06 | 10:17 | 12 | 2 |
| 3-31-15 | Opacity | Unit 2 | 46 | 2/3/15 | 6:12 | 6:29 | 18 | 3 |
| 3-31-15 | Opacity | Unit 2 | 33 | 2/3/15 | 6:36 | 6:47 | 12 | 2 |

**EXHIBIT B**

| Quarter Ending | Pollutant | Unit | Max Value | Date of Violation | Start Time | End Time | Duration of Violation (min) | Number of 6 min events |
|---|---|---|---|---|---|---|---|---|
| 3-31-15 | Opacity | Unit 1 | 36 | 2/18/15 | 1:18 | 1:23 | 6 | 1 |
| 3-31-15 | Opacity | Unit 1 | 30 | 2/18/15 | 5:42 | 5:53 | 12 | 2 |
| 3-31-15 | Opacity | Unit 1 | 24 | 2/18/15 | 6:12 | 6:23 | 12 | 2 |
| 3-31-15 | Opacity | Unit 1 | 28 | 2/18/15 | 18:18 | 18:23 | 6 | 1 |
| 3-31-15 | Opacity | Unit 2 | 40 | 3/4/15 | 6:24 | 6:29 | 6 | 1 |
| 3-31-15 | Opacity | Unit 2 | 27 | 3/4/15 | 9:24 | 9:47 | 24 | 4 |
| 3-31-15 | Opacity | Unit 1 | 51 | 3/9/15 | 5:30 | 5:41 | 12 | 2 |
| 9-30-15 | Opacity | Unit 2 | 28 | 7/8/15 | 13:18 | 13:23 | 6 | 1 |
| 9-30-15 | Opacity | Unit 2 | 34 | 7/8/15 | 13:30 | 13:41 | 12 | 2 |
| 9-30-15 | Opacity | Unit 2 | 39 | 9/1/15 | 13:48 | 14:05 | 18 | 3 |
| 9-30-15 | Opacity | Unit 2 | 31 | 9/1/15 | 14:12 | 14:17 | 6 | 1 |
| 9-30-15 | Opacity | Unit 1 | 53 | 9/13/15 | 12:48 | 12:59 | 12 | 2 |
| 9-30-15 | Opacity | Unit 1 | 41 | 9/13/15 | 13:06 | 13:17 | 12 | 2 |
| 9-30-15 | Opacity | Unit 1 | 37 | 9/13/15 | 15:24 | 15:29 | 6 | 1 |
| 9-30-15 | Opacity | Unit 1 | 66 | 9/13/15 | 15:42 | 16:11 | 30 | 5 |
| 9-30-15 | Opacity | Unit 1 | 21 | 9/13/15 | 16:24 | 16:29 | 6 | 1 |
| 9-30-15 | Opacity | Unit 1 | 31 | 9/13/15 | 16:36 | 16:59 | 24 | 4 |
| 9-30-15 | Opacity | Unit 1 | 26 | 9/13/15 | 17:24 | 17:41 | 18 | 3 |
| *Violations of 40 CFR § 60.42(a)(2) and Special Conditions 3(b) and 6 or Permit # 0263-AOP-R9* | | | | | | | | |
| 9-30-15 | Opacity | Unit 2 | 25 | 9/28/15 | 13:48 | 13:53 | 6 | 1 |
| 12-31-15 | Opacity | Unit 2 | 24 | 12/15/15 | 6:42 | 6:53 | 12 | 2 |
| *Violations of 40 CFR § 60.42(a)(2) and Special Conditions 3(b) and 6 of Permit # 0263-AOP-R10* | | | | | | | | |
| 6-30-16 | Opacity | Unit 2 | 43 | 6/21/16 | 14:30 | 14:41 | 12 | 2 |
| 12-31-16 | Opacity | Unit 1 | 44 | 12/10/16 | 5:24 | 5:59 | 36 | 6 |
| 12-31-16 | Opacity | Unit 1 | 57 | 12/10/16 | 6:06 | 6:29 | 24 | 4 |
| 12-31-16 | Opacity | Unit 1 | 39 | 12/10/16 | 6:36 | 6:59 | 24 | 4 |
| 12-31-16 | Opacity | Unit 1 | 23 | 12/10/16 | 7:06 | 7:23 | 18 | 3 |
| 12-31-16 | Opacity | Unit 1 | 22 | 12/10/16 | 12:30 | 12:35 | 6 | 1 |
| 12-31-16 | Opacity | Unit 1 | 40 | 12/13/16 | 22:30 | 22:59 | 30 | 5 |
| 12-31-16 | Opacity | Unit 1 | 35 | 12/13/16 | 23:12 | 23:59 | 48 | 8 |
| 12-31-16 | Opacity | Unit 1 | 22 | 12/14/16 | 2:18 | 2:23 | 6 | 1 |
| 12-31-16 | Opacity | Unit 1 | 22 | 12/14/16 | 2:30 | 2:59 | 30 | 5 |
| 12-31-16 | Opacity | Unit 1 | 21 | 12/14/16 | 3:12 | 3:17 | 6 | 1 |
| 12-31-16 | Opacity | Unit 1 | 21 | 12/14/16 | 3:54 | 3:59 | 6 | 1 |
| 3-31-17 | Opacity | Unit 1 | 92 | 2/16/17 | 5:00 | 6:29 | 90 | 15 |
| 3-31-17 | Opacity | Unit 1 | 82 | 2/16/17 | 6:36 | 7:35 | 60 | 10 |
| 3-31-17 | Opacity | Unit 1 | 22 | 2/16/17 | 7:42 | 7:47 | 6 | 1 |
| 3-31-17 | Opacity | Unit 1 | 81 | 2/16/17 | 9:00 | 12:05 | 186 | 31 |
| 3-31-17 | Opacity | Unit 1 | 24 | 2/16/17 | 12:12 | 12:35 | 24 | 4 |
| 3-31-17 | Opacity | Unit 1 | 38 | 2/16/17 | 12:42 | 13:05 | 24 | 4 |
| | | | Totals | | | | 1938 | 323 |