IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| SIERRA CLUB AND | ) | |
| NATIONAL PARKS CONSERVATION | ) | |
| ASSOCIATION, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | NO. 4:18-cv-00854-KGB |
| | ) | |
| ENTERGY ARKANSAS, LLC, ENTERGY | ) | |
| POWER, LLC, AND ENTERGY | ) | |
| MISSISSIPPI, LLC, | ) | |
| Defendants. | ) | |

## OPENING SUPPLEMENTAL BRIEF OF
## THE ARKANSAS AFFORDABLE ENERGY COALITION

COMES NOW, the Arkansas Affordable Energy Coalition ("Coalition"), by and through its undersigned counsel, and submits the following Opening Supplemental Brief addressing the issues raised in the Court's September 30, 2019 Order (ECF No. 53). Before addressing the specific issues listed in the Court's Order, the Coalition addresses two preliminary issues related to the issues raised by the Court – (a) the Plaintiffs' standing to bring this lawsuit, and (b) whether a proposed intervenor such as the Coalition must demonstrate Article III standing.

## SUMMARY OF ARGUMENT

I.     The Court should first determine that the Plaintiffs lack standing based on the allegations of their Complaint. Because the Plaintiffs lack standing, the Court does not have jurisdiction over their Complaint.

II.     Even if the Court determines that Plaintiffs have standing, the Coalition need not satisfy Article III standing requirements because the Coalition has not invoked the Court's jurisdiction and seeks to intervene in support of the Defendants.

III.     Further, even if the Coalition had to demonstrate an Article III injury, the Coalition has alleged an imminent economic injury based on the allegations of the Plaintiff's Complaint. The Defendants, including Entergy Arkansas, LLC ("EAL" or "Entergy"), are public utilities operating under the authority of the Arkansas Public Service Commission ("APSC").   If the Court grants the relief sought by Plaintiffs' Complaint, the Court must enjoin Defendants from operating the White Bluff and Independence power plants unless and until the Defendants install additional costly control technology.   Such action would require the Defendants to obtain replacement power, impacting the electricity rates imposed on members of the Coalition nearly automatically through EAL's Energy Cost Recovery Rider ("Rider ECR"), which is a fuel adjustment clause re-determined annually based upon a math formula.   Arkansas Electric Cooperative Corporation ("AECC"), which is another utility owner of the power plants at issue, also has an automatic fuel adjustment tariff called the Fuel and Purchased Energy Adjustment Rider.   Moreover, if EAL and the other utility owners of Independence and White Bluff install the costly controls, the ratepayers of those utilities will have to pay those costs through increased electricity rates.   On the other hand, if EAL and the other utility owners elect to shut down the plants, the ratepayers of those utilities will have to pay for the costs of replacement capacity on a permanent basis.   These imminent injuries to the Coalition's members (increased electric rates due to automatic rate adjustment clauses, court ordered installation of scrubbers, or the costs of replacement capacity for White Bluff and Independence) are caused by and traceable to the relief requested in the Plaintiffs' Complaint.   The relief sought by the Coalition – dismissal – would redress the injury to the Coalition.

IV.     Granting the relief requested by the Plaintiffs would usurp the State's authority because it is a collateral attack of air permit decisions made by the Arkansas Division of

Environmental Quality ("ADEQ").   It would also undermine the APSC's authority to determine whether the Defendants' investments in additional control technology, or their alternative election to shut down the plants and obtain replacement capacity, were prudent.

V.     Under *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010), the Court cannot entertain the Plaintiffs' claims because they are time-barred.   The applicable statute of limitations, 28 U.S.C. § 2642, is jurisdictional, goes to the Court's subject matter jurisdiction, and cannot be waived.   Notwithstanding whether it is jurisdictional, the Defendants cannot waive the applicable statute of limitations because doing so affects the public interest – the provision of low cost electricity to the State of Arkansas.

VI.    The allegations in the Plaintiffs' Amended Complaint regarding alleged violations of opacity limits in the air permit suffer from the same jurisdictional Article III standing defects and time bars as the allegations in the original Complaint.

VII.   The Coalition reserves the right to file motions to dismiss all or part of the Plaintiffs' Complaint and to expand further on the Coalition's arguments herein if it is granted status as an intervenor.

## ARGUMENT

### I.     THE COURT SHOULD DETERMINE THAT THE PLAINTIFFS LACK STANDING BASED ON THE ALLEGATIONS IN THEIR COMPLAINT.

In its September 30, 2019 Order, the Court asked for supplemental briefing on issues relating to the proposed intervenors' standing, and the Court's subject matter jurisdiction relating to defenses to the Plaintiffs' Complaint (ECF No. 53 at 10).   Before taking up those issues, however, the Court must determine whether the Plaintiffs themselves have satisfied the requirements for Article III standing.   Otherwise, the Court would be proceeding based on

"hypothetical jurisdiction," an approach the United States Supreme Court has rejected.   *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).   As the Court stated:

> We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."

523 U.S. 94–95 (1998) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).   *See Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, 551 F.3d 812, 816 (8th Cir. 2009) ("It is a verity that federal courts are courts of limited jurisdiction.   Parties may not enlarge that jurisdiction by waiver or consent. . . . Likewise, a court may not assume 'hypothetical jurisdiction' to decide 'contested questions of law when its jurisdiction is in doubt.'") (citation omitted); *see also Duit Constr. Co. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015).[1]

If the Plaintiffs lack standing, then there is no case or controversy to support this Court's jurisdiction,[2] and there is no need for the Coalition to seek intervention.   Many of the questions raised by the Defendants and the Court in its September 30, 2019 Order regarding the Coalition's standing apply with even greater force to the Plaintiffs and their members.[3]   If the Plaintiffs have

---

[1]  *See also* John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1225-26 (1993) ("Standing is, after all, a constitutional requirement.   Assuming standing on the basis of the pleadings would be tantamount to assuming Article III jurisdiction.   The proper approach is just the opposite—to 'presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.'") (quotation marks and citations omitted).

[2]  *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 966 (8th Cir. 2016) ("*OOIDA I*") (noting that there is no case or controversy unless the party initiating the action has standing to sue).

[3]  It is telling that the Defendants challenge the proposed intervenors' standing but do not challenge the Plaintiffs' standing.   This raises the question of whether, in addition to the Plaintiffs' lack of standing, there is a true controversy in this case between the Plaintiffs and Defendants necessary to support the Court's Article III jurisdiction.   That is of no consequence as to the issue of the

not alleged a concrete and particularized injury in fact to one of their members that is actual or imminent, that is traceable and caused by the Defendants' conduct, and that will be addressed by the relief sought by the Plaintiffs, then there is no lawsuit and the Court should not proceed further. This is true regardless of how many statutory or permit violations the Plaintiffs attempt to allege in their Amended Complaint.   Consequently, the Court should examine whether the Plaintiffs have alleged injury, causation and redressability sufficient to support Article III standing before proceeding with the case.

As the Court points out in its September 30, 2019 Order, a party must satisfy three requirements to establish Article III standing:

> 1.      The Plaintiffs must have suffered an injury in fact – invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.
>
> 2.      There must be a causal connection between that injury and the conduct by the Defendants that is complained of – the injury has to be "fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."
>
> 3.      It must be likely that the injury complained of will be redressed by a favorable decision.

Order, ECF No. 53 at 11-12 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

As the Supreme Court has noted, "the first and foremost of standing's elements is injury in fact." *Steel Co.*, 523 U.S. at 103.   ("'[T]he irreducible constitutional minimum of standing' requires the party invoking federal jurisdiction to identify a 'concrete and particularized' injury-in-fact that is 'actual or imminent, not conjectural or hypothetical.'") (quoting *Lujan*, 504 U.S. at 560).   The injury must be "fairly traceable to the challenged action of the defendant and likely

---

Plaintiffs' standing, however, because the Court must scrutinize the plaintiffs standing and may do so *sua sponte*. *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016).

to be redressed by a favorable judicial decision." *Id.*   To show injury in fact, a plaintiff must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"   Order, ECF No. 53 at 13-14 (quoting *Spokeo Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016); *Lujan*, 504 U.S. at 560).   *See also OOIDA I*, 831 F.3d at 966.   With regard to environmental cases, courts must carefully distinguish between injury to the petitioner and injury to the environment.   Article III standing requires injury to the *petitioner*.   Injury to the environment is *insufficient*.   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 537 (5th Cir. 2019).   A review of the Plaintiffs' Complaint in this case demonstrates that Plaintiffs have not satisfied these requirements.

### A.    Plaintiffs Have Not Shown Injury In Fact.

Although the Plaintiffs may have alleged various Clean Air Act violations, neither the Complaint (nor the Amended Complaint) offer any facts explaining how any of those alleged violations have resulted in a concrete and particularized injury to any of the Plaintiffs' members. Article III standing requires more than a bare allegation of a statutory violation.   *Spokeo*, 136 S.Ct. at 1548, 1549 (Congress cannot erase the Article III injury requirement by statutorily granting a person the right to sue; "Article III standing requires a concrete injury even in the context of a statutory violation.").

The Complaint alleges that "as shown, in part, by declarations attached to this Complaint . . . the illegal and excessive discharges of pollution from the Independence and White Bluff plants injure Plaintiffs' members' diverse *interests*."   ECF No. 1, ¶ 25 (emphasis added). Injury to a cognizable "interest" is not sufficient, however.   *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).   There must be a concrete injury to the Plaintiffs or one or their members that is particular to the person complaining of the injury.   *Id.*; *Lujan*, 504 U.S. at 563 ("[T]he 'injury in

fact' test requires more than an injury to a cognizable interest.   It requires that the party seeking review be himself among the injured.").

Both the Complaint and the attached declarations fail to provide an explanation of how any of the alleged violations of the Clean Air Act have injured any particular member of the Plaintiffs' organizations.[4]   There is no allegation of any concrete injury to any of the Plaintiffs' members who submitted declarations.[5]   *Compare OOIDA I*, *supra* (case dismissed for failure to demonstrate concrete injury).   At most, Plaintiffs' members express only a general "concern" about public health effects, the members' interests, and haze.   In particular:

- Stewart Declaration, p. 3 - "*concerned* about the air quality . . . and that pollution may be impairing my family's ability to breath clean air."   p. 4 "If the local fish are contaminated, I am also *concerned* for the health of larger mammals in the area, and for the health of myself and my family." (Emphasis added).

- Allen Declaration – p. 4 "I am often *concerned* about the impacts of pollution from Arkansas power plants on my own health, and the health of my family and friends in the area. I have a few friends that have asthma who live in Dover or nearby, and I am *concerned* about the impact of air pollution upon their health.   Because of my *public health concerns*, I avoid prolonged exposure in areas adjacent to power plants in Arkansas." (Emphasis added).

- Castleberry Declaration p. 2 "This haze causes me to have *concern* for the state and well-being of the park's natural environment and lessens my enjoyment of the park.";   p. 4 "I am also *concerned* about the pollution in Maumelle, Arkansas where I live."; p.

---

[4] Although each of the six "claims for relief" in the Complaint (paragraphs 81 – 104) purport to demonstrate a Clean Air Act violation, none of the "claims for relief" explains or demonstrates how the alleged violation caused a concrete and particularized injury to any of the Plaintiffs' members that submitted declarations to establish the Plaintiffs' standing.

[5] In the recent State of the Air Report issued by the Arkansas Division of Environmental Quality, the State of Arkansas is in compliance with all primary and secondary health and welfare based National Ambient Air Quality Standards ("NAAQS").   ADEQ State of the Air Report 2019, p. 13, attached hereto as Exhibit A at A-20.   In fact, the level of sulfur dioxide ($SO_2$) in the State of Arkansas, which is the primary pollutant that would be controlled by scrubbers at the White Bluff and Independence facilities which the Plaintiffs seek to achieve through their Complaint, is less than 10% of the NAAQS level.   *See also*, ADEQ Phase II RHR SIP Responsive Summary, Response to Comment 3, p. 4, attached hereto as Ex. B at B-4.

5 "I have *public health concerns* for myself, my family and friends who all live in the area." (Emphasis added).

- Nye Declaration - p. 2 "sometimes my enjoyment of these vistas [at the Buffalo River Trail] is diminished by hazy conditions"; "it *concerns me* what effect these polluted conditions are having on the flora and fauna"; "I am *concerned about* the effect of this pollution on the wildlife and ecosystem of the BNR." (Emphasis added).

None of these allegations establishes injury in fact.   No concrete injury to any declarant is stated in any of these declarations.   Bare complaints about injury to the environment are not sufficient.   *Friends of the Earth*, 528 U.S. at 181.   Furthermore, the Plaintiffs' members' "concerns" about the effects of the challenged conduct are insufficient.   ECF No. 1 at ¶ 24.   Fear of harm does not satisfy the Article III standing requirements.   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020).   As the Court observed in its September 30, 2019 Order:[6]

> [T]he fear of possible injury . . . [is] insufficient to satisfy the requirement of the standing doctrine that plaintiffs," including organizations, "demonstrate a judicially cognizable injury." *Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir. 1989). "'[C]onclusory allegations' about an injury are insufficient to establish standing." *NHH Investor Grp. v. DFH Watford, LLC*, No. 4:15-CV-027, 2015 WL 12867309, at *2 (D.N.D. Oct. 8, 2015) (quoting *Assoc. Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 685, 687 (8th Cir. 1979)).

Nor is an "interest" in a problem sufficient.   *Sierra Club v. Morton*, 405 U.S. at 739.

Furthermore, Plaintiffs' allegations of concern about haze and pollution are generally available grievances that are equally applicable to any member of the public at large.   Such generalized grievances that do not allege a distinctive, concrete harm to the plaintiff are insufficient to establish Article III standing.   *Lujan*, 504 U.S. at 573.

---

[6] Order, ECF No. 53 at 21.

B.     **Plaintiffs' Allegations Do Not Demonstrate That the Alleged Injury Is Fairly Traceable to the Defendants' Challenged Conduct.**

Plaintiffs also fail to demonstrate traceability and causation to establish Article III standing. At the outset, the allegations in the Complaint and the attached declarations do not satisfy the geographic and temporal requirements for an Article III injury.   It is not sufficient to allege that Plaintiffs were "in the vicinity" of an affected area.   *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 886-87 (1990).   Here, Plaintiffs have not alleged facts to show they were at a specific location (geographical nexus) at a time (temporal nexus) when alleged illegal emissions from White Bluff or Independence were causing illegal haze.   Without a geographical and temporal nexus, Plaintiffs cannot demonstrate traceability.   *Ctr. for Biological Diversity*, 937 F.3d at 533.

Even if Plaintiffs could show proximity to the plants at issue or an affected area, the declarations supporting the Complaint express general grievances about "haze" with no indication of where any purported haze happened or when it happened.   Nor do the declarations specify the amount of haze.   Without knowing where and when the alleged injury happened to any of the Plaintiffs' members who submitted declarations, it is impossible to determine whether the alleged injury was caused by the Defendants' alleged illegal conduct.

The declarations also fail entirely to tie any haze that may have existed to White Bluff or Independence.   Haze could come from any number of sources, including natural events, such as wildfires, mobile sources and "area sources."[7]   Furthermore, according to the Arkansas Regional Haze Rule State Implementation Plan ("Arkansas RHR SIP") that was recently approved by the United States Environmental Protection Agency ("EPA"), all the $SO_2$ point sources in Arkansas

---

[7] Arkansas area sources and natural sources together cause more light extinction, i.e., haze, at the two Class I areas located in Arkansas than all Arkansas point sources combined, which would include White Bluff and Independence.   *See* ADEQ Phase II RHR SIP Narrative, pp. 38-40, attached hereto as Ex. C, at C-41 to -43.

together (including White Bluff and Independence) contribute less than 3% of light extinction, *i.e.*, haze, at the Arkansas Regional Haze Rule ("RHR") Class I areas of the Buffalo River National Park and Caney Creek.[8]   Thus, it is highly unlikely that White Bluff and Independence caused any "haze" injury to the Plaintiffs.

Without knowing where and when the alleged injury happened to any of the Plaintiffs' members who submitted declarations, it is impossible to determine whether the alleged injury was caused by the Defendants' alleged illegal conduct.   Plaintiffs have failed to demonstrate traceability.

### C.    Plaintiffs Cannot Demonstrate Redressability.

Likewise, Plaintiffs have not satisfied the redressability requirement for Article III standing.   The relief sought by Plaintiffs' Complaint would not remedy the Plaintiffs' alleged injury.   As indicated above, White Bluff and Independence together with all the other $SO_2$ point sources in Arkansas contribute less than 3% of visibility impairment or haze ("three percent of total light extinction").   Even if all these $SO_2$ point sources were completely shut down, it would not alleviate the haze concerns alleged in the Complaint.   Haze would still exist from other sources – for example, natural and controlled fires, mobile sources, agricultural sources, and point sources located outside Arkansas.

In particular, the Plaintiffs seek a declaratory judgment that Defendants are violating the Clean Air Act (ECF No. 1, ¶ 105), and for civil penalties under the Clean Air Act (ECF No. 1, ¶ 109); such relief does not redress the type of Article III injury that is required for standing, however.   *Steel Co.*, 523 U.S. at 105-106.   Plaintiffs also ask the Court to enjoin Defendants from operating the Independence and White Bluff plants except in accordance with the Clean Air Act;

---

[8]  ADEQ Phase II RHR SIP Narrative, p. 34-35, attached hereto as Exhibit C, at C-37 and -38.

however, this is a generalized remedy that benefits the public at large and does not redress a particularized Article III injury.   *Id.* at 106 (vindication of the law by an order to obey the law is an undifferentiated public interest which is insufficient for Article III standing).   Plaintiffs additionally ask for remediation of "environmental damage" (ECF No. 1, ¶ 108) and for beneficial mitigation projects to enhance public health and the environment (ECF No. 1, ¶ 110); however, again, these requests for relief do not redress the type of concrete, particularized Article III injury *to the Plaintiffs' members* that is required for standing.

Finally, Plaintiffs ask that the Court order Defendants "to submit required permit applications, obtain required permits, comply with the requirements of any permits obtained, and submit correct compliance certifications."   (ECF No. 1, ¶ 107).   Again, this relief might benefit the public at large, but it would not redress the type of concrete, particularized Article III injury required for standing as to any of the Plaintiffs' members.

In addition to the fact that the Plaintiffs' requested relief would not redress their purported injuries, they request relief from the wrong party.   Plaintiffs seek an order directing the Defendants to submit an air permit application in order to force the ADEQ to issue a new permit to the Defendants that would require the installation of Best Available Control Technology ("BACT") at White Bluff and Independence, actions that Plaintiffs claim should have been done ten years ago.   This relief depends on action by another party, *i.e.*, ADEQ, that the Plaintiffs have not sued; thus, it is insufficient to support Article III standing.   *See Duit Constr. Co.*, 796 F.3d 938.[9]

---

[9] Plaintiff Sierra Club had its chance to appeal ADEQ's decision not to require Prevention of Significant Deterioration review and a BACT determination for the White Bluff and Independence air permits when Sierra Club commented on those air permits issued in 2012 and 2011.   *See* ADEQ's Response to Comments, White Bluff Title V Permit No. 0263-AOP-R7, attached as Exhibit D-1 through -24, and ADEQ's Response to Comments, Independence Title V Permit No.

## II.    THE COALITION DOES NOT HAVE TO SHOW ARTICLE III STANDING SINCE IT HAS NOT INVOKED THE JURISDICTION OF THE COURT.

In its September 30, 2019 Order, the Court stated that the Eighth Circuit requires a prospective intervenor to establish Article III standing in addition to the Fed. R. Civ. Proc. 24 requirements for intervention, citing *National Parks Conservation Association v. EPA*, 759 F3d 969 (8th Cir. 2014), and *U.S. v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009).   The Coalition recognizes that prior Eighth Circuit precedent holds that *any* intervenor must demonstrate Article III standing in addition to the requirements for intervention; however, these Eighth Circuit cases have been limited by recent United States Supreme Court cases, and the requirement for the Coalition to demonstrate standing as an intervenor does not apply in this case.

The standing requirement limits a party's ability to invoke the power and jurisdiction of the Court.   Only the Plaintiffs here have invoked the power of this Court.   Because the Coalition has not asserted any claim, it has not invoked the powers of the Court or the Court's jurisdiction. Indeed, the Coalition contends that the Court must dismiss the Plaintiffs' Complaint, and seeks to intervene in support of the Defendants.[10]   As a result, the requirements to demonstrate Article III standing do not apply to the Coalition in this case.

*National Parks Conservation Association* and *Metropolitan St. Louis Sewer District* relied on *Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996), the seminal Eighth Circuit case on this question.   In that case, Judge Richard Arnold writing for a divided panel over 20 years ago

---

0449-AOP-R7, attached as Exhibit E -1 through -10.   There is no record on the Arkansas Pollution Control and Ecology permit appeals webpage that it did so.   *See*, http://www.adeq.state.ar.us/commission/p.aspx.   Consequently, as discussed more fully below, this lawsuit is an impermissible collateral attack on ADEQ's air permit decisions.

[10]  If there is a true dispute in this case between the Plaintiffs and the Defendants, then presumably the Defendants will also seek dismissal of the Complaint.

acknowledged a split in the Circuit Courts that the Supreme Court had not directly addressed, but held that *any* proposed intervenor must demonstrate Article III standing:

> An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well.

85 F.3d at 1300.

This Court must examine the Eighth Circuit's broad holding in *Mausolf* in light of subsequent U.S. Supreme Court cases addressing the requirement of Article III standing for intervenors.   *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S.Ct. 1645 (2017); *Va. House of Delegates v. Bethune-Hill*, 139 S.Ct. 1945 (2019).   These cases illustrate that a proposed intervenor must demonstrate standing only when the intervenor seeks to affirmatively invoke a court's jurisdiction or if the intervenor seeks to pursue relief not requested by a plaintiff.   Thus, the U.S. Supreme Court has limited (if not overruled) the Eighth Circuit's holding in *Mausolf* and subsequent cases, so those cases are not applicable to the Coalition's motion to intervene.

In *Town of Chester*, the Supreme Court stated: "Must a litigant possess Article III standing in order to intervene of right under Federal Rule of Civil Procedure 24(a)(2)?   . . . [W]e hold – that such an intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief *not requested by a plaintiff*."   137 S. Ct. at 1648 (emphasis added).   Accordingly, the Supreme Court recognized that, if an intervenor was not pursuing relief, then it need not demonstrate Article III standing.[11]

---

[11]  The Eighth Circuit recognized this holding in *Liddell v. Special Administrative Board*, 894 F.3d 959 (8th Cir. 2018), which involved a new party seeking to intervene as a plaintiff in litigation that had been ongoing for decades in order to challenge the implementation of a long-standing consent decree.

In *Virginia House of Delegates*, the Court further limited the standing requirement for intervenors to a litigant "invoking the court's jurisdiction." 139 S.Ct. at 1951. There, the appellant Virginia House of Delegates had participated as an intervenor in litigation in the lower courts in support of the defendants, or as an appellee. Ultimately, the House of Delegates sought to appeal an adverse decision by the trial court without the presence of the original defendant. The Supreme Court held that, because the original defendant was no longer involved, the intervenors had to independently demonstrate Article III standing when appealing the lower court's order. *Id*. The Court stated:

> Before the District Court, the House participated in both bench trials as an intervenor in support of the State Defendants. And in the prior appeal to this Court, the House participated as an appellee. Because neither role *entailed invoking a court's jurisdiction*, it was not previously incumbent on the House to demonstrate its standing.

*Id.* (emphasis added).

The Coalition has not invoked this Court's jurisdiction, nor has it affirmatively sought relief from the Court. Instead, the Coalition seeks to intervene in support of the Defendants – in opposition to Plaintiffs' claims and their assertion that they have standing to assert them. Thus, the applicable law does not require the Coalition to demonstrate Article III standing.

## III. THE COALITION HAS SHOWN AN IMMINENT ECONOMIC INJURY THAT MEETS THE REQUIREMENTS FOR ARTICLE III STANDING.

As the Coalition has explained, the Court need not undertake an analysis of the Coalition's standing to intervene in this case because (1) the Plaintiffs themselves lack standing, depriving the Court of subject matter jurisdiction in the first instance; and (2) since the Coalition has not—and does not—seek any affirmative relief from the Court, the Coalition need not satisfy ordinary Article III standing requirements. In the alternative, even if the Court determines that it must

evaluate the Coalition's standing to intervene, the Coalition more than satisfies the Article III requirements because the relief sought by the Plaintiffs—if ordered by the Court—will have direct and negative consequences to the Coalition's members.   Accordingly, the Court should conclude that the Coalition has standing to intervene.

At the outset, one should note that the Coalition has been granted intervenor status by the Eighth Circuit based on the same claims of economic injury as are present in this case.   In the Plaintiffs' appeal to the Eighth Circuit of the EPA's Federal Implementation Plan ("FIP") for the Arkansas Regional Haze Rule (Docket 16-4309), the Eighth Circuit issued an order on December 30, 2016 allowing the Coalition to intervene based on its identical claims of economic injury.   *See* Coalition Motion to Intervene, Eighth Circuit Docket No. 16-4309, attached hereto as Exhibit F, and Order Granting Motion to Intervene, Eighth Circuit Docket No 16-4309, attached hereto as Exhibit G.

More recently, the Sierra Club and National Parks Conservation Association filed a new challenge at the Eighth Circuit to EPA's approval of the replacement Arkansas RHR SIP.   *Sierra Club v. U.S. EPA, et al*, Docket No. 19-3526.   The Coalition sought to intervene in that case based on claims of economic injury.   *See* Coalition's December 23, 2019 Motion to Intervene, attached as Exhibit H.   On January 8, 2020 the Eighth Circuit granted the Motion giving the Coalition intervenor status. *Se*e Order dated January 8, 2020, attached hereto as Exhibit I.

In analyzing both Article III standing and requests for intervention, the Court should follow two guidelines set forth in applicable case law.   First, the Court must make its determination based upon the allegations of the Plaintiff's Complaint, not the proposed settlement agreement.   *Nat'l Parks Conservation Ass'n*, 759 F. 3d at 973 (holding that a district court's decision to deny an intervention based upon the plaintiffs' brief in response to intervention which "recharacterized

their case . . . was improper").   Second, this Court should presume that the parties will follow existing law as they implement the relief sought in the plaintiffs' Complaint.   *See, e.g.*, *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) ("Once approved by the EPA, the TMDL's wasteload allocations are binding on future permits unless the EPA approves a replacement TMDL.   To say that the permit will comply with the TMDL is not 'conjectural.'").   Applying those guidelines here to assess the elements of standing (as discussed above) demonstrates the Coalition has standing to intervene.

### A.  The Coalition Will Suffer Injury In Fact.

To establish injury in fact, a party must show that it will suffer "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."   *Spokeo*, 136 S.Ct. at 1547 (*quoting Lujan*, 504 U.S. at 560-61).   The Coalition anticipates that the Plaintiffs may contend that the Coalition cannot demonstrate injury in fact because the threatened harm on which the Coalition bases its standing depends on future action of the Court and perhaps state regulators.   But the Supreme Court has established that standing may be based on future injury when the "threatened injury" is "certainly impending," or there is "a substantial risk that the harm will occur."   *Clapper*, 568 U.S. at 409, 414 n.5) (*quoting Lujan*, 504 U.S. at 565 n.2.); *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).   Indeed, "[a]n injury may be imminent even though contingent upon an unfavorable outcome in litigation."   *Kane Cty. v. United States*, 928 F.3d 877, 888 (10th Cir. 2019).

As demonstrated below, and in the declaration attached hereto as Exhibit J, the Coalition has shown that there is a substantial risk that the relief sought in the Plaintiffs' complaint will cause actual, concrete harm to members of the Coalition.   The primary request in Plaintiffs' Complaint is that the Court "[p]ermanently enjoin Defendants from operating the Independence and White

Bluff plants except in accordance with the Clean Air Act"[12] – effectively shutting down the power plants until they comply with Plaintiffs' interpretation of the Clean Air Act, which would require the installation of costly pollution control technology.   As established in the accompanying declaration of M. Shawn McMurray, which is attached hereto as Exhibit J, shutting down these plants would require EAL and the other utility owners to immediately obtain replacement power to provide electricity service to their customers – detrimentally impacting the rates that at least one Coalition member and other ratepayers automatically pay through EAL's Rider ECR.[13]

Rider ECR recovers EAL's net fuel and purchased energy costs; it is annually re-determined based upon a mathematical formula.   The Rider is redetermined each year in a filing made on or about March 15, with any change in rates effective on April 1.   Since the adjustment to Rider ECR is based on a formula, any change in fuel expense or purchased energy expense—two inputs to the formula—will change the redetermined ECR rate nearly automatically.   Based on past practice and empirical history, if the coal plants in question are shut down and EAL is forced to obtain replacement power, the ECR rate charged to Coalition members and other ratepayers will increase as a result – nearly automatically.   The APSC has very limited discretion

---

[12] Plaintiffs' Complaint (ECF No. 1 at 28).

[13] EAL has admitted in numerous other contexts that any curtailment of operations at the two power plants will require it to obtain replacement energy.   For example, EAL filed the declaration of its employee, Kurt Castleberry, in the Eighth Circuit Court of Appeals (in Case No. 16-4270) in support of its request to stay the Arkansas RHR.   A copy of this declaration is attached hereto as Exhibit K.   In paragraph 15 of his declaration, Mr. Castleberry acknowledges that deactivation of the plants would require EAL to obtain replacement power. *See*, Ex. K-6.   Moreover, EAL previously sought the APSC's approval of the installation of pollution control technology at White Bluff in APSC Docket No. 09-024-U.   The petition filed by EAL in that docket is attached as Exhibit C to the Coalition's January 22, 2019 Reply Brief in this case, ECF No. 42-3.   In EAL's petition for APSC approval of the installation of controls at White Bluff, EAL acknowledges in paragraph 15 that curtailment of operations at White Bluff would require it to "purchase new replacement power to meet customer needs reliably."

with regard to the ECR Rider, insofar as it has already approved the tariff (which is attached hereto as Exhibit L) and its review of the annual ECR re-determinations is essentially limited to determining whether EAL correctly calculated the formula's inputs.

AECC also has an APSC-approved automatic purchased energy adjustment tariff, which it adjusts on a monthly basis.   This tariff, which is attached hereto as Exhibit M, is called the Fuel and Purchased Energy Adjustment Rider, and it passes the costs of purchased energy through to AECC's member cooperatives.   As previously noted, another member of the Coalition takes service from one of AECC's member cooperatives.[14]   Like EAL, any curtailment of operations at White Bluff and Independence will require AECC to obtain replacement energy in order to fulfill its obligation to provide reliable electricity service, and, like EAL, AECC will recover the costs of that purchased energy through its Fuel and Purchased Energy Adjustment Rider.   If the Court grants the relief sought in the Plaintiffs' Complaint, EAL and AECC (and the other utility owners) will increase the electricity rates charged to members of the Coalition (and other ratepayers) through these purchased energy adjustment riders which the APSC has already approved. Therefore, there is a substantial risk that the relief sought in the Plaintiffs' Complaint will result in electricity rate increases that must be borne by members of the Coalition.

In addition, White Bluff and Independence are two of the largest coal based power plants in the United States.   Together the two plants used approximately 7.5 million metric tons of coal

---

[14] Each of the 17 distribution cooperatives who provide electric service to their respective members also have an Energy Adjustment Rider as part of their tariffs filed with the APSC.   This rider allows a distribution cooperative to automatically increase its retail rates if its cost of purchased power increases.   Most distribution cooperatives purchase the majority of their power from AECC, which is a co-owner along with EAL of White Bluff and Independence.   Therefore, the closure of these plants would negatively affect the ratepayers of the distribution cooperatives, just as EAL ratepayers are adversely impacted.   An example of a distribution cooperative's Entergy Adjustment Rider is attached hereto as Exhibit N, which is Mississippi County Electric Cooperative's Energy Adjustment Rider, Schedule 20, Sheet Number 39.

in 2019.[15]  Loss of these sales will cause adverse economic harm to the coal companies supplying

this fuel and to the Coalition members that provide support services to those coal companies.

The Court could alternatively[16] require EAL and the other utility owners to install costly

pollution control technology in the form of scrubbers at the White Bluff and Independence Plants

in order for the two plants to remain open.   The estimated cost to install these controls exceeds $2

Billion.[17]   In October 2016, Energy Ventures Analysis, Inc. ("EVA") conducted an economic

impact study of the control requirements contained in a RHR FIP that the EPA issued for Arkansas

in September 2016 ("Arkansas RHR FIP").[18]   This Arkansas RHR FIP required installation of the

same pollution controls sought by the Plaintiffs in their Complaint.   The EVA analysis, which is

attached hereto as Exhibit P, estimated that the Arkansas RHR FIP's requirements would

significantly raise electricity rates for the customers of the utility owners, with increases ranging

from 3.8% to as much as 23.9% for customers of the municipal utility owned by the City of

---

[15]  *See* Energy Information Administration 923 Schedule for Feb. 21, 2020 available at
eia.gov/electricity/data/eia923.

[16]  *See generally* Plaintiffs' Complaint (ECF No.1 at ¶¶ 69-70, 74-75, 79-80, 83, 91, 99).

[17]  At least two different sources verify the extremely high cost of the pollution control technology
which the Plaintiffs' Complaint would require.  First, as part of the process of revising the
Arkansas RHR SIP, EAL provided an updated five-factor analysis for the White Bluff plant to
ADEQ.  The White Bluff Five Factor Analysis is attached hereto as Exhibit O.   Table 4-3, which
appears at Exhibit O-18, contains capital cost estimates for the installation of SDA on the two
White Bluff units. EAL estimated the cost of installing each scrubber at $495.74 million. The same
table reveals that the annual operation and maintenance cost for each SDA will total $9.6 million
per year.   Second, in paragraph 5 of EAL's petition for the APSC's approval of the installation of
controls at White Bluff, EAL stated: "The total cost of the Project is estimated to be $1.04 billion,
with [EAL's] share being $631 million."   *See* Exhibit C to the Coalition's Jan. 22, 2019 Reply
Brief, ECF No. 42-3.   Hence, the estimate of $2 billion for installation of controls at both White
Bluff and Independence is reasonable based upon EAL's previous representations regarding the
cost of said controls.

[18]  The Arkansas RHR FIP was withdrawn by EPA because the State of Arkansas issued a new
state implementation plan that the EPA approved. *See* 84 Fed. Reg. 51056 (Sept. 27, 2019).

Jonesboro.   For EAL customers (which include a member of the Coalition), EVA estimated the plan would raise rates by 8.4%.   For customers of AECC's distribution cooperatives (which include a member of the Coalition), EVA estimated the plan would raise rates by 13.4%.[19]   If the Court requires Defendants to install the scrubbers at the two plants, Defendants could impose interim surcharges on the members of the Coalition and other ratepayers under Arkansas Code § 23-4-501, *et seq.* to recover this $2 billion.

Ark. Code Ann. § 23-4-501, *et seq*. provides that a utility may impose an interim surcharge upon ratepayers, until its next general rate case, to recover costs and investments, provided that these costs and investments:

**(A)** Are not currently being recovered in existing rates;

**(B)** Are reasonably incurred;

**(C)** Were not reasonably known and measurable at a time that allowed for a reasonable opportunity for the inclusion and consideration of the investments or expenses for recovery in the public utility's last general rate case;

**(D)** Are incurred by the public utility to comply with legislative or administrative rules, regulations, or requirements;

**(E)** Relate to the protection of the public health, safety, or the environment;

**(F)** Cannot otherwise be recovered in a prompt and timely manner; and

**(G)** Are any of the following:

**(i)** Mandatory;

**(ii)** A condition of continued operation of a utility facility; or

**(iii)** Previously approved by the commission.

---

[19] Ex. P, Table 10 at P-9.

The relief sought in the Plaintiffs' Complaint would make installing these scrubbers "mandatory."[20] It would also enable the Defendants to claim they installed the controls "to comply with legislative or administrative rules, regulations, or requirements," and that said installation relates "to the protection of the public health, safety, or the environment." Unless the APSC could find that the Defendants did not "reasonably" incur these costs, or that these expenses and investments could "otherwise be recovered in a prompt and timely manner," it would have little or no discretion to overturn such a surcharge. Certainly, the Defendants could use this statute and others to impose these costs on ratepayers – why would they not? *Compare City of Kennett v. EPA*, *supra* (court should presume that parties would follow the law). The law permits Defendants to pass its costs on to its customers, and, like any reasonable business, it will do so with any increased cost that arises from this litigation. Indeed, Defendants would contend that they are entitled to receive a fair return on the capital they would have to invest to either install pollution controls or obtain replacement capacity and energy.[21]

Alternatively, if the Court permanently enjoins the operation of the two power plants, or EAL and the other utility owners elect to shut down the plants in lieu of installing the required controls, EAL and the other utility owners of the plants will need replacement capacity in order to provide reliable electricity service to their customers. Replacement capacity is distinct from the

---

[20] *See, e.g.*, *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320-21 (11th Cir. 2002) (noting that, by agreeing to a settlement's terms, defendant bound himself to comply with a statute in specific ways, and the agreement was enforceable by the court); *see also Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 381 (1994) (a court retains ancillary jurisdiction to enforce a settlement agreement where it incorporates the terms of the agreement into its order).

[21] *See, e.g.*, *Acme Brick Co. v. Ark. Pub. Serv. Comm'n*, 299 S.W.2d 208 (Ark. 1957) (noting that public utility has an obligation to "render services at the lowest possible prices commensurate with a fair and reasonable return on its prudently invested capital").

purchased energy costs that EAL could collect through its Rider ECR nearly automatically. While energy typically refers to kilowatt hours ("kWh"), which measure energy in use, capacity typically refers to kilowatts ("kW"), which measures generating capability.   In order to ensure reliable service – as the law requires – a utility has to have enough generating capacity to meet the peak load of its system.   For most utilities in Arkansas, that system peak usually occurs in the summer, when the load of commercial and industrial customers remains constant while residential customers are at their highest usage due to the operation of air conditioners along with their typical requirements.   The retirement of the coal plants at issue would cause significant reductions in the peak generating capacity of the utility owners of the plants.[22]   In order to continue to provide reliable service, those utilities will have to acquire replacement capacity.   The EVA analysis noted that the replacement capacity cost for the power plants affected by the Regional Haze Rule federal implementation plan would likely be 45% higher than the costs of installing pollution controls on the affected plants.   In a supplemental analysis, which is attached hereto as Exhibit Q, EVA

---

[22] Mr. Castleberry also acknowledges this in his Eighth Circuit declaration.   In paragraph 20, he states:

> If the units must be deactivated, the co-owners would need to replace the over 3,300 MW in electricity generation capacity from White Bluff and Independence that are necessary to meet the needs of their respective customers and to satisfy the co-owners' respective obligations to MISO.   The over 3,300 MW from these two plants is enough to power approximately 500,000 homes at peak hours.   It represents approximately 23 percent of the total net generation in the state of Arkansas, according to 2015 data from the U.S. Energy Information Administration.   Additionally, I understand that the combined 251 MW owned by the City Water and Light Plant of the City of Jonesboro represents approximately 80% of that co-owner's customers' electric capacity demand and more than 65% of their energy usage.

*See* Exhibit K-8.   Moreover, paragraph 15 of EAL's APSC petition for approval of the installation of controls at White Bluff acknowledges that curtailment of operations at White Bluff would necessitate the construction of "additional generating capacity." *See* Exhibit C to the Coalition's January 22, 2019 Reply Brief in this case, ECF No. 42-3.

estimated that the replacement capacity costs for White Bluff alone would total approximately $1.49 billion.

To add insult to injury, as EVA also notes, the White Bluff plant has largely already been paid for by Arkansas ratepayers.   Hence, the replacement capacity costs for these plants will likely result in substantial electricity rate increases for Arkansas ratepayers (which include members of the Coalition) – over and above what they have already paid – because, as noted, Arkansas law permits utilities to charge rates that provide a fair return on their prudently invested capital.

Moreover, EAL has another APSC approved tariff – Rider CA – which allows cost recovery for EAL's most recent large capacity acquisition - Power Block 2 of the Union Power Station located near El Dorado, Arkansas.   Rider CA, which is attached as Exhibit R, provides a representative historical example of a manner in which EAL could attempt to recover replacement capacity costs associated with an extended shutdown or early retirement of the coal plants at issue.

Analysis of EAL's latest Integrated Resource Plan[23] belies any claim that the retirement of the plants will not require EAL to obtain replacement capacity.   In its 2018 IRP, EAL presents the results of various modeling regarding its future capacity needs.   Importantly, in all the scenarios EAL evaluated, it presumed deactivation dates for White Bluff and Independence of 2028 and 2030, respectively.   According to the 2018 IRP, "[EAL] is projected to need new generating capacity over the course of the 20-year IRP planning period in order to reliably serve customers.   Taking deactivation assumptions into account, short of any new additions to generation beyond the planned resources described earlier, the long term deficit is expected to

---

[23] The APSC requires Arkansas utilities to file an Integrated Resource Plan ("IRP") every three years.   EAL filed its most recent IRP in 2018, which is attached as Ex. S. The Coalition respectfully asks this Court to take judicial notice of this publicly-filed document, which may be accessed at the following HTML:
https://www.entergy-arkansas.com/userfiles/content/IRP/2018/07-016-U_60_1.pdf

exceed 1,000 MW by 2028.  This need grows to over 4,700 MW by the end of the planning horizon."[24]  Unsurprisingly, the IRP demonstrates that, if EAL's deactivation assumptions are validated, it will need to begin acquiring substantial replacement capacity in 2025.[25]  Moreover, EAL's modeling in its 2018 IRP suggests that it will need to acquire a new gas-fired generating unit in 2028, regardless of variations in its planning assumptions,[26] suggesting that the Coalition's assertion regarding the impact of the relief sought in the Complaint (and the proposed settlement agreement) on gas prices.[27] is not attenuated under any definition of the term.

Similar analysis of AECC's most recent IRP[28] also demonstrates that it will require replacement capacity if the plants are shut down.  On page 11, AECC presents a table showing

---

[24] EAL 2018 IRP, *supra*, at 18; Ex. S-19 to -20

[25] *Id.* at 68; Ex. S-69

[26] *Id.*

[27] As demonstrated by the prior references to Mr. Castleberry's Eighth Circuit declaration, permanent shutdowns of White Bluff and Independence will create significant capacity deficits for several Arkansas utilities.  As the IRPs of AECC and EAL amply demonstrate, economics dictate that those utilities will construct new gas-fired plants in order to replace that capacity.  As part of its opposition to the Clean Power Plan (which the EPA ultimately withdrew), AECC presented analysis to the Arkansas Department of Environmental Quality which demonstrated that replacement of significant coal-fired generating resources with gas-fired resources will substantially increase natural gas prices.  Slide 20 of AECC's PowerPoint presentation, which is attached hereto as Exhibit T, at T-20, presented the results of its analysis predicting a "gas price increase of $1/MMBtu."  AECC's presentation is available at https://www.adeq.state.ar.us/air/planning/cpp/pdfs/adeq_apsc_111d_stakeholder_mtg_aug_28_14_aecc_v2.pdf.  Moreover, the US Energy Information Administration ("EIA") acknowledges that basic economic principles demonstrate that increased demand for natural gas resulting from increased use of gas for electricity production will place upward pressure on natural gas prices.  EIA, "What are the major factors affecting natural gas prices?," available at https://www.eia.gov/tools/faqs/ faq.php?id=43&t=8.

[28] AECC's most recent IRP, which is also filed with the APSC every three years, is attached hereto as Exhibit U.  Moreover, since it is publicly available, the Coalition respectfully asks the Court to take judicial notice of it.  One can access it at http://www.apscservices.info/pdf/07/07-017-U_7_1.pdf.

that 35% of its generating capacity is currently coal-fired.[29]   On page 21, AECC acknowledges that the shutdown of White Bluff will cause it to incur a capacity shortfall; it states: "The assumed retirement of the White Bluff generation units at the end of year 2028 also show pronounced effects, such that AECC projects a significant system capacity shortfall of about 240 MW in year 2029, widening to about 920 MW in year 2031."[30]   Further, on pages 22 and 28, AECC acknowledges that the retirement of Independence (coupled with the retirement of White Bluff) would fully eliminate the coal-fired capacity it is obliged to provide to its Regional Transmission Organization.[31]   Hence, AECC would certainly have to obtain replacement capacity if the Court grants the relief sought by the plaintiffs and permanently enjoins operation of the power plants.

The injury to Coalition members resulting from an electricity rate increase required to pay for scrubbers or replacement capacity and energy is not generalized.   Each of the Coalition's members have to pay for their own electricity costs, not the general public, and the degree of electricity rate increases applicable to Coalition members will produce different economic injuries than those suffered by members of the general public, *e.g.*, a loss of business due to increases in costs to produce products.

### B.     The Injury to the Coalition's Members Is Traceable to the Plaintiffs' Complaint and Redressable by the Court.

The Coalition's prospective injury is directly traceable to Plaintiffs, satisfying the second prong of the standing requirement.   If the Court grants the Plaintiffs the relief they seek – permanently enjoining Defendants from operating White Bluff and Independence except in accordance with the Plaintiffs' interpretation of the Clean Air Act – the Coalition would be injured

---

[29] Ex. U-12.

[30] Ex. U-22.

[31] Ex. U-23 and -29.

by increased electric rates due to the cost of replacement power during the time the plants are idled while bringing them into compliance and by the costs of such compliance – the installation of scrubbers.   In reviewing another motion to intervene, the Eighth Circuit concluded that intervenor parents faced imminent injury in a case where, if plaintiff ACLU won its suit against the defendant school, the school could stop providing religious accommodations to their children.   *ACLU Minn. v. Tarek Ibn Ziyad Acad.*, 643 F.3d 1088, 1092 (8th Cir. 2011).   Similarly, in the *National Parks* case, the Eighth Circuit found an intervenor power plant owner would be harmed by the imposition of costly pollution controls on its power plant if environmental groups obtained the relief they sought against the EPA. 759 F.3d at 975.   The Eighth Circuit has also concluded that states and other entities had standing to intervene where, if plaintiff South Dakota won its suit against the defendant Army Corps of Engineers, the Corps could alter the amount of water it released from a reservoir that would be available to intervenors.   *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024-25 (8th Cir. 2003).   Just as in those cases, resolution of Plaintiffs' Complaint will directly impact the Coalition.

Finally, this Court could redress the Coalition's potential injury by dismissing this case, because, as the Coalition contends, the Plaintiff lacks standing to bring this case, or by ruling in the Coalition's favor on its defenses to Plaintiffs' claims.   An order by this Court granting the relief requested by the Plaintiffs would require that White Bluff and Independence cease operations until BACT can be installed, or the cessation of coal use or closure of Independence, which is not required under the Arkansas RHR SIP, any of which would result in electricity rate increases to recover the costs of compliance.   If the Coalition were allowed to intervene and prevailed in this litigation, and the Court denied all of Plaintiffs' requested relief, the Coalition's prospective injury would be redressed.   A court's ability to rule in favor of an intervening defendant and thus prevent

a legal ruling that would cause it harm satisfies the redressability prong of the standing test.   *See Tarek Ibn Ziyad Acad.*, 643 F.3d at 1092.

### C.   The Injury to the Coalition Caused by the Complaint Is Not Attributable to the Arkansas RHR SIP.   The Complaint Seeks Different and More Extensive Relief Than the SIP.

In its September 30, 2019 Order, the Court questions whether the injury alleged by CURAD or the Coalition satisfies the causation or redressability requirements for Article III standing because of the effects of the Arkansas RHR SIP (ECF No. 53 at 23-24).   As discussed previously, the relief sought in Plaintiffs' Complaint would require both the White Bluff and Independence plants immediately to cease operation until they were in compliance with the Clean Air Act, and would require Entergy to submit an application to ADEQ to require the installation of BACT, i.e., scrubbers, on both the White Bluff and Independence plants.   Either of these events will result in increased costs.   As Mr. Castleberry's declaration admits, the installation of scrubbers at White Bluff and Independence would cost approximately $2 Billion.   (Castleberry Declaration, ¶ 21, attached as Exhibit V, at V-6).   Mr. Castleberry also admits that cessation of operation of White Bluff and Independence would result in costs that would require regulatory approval by the APSC, to wit:

> Entergy Arkansas at this time has not made any request to the APSC regarding rates or cost recovery related to the proposed Settlement Agreement but acknowledges that the APSC is the appropriate agency to address such issues *at the time those issues materialize*.   Nothing in the proposed Settlement Agreement restricts or limits the jurisdiction of the APSC in this respect.   To the contrary Paragraph 22 of the proposed Settlement Agreement demonstrates Entergy Arkansas's recognition that regulatory approvals would be needed to recover costs related to the installation of pollution controls, undepreciated capital costs, and replacement generation . . . similarly, Paragraph 16 of the proposed Settlement Agreement memorializes Entergy Arkansas' intention to present resource acquisition matters before the APSC."

Castleberry Declaration, ¶34, p. 8-9, (attached as Exhibit V-8 and -9) (emphasis added).[32]   While Entergy's need for retail cost recovery might not yet have materialized, the groundwork for that need will be achieved by an order in this case granting the relief requested by the Plaintiffs.   Mr. Castleberry's declaration in this case lays out Entergy's rationale for entering into the proposed Settlement Agreement, but those arguments should be directed to the APSC, which Entergy admits has jurisdiction over it and over the setting of its rates.   This Court is not the proper venue or forum for making those decisions.[33]

With regard to the Court's question about the impact of the Arkansas RHR SIP, the relief sought in the Plaintiffs' Complaint differs substantially from the actions the SIP mandates.   First, the Arkansas RHR SIP does not require the installation of a scrubber or the cessation of the use of coal at the Independence facility.   The Entergy Administrative Order on Consent ("AOC") only requires use of low-sulfur coal ("LSC") at Independence.   (*See* Entergy AOC, ¶ 6, copy attached hereto as Exhibit W, at W-4).   Furthermore, Entergy voluntarily requested that ADEQ include a provision requiring the use of LSC in the AOC:

> As previously discussed in Response 25(c), 25(d) and 26, ADEQ has determined that *no further controls are needed* to achieve reasonable progress in the first planning period.   Nevertheless, Entergy has *voluntarily proposed* that ADEQ include LSC as a control for Independence in the long term strategy.

---

[32] Mr. Castleberry also explained the adverse impacts and the requirements for obtaining regulatory approvals, including a determination of public interest, for deactivation and/or obtaining replacement of capacity for White Bluff and Independence in his declaration filed with the Eighth Circuit in Docket 16-4270, Doc. 4619424.   *See* paragraphs 17-26 of Castleberry's Jan. 11, 2018 declaration attached as Exhibit K, at K-7 to -11.

[33] *Compare Hempstead Cty. Hunting Club, Inc. v. Sw. Elec. Power Co.*, 385 S.W.3d 123 (Ark. 2011) (federal district court did not have concurrent jurisdiction with the APSC over matters within the APSC's jurisdiction); *Cullum v. Seagull Mid-South, Inc.*, 907 S.W.2d 741 (Ark. 1995) (tort action against public utility impermissibly encroached on exclusive authority of APSC to set rates); *H.J., Inc. v. Nw. Bell Tel. Co*., 954 F.2d 485, 489 (8th Cir. 1992) (under filed rate doctrine a court does not have jurisdiction of a complaint where the court's decision impacts an agency's procedures and rate determinations).

ADEQ Phase II RHR SIP Responsive Summary, Response 32, p. 67 (attached as Ex. B, at B-67) (emphasis added).   The Coalition did not object to the use of LSC as BART for White Bluff, but did object to both the installation of scrubbers at either White Bluff and Independence and the premature closure or cessation of the use of coal at White Bluff or Independence due to the adverse impacts either decision would have on electricity costs.   Consequently, with respect to the Independence plant, the relief sought in the Complaint (and the terms of the proposed Settlement Agreement) are more extensive than the Arkansas RHR SIP, because the SIP does not require the cessation of the use of coal at Independence.   Hence, the Plaintiffs' Complaint (and the proposed Settlement Agreement) causes an injury to the Coalition's members that is not present in the Arkansas RHR SIP.

With regard to White Bluff, again, the relief requested in the Complaint (or under the Settlement Agreement) differs substantially from the actions mandated by the Arkansas RHR SIP. ADEQ did not mandate or require that Entergy install scrubbers or cease the use of coal at White Bluff in order to comply with the requirements of the RHR.   This was a voluntary decision made by Entergy which was recognized by ADEQ and adopted into the Arkansas RHR SIP.   This is evident from ADEQ's Responsive Summary for the Arkansas RHR SIP, in which it stated:

> ADEQ is revising its disapproved 2008 BART determination for White Bluff . . . after consideration of the revised remaining useful life of White Bluff as indicated by *Entergy's proposed commitment* to cease coal-fired operations at White Bluff.

ADEQ Phase II RHR SIP Responsive Summary, Response 20(b), p. 34, attached as Exhibit B, at B-34 (emphasis added).   ADEQ further explained:

> The inclusion of an enforceable cessation of coal-fired operations date for White Bluff in the proposed SIP was necessary to comply with BART guideline requirements for taking into account *the planned operational changes* for White Bluff . . .

ADEQ Phase II RHR SIP Responsive Summary, Response 31, p. 63, attached as Exhibit B, at B-63 (emphasis added).   Again, ADEQ emphasized that the closure of White Bluff was not mandated by ADEQ, but was a voluntary decision by Entergy:

> ADEQ agrees with the commenters that the early closure or cessation of coal at White Bluff *is not an explicit BART determination* . . . . ADEQ has incorporated Entergy's enforceable closure commitment into the AO *to reflect the plans that Entergy has made publicly available.*

ADEQ Phase II RHR SIP Responsive Summary, Response 32, p. 66, attached as Exhibit B, at B-66 (emphasis added).

Further, this is explicit in the AOC itself:

> 4.        *Consistent with ENTERGY ARKANSAS's representations* to ADEQ in its Updated Five Factor Analysis for White Bluff, White Bluff Unit 1 (SN-01) and White Bluff Unit 2 (SN-02) shall permanently cease coal-fired operations by no later than December 31, 2028.

Entergy AOC, Order and Agreement Section paragraph 4, attached as Exhibit W, at W-4 (emphasis supplied).   Consequently, the relief sought in the Complaint – an order by this Court to cease operation of White Bluff except in compliance with the Clean Air Act, and directing Entergy to submit an air permit application to install BACT – is more extensive than that which the RHR requires.   The Arkansas RHR SIP simply recognized a voluntary decision by Entergy to cease coal combustion at White Bluff.

In addition, the AOC explicitly recognizes that Entergy must obtain all necessary regulatory approvals in order to cease coal combustion at White Bluff, to wit:

> 1.   ENTERGY ARKANSAS shall comply with all requirements set forth in this Order and Agreement.

> 12.   Nothing contained in this AO shall relieve ENTERGY ARKANSAS of any obligations imposed by any other applicable local, state, or federal laws . . .

Entergy AOC, Order and Agreement Section paragraphs 1 and 12, attached as Exhibit W, at W-3

and -5.   ADEQ also recognized this obligation in its Responsive Summary, to wit:

> Entergy is responsible for obtaining any other regulatory approvals in order to meet
> its commitment to cease the use of coal at White Bluff.

> [I]t is Entergy's responsibility to obtain any regulatory approvals needed to meet
> the commitment in the Entergy Administrative Order.

> In addition, any other applicable requirements necessary to allow Entergy to
> lawfully cease the use of coal at White Bluff are the responsibility of Entergy to
> meet.

ADEQ Phase II RHR SIP Responsive Summary, Response 32, pp. 66, 69, attached as Exhibit B,

at B-66 and -69.

Finally, as discussed above, Mr. Castleberry's own declaration before the Eighth Circuit

acknowledges that Entergy will have to obtain APSC approval in order to satisfy the requirements

of the relief sought in Plaintiffs Complaint.   *See* Exhibit K, at K-9 and -10.   The relief sought in

the Complaint and by the Settlement Agreement exceeds the requirements of the Arkansas RHR

SIP because it seeks through this Court to undermine and effectively foreclose the APSC's

authority to determine whether these actions are in the public interest.   Thus, the Arkansas RHR

SIP does not break the chain of causation of injury to the Coalition caused by the Complaint and

the terms of the Settlement Agreement.

## IV.   GRANTING THE RELIEF REQUESTED BY THE PLAINTIFFS WOULD USURP THE STATE'S AUTHORITY.

The Plaintiffs' Complaint is a collateral attack on the White Bluff and Independence air

permits.   Plaintiff Sierra Club commented on the failure to require PSD review and to obtain a

BACT determination during the proceedings for the White Bluff and Independence air permits

issued in 2012 and 2011, (*see* Exhibits D and E).   However, there is no record on the Arkansas

Pollution Control and Ecology permit appeal webpage that Sierra Club appealed those permit

decisions even though it had the opportunity to do so.   *See*, http://www.adeq.state.ar.us/commission/p.aspx.   Article III of the Constitution limits federal courts' jurisdiction to actual cases and controversies.   This fundamental principle, through the doctrine of standing, is "built on separation of powers principles" and "serves to prevent the judicial process *from being* used to usurp the powers of the political branches.   *Clapper*, 568 US. at 408; *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. U. S. Dep't of Transp.*, 878 F.3d 1099, 1101 (8th Cir. 2018) ("*OOIDA II*") (standing "identifies those disputes which are appropriately resolved by through the judicial process.")   Plaintiffs' Complaint in this case usurps the authority of Arkansas's state regulatory agencies in at least two ways.

First, the Plaintiffs' Complaint is a collateral attack on the White Bluff and Independence air permits which were issued by ADEQ  in 2012 and 2011, respectively.   As explained in footnote 9, Plaintiff Sierra Club commented on both permits, complaining of the failure to require PSD Review, which would lead to a BACT determination.   *See* ADEQ Response to Comments, attached as Ex. D and Ex. E.   There is no record on the Arkansas Pollution Control and Ecology webpage that Sierra Club appealed those air permits even though it had the opportunity to do so under Arkansas law.   *See*, Ark. Code Ann. §8-4-205; §§8-4-222 to -227.   Consequently, Plaintiffs have failed to exhaust the administrative remedies given to them under Arkansas law and the Clean Air Act.   Plaintiffs now attempt to get a second bite at the apple through their Complaint, and thereby usurp the ADEQ's permitting decision by seeking to invoke this Court's authority.

This same tactic by Sierra Club was rejected by the Eighth Circuit in *Otter Tail*.   In *Otter Tail*, the Sierra Club brought claims under both the NSR and New Source Performance Standards ("NSPS") provisions of the Clean Air Act.   The Eighth Circuit held that the NSR claims were

time-barred.   615 F.3d at 1018.   As to the NSPS claims, the Eighth Circuit noted that Sierra Club could have raised those claims during the permitting process, and, if it had done so, Sierra Club could have obtained judicial review.   615 F.3d at 1020.   Sierra Club's failure to do so precluded obtaining judicial review under the citizens' suit provisions of the Clean Air Act.   The Eighth Circuit observed:

> Our conclusion is further bolstered by the practicalities of the permitting process and judicial review thereof.   The interpretation Sierra Club urges would allow plaintiffs either to challenge permitting authorities' applicability determinations during the permit review process or to wait and raise the same issues in an enforcement action.   As the *Romoland* court noted, such a scheme could lead to simultaneous suits by multiple parties raising the same or similar issues.   This would not only waste judicial resources, but could also result in inconsistent decisions.   *See Romoland*, 548 F.3d at 755.   In addition, to allow plaintiffs to raise issues resolved during the permitting process long after that process is complete would upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies.   *See e.g.*, *United States v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir. 1994).   Absent clear evidence to the contrary, we must conclude Congress intended a more sensible and efficient regulatory scheme.

615 F.3d at 1022.   *See also Action for Rational Transit v. W. Side Highway Project*, 699 F.2d 614, 616-17 (2d Cir. 1983) (per curiam) (Court did not have jurisdiction over Clean Air Act citizens' suit because plaintiffs failed to pursue their administrative remedies under state law.)   Here, Plaintiff Sierra Club raised its objections about the White Bluff and Independence permits in comments before the ADEQ years ago.   ADEQ issued the permits over the Sierra Club's objections, but it appears that Sierra Club did not appeal the permits as allowed under Arkansas law.   Ark. Code Ann. §§ 8-4-222 to -227.   Just as in *Otter Tail*, the present suit is an impermissible collateral attack on the permits issued by ADEQ for White Bluff and Independence, and seeks to usurp the authority of the state regulatory agency with primary jurisdiction over the matter.

Second, numerous federal appellate courts, including the U.S. Supreme Court, have recognized that state regulators have a compelling and legitimate interest in the regulation of local public utility rates.  *See e.g.*, *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) (citing *Munn v. Illinois,* 94 U.S. 113 (1877)) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 509 (8th Cir. 2002) ("[T]the long history of utility rate regulation in this country establishes that Missouri has a legitimate interest in protecting local ratepayers by regulating . . . utility companies."); *New Orleans Pub. Serv., Inc. v. City of New Orleans*, 798 F.2d 858, 862 (5th Cir. 1986) ("[T]he regulation and adjustment of local utility rates is of paramount local concern and a matter which demands local administrative expertise."); *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1424-5 (4th Cir. 1985); *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 910 (7th Cir. 2003) ("Wisconsin clearly has an interest in policing its public utilities to protect the welfare of ratepayers.").  Further, federal appellate courts often defer to state regulators when parties ask them to adjudicate disputes involving public utilities. *See, e.g.*, *New Orleans Pub. Serv., Inc.*, 798 F.2d at 864 (affirming district court's application of federal abstention doctrines to public utility controversy).

Indeed, Arkansas law vests the APSC with "sole and exclusive ratemaking authority." *Centerpoint Energy v. Miller Cty. Circuit Court*, 258 S.W.3d 336 (Ark. 2007).   In *Miller County*, the Arkansas Supreme Court stated:

> This court has recognized that the APSC "is a creature of the legislature, and its duties are legislative."  *Cullum v. Seagull Mid-South, Inc.*, 322 Ark. 190,194, 907 S.W.2d 741, 743 (Ark. 1995).  Moreover, the General Assembly has endowed the APSC with sole and exclusive ratemaking authority: "[t]he Arkansas Public Service Commission is vested with the sole and exclusive jurisdiction and authority to determine the rates to be charged for each kind of product or service to be furnished or rendered by electric, gas, telephone, or sewer public utilities in Arkansas."   Ark. Code Ann. § 23-4-201(a)(1) (Repl. 2002).

The term "rate" is broadly defined under Arkansas law to include: every *compensation*, charge, fare, toll, rental, and classification, or any of them, demanded, observed, charged, or collected by any public utility for any service, products, or commodity offered by it as a public utility to the public and means and includes any rules, regulations, practices, or contracts affecting any compensation, charge, fare, toll, rental, or classification.

Ark. Code Ann. § 23-1-101(10) (Repl. 2002) (emphasis added).

*Miller County*, 258 S.W.3d at 341; *see also Hempstead Cty. Hunting Club, Inc. v. Sw. Elec. Power Co*., 385 S.W.3d 123 (Ark. 2011); *Austin v. Centerpoint Energy Arkla*, 226 S.W.3d 814 (Ark. 2006).   Further, Arkansas appellate courts often defer to the Commission's expertise when adjudicating disputes emerging from its proceedings.   *See, e.g.*, *Ark. Elec. Energy Consumers v. Ark. Pub. Serv. Comm'n*, 813 S.W.2d 263, 279 (Ark. Ct. App. 1991) ("It has often been said that, if an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, or discriminatory, then this court must affirm the Commission action."). This is typically because the courts recognize that the Commission possesses the nuanced expertise necessary to understand and assess disputes involving public utilities.

In the exercise of its exclusive jurisdiction, Arkansas law requires the Commission to set "just and reasonable" rates.[34]   The "just and reasonable" standard contained in Arkansas statutes includes the prudence standard defined in previously cited Arkansas case law and widely utilized by various jurisdictions nationwide.   By illustration, a Texas appellate court has opined that a utility fails to prove its rates are just and reasonable if the rate base includes expenses the utility failed to prove are prudent.[35]   In *City of Alvin*, a Texas appellate court stated that "the Commission correctly disallows rate base expenses that a utility fails to prove are prudent and, therefore, just

---

[34] Ark. Code Ann. § 23-4-103.

[35] *City of Alvin v. Pub. Util. Comm'n of Texas*, 876 S.W.2d 346, 353-354 (Tex. App.—Austin 1993, judgm't set aside by agr.).

and reasonable" because "the prudence standard . . . is a long-recognized ratemaking method that furthers the legislative intent behind the reasonableness requirement" and "no difference exist[s] between a reasonableness standard and a prudence standard."[36]   Notably, Texas law contains the same "just and reasonable" standard found in Arkansas statutes.[37]   The Supreme Court of Mississippi has also recognized that the "just and reasonable" standard includes the prudence standard.[38]

Indeed, the need for a finding of prudence prior to rate recovery has been a settled feature of Arkansas ratemaking law for decades.   In 1957, the Arkansas Supreme Court stated the following:

> [I]t has been traditional . . . to limit the net earnings of a utility company to a percent of its invested capital or some other indication of the extent of its capital assets.   In Arkansas the rate base is the *prudent* investment value of the property of the utility . . . It is upon this method of rate fixing that the relationship between the utility, on the one hand, and the public, on the other, has been established.   Upon this basis the public grants the utility a monopoly [or a virtual monopoly] to do business and guarantees the right to charge a price that will produce a fair and reasonable return to the stockholders on all the capital invested by them. In return for the public's

---

[36] *Id.* at 354.

[37] *Id.* at 353 ("PURA requires that rates set by the Commission must always be just and reasonable."); *see also Pub. Util. Comm'n of Tex. v. Houston Lighting & Power Co.*, 778 S.W.2d 195 (Tex. App.—Austin 1989, no writ), in which a Texas appellate court stated:

> If appellee desires to raise its utility rates, the Public Utility Regulatory Act ("PURA") mandates that appellee file a rate case with the Commission and demonstrate that appellee's requested rate level is "just and reasonable."   Tex. Rev. Civ. Stat. Ann. art. 1446c §§ 40 and 43(a) (Supp.1989). In other words, appellee, in order to raise the price of its product, must participate in a rate case and *bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested.*

*Id.* at 198 (emphasis added).

[38] *Miss. Power Co. v. Miss. Pub. Serv. Comm'n*, 168 So.3d 905, 911 (Miss. 2015) (en banc) ("In the absence of prudency hearings, we fail to discern how a rate can be arbitrarily declared as 'fair, just, and reasonable' and/or 'just and reasonable.'").

> concessions, the utility is obligated [under the statutes of this state, and under the rate base method] to render services at the lowest possible prices commensurate with a fair and reasonable return on its *prudently* invested capital.   To the above end, the utility holds and must manage its property in the nature of a trusteeship.

*Acme Brick Co. v. Ark. Pub. Serv. Comm'n*, 227 Ark. 436, 441 (1957) (emphasis added).   In a subsequent case, the Arkansas Supreme Court described this requirement as a "fundamental rule" guiding the determination of utility rates.   It stated:

> It is the duty of the Company to *operate in such manner as to give to the consumers the most favorable rate reasonably possible.* This stems from the fact that the State has given the Company the exclusive right to sell and distribute [electricity] to its customers.   Consequently *the Company bears a trust relationship to its customers and must conduct its operations on that basis* and not as if it were engaged in a private business with no restrictions as to the income it could earn.

*City of El Dorado v. Ark. Pub. Serv. Comm'n*, 362 S.W.2d 680, 683-84 (Ark. 1962) (emphasis added).

In a 1991 case upholding a substantial prudence disallowance, a Louisiana appellate court underscored the importance of prudence review, identifying it as a crucial protection for utility ratepayers.   It stated:

> The concept of a prudent investment in public utility law is a regulatory oversight standard that attempts to serve as a legal basis for judging whether utilities *meet their public interest obligations*."   R. Burns, R. Poling, M. Whinihan, and K. Kelly, The Prudent Investment Test in the 1980s, iv (1985). This court strongly affirms the importance of the prudence standard for motivating public utilities to prudent management of their affairs *and for protection of the interests of the ratepaying public against excessive and unjust utility rates.*

*Alliance for Affordable Energy, Inc. v. Council of City of New Orleans*, 578 So.2d 949, 973 (La. Ct. App., 4th Dist., 1991) (emphasis added) (judgment vacated by agr., 588 So. 2d 89 (1991).   The Louisiana court further explained that prudence review is a necessary tool for the regulatory scrutiny required to protect captive ratepayers; it stated:

> A utility does not enjoy an absolute right to solvency or profit. A public utility is a monopoly which exists in a non-competitive market.   Because a utility enjoys such a great economic advantage, it owes *a high duty of prudence* to its consumers in

decision making, operation and management.   Regulators of utilities must strictly inspect and examine them since such entities are without competition in a free market.   *Power consumers are unable to select an alternative utility for power.* Consumers possess federal and state constitutional rights to protect them against the taking of their property without due process of law.   When power costs are increased and shifted to consumers, *the latter must accept the increases without recourse*.   Therefore the pass through of imprudent costs to ratepayers/consumers is prohibited by law.   The public ought not to bear the burden of utility imprudence or misconduct.

Further, the stockholders of a utility have no right to a profit as a matter of law.   *A utility would have no incentive to behave prudently in its transactions if it bore no risk of loss*.   Law and public policy in their present form encourage utilities to manage their affairs in a prudent manner.   Modification of the existing legal rules would not only sanction imprudent utility management and operation, it would also promote waste, inefficiency and misconduct at public expense.

*Id.* at 973-974 (emphasis added).

As previously stated, the obligations regarding the retirement dates for White Bluff and Independence contained in the Arkansas RHR SIP are voluntary business decisions determined by EAL.   This is abundantly clear with regard to the Independence plant, insofar as ADEQ noted that EAL itself requested that the Arkansas RHR SIP mandate the use of low sulfur coal at Independence.   Moreover, the Arkansas RHR SIP does not include a mandate requiring retirement (or cessation of coal burning) of Independence.   With regard to White Bluff, ADEQ clarified that the early closure of the plant was not required by a BART determination, but was included in the Arkansas RHR SIP because of EAL's voluntary decision to shut down the plant early in 2028. Since the plant shutdown dates contained in the Arkansas RHR SIP were voluntary submissions by EAL that ADEQ merely incorporated into its plan, the APSC retains exclusive jurisdiction to ascertain the prudence of EAL's voluntary decisions to retire over a decade early two of its largest generating units which are co-owned by other Arkansas public utilities and municipalities.   As previously noted, the Arkansas RHR SIP makes this abundantly clear by noting that nothing in the SIP relieves EAL of "any obligations imposed by any other applicable local, state, or federal laws,"

including its obligation to submit its retirement decisions to the APSC for its important prudence review.

On the other hand, if this Court grants the relief sought in the Plaintiffs' Complaint (or approves the settlement agreement submitted by the parties), this Court will transform EAL's voluntary business decisions into enforceable mandates of this Court [39] based upon its interpretation of the federal Clean Air Act.  Such action would necessarily diminish the APSC's discretion to review EAL's shutdown decisions for prudence, insofar as the APSC can hardly second guess EAL's business decision to comply with an enforceable federal court order, or a federal court's interpretation of the Clean Air Act.  Further, insofar as the relief sought by the Plaintiffs or the approval of the settlement agreement would create a "mandate" where none currently exists, the settling parties attempt to insulate these shutdown decisions from the APSC's full scrutiny by permitting EAL to seek recovery of its compliance costs through Ark. Code Ann. §23-4-501, *et seq*., which permits much less Commission discretion than a full-blown prudence investigation.  Indeed, if the settling parties were correct that the settlement agreement merely replicates the requirements which are already contained in the Arkansas RHR SIP, it begs the questions of why the settling parties feel compelled to obtain this Court's approval of a settlement agreement in the first place, or why the Plaintiffs feel compelled to sue EAL to obtain relief that ADEQ has already provided.

V.     **THE TIME LIMITS IN 28 U.S.C. § 2462 ARE JURISDICTIONAL AND CANNOT BE WAIVED. UNDER *OTTER TAIL*, THE PLAINTIFFS' CLAIMS CANNOT BE ENTERTAINED ANY THE COURT.**

In *Sierra Club v. Otter Tail*, 615 F.3d 1008 (8th Cir. 2010), the Eighth Circuit held that the plaintiff's claims under the Clean Air Act citizens' suit provisions were barred by the statute of

---

[39] *See* footnote 20, *supra*.

limitations at 28 U.S.C. § 2642.   The issue this Court raised in its September 30, 2019 Order is whether that statute of limitations is jurisdictional.

In *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015), the Supreme Court recognized that some statutes of limitation are jurisdictional; that is, failure to comply with the time bar deprives a court of all authority to hear the case, and the time bar cannot be waived.   The Court then clarified when a statute of limitation is jurisdictional and when it is not.   A jurisdictional statute of limitation is one where Congress has stated that the time limit has jurisdictional consequences; otherwise, a statutory time bar is just a "claim processing rule" that does not deprive a court of the authority to hear a case, to wit:

> One way to meet that burden—and the way the Government pursues here—is to show that Congress made the time bar at issue jurisdictional.   When that is so, a litigant's failure to comply with the bar deprives a court of all authority to hear a case.   Hence, a court must enforce the limitation even if the other party has waived any timeliness objection. . . .  In recent years, we have repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has "clearly state[d]" as much. . . . [A]bsent such a clear statement, ... 'courts should treat the restriction as nonjurisdictional.' "  . . . . That does not mean "Congress must incant magic words." . . . . But traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences.
>
> And in applying that clear statement rule, we have made plain that most time bars are nonjurisdictional. . . . Time and again, we have described filing deadlines as "quintessential claim-processing rules," which "seek to promote the orderly progress of litigation," but do not deprive a court of authority to hear a case. . . . That is so . . . even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, that is so "however emphatic[ally]" expressed those terms may be . . . . Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it.

*Kwai Fun Wong*, 575 U.S. at 408–10 (citations omitted).   The Court then held that the statute of limitations for the Federal Tort Claims Act, 28 U.S.C. § 2401, was non-jurisdictional because the statute of limitations did not speak to a court's power.   It stated:

In enacting the FTCA, Congress did nothing of that kind. It provided no clear statement indicating that § 2401(b) is the rare statute of limitations that can deprive a court of jurisdiction.   Neither the text nor the context nor the legislative history indicates (much less does so plainly) that Congress meant to enact something other than a standard time bar.

*Most important, § 2401(b)'s text speaks only to a claim's timeliness, not to a court's power. It states that "[a] tort claim against the United States shall be forever barred unless it is presented [to the agency] within two years ... or unless action is begun within six months" of the agency's denial of the claim.*   That is mundane statute-of-limitations language, saying only what every time bar, by definition, must: that after a certain time a claim is barred. . . . *What matters instead is that § 2401(b) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." . . . .* It does not define a federal court's jurisdiction over tort claims generally, address its authority to hear untimely suits, or in any way cabin its usual equitable powers. Section 2401(b), in short, "reads like an ordinary, run-of-the-mill statute of limitations," spelling out a litigant's filing obligations without restricting a court's authority.

*Kwai Fun Wong*, 575 U.S. 410–11 (emphasis added).

In this case, however, the relevant statute of limitations focuses on the Court's power to entertain the plaintiffs' lawsuit.   As discussed, in *Sierra Club v. Otter Tail*, *supra*, the Eighth Circuit held that the statute of limitations at 28 U.S.C. § 2462 applied to the plaintiffs' claims brought under the citizens' suit provisions of the Clean Air Act.   615 F.3d at 1013-14.

Likewise, under *Otter Tail*, the Plaintiffs' Clean Air Act citizens' suit claims here are governed by the five year statute of limitations at 28 U.S.C. § 2462.   The language of § 2462 is markedly different than the language in § 2401 that was at issue in *Kwai Fun Wong*, however. Section 2462 focuses on the court's power to "entertain" a claim, rather than a claim processing rule like § 2401.   Section 2462 states:

Except as otherwise provided by Act of Congress, *an action, suit or proceeding* for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, *shall not be entertained* unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C.A. § 2462 (emphasis added).   Unlike the FTCA "claims processing" statue at issue in *Kwai Fun Wong*, § 2462 does not focus solely on whether the plaintiffs *claim* is "barred"; instead it focuses on the court's power to "*entertain*" the "*action, suit or proceeding.*"[40]   Consequently, under the rationale of *Kwai Fun Wong*, § 2462 is jurisdictional because it is directed at the court – not the plaintiff's claim – and prohibits a court from *entertaining* a case after five years has elapsed. Because the applicable statute of limitations in this case is jurisdictional, it may not be waived, it may be asserted at any time, and it is incumbent on the Court to apply the statute *sua sponte* to determine whether the Court has subject matter jurisdiction of the Plaintiffs' claims.

Notwithstanding whether the statute of limitations under § 2462 is jurisdictional, "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *VanLandingham v. Grand Junction Reg'l Airport Auth.,* 46 F. Supp. 3d 1119, 1125–26 (D. Colo. 2014) *citing Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945).   It is well established in the State of Arkansas that the provision of low-cost electricity is in the public interest and that a public utility holds its assets and resources in trust for its ratepayers.[41]   As the Arkansas Supreme Court has stated:

> [T]he public grants the utility a monopoly [or a virtual monopoly] to do business
> and guarantees the right to charge a price that will produce a fair and reasonable
> return to the stockholders on all the capital invested by them. In return for the

---

[40] "Most important, § 2401(b)'s text speaks only to a claim's timeliness, not to a court's power." *Kwai Fun Wong*, 575 U.S. at 410.

[41] *See* Arkansas Public Service Commission Resource Planning Guidelines for Electric Utilities, Section 4.1 ("The objectives of the Resource Plan include, but are not limited to, low cost, adequate and reliable energy services"), available at http://www.apscservices.info/Rules/resource_ plan_guid_for_elec_06-028-R_1-7-07.pdf ; *Ark. Elec. Energy Consumers, Inc. v. Ark. Pub. Serv. Comm'n*, 410 S.W.3d 47, 53 (Ark. 2012) (public utility's production assets are held in trust for the public.); *see also* Ark. Code Ann. § 23-4-305 ("The Consumer Utilities Rate Advocacy Division shall represent the state, its subdivisions, and all classes of Arkansas utility rate payers and shall have the following functions, powers, and duties: . . . To advocate the holding of utility rates to the lowest reasonable level.")

public's concessions, the utility is obligated [under the statutes of this state, and under the rate base method] to render services at the lowest possible prices commensurate with a fair and reasonable return on is prudently invested capital. To the above end, the utility holds and must manage its property in the nature of a trusteeship.

*Acme Brick Co. v. Ark. Pub. Serv. Comm'n*, 299 S.W.2d 208, 211 (Ark. 1957).

As discussed in Section III of this brief, if the Court grants the relief requested by the Plaintiffs, the coal plants in question will be shut down and EAL and the other utility owners will be forced to obtain replacement power, causing the electricity rates charged to Coalition members and other ratepayers to increase as a result – nearly automatically.   Alternatively, the Court could require EAL and the other utility owners to install costly pollution control technology in the form of scrubbers at the White Bluff and Independence Plants in order for the two plants to remain open. The estimated cost to install these scrubbers exceeds $2 Billion and would result in significant rate increases to members of the Coalition and to many other electricity consumers in the State of Arkansas.   As discussed above in Section V, Clean Air Act citizens suit provisions under which Plaintiffs bring this case are governed by the five year statute of limitations at 28 U.S.C. § 2462. Therefore, in this case, the § 2462 statute of limitations affects the public interest because asserting it as a bar to the claims here would prevent the shutdown of the plants and remove the need for more expensive replacement electrical power and capacity, or the need for costly environmental controls to be installed at the plants, all of which would resul in significant rate hikes for Coalition members.

Although the Defendants have not yet answered the Complaint, it appears, based on the proposed settlement agreement, that the Defendants would not assert the § 2462 statute of limitations as a defense to the claims in the Complaint.   Because the § 2462 statute of limitations affects the public interest in this case, however, it may not be waived, it may be asserted at any

time, and, again, it is incumbent on the Court to apply the statute *sua sponte* to determine whether the Court has subject matter jurisdiction of the Plaintiffs' claims.

## VI.   THE AMENDED COMPLAINT SUFFERS FROM THE SAME JURISDICTIONAL AND STANDING DEFECTS AS THE ORIGINAL

The Plaintiffs' Amended Complaint alleges additional violations of opacity standards under the New Source Performance Provisions of the Clean Air Act.   (ECF No. 54, Amended Complaint ¶¶ 58-63; Ex. B).   These allegations could have been made at the time the original Complaint was filed but were not.   They appear to be an attempt to avoid dismissal of the Complaint based on the five-year statute of limitations that is applicable to the Plaintiffs' original New Source Review claims.

Some of these new allegations may be time-barred for the same reason.   More importantly, these allegations suffer from the same standing defects as the claims in the original Complaint. The new alleged opacity violations are more localized, since they relate to opacity at the point of the stack where they are emitted, as opposed to visibility impairment at some distant location. Again, neither the Amended Complaint nor the declarations attached to the Amended Complaint allege that these opacity violations at the White Bluff stack resulted in a concrete, particularized injury to any of the Plaintiffs' members.   Notably, the declarations attached to the Amended Complaint appear to be the same declarations that were attached to the original Complaint, but there is nothing in the declarations that relate to the new allegations.   Furthermore, just as with the NSR allegations, the relief requested in the Amended Complaint would not redress any concrete, particularized injury that might have occurred as a result of these alleged violations. Consequently, the Plaintiffs have not demonstrated Article III standing as to the allegations of the Amended Complaint.

## VII.   RESERVATION OF RIGHTS

The Coalition reserves the right to file motions to dismiss all or part of the Plaintiffs' Complaint and to expand further on the Coalition's arguments herein if it is granted status as an intervenor.

## <u>CONCLUSION</u>

The Court should conclude the Plaintiffs have not—and cannot—demonstrate standing to assert their generalized environmental concerns.   Alternatively, if the Court determines that Plaintiffs have standing, it should likewise permit the Coalition to intervene.   First, since the Coalition seeks to intervene in support of the Defendants, it need not satisfy traditional Article III standing requirements.   Second, even if it does, the Coalition has more than adequately demonstrated the imminent economic injury that would result if the Court grants the relief requested by the Plaintiffs, and that the Coalition's interests would be redressed by the ultimate relief it seeks—dismissal of the Plaintiffs' Complaint.   Moreover, the Plaintiff's suit suffers from various defects that justify said dismissal, insofar as it usurps the authority of state regulators in important ways, and is also time-barred by a statute of limitations that the Defendants cannot waive.

For all of the foregoing reasons, the Court should permit the Coalition to intervene and fully participate in this action as a party to protect is economic interests.

Respectfully submitted:

/s/ Danica L. Milios
JACKSON WALKER, L.L.P.
100 Congress, Suite 1100
Austin, Texas 78701
Telephone:   (512) 236-2346
Facsimile:   (512) 391-2122
Danica L. Milios

*dmilios@jw.com*
Michael Nasi
*mnasi@jw.com*

and


/s/ Mark H. Allison
DOVER DIXON HORNE, PLLC
425 West Capitol Avenue, Suite 3700
Little Rock, Arkansas 72201
Telephone: (501) 375-9151
Facsimile: (501) 375-6484
Mark H. Allison, AR Bar No.: 85001
*mallison@ddh.law*
Randall L. Bynum, AR Bar No.: 89194
*rbynum@ddh.law*

***ATTORNEYS FOR ARKANSAS
AFFORDABLE ENERGY COALITION***

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2020, I filed the foregoing with the Clerk of the Court, which shall send notification of such filing using the CM/ECF system to the following persons registered to receive such notice:

Richard H. Mays, Esq.
Richard Mays Law Firm PLLC
2226 Cottondale Lane
Suite 100
Little Rock, AR 72202
rmays@richmayslaw.com

George E. Hays, Esq.
P. O. Box 843
Bellevue, WA 98009
georgehays@mindspring.com

Naomi Kim Melver
P. O. Box 25
Greenbank, WA 98253
nmelver@gmail.com

John Peiserich, Esq.
G. Alan Perkins, Esq.
PPGMR Law, PLLC
101 Morgan Keegan Drive, Suite A
Little Rock, AR 72202
john@ppgmrlaw.com
alan@ppgmrlaw.com

Timothy K. Webster, Esq.
SIDLEY AUSTIN L.L.P.
1501 K Street, N.W.
Washington, DC 20005
twebster@sidley.com

Debra J. Jezouit, Esq.
Baker Botts L.L.P.
1299 Pennsylvania Ave. N.W.
Washington, DC 20004
Debra.jezouit@bakerbotts.com

Kimberley Bennett, Esq.
ENERGY SERVICES, LLC
425 West Capitol Ave., Suite 28E
Little Rock, Arkansas 72201
Kbenne3@entergy.com

Susan Margaret Floyd, Esq.
ENTERGY SERVICES, LLC
639 Loyola Avenue, 22nd Floor
New Orleans, Louisiana 70113
sfloyd@entergy.com

Sarah Tacker, Esq.
Senior Assistant Attorney General
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Sarah.Tacker@ArkansasAG.gov

Christina L. Baker, Ark. Bar No. 2016001
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-13625
Christina.Baker@ArkansasAG.gov

/s/ Mark H. Allison

LIST OF EXHIBITS

A   ADEQ State of the Air Report 2019, publicly available at
    http://www.adeq.state.ar.us/air/state-of-air/

B   ADEQ Phase II RHR Responsive Summary, publicly available at
    http://www.adeq.state.ar.us/air/planning/sip/regional-haze.aspx-public-notice-and-
    comments-aggregated.pdf

C   ADEQ Phase II RHR SIP Narrative (also Attachment F to Castleberry Dec., Doc 34-1),
    publicly available at http://www.adeq.state.ar.us/air/planning/sip/regional-haze.aspx

D   ADEQ White Bluff Title V Permit No. 0263-AOP-R7 (Aug. 9, 2012), publicly available
    at http://www.adeq.state.ar.us/home/pdssql/pds.aspx#Display

E   ADEQ Independence Title V Permit No. 0449-AOP-R7 (April 22, 2011), publicly
    available at http://www.adeq.state.ar.us/home/pdssql/pds.aspx#Display

F   Coalition Motion to Intervene, Eighth Circuit Docket No. 16-4309

G   Order granting Coalition's motion to intervene in Eighth Circuit Docket 16-4309

H   Coalition's Motion to Intervene, Eighth Circuit Docket No. 19-3526

I   Order granting Coalition's motion to intervene in Eighth Circuit Docket 19-3526

J   Declaration of Shawn McMurray

K   Declaration of Kurt Castleberry, Eighth Circuit Docket No 16-4270

L   Entergy ECR Rider/Tariff, publicly available at http://www.apscservices.info/Tariff.asp

M   AEEC Fuel and Purchased Energy Adjustment Tariff, publicly available at
    http://www.apscservices.info/Tariff.asp

N   Mississippi County Electric Cooperative Energy Adjustment Tariff, publicly available at
    http://www.apscservices.info/Tariff.asp

O   White Bluff Five Factor Analysis, publicly available at
    http://www.adeq.state.ar.us/air/planning/sip/regional-haze.aspx

P   EVA Report on Impact of Arkansas RHR FIP

Q   EVA Replacement Cost Report

R   Entergy Rider CA, publicly available at http://www.apscservices.info/Tariff.asp

S   Entergy 2018 Integrated Resource Plan, publicly available at https://www.entergy-arkansas.com/userfiles/content/IRP/2018/07-016-U_60_1.pdf

T   AECC Clean Power Plan Powerpoint Presentation, publicly available at https://www.adeq.state.ar.us/air/planning/cpp/pdfs/adeq_apsc_111d_stakeholder_mtg_aug_28_14_aecc_v2.pdf

U   AECC 2019 Integrated Resource Plan, publicly available at http://www.apscservices.info/pdf/07/07-017-U_7_1.pdf.

V   Kurt Castleberry Sierra Club-Entergy Settlement Agreement Declaration

W Entergy RHR Administrative Order on Consent