Richard H. Mays (State Bar No. 61043)
Richard Mays Law Firm PLLC
2226 Cottondale Lane
Suite 100
Little Rock, AR 72202
Telephone: (501) 691-1106
Email: rmays@richmayslaw.com

George E. Hays (WA State Bar No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com

Naomi Kim Melver (WA State Bar No. 52463)
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| Sierra Club and National Parks Conservation Association, | Case No. 4:18-cv-00854-KGB |
|---|---|
| Plaintiffs, | **Plaintiffs' Response Brief Pursuant to Court's Order for Further Briefing [Docs. 53, 64]** |
| v. | |
| Entergy Arkansas, LLC, Entergy Power, LLC, and Entergy Mississippi, LLC, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iv

TABLE OF EXHIBITS  ........................................................ xi

INTRODUCTION ............................................................... 1

ARGUMENT .................................................................... 1

I.     Plaintiffs Have Article III Constitutional Standing to Bring This Clean Air Act Citizen Suit Enforcement Case ............................................................ 1

     A.  Emissions from Independence and White Bluff Contribute to Hazy Conditions that Injure Plaintiffs' Members and Will Be Redressed by Success in this Clean Air Act Enforcement Action .......................................................... 2

     B.  $NO_x$ Emissions from the Plants Contribute to Poor Air Quality in St. Louis and Memphis and Injure Sierra Club's Members Who Live and Work There ................. 12

     C.  Mercury Emissions from the Plants Contaminate Arkansas Fish ................. 15

     D.  Sierra Club's Members Have Standing to Challenge the Opacity Violations at White Bluff ..................................................................... 18

     E.  The Injuries of Plaintiffs' Members Give Plaintiffs Sierra Club and NPCA Associational Standing ..................................................... 19

     F.  AAEC's Arguments Regarding Plaintiffs' Standing Are Unavailing ............ 19

II.    Plaintiffs Were Not Bound to Exhaust Administrative Remedies Before Bringing this Action ..................................................................... 22

III.   Under 42 U.S.C. § 7607(b)(2), the Proposed Intervenors' Argument that this Action Usurps the State's Ability to Regulate Local Public Utility Rates is Barred .............. 26

IV.   The Applicable Statute of Limitations, 28 U.S.C. § 2462, Is "Non-jurisdictional," Should Not Be Raised *Sua Sponte* or By Non-Parties, and the "Public Interest" Exception to Waiver Does Not Apply In This Case ............................................ 28

     A.  As Prior Courts Have Already Ruled, 28 U.S.C. § 2462 Is a "Non-jurisdictional" Statute of Limitations ..................................................... 29

     B.  A "Non-jurisdictional" Statute of Limitations Should Not Be Raised *Sua Sponte* By This Court or By Non-Parties ............................................... 33

   C.  The "Public Interest" Exception to Waiver Cited By AAEC Is Inapplicable Here, And AAEC's Interpretation of That Standard Is Inaccurate...............................................35

        a.  The Presumption That Statutory Provisions Are Subject to Waiver by Voluntary Agreement of the Parties Applies Here ..........................................35

        b.  28 U.S.C. § 2462 Is Not "A Statutory Right Conferred on a Private Party" ...36

        c.  AAEC Misinterprets the "Affects the Public Interest" Standard, And Defendants Waiver of the Statute of Limitations Defense Would Not "Contravene the Statutory Policy" or Purpose of the CAA That "It Was Meant to Effectuate" ...................................................................................................38

        d.  Defendants May Waive 28 U.S.C. § 2462 Under Any Public Interest Standard ............................................................................................................42

V.    The Opacity Limit Violations Have No Time Bar Issues, and the Settlement Agreement Lodged In This Court Would Resolve the Additional Claims in the Amended Complaint In The Public Interest ...........................................................................................................44

VI.   The Proposed Intervenors Do Not Meet the Applicable Legal Standards for Intervention ................................................................................................................................45

CONCLUSION..................................................................................................................................46

## TABLE OF AUTHORITIES

**Cases**

*Action for Rational Transit v. W. Side Highway Project by Bridwell*,
    699 F.2d 614 (2d Cir. 1983)........................................................................ 24, 25

*Arizona Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125, 131 S. Ct. 1436, 179 L. Ed. 2d 523 (2011)................................ 45

*Ass'n of Irritated Residents v. C & R Vanderham Dairy*,
    435 F. Supp. 2d 1078 (E.D. Cal. 2006).................................................... 24, 26

*Ass'n of Irritated Residents v. C & R Vanderham Dairy*,
    No. 105CV-01593 OWW SMS, 2007 WL 2815038
    (E.D. Cal. Sept. 25, 2007)................................................................................. 21

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*,
    177 F. Supp. 2d 1011 (N.D. Cal. 2001) ........................................................... 21

*Brooklyn Sav. Bank v. O'Neil*,
    324 U.S. 697, 65 S. Ct. 895, 89 L. Ed. 1296 (1945) ................................. *passim*

*Canady v. S.E.C.*,
    230 F.3d 362 (D.C. Cir. 2000) ......................................................................... 41

*Chasteen v. Rock Financial*,
    No. 07-cv-10558, 2012 WL 8705090 (E.D. Mich. Jan. 31, 2012) ................... 37

*Clark v. Capital Credit & Collection Services, Inc.*,
    460 F.3d 1162 (9th Cir. 2006) ......................................................................... 39

*Communities For a Better Environment v. Cenco Ref. Co.*,
    180 F. Supp. 2d 1062 (C.D. Cal. 2001) ........................................................... 24

*Day v. McDonough,*
    547 U.S. 198, 126 S. Ct. 1675, 164 L.Ed.2d 376 (2006) ........................... 33, 35

*DeArment v. Lehman*,
    No. 90-5099, 1991 WL 270172 (W.D. Ark. Mar. 1, 1991)............................... 40

*Doe v. Constant*,
    354 Fed. Appx. 543 (2d Cir. 2009)................................................................... 26

*Doe v. County of Montgomery*,
    41 F.3d 1156 (7th Cir.1994) ............................................................................ 21

*Envtl. Def. v. Duke Energy Corp.*,
    549 U.S. 561, 127 S. Ct. 1423, 1436, 167 L. Ed. 2d 295 (2007)...................................... 27

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    66 F. Supp. 3d 875 (S.D. Tex. 2014) ............................................................................ 22

*F.D.I.C. v. Williams*,
    60 F. Supp. 3d 1209 (D. Utah 2014)............................................................................. 44

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)..................................... 1, 2, 4, 20

*Gabelli v. S.E.C.*,
    568 U.S. 442, 133 S. Ct. 1216, 185 L. Ed. 2d 297 (2013) ........................................ 31, 38

*Grand Canyon Tr. v. Tuscon Elec. Power Co.*,
    269 F. Supp. 2d 1195 (D. Ariz. 2003) ........................................................................... 20

*Hagans v. Lavine*,
    415 U.S. 528, 94 S. Ct. 1372, 39 L. Ed. 2d 577 (1974)................................................... 45

*Hanson v. McBride*,
    No. 3:18-cv-00524, 2019 WL 6250766
    (M.D. Tenn. Nov. 22, 2019) ........................................................................................ 40

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011)......................................... 29, 31

*In re Big River Steel, LLC,* Petition No. VI-2013-10 (U.S. E.P.A. Oct. 31, 2017)
    (August 9, 2010) ("*Nucor Steel Order*") .......................................................................25

*In re DiVittorio*,
    670 F.3d 273 (1st Cir. 2012) ........................................................................................ 41

*In re Lehman Bros. Securities and ERISA Litigation*,
    No. 09 MD 2017(LAK), 2012 WL 6584524
    (S.D.N.Y. Dec. 18, 2012)................................................................................. 42, 43, 44

*Jean v. Dorelien*,
    431 F.3d 776 (11th Cir. 2005) ..................................................................................... 26

*John R. Sand & Gravel Co. v. U.S.*,
    552 U.S. 130, 128 S. Ct. 750, 169 L. Ed. 2d 591 (2008).................................................. 34

*King v. Briggs*,
    83 F.3d 1384 (Fed. Cir. 1996)...................................................................................... 46

*Knick v. Township of Scott, Pennsylvania,*
    139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019) ................................................................. 25

*LaFleur v. Whitman,*
    300 F.3d 256 (2d Cir.2002)........................................................................................... 21

*Lancaster v. Buerkle Buick Honda Co.,*
    809 F.2d 539 (8th Cir. 1987) ....................................................................................... 41

*League to Save Lake Tahoe, Inc. v. Trounday,*
    598 F.2d 1164 (9th Cir. 1979) ..................................................................................... 25

*Logan v. MGM Grand Detroit Casino,*
    939 F.3d 824 (6th Cir. 2019) ..................................................................... 37, 38, 40, 44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)............................................. 20

*Maalouf v. Islamic Republic of Iran,*
    923 F.3d 1095 (D.C. Cir. 2019) .................................................................................. 34

*Mathews v. Eldridge,*
    424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)....................................................... 26

*Mid State Horticultural Co., Inc. v. Pennsylvania R. Co.,*
    320 U.S. 356, 64 S. Ct. 128, 88 L. Ed. 96 (1943)................................................... 42, 44

*Musacchio v. United States,*
    136 S. Ct. 709, 193 L. Ed. 2d 639 (2016) .................................................................... 29

*New York v. Hill,*
    528 U.S. 110, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000)........................................... 36, 39

*Northwest Environmental Defense Center v. Cascade Kelly Holdings LLC,*
    155 F. Supp. 3d 1100 (D. Or. 2015) ........................................................................... 24

*Oregon Envtl. Council v. Oregon Dep't. of Envtl. Quality,*
    775 F. Supp. 353 (D. Or. 1991) ................................................................................. 24

*Redzepagic v. Hammer,*
    No. 14 Civ. 9808 (ER), 2017 WL 780809
    (S.D.N.Y. Feb. 27, 2017) ........................................................................................... 40

*Riccio v. Sentry Credit, Inc.,*
    954 F.3d 582 (3d Cir. 2020)......................................................................................... 25

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,*
   547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) ................................................... 2

*Sebelius v. Auburn Reg'l Med. Ctr.,*
   568 U.S. 145, 133 S. Ct. 817, 184 L. Ed. 2d 627 (2013) ........................................... 29, 30

*Secretary, U.S. Department of Labor v. Preston,*
   873 F.3d 877 (11th Cir. 2017) .......................................... 30, 33, 36, 42, 43, 44

*S.E.C. v. Amerindo Inv. Advisors,*
   639 Fed. Appx. 752 (2d Cir. 2016) ............................................... 29, 33, 34, 41

*S.E.C. v. Graham,*
   21 F. Supp. 3d 1300 (S.D. Fla. 2014) ............................................................... 30

*Sierra Club v. Cedar Point Oil Co., Inc.,*
   73 F.3d 546 (5th Cir.1996) ............................................................................. 21

*Sierra Club v. Envtl. Prot. Agency,*
   796 F.3d 656 (6th Cir. 2015) ........................................................................... 20

*Sierra Club v. Envtl. Prot. Agency,*
   926 F.3d 844 (D.C. Cir. 2019) .................................................................... 4, 20

*Sierra Club v. Franklin Cty. Power of Illinois, LLC,*
   546 F.3d 918 (7th Cir. 2008) ........................................................................... 21

*Sierra Club v. Otter Tail Power Co.,*
   615 F.3d 1008 (8th Cir. 2010) ......................................................................... 22

*Sierra Club v. U.S. Army Corps of Engineers,*
   645 F.3d 978 (8th Cir.  2011) ....................................................................... 21

*Sims v. Apfel,*
   530 U.S. 103, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) .................................... 26

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.,*
   207 F.3d 789 (5th Cir. 2000) ........................................................................... 13

*Tucker v. Beneficial Mortg. Co.,*
   437 F. Supp. 2d 584 (E.D. Va. 2006) .............................................................. 41

*United States v. Ameren Missouri,*
   421 F. Supp. 3d 729 (E.D. Mo. 2019) ............................................................... 5

*United States v. Hines*,
   No. 3:16-cv-1477-J-32PDB, 2017 WL 6536574
   (M.D. Fla. Dec. 21, 2017) ........................................................................ 29, 30, 33

*United States v. Kwai Fun Wong*,
   575 U.S. 402, 135 S. Ct. 1625, 191 L. Ed. 2d 533 (2015) ....................................... *passim*

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33, 73 S. Ct. 67, 97 L. Ed. 54 (1952) ................................................. 45

*United States v. Mezzanatto*,
   513 U.S. 196, 115 S. Ct. 797, 130 L. Ed. 2d 697 (1995) ......................................... 35, 36

*United States v. Mitchell*,
   518 F.3d 740 (10th Cir. 2008) .................................................................... 34

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
   412 U.S. 669, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973) .......................................... 21

*United States v. Wisconsin Elec. Power Co.* ("*WEPCO*"),
   522 F. Supp. 2d 1107 (E.D. Wis. 2007) ......................................................... 41, 42

*Utah Physicians for A Healthy Env't v. Diesel Power Gear, LLC*,
   374 F. Supp. 3d 1124 (D. Utah 2019) ........................................................... 22

*VanLandingham v. Grand Junction Reg'l Airport Auth.*,
   46 F. Supp. 3d 1119 (D. Colo. 2014) ...................................................... 28, 35, 36, 38

*Warner Bros. Entm't v. X One X Prods.*,
   840 F.3d 971 (8th Cir. 2016) .................................................................... 34

*Wash. Envtl. Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ................................................................... 21

*Weiler v. Chatham Forest Products, Inc.*,
   392 F.3d 532 (2d Cir. 2004) .................................................................... 24

*WildEarth Guardians v. U.S. E.P.A.*,
   759 F.3d 1064 (9th Cir. 2014) ................................................................... 21

*Wlodynski v. Ryland Homes of Florida Realty Corp.*,
   No. 8:08-CV-00361-JDW-MAP, 2008 WL 2783148
   (M.D. Fla. Jul. 17, 2008) ........................................................................ 37

*Yagman v. Pompeo*,
   868 F.3d 1075 (9th Cir. 2017) ................................................................... 26

**Statutes**

28 U.S.C. § 1658 ................................................................................................... 37, 38

28 U.S.C. § 2401 ................................................................................................... 31, 32

28 U.S.C. § 2462 .................................................................................................. *passim*

CAA Section 169, 42 U.S.C. § 7479(3) .................................................................. 5, 11

CAA Section 304(a)(1), 42 U.S.C. § 7604(a)(1) ................................................. *passim*

CAA Section 304(a)(3), 42 U.S.C. § 7604(a)(3) ................................................. *passim*

CAA Section 307(b)(2), 42 U.S.C. § 7607(b)(2) .............................................. 22, 23, 27

CAA Section 504(f), 42 U.S.C. § 7661c(f) ............................................................... 23

**Regulations and Federal Register Notices**

40 C.F.R. Part 51, Appendix Y ................................................................................ 8, 9

40 C.F.R. § 51.301 ..................................................................................................... 8

40 C.F.R. § 81.326 .................................................................................................... 13

47 Fed. Reg. 2112 (Jan. 14, 1982) ............................................................................ 27

65 Fed. Reg. 61,103 (Oct. 16, 2000) ......................................................................... 27

66 Fed. Reg. 51,312 (Oct. 9, 2001) ........................................................................... 28

69 Fed. Reg. 4566 (Jan. 30, 2004) ............................................................................ 17

70 Fed. Reg.  25,162 (May 12, 2005) ......................................................................... 17

70 Fed. Reg. 39,104 (July 6, 2005) ............................................................................ 8

75 Fed. Reg. 45,210 (Aug. 2, 2010) ........................................................................... 17

Arkansas Pollution Control and Ecology Commission (APC&EC)
      Reg. 19, Chapter 2 ......................................................................................... 18, 19

Arkansas Pollution Control and Ecology Commission (APC&EC)
      Reg. 26.301(A) ................................................................................................. 5, 10

Arkansas Pollution Control and Ecology Commission (APC&EC)
        Reg. 26.301(C)................................................................................5, 10

Arkansas Pollution Control and Ecology Commission (APC&EC)
        Reg. 26.704 ...........................................................................................23

**Rules**

Eighth Cir. Rule 32.1A ....................................................................................45

Fed. R. Civ. P. 1 ...............................................................................................43

Fed. R. Civ. P. 8(c) .............................................................................34, 38, 43

Fed. R. Civ. P. 12(b) ................................................................................38, 43

**Other Materials**

Federal Land Managers' Air Quality Related Values Work Group (FLAG)
        Phase I Report at x-xi and § 3.3.3 (2010) .......................................... 9

## TABLE OF EXHIBITS

Exhibit 1
     Declaration of Mr. John Hill ............................................................................3

Exhibit 2
     Declaration of Mr. Brandon Markin .................................................................4

Exhibit 3
     Declaration of Ms. Victoria R. Stamper ...................................5, 6, 11, 13, 15

Exhibit 4
     Declaration of Dr. H. Andrew Gray ..............................................................7, 8

Exhibit 5
     Declaration of Mr. Rick Owen ....................................................................4, 18

Exhibit 6
     Declaration of Ms. Ann Owen .....................................................................4, 18

Exhibit 7
     Declaration of Ms. Mary Weeks .................................................................4, 18

Exhibit 8
     Declaration of Mr. Scott Banbury ..................................................................13

Exhibit 9
     Declaration of Ms. Sarah Willey ...................................................................12

Exhibit 10
     Declaration of Mr. John Hickey .....................................................................13

Exhibit 11
     Declaration of Mr. Lyle R. Chinkin ..........................................................14, 15

Exhibit 12
     Declaration of Ms. Michelle Epstein ..............................................................19

Exhibit 13
     Declaration of Ms. Laura Conners .................................................................19

Exhibit 14
     Declaration of Mr. James Bruce McMath...................................................4, 18

Exhibit 15
     Notice from Shelby County Health Department.................................................

Exhibit 16
    Mercury in Fish in Arkansas, What You Should Know ....................................................16

Exhibit 17
    Fish Consumption Notice - Mercury in Fish ...................................................................16

## INTRODUCTION

Plaintiffs Sierra Club and National Parks Conservation Association respectfully submit this Response Brief pursuant to the Court's Orders dated September 30, 2019 [Doc. 53] and February 21, 2020 [Doc. 64].  As shown below, Plaintiffs have standing to bring this action, and they were not required to exhaust administrative remedies before bringing it.  With respect to the argument of the proposed intervenors that this action usurps the regulatory authority of the Arkansas Public Service Commission, that argument should have been raised during the rulemakings creating the Arkansas PSD program, not now in this enforcement action.  Furthermore, the applicable statute of limitations defense is non-jurisdictional and has been waived.  Finally, the opacity violations have no limitations or subject matter jurisdiction issues, and the settlement agreement addresses all claims in the amended complaint in the public interest.

## ARGUMENT

### I.   Plaintiffs Have Article III Constitutional Standing to Bring This Clean Air Act Citizen Suit Enforcement Case.

Contrary to the contentions of the Arkansas Affordable Energy Coalition ("AAEC") [Doc. 68, at 3 – 11], Plaintiffs National Parks Conservation Association ("NPCA") and Sierra Club have standing to bring this action.  To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Id*. at 181.  The presence of one party with

standing is sufficient to satisfy Article III's case-or-controversy requirement.  *Rumsfeld v. Forum*

*for Acad. and Inst. Rights, Inc.,* 547 U.S. 47, 52 n.2, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

In this case, Plaintiffs' members have numerous injuries in fact, each of which is fairly

traceable to Entergy's Clean Air Act ("CAA") violations at Independence and White Bluff, and

each of which would be redressed if Plaintiffs obtain the relief sought.  These injuries include (1)

aesthetic injuries caused by observing hazy conditions where Plaintiffs' members live, work, and

recreate; (2) reasonable concerns related to health while living and working in areas that

struggling to meet federal ambient air quality standards; (3) limitations of the consumption of

fish with high mercury concentrations; and (4) observation of air pollution being emitted from

the smoke stacks at the White Bluff plant.

A. Emissions from Independence and White Bluff Contribute to Hazy Conditions that
   Injure Plaintiffs' Members and Will Be Redressed by Success in this Clean Air Act
   Enforcement Action.

1. *Injury-in-Fact*

Several of Plaintiffs' members have been and continue to suffer aesthetic injury by

having to put up with hazy, polluted skies where they live, work, and recreate.  Jack Stewart, a

retired teacher and member of NPCA, has lived next to the Buffalo National River Park, where

he walks almost every day, for 20 years.  He is concerned about the impact haze is having on his

view of natural scenery in the park and his views of the river and mountains in the distance, as

well as the bluffs above the river.  [Doc. 54, at 38-39].

Robert Allen is a retired chemistry professor and Sierra Club member.  He visits the

Buffalo National River area at least six times a year where he enjoys camping, hiking, and

canoeing, but he finds that haze pollution in the area lessens his enjoyment.  [Doc 54, at 42-43].

"[H]aze in the area decreases visibility and my ability to take in scenic views from the nearby

bluffs, lessening my enjoyment of the area."  He also visits Hot Springs National Park around

twice a year, and has been disturbed by the hazy conditions he has found there.

Don Castleberry is a retired National Park Superintendent who is a member of NPCA and

Sierra Club.  Castleberry lives in Maumelle, Arkansas and regularly visits both Buffalo National

River and Hot Springs National Park.   At the river, he enjoys hiking, canoeing, floating down

the river, and photography, but he is disturbed by the hazy conditions he has seen there "when

viewing vista points such as at Buffalo Point and other high points along the river."  [Doc. 54, at

48-49].  He has also observed hazy conditions at Hot Springs National Park, which he visits

every six to eight weeks:

> The park has two mountains with a meandering drive up to a popular observation tower
> with dramatic views.  From this point hazy conditions and pollution are readily visible.
> The visible haze lessens my enjoyment at Hot Springs National Park.

*Id*. at 49.  Castleberry is also troubled by hazy skies he has observed near his home in Maumelle,

especially apparent when crossing the Interstate 430 bridge connecting Maumelle to Little Rock

or when looking west to Pinnacle Mountain State Park.  *Id.* at 50.

Janet Nye is also an NPCA member who lives in Maumelle.  *Id.* at 53.  She has a second

home in Gilbert, which is only a quarter mile from the boundary of the Buffalo National River

Park.  She enjoys hiking the Buffalo River Trail, but her enjoyment of the experience is

diminished by "hazy conditions." *Id*. at 55.

> In areas where the view is particularly expansive, the haze makes the visibility poor.  It
> really bothers me when I hike up to an overlook only to find the vista obscured by haze.

John Hill, a Sierra Club member who lives in Western Little Rock, is troubled by the

hazy conditions he experiences outside his home.  **Exhibit 1.**  He notices hazy conditions at

times when he looks toward the Pinnacle Mountains and Ouachita Mountains and in his routine,

3

almost daily walks around Two Rivers Park and Pinnacle Mountain State Park.  Of the latter, he

notes that there is a "steep climb, but there is a beautiful, far-reaching view of Little Rock and

beyond from the top."  Seeing smog, however, "decreases [his] enjoyment of these walks."

Another Sierra Club member who lives in the Little Rock area (north) is Brandon Markin.

**Exhibit 2**.  As a photographer, he is particularly aware of hazy conditions around Little Rock,

which he observes about half of the year.

> There are some really unique and beautiful spots that I enjoy photographing like places in
> the Delta, the Ozarks, and the Ouachita Mountains.  If the air is too hazy, it is not worth it
> for me to go out to photograph due to poor quality of light which will affect the quality of
> photos I take.

*Id.*  Like Mr. Hill, Mr. Markin also spends time hiking in Pinnacle Mountain State Park and Two

Rivers Park, it saddens him when smog inhibits the views from those parks.  Other Sierra Club

members who live in the Little Rock area are also disturbed by the haze they observe, including

Richard Owen, **Exhibit 5**, Ann Owen, **Exhibit 6**, Mary Weeks, **Exhibit 7**, and Bruce McMath,

**Exhibit 14**.

The harms described above establish injury-in-fact for Plaintiffs' members.  *See Laidlaw,*

528 U.S. at 182; *Sierra Club v. Envtl. Prot. Agency*, 926 F.3d 844, 849 (D.C. Cir. 2019).

2.   *Traceability*

The aesthetic injuries to Plaintiffs' members from the haze and smog that they observe

are traceable to Entergy's alleged violations in this case.  As discussed below, the object of

Plaintiffs' action is to reduce emissions of $SO_2$ and $NO_x$ from White Bluff and Independence.

These pollutants are contributing to the smog and haze being observed by Plaintiffs' members.

With respect to Plaintiffs' claims, as the Court pointed out in its September 30, 2019

order, [Doc. 53, at 4-5], Plaintiffs allege that in 2007, 2008, and 2009, Entergy made unpermitted

major modifications at White Bluff and Independence.  In Arkansas, there are significant

consequences for these types of violations.  First, any major source in Arkansas making a major modification must obtain a modified Title V permit, APC&EC Reg. 26.301(C), and may not operate without one.  APC&EC Reg. 26.301(A).  Thus, under the law, the plants should stop operating until they obtain the proper operating permits, which would drop emissions of $SO_2$ and $NO_x$ from their current levels to zero.

Second, as the Court also noted, [Doc. 53, at 5], the required permits for Independence and White Bluff would include "emission limitations that would be imposed by that permit pursuant to BACT requirements."  *See United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 804 (E.D. Mo. 2019) (In a New Source Review ("NSR") enforcement action, the court concluded that an owner who performed an unpermitted major modification at a coal-fired power plant "must obtain the necessary PSD permit for the facility [and] implement the best available control technology.").  Therefore, a successful outcome in this case would lead to the imposition of Best Available Control Technology ("BACT") emission limitations for $SO_2$ at Independence Units 1 and 2, and for $NO_x$ at White Bluff Unit 2.  While BACT is to be determined on a case-by-case basis for a source, the Clean Air Act mandates a minimum level of BACT emissions control by providing that "in no event shall application of 'best available control technology' result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 ... of this title."  42 U.S.C. § 7479(3).  These "New Source Performance Standards" establish the BACT "floor," and thus it can be said with certainty that imposition of BACT for $SO_2$ at Independence and BACT for NOx at White Bluff would require emission reductions below the current levels from Independence and White Bluff. *See* Stamper Declaration, **Exhibit 3.**

The next question with respect to traceability is: do emissions of $SO_2$ from Independence and of $NO_x$ from White Bluff contribute to hazy or smoggy conditions observed by Plaintiffs' standing witnesses?  As shown below, the answer is yes.

First, Victoria Stamper, an expert retained by Plaintiffs, evaluated current levels of emissions from the plants.  **Exhibit 3**.  Ms. Stamper received a Bachelor of Science Degree in Civil Engineering from Michigan State University in 1989.  She worked for ten years at EPA's office in Denver as the lead staff member on NSR requirements of state implementation plans, acquiring expert knowledge on Clean Air Act requirements and federal regulations pertaining to NSR.  *Id.*  In 2003, she established her own consulting business and has reviewed and has assisted with comments, or provided expert comments, on BACT determinations for approximately 20 proposed new coal-fired power plants.

Ms. Stamper has analyzed the current emissions levels from Independence and White Bluff based on actual emissions data for each unit recorded with continuous emissions monitoring systems and reported to EPA's Air Markets Program Database.  *Id.*  Ms. Stamper has determined the hourly emission rates for the plants on the 90th percentile day over the 2018-19 time period for the relevant pollutants.  *Id.*  Ms. Stamper chose the 90th percentile day as a conservative assumption.  In comparison to the 90th percentile day, there were 72 days over the 2018-2019 timeframe when Independence emitted $SO_2$ or White Bluff emitted $NO_x$ at a higher daily rate.

The following table (Table 1) shows the 24-hour average emission rates of $SO_2$ and NOx on the relevant 90th percentile day.  Note the extent of these emissions.  For example, on the relevant day, Independence emitted $SO_2$ at approximately 7560 pounds (~3.8 ***tons***) per **hour.**

| Table 1 | | | |
|---|---|---|---|
| Plant/Unit | 90th Percentile Day of Highest Plantwide $SO_2$ (for Independence) or $NO_x$ (for White Bluff) Emissions Over 2018-2019 | Unit-Specific $SO_2$ Emissions on 90th Percentile Day over 2018-2019, lb/hr | Unit-Specific $NO_x$ Emissions on 90th Percentile Day over 2018-2019, lb/hr |
| Independence U1 | 9/27/19 | 3,478.75 | 884.83 |
| Independence U2 | 9/27/19 | 4,081.17 | 1,022.08 |
| White Bluff U1 | 1/21/2019 | 4,673.17 | 1,354.00 |
| White Bluff U2 | 1/21/2019 | 4,079.08 | 1,028.17 |

Plaintiffs then asked an experienced expert air pollution modeler whether he would expect a plant emitting at the rate identified by Ms. Stamper to contribute to visibility impairment at the locations where Plaintiffs' standing witnesses experienced hazy or smoggy conditions. For this task, Plaintiffs chose Dr. H. Andrew Gray. Dr. Gray holds a Ph.D. and M.S. in environmental engineering science from California Institute of Technology and a B.S. in civil engineering/engineering and public policy from Carnegie-Mellon University. *See* **Exhibit 4**. For over forty years, Dr. Gray has conducted research on air quality for governments, corporations, and citizen groups.

As Dr. Gray explains in his report, *id.*, when pollution is emitted into the air from facilities like White Bluff and Independence, the emissions can cause hazy conditions and impair visibility in several ways. Haze is caused by pollution particles in the air that absorb and scatter sunlight, which results in a reduction in clarity and color. Dr. Gray describes that:

> Some visibility-impairing pollutants are directly emitted into the air, such as particulate matter that is released as ash in the flue gas from the combustion of coal in the boiler, and these pollutants can scatter light and impair visibility. Other pollutants are emitted from the stacks in gaseous form, such as $SO_2$ and $NO_x$, but then convert to sulfate and nitrate particles in the air due to reactions with other compounds such as ammonia. The sulfate and nitrate particles are "hygroscopic" meaning that these particles grow in size in the presence of water vapor. At high ambient relative humidity levels, sulfate and nitrate particles grow to roughly a size equivalent to wavelength of light where they become highly efficient at scattering light. For this reason, sulfate and nitrate pollution are among the most common causes of visibility impairment.

**Exhibit 4,** at 6-7.

7

When a permitting authority conducts dispersion modeling to determine the impacts a plant may have on visibility impairment, it often uses the CALPUFF air dispersion model. CALPUFF is the model recommended by Federal Land Managers for evaluating visibility impacts from a stationary source. **Exhibit 4,** at 8.  Specifically, EPA has stated that "CALPUFF is the best modeling application available for predicting a single source's contribution to visibility impairment."  70 Fed. Reg. 39,104 at 39,122 (July 6, 2005).  Dr. Gray used this same model to determine whether emissions from White Bluff and Independence contribute to hazy conditions observed by Plaintiffs' standing witnesses.  Dr. Gray modeled the 90th percentile maximum daily $SO_2$ emission rate for the Independence plant and the 90th percentile maximum daily $NO_x$ emission rate for the White Bluff plant over the most recent two years of data (i.e., 2018-2019) rather than modeling the twenty-four hour average emission rate from the maximum emitting day as called for in EPA's BART guidelines.  40 C.F.R. Part 51, Appendix Y, Section III.A.3.

To determine whether visibility impairment will occur due to an emissions source, visibility impairment occurs for the purpose of Dr. Gray's modeling analysis when there is a change in the "deciview index" compared to natural background which exceeds 0.5 deciviews (dv).[1]  EPA has established deciviews as a unit of measurement of haze, and it is designed to reflect changes in visual perception.  Also, consistent with FLAG and Appendix Y, the modeling applies the 98th percentile dv value, which equates to the 8th highest change in dv for a one-year modeling period (8/365 = 0.0219).[2]  For his report, and consistent with EPA regulations and

---

[1] Deciview is the unit of measurement on the deciview index scale for quantifying in a standard manner human perceptions of visibility.  40 C.F.R. § 51.301.
[2] *See* 40 C.F.R. Part 51, Appendix Y at III.A.3. Option 1 (EPA BART Guidelines); *see also* Federal Land Managers' Air Quality Related Values Work Group (FLAG) Phase I Report at x-xi

guidance, Dr. Gray defined the natural background using published data from FLAG 2010 on the 20% best natural visibility days.

In conducting his study, Dr. Gray examined areas where Plaintiffs' standing witnesses observe hazy conditions including Buffalo National River Park, Hot Springs National Park, and the Little Rock metropolitan area.  Specifically, Dr. Gray modeled four rectangular areas corresponding with locations where NPCA and Sierra Club members observed hazy conditions. Dr. Gray found that the visibility impacts exceeding 0.5 deciviews "are pervasive" and that "the 98th percentile change in deciview index exceeds 0.5 [deciviews] at all receptors modeled."  The tables below show a summary of his results.

**Table 2-1.**
**CALPUFF Modeled Visibility Impact Results**
**Independence Power Plant (2 units)**
**Base Case: Change in Deciviews (Δdv)**

| Location | Metric | Maximum Modeled Results for Any One Year Modeling Period |
|---|---|---|
| Hot Springs National Park | # Days>0.5 Δdv | 34 |
| | # Days>1.0 Δdv | 13 |
| | 98th %-ile Δdv | 1.381 |
| Little Rock | # Days>0.5 Δdv | 71 |
| | # Days>1.0 Δdv | 38 |
| | 98th %-ile Δdv | 2.307 |
| Overlook Trail | # Days>0.5 Δdv | 42 |
| | # Days>1.0 Δdv | 18 |
| | 98th %-ile Δdv | 1.618 |
| Jasper-Gilbert | # Days>0.5 Δdv | 48 |
| | # Days>1.0 Δdv | 21 |
| | 98th %-ile Δdv | 1.698 |

---

and § 3.3.3 (2010), available at
https://www.rosemonteis.us/sites/default/files/references/016592.pdf .

**Table 2-2.**
**CALPUFF Modeled Visibility Impact Results**
**White Bluff Power Plant (2 units)**
**Base Case: Change in Deciviews (Δdv)**

| Location | Metric | Maximum Modeled Results for Any One Year Modeling Period |
|---|---|---|
| Hot Springs National Park | # Days>0.5 Δdv | 55 |
| | # Days>1.0 Δdv | 27 |
| | 98th %-ile Δdv | 1.786 |
| Little Rock | # Days>0.5 Δdv | 93 |
| | # Days>1.0 Δdv | 58 |
| | 98th %-ile Δdv | 3.440 |
| Overlook Trail | # Days>0.5 Δdv | 59 |
| | # Days>1.0 Δdv | 18 |
| | 98th %-ile Δdv | 1.515 |
| Jasper-Gilbert | # Days>0.5 Δdv | 55 |
| | # Days>1.0 Δdv | 19 |
| | 98th %-ile Δdv | 1.582 |

As the tables above illustrate, the CALPUFF model shows that at the levels White Bluff and Independence currently emit, the plants significantly contribute to visibility impairment in all areas where Plaintiffs' standing witnesses observed hazy conditions. For example, White Bluff alone causes 93 days a year when visibility is impaired by at least half a deciview, and 58 days when impairment is at least one deciview. The impact is so significant that on the 98th percentile day in Little Rock, visibility impairment is 3.440 deciviews. As mentioned above, visibility is impaired when the change from natural background exceeds .5 deciviews.

> 3.  *Redressability*

Dr. Gray's study shows that the aesthetic injuries due to the haze and smog observed by Plaintiffs' members can be redressed by a favorable ruling in this action. Under APC&EC Reg. 26.301(A) and (C), the plants may not operate without a revised Title V permit containing PSD requirements, and during those periods of non-operation, all of the visibility impacts shown by Dr. Gray's study, and discussed above, would disappear.

Dr. Gray's study showed further impacts of redressability.  Dr. Gray modeled what would happen if the minimum level of control required through the definition of BACT (the "applicable standard established pursuant to section 7411," *see* 42 U.S.C. § 7479(3)), is imposed as a result of the outcome of the case.  To conduct this analysis, Plaintiffs' expert Stamper calculated the emission rate that would result through the imposition of the "BACT floor."  **Exhibit 3**, at ¶¶ 23-24.  Dr. Gray then used this information to show the positive contributions toward visibility improvement that would result.  These results are reflected in the Tables below.

**Table 2-5.**
**CALPUFF Modeled Visibility Impact Results**
**Independence Power Plant (2 units)**
**Improvement for NSPS vs. Base: Change in Deciviews (Δdv)**

| Location | Metric | Maximum Modeled Results for Any One Year Modeling Period |
|---|---|---|
| Hot Springs National Park | Reduced # Days>0.5 Δdv | 25 |
| | Reduced # Days>1.0 Δdv | 12 |
| | Reduced 98th %-ile Δdv | 0.898 |
| Little Rock | Reduced # Days>0.5 Δdv | 36 |
| | Reduced # Days>1.0 Δdv | 36 |
| | Reduced 98th %-ile Δdv | 1.259 |
| Overlook Trail | Reduced # Days>0.5 Δdv | 32 |
| | Reduced # Days>1.0 Δdv | 15 |
| | Reduced 98th %-ile Δdv | 1.103 |
| Jasper-Gilbert | Reduced # Days>0.5 Δdv | 33 |
| | Reduced # Days>1.0 Δdv | 18 |
| | Reduced 98th %-ile Δdv | 1.031 |

11

**Table 2-6.**
**CALPUFF Modeled Visibility Impact Results**
**White Bluff Power Plant (2 units)**
**Improvement for NSPS vs. Base: Change in Deciviews (Δdv)**

| Location | Metric | Maximum Modeled Results for Any One Year Modeling Period |
|---|---|---|
| Hot Springs National Park | Reduced # Days>0.5 Δdv | 1 |
| | Reduced # Days>1.0 Δdv | 1 |
| | Reduced 98th %-ile Δdv | 0.047 |
| Little Rock | Reduced # Days>0.5 Δdv | 2 |
| | Reduced # Days>1.0 Δdv | 4 |
| | Reduced 98th %-ile Δdv | 0.110 |
| Overlook Trail | Reduced # Days>0.5 Δdv | 4 |
| | Reduced # Days>1.0 Δdv | 2 |
| | Reduced 98th %-ile Δdv | 0.034 |
| Jasper-Gilbert | Reduced # Days>0.5 Δdv | 3 |
| | Reduced # Days>1.0 Δdv | 1 |
| | Reduced 98th %-ile Δdv | 0.016 |

B. <u>NO$_x$ Emissions from the Plants Contribute to Poor Air Quality in St. Louis and Memphis and Injure Sierra Club's Members Who Live and Work There.</u>

1. *Injury-in-Fact*

Sierra Club members who live in St. Louis and Memphis are also being injured because they live in areas that struggle to meet federal air quality standards for ozone, and they have reasonable concerns about their health. Sierra Club member Sarah Willey, **Exhibit 9,** lives in Florissant, Missouri, which is a suburb of St. Louis and located in Saint Louis County. Ms. Willey was diagnosed with asthma in 2011. She knows that St. Louis suffers from an air pollution problem and is concerned about the impact air pollution may have on her asthma condition. When she hears of pollution warnings on the news, she changes her behavior:

> I pay attention to the news and declarations of bad air days. My grandmother, who lives on the Illinois side of the Mississippi River, will sometimes send me text messages warning me about the air quality if she has noticed something on the news about bad air quality. On especially bad air quality days, I sometimes ask to work from home so that I can avoid going outside at all. On days like that, if I am very motivated to get outside, I

12

sometimes wear a cloth buff over my face to protect myself.  On days like that, I will not sit outside at a restaurant which I would otherwise enjoy doing.

*Id*. at ¶ 9.  John Hickey is another Sierra Club member who lives in St. Louis County, is aware of St. Louis' designation as non-attainment for ozone, and as a 60-year old, is "is worried about the impact of our ozone problem on my health," particularly because he has a family history of heart disease.  **Exhibit 10.**

Sierra Club member Scott Banbury lives in North Memphis, Tennessee.  **Exhibit 8.**  Mr. Banbury spends a lot of time outside running, biking, hiking, and paddling.  He is, however, concerned about the impacts Memphis air quality has on his health.  He receives emails from the Shelby County health department when ozone levels in Memphis are bad, and on bad air days, he avoids downtown Memphis and sometimes goes out to a state park to run instead of staying in town.  *Id*. at ¶ 6.  He is also disturbed by smudgy brown haze he sometimes sees from tall buildings in downtown Memphis.  *Id*. at ¶ 9.

These injuries are legally cognizable for standing purposes.  Courts have held that breathing unhealthy or polluted air is sufficient to show injury in fact.  *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (holding that "breathing and smelling polluted air" suffices for standing).

*2. Traceability*

Both St. Louis and Memphis suffer from unhealthy levels of ozone pollution.  EPA has designated St. Louis as "nonattainment" because the area fails to meet the 2015 National Ambient Air Quality Standard for ozone.  *See* 40 C.F.R. § 81.326.  Although EPA designated the Memphis area as attainment for ozone in 2016, it is still operating under an ozone "maintenance plan."  And even though Memphis is supposedly maintaining the standard, its monitors showed four exceedances of the ozone standard in 2019, nine exceedances in 2018, and one in 2017.

13

Stamper Declaration, **Exhibit 3,** ¶ 25.  Moreover, the Shelby County Health Department is still issuing "Code Orange" alerts when it forecasts ozone levels will exceed the ozone air quality standard.[3]

Plaintiffs' third expert, Lyle Chinkin, has concluded that the poor air quality in St. Louis and Memphis are attributable, in part, to $NO_x$ emissions from Independence and White Bluff. **Exhibit 11.**  Mr. Chinkin is Chief Scientist and Chief Executive Officer for Sonoma Technology, Inc. ("STI"), which specializes in air quality and meteorological research and services.  He received a Bachelor of Science degree in 1981 and a Master of Science in 1984 in Atmospheric Sciences from the University of California at Davis, has over 35 years of experience in professional consulting regarding air quality, and served for five years at the California Air Resources Board.  *Id*. at ¶ 2.  Much of his work involves air modeling.  Based on a modeling study he has done, Mr. Chinkin concludes that based on the most recent (2018 and 2019) levels of $NO_x$ emissions from the two plants, they "independently and collectively contribute substantially to ozone formation downwind in St. Louis and Memphis," even accounting "for reduced NOx emission rates from those facilities in 2018 and 2019."  *Id*. at ¶ 16.

As explained above in the previous section discussing visibility, Independence and White Bluff, having been the subject of unpermitted major modifications, should be barred from operating until each has a Title V permit that includes PSD emission limits.  *See* Section I.A.3 above.  Consequently, there is a traceable relationship between the illegal conduct of which Plaintiffs' complain, excess NOx emissions from the two plants, and the poor air quality in St. Louis and Memphis.  Plaintiffs' members Banbury, Hickey, and Willey have a reasonable concern about the impact this poor air quality is having on their health.

---

[3] *See* https://shelbycountytn.gov/CivicAlerts.aspx?AID=2647 (last visited April 29, 2020).

3.   *Redressability*

Through his analysis, Mr. Chinkin concluded that even accounting for recent NOx reductions from the plants, "estimated 8-hr ozone impacts from White Bluff were as large as 1.87 ppb in the Memphis area, which is well above the significance threshold of 1%" established by EPA.  **Exhibit 11**, at ¶ 16.  He adds:

> The estimated 8-hr ozone impacts from White Bluff were as large as 0.65 ppb in the St. Louis area, which is just under the significance threshold established under CSAPR, but still substantial.  Estimated ozone impacts from Independence were as large as 1.70 ppb in St. Louis and 1.33 ppb in Memphis.

*Id.*  Thus, if Plaintiffs obtain the relief they seek, during the period that the plants will have to shut down while they obtain the requisite permits, ozone creating NOx emissions will be significantly reduced.  Once White Bluff obtains a PSD permit, NOx emissions from Unit 2 at the plant will decrease by at least 26%.  Stamper Declaration, **Exhibit 3**, at ¶ 24.  Mr. Chinkin states that "the addition or subtraction of NOx emissions has a linearly proportional impact on the ozone impacts," *id.* at ¶ 12, and thus any reduction in NOx emissions from the White Bluff plant will have a linearly proportional reduction in ozone impacts due to the White Bluff plant.

C.   Mercury Emissions from the Plants Contaminate Arkansas Fish.

1.   *Injury-in-Fact*

Sierra Club member Robert Allen, discussed above, enjoys fishing a few times a year during the summer at various local spots and in wilderness areas.  [Doc. 54, at 45-46].   Because of warnings from the State of Arkansas regarding mercury contamination in fish, including at areas like Johnson Hole, Gray's Lake, and Lake Ouchita, *id.,* Allen alters his behavior:

> I … avoid fishing at locations with mercury in fish warnings.  Even though I go fishing a few times during the summers, I don't eat many local fish, preferring to catch and release. The possibility of mercury contamination is always in the back of my mind whenever I go fishing or consider eating local fish.

*Id*.

Jack Stewart, an NPCA member discussed above, is also concerned about mercury

contamination in Arkansas fish:

> I have read warnings about eating local fish due to possible contamination from pollution online.  I've seen a sign warning of mercury contamination to not eat the fish at Johnson Hole near Clinton, which is approximately 52 miles away from where I live and 58 miles from the Independence power plant.  I also understand that there is a mercury warning at Gray's Lake, which is approximately 32 miles from the White Bluff power plant. Because of mercury in fish warnings, I am much more careful about the source of the fish that I eat, and have reduced my consumption of local fish as a result.  Fried local fish is popular here.  Being nearby the Southern United States, a lot of people eat it and serve it regularly around my town and surrounding areas.  But I've definitely cut back eating the local fish since learning about the mercury warnings.  I've learned that pollution from coal-fired power plants in the area can contribute towards mercury contamination in the fish.  If the local fish are contaminated, I am also concerned for the health of larger mammals in the area, and for the health of myself and my family.

[Doc. 54, at 40-41].

### 2.  *Traceability and Redressability*

The Arkansas Department of Health has issued a Fish Consumption Notice for the

general public about Arkansas water bodies due to mercury in fish, including a notice to not eat

largemouth bass at all or to not eat bass over a certain length, and to not eat more than two meals

per month of largemouth bass, catfish and other fish from the water bodies that members express

concerns with (Gray's Lake, Johnson Hole, and Lake Ouachita).[4]   Arkansas' brochure entitled

"Mercury and Fish in Arkansas, What You Should Know," **Exhibit 16,** states that "[m]ercury is

an element that occurs naturally in rock, but it also is thought to come from burning coal and

---

[4] *See* "Fish Consumption Notice – Mercury in Fish," produced by Arkansas Department of Health, Arkansas Game and Fish Commission, and Arkansas Department of Environmental Quality, available at https://www.healthy.arkansas.gov/programs-services/topics/fish-advisories, (last visited April 30, 2020).  *See* **Exhibit 17**.

trash, as well as from some industry."   Indeed, the EPA's website on its "Mercury and Air Toxics Standards" states that "Power plants are the biggest source of mercury."[5]

The $SO_2$ pollution controls and the $NO_x$ pollution controls that would need to be installed at Independence Units 1 and 2 and White Bluff Unit 2 to meet the minimum level of BACT (i.e., the NSPS standards) which would primarily be wet or dry flue gas desulfurization (FGD) units at Independence (i.e., scrubbers) and selective catalytic reduction (SCR) at White Bluff Unit 2, have the added benefit of also reducing mercury emissions.  In fact, in 2004 and 2005, when EPA undertook its first rulemaking to address interstate transport of fine particulate matter and ozone (called the "Clean Air Interstate Rule"), EPA touted the mercury benefits of the pollution controls required by its $SO_2$ and $NO_x$ emissions trading program, stating that "we know that electric utilities can reduce their emissions of all three pollutants [i.e., $SO_2$, $NO_x$, and mercury] by installing flue gas desulfurization (FGD) (which controls $SO_2$ and mercury emissions) and selective catalytic reduction (SCR) (which controls $NO_x$ and mercury)."  69 Fed. Reg. 4566, 4575 (Jan. 30, 2004).  EPA stated with its promulgation of this Clean Air Interstate Rule that "reduced mercury emissions" were anticipated as a result of the rule which "will lessen mercury contamination in lakes and thereby potentially decrease both human and wildlife exposure to mercury-contaminated fish."  70 Fed. Reg.  25,162, 25,170, 25,219, and 25,312 (May 12, 2005). EPA continued to tout benefits of expected mercury reduction in subsequent revisions to its $SO_2$ and $NO_x$ trading program, including the benefit of decreased mercury methylation from $SO_2$ reductions.  75 Fed. Reg. 45,210, 45,350, 45,352-45,353 (Aug. 2, 2010).

---

[5] *See* EPA's Mercury and Air Toxics Standards (MATS) website, available at https://www.epa.gov/mats, (last visited April 30, 2020).

D. <u>Sierra Club's Members Have Standing to Challenge the Opacity Violations at White Bluff.</u>

1. *Injury in Fact*

Several Sierra Club members have observed, and been disturbed by, pollution coming from smoke stacks at the White Bluff plant.  For example, Rick Owen, who lives in Little Rock, sees the plant, which is about 30 miles south of town when heading South.  "It's very big and can be seen from the freeway.  The plumes of light grayish smoke that I have seen coming out of the smoke stack make me worried for my own heath and the health of my community."  **Exhibit 5**, at ¶ 6.  His wife Ann, **Exhibit 6**, at ¶ 8, shares similar concerns:

> I live about 30 miles from the White Bluff Power Plant.  I pass by the plant occasionally when driving south and have seen it in the past month.  The plant can be viewed from the highway, and I have observed the opaque, dense smoke that comes out of the stacks.  Because I have known about the plant and the pollution it emits for a long time, I am generally concerned for my own heath and the health of my community, but seeing the actual emissions increases my concern.  I think about how widespread the impacts of pollution are.

Mary Weeks, another Sierra Club member from Little Rock, also finds the visible pollution emanating from White Bluff disturbing:

> I sometimes take trips to Monticello, Arkansas to visit friends down there and will see the power plant on the way.  On those drives, I see the pollution from the plant.  When I see that pollution, I think about that pollution coming to ground level and all the people impacted by it.  I worry that it detracts from the quality of life of people breathing that pollution.

**Exhibit 7**, at ¶ 5.  Sierra Club member James Bruce McGrath has also been disturbed by "the plumes of smoke emitting from the stacks" at White Bluff, as seen both from the air in his small plane and when he travels on I-530.   **Exhibit 14.**

2. *Traceability and Redressability*

According to the Arkansas SIP, "'Opacity' means the degree to which air emissions reduce the transmission of light and obscure the view of an object in the background."  APC&EC

18

Reg. 19, Chapter 2.  In the amended complaint, [Doc. 54], Plaintiffs alleged that Entergy violated the twenty percent opacity standard at White Bluff 323 times, including 185 times after December 17, 2014.  *Id.* at ¶ 118 and Exhibit B.  The opacity standards at issue help control the very problem Plaintiffs' members are complaining about, namely visible pollution coming from White Bluff's stacks.  Thus, Plaintiffs' injuries are directly traceable to Entergy's violations, and if Entergy brings White Bluff's visible emissions under control, those injuries will be redressed.

    E.   <ins>The Injuries of Plaintiffs' Members Give Plaintiffs Sierra Club and NPCA Associational Standing</ins>.

    The declarations of Michelle Epstein (Sierra Club) and Laura Connors (NPCA) confirm that all of Plaintiffs' members discussed above are members of the respective organizations and were members at the time the Complaint, [Doc. 1], was filed on November 16, 2018.  **Exhibits 12** and **13**.  Furthermore, the claims Plaintiffs' are bringing in this case are germane to their organizational purposes.  NPCA's purpose is "to protect and enhance America's national parks." **Exhibit 13**, at ¶ 4.  As part of this work, NPCA advocates for protection of the natural environment, including air quality, in and around national parks.  It has also engaged in litigation and provided comments to federal agencies regarding rulemakings affecting visibility and air quality in and around those parks.  *Id.*  Similarly, Sierra Club's mission "is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives." **Exhibit 12**, at ¶ 6.

    F.  <ins>AAEC's Arguments Regarding Plaintiffs' Standing Are Unavailing</ins>.

    AAEC's arguments regarding Plaintiffs' standing to bring this action are refuted by the above facts and expert witness declarations.  As Plaintiffs have shown, this is not a case like

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), where the plaintiffs were seeking to protect endangered species in a far off land that they had no concrete plans of visiting in the future.  Rather, this is a case where Plaintiffs members who live and work in Eastern Arkansas and neighboring states breathe the air and suffer a variety of injuries from the largest sources of air pollution in Eastern Arkansas.

As shown above, Plaintiffs' members are not concerned about general public health effects alone [Doc. 68, at 7].  Rather, they have reasonable concerns about the impacts the plants are having on their own lives and health.  *See Laidlaw,* 528 U.S. at 182 (noting that plaintiff's members "reasonable concerns about the effects of [defendant's] discharges, directly affected those affiants' recreational, aesthetic, and economic interests.").

AAEC makes a unique and completely unsupported argument that concerns about "haze and pollution" are not a cognizable injury.  To the contrary, in many environmental cases, plaintiffs have been granted standing based on injuries caused by haze and visibility impairment:

- *Sierra Club v. Envtl. Prot. Agency*, 926 F.3d 844, 849 (D.C. Cir. 2019) (The Court found standing in a case challenging an operating permit for a coal-fired plant in Utah, noting that plaintiff's members asserted that haze in nearby national parks reduced their enjoyment and that EPA had found that the plant contributes to that haze.);

- *Sierra Club v. Envtl. Prot. Agency*, 796 F.3d 656, 663 (6th Cir. 2015) (In a case where environmental group challenged an attainment designation by EPA, observation of "regional haze" is an aesthetic injury constituting an "injury-in-fact.");

- Grand Canyon Tr. v. Tuscon Elec. Power Co., 269 F. Supp. 2d 1195, 1197 (D. Ariz. 2003), rev'd in part, vacated in part sub nom. Grand Canyon Tr. v. Tucson Elec. Power Co., 382 F.3d 1016 (9th Cir. 2004), opinion amended and superseded on denial of reh'g, 391 F.3d 979 (9th Cir. 2004), and rev'd in part, vacated in part sub nom. Grand Canyon Tr. v. Tucson Elec. Power Co., 391 F.3d 979 (9th Cir. 2004) (in a CAA citizen suit, the observation by standing witnesses  of "ugly haze" caused by subject plant constituted an "injury in fact.");

- *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1072 (9th Cir. 2014) (standing witness who saw hazy conditions in parks where she visits has "specific and recreational injuries" (*citing Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013)));

- *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 177 F. Supp. 2d 1011, 1016 (N.D. Cal. 2001), *rev'd on other grounds*, 366 F.3d 692 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (June 2, 2004) (Plaintiffs' injuries were caused by "haze and smog");

- *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, No. 105CV-01593 OWW SMS, 2007 WL 2815038, at *15 (E.D. Cal. Sept. 25, 2007) (Plaintiffs brought an action against dairy for constructing without a permit.  Haze obscuring a view of the mountains is "aesthetic harm establishing injury in fact"); and

- *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 989 (8th Cir.  2011) ("Reynolds's testimony suffices to show an injury in fact because he lives in the area and enjoys taking pictures, hunting, and studying its history and archaeology and is disturbed by the 'enormous amount of mud' and siltation from the plant site, the 'increase in dust' caused by traffic on the highway, as well as noise and light pollution coming from the plant.  The district court implicitly found that some of these injuries were caused by actions taken by SWEPCO under its § 404 permit.  As a member of the Sierra Club, Reynolds has alleged injuries sufficient both for him as an individual plaintiff and for the Sierra Club as an association").

Plaintiffs have also demonstrated that their members' injuries are traceable to Entergy's alleged illegal conduct and that success in this litigation would redress those injuries.  With respect to the issues of traceability and redressability, courts have stressed that:

> [T]he "injury-in-fact necessary for standing 'need not be large, **an identifiable trifle will suffice.**'"  *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir.2002) (*quoting Sierra Club v. Cedar Point Oil Co., Inc*., 73 F.3d 546, 557 (5th Cir.1996)); *see also Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir.1994) ("**[A]n identifiable trifle is enough for standing** to fight out a question of principle ...." (*quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973)).

*Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 925–26 (7th Cir. 2008) (emphasis added); *see also Bayview*, 177 F. Supp. 2d at 1019-20 ("The plaintiffs contended that if they obtained their desired relief that would be a reduction of NOx that would lead to reduced 'haze and smog.'"  Even "this slight impact is sufficient to satisfy traceability."); *Utah Physicians for A Healthy Env't v. Diesel Power Gear, LLC*, 374 F. Supp. 3d 1124, 1135 (D. Utah 2019) (In CAA citizen suit alleging that Defendants had tampered with motor vehicle pollution

controls, the Defendants argued that Plaintiffs lacked standing because of the small contribution

of Defendants' violations to the overall air basin.  The Court found, however, that as long as the

vehicles emitted pollutants of the type causing Plaintiffs' members' injuries, standing was

established).  Even AAEC essentially admits that White Bluff and Independence contribute more

than a "trifle" to visibility impairment in Eastern Arkansas.  [Doc. 68, at 10].

  Finally, "Plaintiffs' members' injuries do not have to be linked to exact dates that

[violations occur]."  *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 66 F. Supp. 3d 875,

892 (S.D. Tex. 2014), *vacated and remanded on other grounds*, 824 F.3d 507 (5th Cir. 2016).  It

is worth noting that Plaintiffs allege that for most of the claims in this case, Independence and

White Bluff violate the law every day they operate.  In sum, Plaintiffs have standing to bring this

case.

## II. Plaintiffs Were Not Bound to Exhaust Administrative Remedies Before Bringing this Action.

  AAEC incorrectly asserts that plaintiffs were required to exhaust administrative remedies

before initiating this Citizen suit.  [Doc. 68, at 31-33].  As authority for this argument, AAEC

first cites *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010).  Plaintiffs

addressed this argument in their Opening Brief, [Doc. 69, at 14-19], explaining that under *Otter*

*Tail,* section 307(b)(2) of the Clean Air Act, 42 U.S.C. § 7607(b)(2), only precludes an

enforcement action when a defendant sought and obtained prior authorization for a modification

through a Title V permitting process.  *Id.* at 26.  Otherwise, the Act's permit shield provision, 42

U.S.C. § 7661c(f)(2) governs.  This provision provides, in pertinent part that:

> Compliance with a [Title V] permit issued in accordance with this subchapter shall be
> deemed compliance with section 7661a of this title.  Except as otherwise provided by the
> Administrator by rule, the permit may also provide that compliance with the permit shall
> be deemed compliance with other applicable provisions of this chapter that relate to the
> permittee if ... (2) the permitting authority in acting on the permit application makes a

determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

Arkansas included the option for Title V permits to contain permit shields, including findings of non-applicability.  APC&EC Reg. 26.704:

> (A)   Except as provided in this regulation, the Department shall, if requested by the applicant, expressly include in a part 70 permit a provision stating that compliance with the conditions of the permit shall be deemed compliance with any applicable requirements as of the date of permit issuance, provided that:
> > (1)   Such applicable requirements are included and are specifically identified in the permit; or
> > (2)   The Department, in acting on the permit application or revision, determines in writing that other requirements specifically identified are not applicable to the source, and the permit includes the determination or a concise summary thereof.
> (B)   A part 70 permit that does not expressly state that a permit shield exists shall be presumed not to provide such a shield.

Under these provisions, a finding of non-applicability with respect to a requirement, such as whether a source is subject to PSD because of a major modification, can only shield that source from enforcement if the applicability determination is included or alluded to in the permit itself. In this case, Entergy never asked for an applicability determination, and no determination regarding these projects was ever added to the permit shield in their Title V permits. Accordingly, as matter of federal and state law, if a major source's Title V permit does not have a permit shield, there is no exhaustion of administrative remedies requirement before citizen suit enforcement can commence.

Unless a source has obtained a Title V permit shield, or unless the unique *Otter Tail* situation exists, there is no other provision in the Clean Air Act requiring the exhaustion of administrative remedies prior to the instigation of a citizen suit.  AAEC's exhaustion argument is not only contrary to the citizen suit statutory provision of the CAA explicitly permitting the filing of this civil suit, 42 U.S.C. § 7604(a), but also to the federal oversight structure created by

the Act.  *See Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 536 (2d Cir. 2004) ("[W]e note as a guiding principle that citizen suits play an important role in the Act's enforcement scheme.  [Cite].  The citizen suit provisions were designed not only to 'motivate governmental agencies' to take action themselves, [cite], but also to make citizens partners in the enforcement of the Act's provisions."  (cites omitted).).

Unsurprisingly, then, a number of courts have found that administrative remedies need not be exhausted prior to citizen suit initiation.  In *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1088-89 (E.D. Cal. 2006), the Court found no exhaustion requirement in a case under 42 U.S.C. § 7604(a)(1) and noted that "other courts within this circuit have refused to require exhaustion of state judicial or administrative remedies prior to filing a citizen suit, *see* [*Communities For a Better Environment v. Cenco Ref. Co.*, 180 F. Supp. 2d 1062, 1087 n.10 (C.D. Cal. 2001)]; [*Oregon Envtl. Council v. Oregon Dep't. of Envtl. Quality*, 775 F. Supp. 353, 364 (D. Or. 1991)]."  *See also Northwest Environmental Defense Center v. Cascade Kelly Holdings LLC*, 155 F. Supp. 3d 1100, 1118-19 (D. Or. 2015) ("The CAA does not contain an express requirement that a plaintiff exhaust state remedies before bringing a citizen suit, and courts within the Ninth Circuit and elsewhere have not interpreted the CAA to require such exhaustion."); [Doc. 69, at 29 n.7].

AAEC cites, [Doc. 68, at 33], *Action for Rational Transit v. W. Side Highway Project by Bridwell*, 699 F.2d 614, 616-17 (2d Cir. 1983), for the proposition that Plaintiffs must pursue their administrative remedies under state law.  In actuality, the Second Circuit there ruled that plaintiffs' action was not one seeking relief under the SIP, but rather an action to revise the SIP – an action that only the Court of Appeals, not the district court, had jurisdiction to hear.  *Id.* at 616.  As a secondary rationale, the court pointed to a state adjudicative process of which the plaintiffs had failed to avail themselves, citing no authority in the CAA, but rather to *League to*

24

*Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164 (9th Cir. 1979). *Trounday*, in turn, involved

the attempted use of a citizen suit to challenge the content of a permitting decision and not

whether a permit should have been obtained or the enforcement of a permit condition, and the

Court ruled that appeals of permits should be brought through the state appeals process, as

provided for specifically in the State SIP. Both *Rational Transit* and *Trounday* were decided

before Congress enacted the 1990 Amendments to the CAA, which created the Title V program

with its permit shield provision. Accordingly, neither addressed the type of permits at issue here.

      As discussed in Plaintiffs' Opening Brief, [Doc. 69, at 31-34], the EPA encourages

citizens to file citizen suits regarding PSD preconstruction permitting matters versus filing Title

V petitions, the latter of which, the EPA says, are now futile in this context.[6] *See id.* at 32,

*quoting Big River Steel Order* ("The EPA believes that its oversight of case-specific state title I

permitting decisions should be handled under title I…. Citizen oversight may still be

accomplished ***through either*** the state appeal process ***or*** through a citizen suit under section 304,

depending on the type of issues involved." (emphasis added).). Neither statute, regulation, nor

EPA guidance mandates that Plaintiffs must pursue a state appeal process. Rather, the Clean Air

Act gives citizens the choice of "either" forum.

      Finally, it is important to note that: "[j]udicially imposed exhaustion requirements do not

limit a court's jurisdiction." *Vanderham Dairy,* 435 F. Supp. 2d at 1090. In an analogous

"judicially created" issue exhaustion requirement case, the Supreme Court noted that a court-

imposed exhaustion requirement would be non-jurisdictional. *Sims v. Apfel*, 530 U.S. 103, n.1,

---

[6] *See also Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167-79, 204 L. Ed. 2d 558
(2019); *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 590 (3d Cir. 2020), finding "special
justifications" such as unworkability of a rule and developments since a decision was handed
down as relevant in deciding whether to follow a particular case.

120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) ("We agree with the parties that, even were a court-imposed issue-exhaustion requirement proper, the Fifth Circuit erred in treating it as jurisdictional.  *Cf. Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (" Implicit in *Salfi* … is the principle that this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case.  The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted.").  *See also Doe v. Constant*, 354 Fed. Appx. 543, 545 (2d Cir. 2009) (Defendant's argument that "Plaintiffs failed to exhaust other available remedies" did not implicate subject matter jurisdiction and was "merely [an] affirmative defense[]."); *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) ('[T]he exhaustion requirement pursuant to the TVPA is an affirmative defense.')"); *Yagman v. Pompeo*, 868 F.3d 1075, 1082-84 (9th Cir. 2017) ("[A]ny failure to exhaust does not bear on the district court's subject matter jurisdiction.").

**III.    Under 42 U.S.C. § 7607(b)(2), the Proposed Intervenors' Argument that this Action Usurps the State's Ability to Regulate Local Public Utility Rates is Barred.**

CURAD argues that: "[t]he Settlement Agreement attempts to usurp the state regulatory authority of the APSC and vest such authority in the federal district court."  CURAD, [Doc. 66, at 13-14].  AAEC makes the same argument. [Doc. 68, at 33-39].  This argument, however, should have been raised during rulemaking; not in this enforcement action.  42 U.S.C. § 7607(b)(2).

As already covered in briefing elsewhere, that provision provides that: "Action of the Administrator with respect to which review could have been obtained under [the judicial review provision] shall not be subject to judicial review in civil or criminal proceedings for enforcement."  This provision bars defendants in enforcement actions from raising issues that

should have been raised during rulemaking.  For example, in *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 581, 127 S. Ct. 1423, 1436, 167 L. Ed. 2d 295 (2007), the Supreme Court ruled that an "interpretation" of a regulation in a Clean Air Act enforcement action was "an implicit invalidation" of a regulation, and so, applying Section 7607(b)(2), the issue should properly have been raised in the Court of Appeals, not the district court.

In this case, EPA took relevant actions where AAEC could have raised the issue of intrusion on Arkansas Public Service Commission's jurisdiction.  EPA first approved Arkansas' PSD program into the SIP as meeting the requirements of Part C of the Clean Air Act in 1982. 47 Fed. Reg. 2112 (Jan. 14, 1982).  Since PSD applies to major sources of air pollution, such as power plants, it is entirely foreseeable that requiring such sources to obtain permits, with their concomitant, possibly expensive, air pollution controls, might impact the provision of electrical power in Arkansas.

AAEC also could have raised this issue again in 2000, when EPA approved a recodified version of Arkansas' PSD rules into the SIP and EPA also approved the Arkansas permitting procedures for issuing PSD permits via the state's Title V operating permit program so that one permit is issued both for construction and operation.  65 Fed. Reg. 61,103 (Oct. 16, 2000). Further, the proposed intervenors could have raised this issue in 2001, when EPA issued a rulemaking to fully approve the Arkansas Title V operating permit program and EPA approved the Arkansas operating permit regulations as it pertains to the Arkansas SIP.  66 Fed. Reg. 51,312 (Oct. 9, 2001).  In that rulemaking, EPA made clear that it was approving Arkansas' Title V regulations into the SIP because Arkansas PSD and other construction permit rules require physical or operational changes at major sources to be processed through the permitting procedures of Arkansas' operating permit regulations.  66 Fed. Reg. 51,312, 51315.  Notably, in

that rulemaking, EPA very clearly answers the question "What Does Federal Approval of a State

Regulation Mean to Me?"

> Enforcement of the State regulation before and after it is incorporated into the
> Federally approved SIP is primarily a State responsibility.  However, after the
> regulation is Federally approved, we are authorized to take enforcement action
> against violators.  Citizens are also offered legal recourse to address violations as
> described in section 304 of the CAA.

66 Fed. Reg. 51,312, 51,314-15.

In short, if AAEC has a problem with a Clean Air Act rule that can require major sources

of air pollution to install air pollution controls, and thereby potentially impact electricity rates or

the Public Service Commission's jurisdiction, it should have, and could have raised those issues

in the Court of Appeals.  And because AAEC could have obtained that review in the Court of

Appeals, the issue cannot be raised here.

**IV.    The Applicable Statute of Limitations, 28 U.S.C. § 2462, Is "Non-jurisdictional," Should
       Not Be Raised *Sua Sponte* or By Non-Parties, and the "Public Interest" Exception to
       Waiver Does Not Apply In This Case.**

Despite AAEC's arguments to the contrary, *see* [Doc. 68, at 39-44], A) 28 U.S.C. § 2462

is a "non-jurisdictional" statute of limitations that B) should not be raised *sua sponte* by this

Court or by non-parties, and C) the "public interest" exception to waiver cited in

*VanLandingham v. Grand Junction Reg'l Airport Auth.*, 46 F. Supp. 3d 1119, 1125-26 (D. Colo.

2014), *citing Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945), does not apply in this CAA

case.  Plaintiffs address each of these arguments in turn below, all confirming that Defendants

can, and in fact have waived the 28 U.S.C. § 2462 statute of limitations affirmative defense in

this case.

A. <u>As Prior Courts Have Already Ruled, 28 U.S.C. § 2462 Is a "Non-jurisdictional"</u>
<u>Statute of Limitations</u>.

AAEC argues that because 28 U.S.C. § 2462 "is jurisdictional, it may not be waived,"

citing *United States v. Kwai Fun Wong*, 575 U.S. 402, 135 S. Ct. 1625, 191 L.Ed.2d 533 (2015).

[Doc. 68, at 40-42].   However, Plaintiffs have already cited two cases that relied upon *Wong*

specifically to rule the opposite, that 28 U.S.C. § 2462 is "non-jurisdictional" [Doc. 69, at 37]:

*S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. Appx. 752, 754 (2d Cir. 2016) and *United States v.*

*Hines*, No. 3:16-cv-1477-J-32PDB, 2017 WL 6536574, at *2 (M.D. Fla. Dec. 21, 2017).

In considering 28 U.S.C. § 2462 in *S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. Appx. at

754, the Second Circuit stated that "'most time bars are nonjurisdictional,' and appellants 'must

clear a high bar to establish that a statute of limitations is jurisdictional.'  [*Wong*, 135 S. Ct. at

1632].  Appellants have not met this burden."

In *Hines*, the Court explained that:

[T]here are several recent Supreme Court cases explaining the analysis for determining
whether a statute of limitations is jurisdictional.  *See, e.g.*, *Musacchio v. United States*,
136 S. Ct. 709, 717 (2016); *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632
(2015); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153–54 (2013); *Henderson v.*
*Shinseki*, 562 U.S. 428, 438 (2011)….

The Supreme Court "adopted a 'readily administrable bright line' for determining
whether to classify a statutory limitation as jurisdictional." *Auburn*, 568 U.S. at 153–54.
To make such a determination, a court should "inquire whether Congress has 'clearly
stated' that the rule is jurisdictional; absent such a clear statement, ...'courts should treat
the restriction as nonjurisdictional in character.'" *Id.* ….

To demonstrate that a statute of limitations is jurisdictional, "Congress must do
something special, beyond setting an exception-free deadline...." *Id.* …. Undertaking this
analysis, the Court concludes that the statute of limitations in 28 U.S.C. § 2462 is not a
jurisdictional bar to this action.

2017 WL 6536574, at *2.

The Court in *Hines* also noted that there is one case, *S.E.C. v. Graham*, 21 F. Supp. 3d

1300, 1307 (S.D. Fla. 2014), that erroneously found that 28 U.S.C. § 2462 is jurisdictional.  The

*Hines* Court distinguished *Graham,* noting that *Graham* "equate[d] all statutory limitation periods as jurisdictional[,]" and that it "preceded the Supreme Court's decision in *Wong*, which 'made plain that most time bars are nonjurisdictional.' [*Wong*, 135 S. Ct. at 1632]. Therefore, [*Graham's*] reasoning has been undermined and the text of § 2462 does not support the limitation being jurisdictional." 2017 WL 6536574, at *n. 2.

Despite AAEC's textual arguments to the contrary, and as the two cases cited above have already found, 28 U.S.C. § 2462 does not support the contention that this statute of limitation is jurisdictional. First, Congress has not "clearly stated" that 28 U.S.C. § 2462 is jurisdictional. *See Wong*, 135 S. Ct. at 1632 ("[W]e have repeatedly held that procedural rules including time bar, cabin a court's power only if Congress has 'clearly state[d]' as much. [Cites]. '[A]bsent such a clear statement, … 'courts should treat the restriction as nonjurisdictional.'"), *quoting Auburn*, 133 S. Ct. at 824; *see also Secretary, U.S. Department of Labor v. Preston*, 873 F.3d 877, 881-83 (11th Cir. 2017) ("Congress is plenty capable of erecting a true jurisdictional bar when it wants to—we have pointed, for instance, to the phrase '[n]o court, justice, or judge shall have jurisdiction' as exemplary. [Cite].... Under clear Supreme Court precedent, it is only an express reference to jurisdiction, not firmness more generally, that counts. Because Section 1113(1) contains no such reference, it is non-jurisdictional—and thus presumptively waivable.") Here, 28 U.S.C. § 2462 makes no express reference to jurisdiction, and so it is similarly non-jurisdictional—and thus presumptively waivable.

Second, AAEC's emphasis on the words "shall not be entertained" within 28 U.S.C. § 2462, [Doc. 68, at 41-42], does not make it jurisdictional. The Supreme Court has "rejected the notion that all mandatory prescriptions, however emphatic, are… properly typed jurisdictional." *Henderson*, 562 U.S. at 439; *Wong*, 135 S. Ct. at 1632 (Claim-processing rules "do not deprive a court of authority to hear a case…. Even when it is framed in mandatory terms

30

(again, most are); indeed, that is so 'however emphatic[ally]' expressed those terms may be." (cites omitted).).

AAEC's textual differentiation between the language of "shall be forever barred" found in *Wong* and "shall not be entertained" in 28 U.S.C. § 2462 does not mean that the later magically "focuses on the court's power," as AAEC argues.  [Doc. 68, at 41-42].  Rather, in order for a statute of limitations to restrict "a court's power," it must "speak in jurisdictional terms or refer… to the jurisdiction of the district courts."  *Wong*, 135 S. Ct. at 1633.  Applying this principle, the *Wong* Court found that 28 U.S.C. § 2401:

> … does not define a federal court's jurisdiction over tort claims generally, address its authority to hear untimely suits, or in any way cabin its usual equitable powers.  Section 2401(b), in short, 'reads like an ordinary, run-of-the-mill statute of limitations,' spelling out a litigant's filing obligations without restricting a court's authority.

*Id.* (cite omitted).  Similarly, 28 U.S.C. § 2462 "does not define a federal court's jurisdiction" over CAA claims, "address its authority to hear untimely suits, or in any way cabin its usual equitable powers."  Because 28 U.S.C. § 2462 is a general statute of limitations that is applied across several provisions of the United States Code, *see Gabelli v. S.E.C.*, 568 U.S. 442, 444, 133 S. Ct. 1216, L. Ed. 2d 297 (2013), while the jurisdictional grant of authority for this Court to hear this case resides elsewhere under 42 U.S.C. § 7604 of the CAA, 28 U.S.C. § 2462 "does not define a federal court's jurisdiction" over CAA claims.

Both, 28 U.S.C. § 2401 at issue in *Wong* and 28 U.S.C. § 2462 at issue here, "'read[] like [] ordinary, run-of-the-mill statute of limitations,' spelling out a litigant's filing obligations without restricting a court's authority."  *Wong*, 135 S. Ct. at 1633 (cite omitted).  28 U.S.C. § 2401 is titled, "Time for commencing action against United States," while 28 U.S.C. § 2462 is titled, "Time for commencing proceedings."  Both "speak[] only to a claim's timeliness, not to a

court's power[,]" *Wong*, 135 S. Ct. at 1632-33, making no references to a specific court or to "jurisdiction" in any way.

Third, the Supreme Court in *Wong* explained "that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." *Wong*, 135 S. Ct. at 1633 (cites omitted). In *Wong* the statute of limitations was found in "a different section of Title 28" than the jurisdictional grant, and still the Supreme Court found that "[n]othing conditions the jurisdictional grant on the limitations periods, or otherwise links those separate provisions. Treating § 2401(b)'s time bars as jurisdictional would thus disregard the structural divide built into the statute." *Id.*

Here, the divide between the statute of limitations and jurisdictional grant of authority is even more remote than in *Wong*, considering that they are contained in wholly separate statutes. The CAA does not contain a statute of limitations period of its own, and so courts apply 28 U.S.C. § 2462 to CAA penalty actions, which is applied across many different penalty provisions throughout the U.S. Code. *See* [Doc. 69, at 36 n.10]. 28 U.S.C. § 2462 is included under Title 28, "Judiciary and Judicial Procedure," whereas the jurisdictional grant of this Court's authority to hear this CAA citizen suit case is under 42 U.S.C. § 7604(a), titled: "Authority to bring civil action; Jurisdiction." These are clearly separate provisions contained in wholly separate statutes, an essential fact that is determinative in finding that 28 U.S.C. § 2462 may be waived, as described further below.

In this case, conferring "jurisdictional" status on 28 U.S.C. § 2462 would "disregard the structural divide built into the statute[s]." *Wong*, 135 S. Ct. at 1633. Just as the *Wong* Court found that "Section 2401(b) is not a jurisdictional requirement[,]" 28 U.S.C. § 2462 is equally "just [a] time limit[], nothing more." *Id.*; *see also Secretary, U.S. Department of Labor*, 873

F.3d at 881.  Indeed, two courts applying *Wong's* directives have already found that 28 U.S.C. § 2462 is not jurisdictional, as described above.[7]

Akin to 28 U.S.C. § 2401, the statute at issue in *Wong*, 28 U.S.C. § 2462 is a non-jurisdictional claim-processing rule, which "do[es] not deprive a court of authority to hear a case."  *See Wong*, 135 S. Ct. at 1632 (cites omitted).  And "the principle criterion in deciding whether a limitations period can be waived is its 'jurisdictional' character…. [In] a non-jurisdictional claim-processing rule—[the] [] [] waiver is permissible."  *Secretary, U.S. Department of Labor*, 873 F.3d at 881.  Therefore, here, because 28 U.S.C. § 2462 is "non-jurisdictional," Defendants waiver of it is permissible, and as explained in Plaintiffs' Opening Brief, [Doc. 69, at 35-44], it would be improper for the Court to disregard that waiver.

B.   A "Non-jurisdictional" Statute of Limitations Should Not Be Raised *Sua Sponte* By This Court or By Non-Parties.

AAEC states that "it is incumbent on the Court to apply the statute [of limitations] *sua sponte*[.]"  [Doc. 68, at 44].  However, because 28 U.S.C. § 2462 is a "non-jurisdictional" statute of limitations and Defendants deliberately waived this affirmative defense, it would be an abuse of discretion for the Court to raise the issue *sua sponte*.  *See Day v. McDonough*, 547 U.S. 198, 205, 126 S. Ct. 1675, 164 L.Ed.2d 376 (2006) (When a statute of limitations is not "jurisdictional," "courts are under no *obligation* to raise the time bar *sua sponte*."  (cites omitted and emphasis original).); *id.* at 202 (It would be "an abuse of discretion to override a [Defendant's] deliberate waiver of a limitations defense.").  The Court in *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) explained that:

---

[7] *S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. Appx. at 754; *Hines*, 2017 WL 6536574, at *2 ("[T]he Court concludes that the statute of limitations in 28 U.S.C. § 2462 is not a jurisdictional bar to this action."); *see also id.* at *n.3 ("The expiration of the statute of limitations is more appropriately raised as an affirmative defense.")

It is well established that a statute of limitations, like other affirmative defenses, generally may not be invoked by the court on its own motion. *See*, *e.g.*, *United States v. Mitchell*, 518 F.3d 740, 748 (10th Cir. 2008) (noting that "all circuits to consider this issue have held so explicitly" and collecting cases).

Non-parties, such as *amicus* groups or the Proposed Intervenors here, also cannot raise a "non-jurisdictional" statute of limitations for the Court's consideration either. *Cf. John R. Sand & Gravel Co. v. U.S.*, 552 U.S. 130, 133, 128 S. Ct. 750 (2008) (An *amicus* brief brought the statute of limitations "issue to the court's attention." The Supreme Court ruled that the "Court of Appeals was right to ignore the Government's waiver and to decide the timeliness question[,]" only because that particular statute was deemed to be "jurisdictional."). Therefore, when a statute of limitations is "non-jurisdictional," as it here, the Court may not ignore Defendants' waiver and decide the timeliness question anyway, even if non-parties attempt to impose it.

The statute of limitations is an "affirmative defense" that must be pled "affirmatively" by a party. "Fed. R. Civ. P. 8(c) provides that a ***party*** must affirmatively plead affirmative defenses." *Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016) (emphasis added). So in this case, because 28 U.S.C. § 2462 is "non-jurisdictional," only Defendants have the power to plead or invoke it.

Here, as Defendants stated in their Opening Brief, [Doc. 67, at 11], "[t]he Entergy Companies have not filed an answer and thus have not raised statute of limitations as a defense." Therefore, regardless of whether Defendants expressly waived it, which they did do here, *see* [Doc. 69, at 41-44], the statute of limitations is an affirmative defense that "is waived if not raised in the answer to the complaint." *S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. Appx. at 754 (held that 28 U.S.C. § 2462 defense was waived for two defendants who did not raise it. (cite omitted).); *Day*, 547 U.S. at 202 ("Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto.") Therefore, the

Court may not consider the statute of limitations defense here because Defendants have not pled or invoked it as legally required for the Court's consideration.

C. The "Public Interest" Exception to Waiver Cited By AAEC Is Inapplicable Here, And AAEC's Interpretation of That Standard Is Inaccurate.

AAEC attempts to invoke a "public interest" exception to Defendants waiver of the statute of limitations defense that does not apply in this case.  It cites *VanLandingham v. Grand Junction Reg'l Airport Auth.,* 46 F. Supp. 3d 1119, 1125–26 (D. Colo. 2014) *citing Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945), for the proposition that "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy."  [Doc. 68, at 42].  However, this legal standard is inapplicable because 1) the presumption that statutory provisions are subject to waiver by voluntary agreement of the parties applies here; 2) 28 U.S.C. § 2462 is not "a statutory right conferred on a private party"; 3) AAEC misinterprets the "affects the public interest" standard and Defendants waiver of the statute of limitations defense would not "contravene the statutory policy" or purpose of the CAA that "it was meant to effectuate"; and 4) Defendants may waive 28 U.S.C. § 2462 under any public interest standard.

1. *The Presumption That Statutory Provisions Are Subject to Waiver by Voluntary Agreement of The Parties Applies Here.*

The Supreme Court, in *United States v. Mezzanatto,* 513 U.S. 196, 200-01, 115 S. Ct. 797, 130 L. Ed. 2d 697 (1995), articulated the following governing principle in regard to waiver:

> Rather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption. *See Shutte v. Thompson,* 15 Wall. 151, 159, 21 L.Ed. 123 (1873) ("A party may waive any provision, either of a contract or of a statute, intended for his benefit")…. [A]bsent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties. [Cite omitted.]

35

The *VanLandingham* Court cited the above principle, 46 F. Supp. 3d at 1125-26, and ultimately held that "[t]here is no subsection under the anti-retaliation provision affirmatively indicating (or even suggesting) that Congress intended to preclude waiver of th[e] right to bring suit." *See also New York v. Hill*, 528 U.S. 110, 116, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000) (Cites *Mezzanatto* in finding that an "'affirmative indication' [is] required to overcome the ordinary presumption that waiver is available."); *Secretary, U.S. Department of Labor v. Preston*, 873 F.3d 877, 886-87 (11th Cir. 2017), *quoting Mezzanatto,* 513 U.S. at 201.

Similarly, 28 U.S.C. § 2462 "make[s] no mention of waiver," *see Mezzanatto*, 513 U.S. at 202, and the CAA does not either, considering that the CAA does not even contain a statute of limitations period of its own.  There is simply not any "affirmative indication of Congress' intent to preclude waiver" of the statute of limitations in either Section 2462 or the CAA.  *See Mezzanatto*, 513 U.S. at 201. Therefore, this statutory provision is "subject to waiver by voluntary agreement of the parties[,]" *id.*, and the proper legal standard here is to inquire whether 28 U.S.C. § 2462 is "non-jurisdictional," and if so, it may be waived.  *See* [Doc. 69, at 35-44].

> *2.   28 U.S.C. § 2462 Is Not "A Statutory Right Conferred on a Private Party."*

The "public interest" exception to waiver cited by AAEC, [Doc. 68, at 42], is inapplicable here because 28 U.S.C. § 2462 is not "a statutory right conferred on a private party." First, it is important to factually distinguish that both *VanLandingham* and *Brooklyn Sav. Bank* involved the affirmative defense of waiver of the petitioners' claims, and not waiver of the affirmative defense of statute of limitations.  The *VanLandingham* case concerned the dismissal of a claim under Rule 12(b)(6) on the explicit basis of the affirmative defense of waiver.  46 F. Supp. 3d at 1124.  The "statutory right conferred on a private party" at issue in *VanLandingham* was "the right to bring suit."  *Id.* at 1126.  In *Brooklyn Sav. Bank*, the relevant issue was whether Petitioners could "validly release and waive" the "right to recover liquidated damages."  324

36

U.S. at 702-03; *see also Wlodynski v. Ryland Homes of Florida Realty Corp.*, No. 8:08-CV-00361-JDW-MAP, 2008 WL 2783148, at *2-3, n.1 (M.D. Fla. Jul. 17, 2008) (References *Brooklyn Sav. Bank* under the affirmative defense of waiver).  However, under modern jurisprudence, the affirmative defense of waiver is not precisely the same as the waiver of an affirmative defense.

In the context of a statute of limitations defense, the recent case *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829 (6th Cir. 2019), explained that "where statutes that create rights and remedies contain ***their own limitation periods***, the limitation period should be treated as a substantive right.  [Cite omitted].  And this type of substantive right generally is not waivable ***in advance*** by employees.  *See Brooklyn Savs. Bank v. O'Neill*, 324 U.S. [at 704]. (Emphasis added.)"  But when Congress "creates a cause of action without any limitation period at all, or Congress… use[s] a general limitation period[,] [s]ee, *e.g.*, 28 U.S.C. § 1658 (federal catch-all statute of limitations)[,]" then a statute of limitations is a "procedural mechanism" or procedural rule, and not a substantive "right."  *Logan*, 939 F.3d at 829-31.  And even though the *Logan* Court held that the particular limitations period at issue in that case was "substantive, rather than procedural" because the "applicable limitation period resides within Title VII itself[,]" that Court limited its ruling so that the substantive limitation period was not "prospectively waivable," *id.* at 829, through a "contractually shortened limitation period."  *Id.* at 839.  Whereas, the Sixth Circuit was careful to note that even if a statute of limitations is a substantive right, "[t]here is no question that the substantive rights of Title VII may be waived *retroactively*, for example as part of a settlement agreement."  *Id.* at n.1 (emphasis original); *see also Chasteen v. Rock Financial*, No. 07-cv-10558, 2012 WL 8705090, at *1, *3, *5 (E.D. Mich. Jan. 31, 2012) (distinguishes prospective contractual limitation clauses particular to Fair Labor Standards Act ("FLSA") suits that "must give way to the minimum" length of time found in the

37

statute, from two "cases [that] involved employers that failed to raise the statute of limitations as a defense during litigation" and that "'must be pleaded as an affirmative defense.'")

Here, the Clean Air Act creates causes of action without including any statute of limitation period at all. 28 U.S.C. § 2462 is a "general limitation period" akin to 28 U.S.C. § 1658, the federal catch-all statute of limitation mentioned by the *Logan* Court above, 939 F.3d at 829, that is applied across "many provisions throughout the U.S. Code." *See Gabelli v. S.E.C.*, 568 U.S. at 444. Both 28 U.S.C. § 1658 and 28 U.S.C. § 2462 are included under Title 28, "Judiciary and Judicial **Procedure**," (emphasis added), and are general limitation periods. Therefore, 28 U.S.C. § 2462 is a "procedural mechanism" or procedural rule, and not a substantive "right." And even if it were a "substantive right," it may still be waived ***retroactively***, "as part of a settlement agreement[,]" as Defendants have done here. *See Logan*, 939 F.3d at n.1.

In sum, 28 U.S.C. § 2462 is not a "statutory right conferred on a private party," and thus, the "statutory rights" "affecting the public interest" standard found in *Brooklyn Sav. Bank* and cited in *VanLandingham* does not apply in this case. Rather, the statute of limitations issue here is in the context of an affirmative defense and the appropriate application of Fed. R. Civ. P. 8(c)(1) and 12(b), *see* [Doc. 69, at 35-44].

> 3.  *AAEC Misinterprets the "Affects the Public Interest" Standard, And Defendants Waiver of the Statute of Limitations Defense Would Not "Contravene the Statutory Policy" or Purpose of the CAA That "It was Meant to Effectuate."*

Even if this Court somehow ruled that 28 U.S.C. § 2462 is a "statutory right" versus a procedural rule, AAEC misinterprets the "affects the public interest" legal standard from *Brooklyn Sav. Bank.* AAEC argues that this case "affects the public interest" due to speculated electricity "rate hikes." [Doc. 68, at 43-44]. However, that unsubstantiated and extraneous

38

interest is irrelevant to the central purpose of the CAA.  The Supreme Court in *New York v. Hill*,

528 U.S. at 116-17, explained that:

> It is true that a "right conferred on a private party, but affecting the public interest, may
> not be waived or released *if such waiver or release contravenes the statutory policy*."
> [*Brooklyn Sav. Bank*, 324 U.S. at 704 (emphasis original)].  The conditional clause is
> essential, however: It is not true that any private right that also benefits society cannot be
> waived…. [S]ome social interests…. ***are simply not at issue***.  [Cite].  In any case, it
> cannot be argued that society's interest in the prompt resolution of outstanding charges ***is
> so central to the IAD*** that it is part of the unalterable "statutory policy[.]"  [Cites omitted
> and emphasis added].

Here, AAEC's fears of future electricity rate hikes "are simply not at issue" in this case,

and it cannot be argued that any potential rate hikes eight to ten years in the future "is so central"

to the CAA "that it is part of the unalterable 'statutory policy,'" as the legal standard from

*Brooklyn Sav. Bank* would require.  *See id.*; *Clark v. Capital Credit & Collection Services, Inc.*,

460 F.3d 1162, 1170 (9th Cir. 2006) ("[P]ermitting the debtor to waive or revoke such a directive

is hardly inconsistent with the provision creating the right or with the public policy ***of the*** [statute

at issue]." (emphasis added).)

The standard from *Brooklyn Sav. Bank* requires both "affecting the public interest" ***and***

that a waiver would contravene the particular statutory policy at issue.  324 U.S. at 704.  The

*Brooklyn Sav. Bank* Court explained that this "affects the public interest" standard is in relation

to "[w]here a private right is granted in the public interest to effectuate a legislative policy,

waiver of ***a right so charged or colored with the public interest*** will not be allowed where it

would thwart the legislative policy ***which it was designed to effectuate***."  324 U.S. at 704

(emphasis added).

In application, this standard requires inquiry into the specific legislative policy which a

particular statute "was designed to effectuate," and requires "inequalities in bargaining power"

between the parties.  *See, e.g.*, *DeArment v. Lehman*, No. 90-5099, 1991 WL 270172, at *2

(W.D. Ark. Mar. 1, 1991) ("Congress enacted the [Fair Labor Standards Act ("FLSA")] in 1938 to protect workers from substandard wages and oppressive working hours…. [A]n individual's right to a minimum wage and overtime pay under the FLSA 'cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate."); *Redzepagic v. Hammer*, No. 14 Civ. 9808 (ER), 2017 WL 780809, at *3 (S.D.N.Y. Feb. 27, 2017) ("Recognizing that there are often great inequalities in bargaining power between employers and employees, Congress made the FLSA's provisions mandatory[.]")

Thus, the standard from *Brooklyn Sav. Bank* applies only under limited circumstances where courts have determined that specific substantive rights under specific statutes, such as the FLSA and Truth in Lending Act (TILA), are subject to unequal bargaining power and so mandatory that waiver will not be allowed.  *See*, *e.g.*, *Hanson v. McBride*, No. 3:18-cv-00524, 2019 WL 6250766, at *1 (M.D. Tenn. Nov. 22, 2019) ("'[S]ubstantive rights under… the FLSA are non-waivable.'  *Logan v. MGM Grand Detroit Casino*, 939 F.3d [at 831].  The reasoning for such a rule… is to prevent employers from using their superior leverage to force workers to accept lesser pay, 'nullify[ing] the purposes' of the statute and thwart[ing] the legislative policies it was designed to effectuate.' [Cite omitted].")

But even under those statutes where some statutory rights have been determined to be nonwaivable under the *Brooklyn Sav. Bank* standard, courts have still permitted waiver of other rights under the same statute because waiver was not deemed to be in conflict with the

underlying statutory policies at issue.  *See*, *e.g.*, *Tucker v. Beneficial Mortg. Co.*, 437 F. Supp. 2d 584, 587-88 (E.D. Va. 2006);[8] *In re DiVittorio*, 670 F.3d 273, 286-87 (1st Cir. 2012).

In this case, there is no inherent unequal bargaining power between the Parties, unlike between employers and employees in FLSA cases.  And the statutory policies underlying the CAA cannot be thwarted by honoring Defendants waiver of the statute of limitations defense here.  The CAA is simply not a statute where courts have determined certain substantive rights are not subject to waiver and settlement.  *Cf.*, *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 540 (8th Cir. 1987) ("This court has recently held [Age Discrimination in Employment (ADEA)] claims involving bona fide factual disputes over the intent and motive of an employer for a termination may be validly settled[.]")

Rather, courts have approved settlement of CAA claims with regularity, and have upheld waiver of the statute of limitations defense under 28 U.S.C. § 2462 specifically.  *See*, *e.g.*, [Doc. 67, at 13-14] (In CAA "*WEPCO*" case, 522 F.Supp.2d 1107, 1119-20 (E.D. Wis. 2007), the Court allowed waiver of the statute of limitations defense for purposes of the settlement); [Doc. 69, at 35-37] (*citing S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. Appx. 752, 754 (2d Cir. 2016); *Canady v. S.E.C.*, 230 F.3d 362, 362-63 (D.C. Cir. 2000).).

In sum, in reviewing the legal standard and caselaw under *Brooklyn Sav. Bank,* AAEC's assertion that "[b]ecause the § 2462 statute of limitations affects the public interest in ***this case***, [] [] it may not be waived," [Doc. 68, at 43-44 (emphasis added)], is not an accurate or complete characterization of that inapplicable standard.  Just because the overall outcome of a case could potentially affect a public interest, here the economic interests of non-parties and ratepayers that

---

[8] *See also id.* at 589 ("[T]he Court shares Defendant's concerns that invalidating the release may undermine the ability of individuals as well as State Attorneys General to negotiate settlements in future lawsuits as defendants would have no incentive to settle.")

are not even the subject matter of this case, does not mean that waiver is unavailable.  AAEC's

reference to Arkansas state law provisions for low-cost electricity, *see* [Doc. 68, at 42-43], are

not legislative policies which either the CAA or 28 U.S.C. § 2462 were "designed to effectuate."

The standard preventing waiver from *Brooklyn Sav. Bank* simply does not apply in this case.

        4.   *Defendants May Waive 28 U.S.C. § 2462 Under Any Public Interest Standard.*

      Even if AAEC's inaccurate interpretation of the "affects the public interest" standard

from *Brooklyn Sav. Bank* somehow did apply, Defendants waiver of the statute of limitations is

in the public interest of the CAA, the actual subject matter of this case.  *See*, *e.g.*, [Doc. 67, at 13-

14] (*citing* "*WEPCO*," 522 F. Supp. 2d 1107, 1119-20 (E.D. Wis. 2007), Defendants state that

"foregoing litigation over the statute of limitations in favor of settlement would serve the public

interest by ensuring emissions reductions and avoiding protracted litigation.").

      In the context of the statute of limitations, there is a line of cases that rely upon *Mid State*

*Horticultural Co., Inc. v. Pennsylvania R. Co.*, 320 U.S. 356, 64 S. Ct. 128, 88 L. Ed. 96 (1943),

to hold that a particular statute of limitations relevant there cannot be waived by an express

agreement under the Interstate Commerce Act.  *Mid State* was cited by *Brooklyn Sav. Bank*, 324

U.S. at 704, but those lines of cases seemingly diverge from there.  Here, *Mid State* is equally

inapplicable because "the holding in [*Mid State*] has generally been limited to cases involving

shippers and carriers and the Interstate Commerce Act."  *In re Lehman Bros. Securities and*

*ERISA Litigation*, No. 09 MD 2017(LAK), 2012 WL 6584524, at *n.12 (S.D.N.Y. Dec. 18,

2012) (cite omitted).  The Court's holding in *Mid State* "was by its own description bound up in

the specifics of the Interstate Commerce Act and the policies that the Court found underlay it."

*Secretary, U.S. Department of Labor*, 873 F.3d at 885.

      The Court in *Secretary, U.S. Department of Labor*, 873 F.3d at 885, in contrast, found

that to deny waiver of the statute of limitations defense there "would frustrate, rather than

advance, ERISA's *overarching purpose*…. We just can't see how refusing to enforce a contractual waiver that all agree was executed knowingly, willingly, and voluntarily—and on that basis dismissing an enforcement action that seeks to recover plan participants' lost retirement savings—could be deemed necessary to the fulfillment of ERISA's stated purpose. Quite the contrary, it seems to us."  (emphasis added).

Here, the same reasoning articulated in *Secretary, U.S. Department of Labor* is equally applicable in this CAA case.  The "overarching purpose" of the CAA and the PSD program specifically is to protect air quality and public health, *see* [Doc. 44-1, at 8], and not to protect electricity ratepayers.  Thus, "dismissing an enforcement action that seeks to" improve air quality in Arkansas on statute of limitations grounds would go against, not for "the fulfillment of [the CAA's] stated purpose."  *See Secretary, U.S. Department of Labor*, 873 F.3d at 885.

Similarly, in *In re Lehman Bros. Securities*, 2012 WL 6584524, at *2 (emphasis added), the Court found that:

> Unlike the Interstate Commerce Act, the Act [at issue] does not have as its *central purpose* uniformity and equality of treatment [between carrier and shipper]…. Tolling agreements allow parties to extend statutory periods while they evaluate their claims and defenses in the hope that they can resolve their dispute without litigation.  In cases such as this one, such agreements can serve the interests of the parties, the public, and the courts.

This reasoning is applicable here as well, where Defendants have explicitly stated that "foregoing litigation over the statute of limitations in favor of settlement would serve the public interest by ensuring emissions reductions and avoiding protracted litigation."  [Doc. 67, at 13]; *see also* Fed. R. Civ. P. 1 (The Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").  Therefore, upholding Defendants waiver of the statute of limitations defense and applying Fed. R. Civ. P. 8(c) and 12(b) actually

serves the central purpose of the CAA and the interests of "the parties, the public, and the

courts." *See In re Lehman Bros. Securities*, 2012 WL 6584524, at *2.

Finally, in *F.D.I.C. v. Williams*, 60 F. Supp. 3d 1209, 1215, n.7 (D. Utah 2014), the Court

relied upon legislative history of the particular statute of limitations at issue, the statement of the

statute's sponsor, in finding that tolling agreements were valid.  Here, however, the CAA does

not contain a statute of limitations of its own so it is not possible to delve into the specific

policies behind a statute of limitations that it does not contain.  This quintessential fact

underscores the need for a "substantive right" versus "procedural rule" distinction, as described

above in *Logan*, 939 F.3d at 829, and shows again why the legal standards from *Brooklyn Sav.*

*Bank* and *Mid State* are simply not applicable in this case.

Ultimately, in the statute of limitations context, as the *Secretary, U.S. Department of*

*Labor* Court concluded, "[n]o matter how we come at the question, we arrive at the same answer:

ERISA's limitation-of-actions provision… is subject to express waiver…. [B]ecause [it] doesn't

erect a 'jurisdictional' bar, it is presumptively waivable."  873 F.3d at 887.  Similarly, the

applicable legal standard in this case is if a particular statute of limitations is "non-

jurisdictional," as it is here, then it is waivable.  As Plaintiffs stated in our Opening Brief, 28

U.S.C. § 2462 is a procedural rule, a defense that Defendants must plead affirmatively in order

for it to apply, and it would be an abuse of discretion for this Court to take up the issue on its

own.  *See* [Doc. 69, at 35-44].

**V.    The Opacity Limit Violations Have No Time Bar Issues, and the Settlement Agreement Lodged In This Court Would Resolve the Additional Claims in the Amended Complaint In the Public Interest.**

AAEC states that "some" of Plaintiffs' opacity violations included in the amended

complaint may be time-barred [Doc. 68, at 44], thereby admitting that at least some of the

opacity violations are not time-barred.  Indeed, 185 of the violations occurred after December 17,

2014, *id.* at ¶ 118 and Exhibit B, and could not be time-barred.  Defendants also noted that the opacity claims grant subject matter jurisdiction.  [Doc. 67, at 10-11].

Meanwhile, the CURAD Brief [Doc. 66, at 4], alleges that the Parties have not indicated whether or not the Settlement Agreement resolves claims in the Amended Complaint or whether the agreement is still in the public interest and a reasonable resolution of litigation posed by the Amended Complaint.  Plaintiffs note that their opacity claims were set forth in their notice letters prior to filing the complaint and that paragraph 26 of the settlement agreement, [Doc. 11], releases all Clean Air Act claims that accrued prior to the date of lodging.

## VI.   The Proposed Intervenors Do Not Meet the Applicable Legal Standards For Intervention.

Finally, Plaintiffs note that the AAEC's references to their intervention in the Eighth Circuit EPA Federal Implementation Plan ("FIP") case for the Arkansas Regional Haze Rule does not mean that they meet the applicable legal standards for intervention in this case.  *See* [Doc. 68, at 15].  The Eighth Circuit in that case never issued an opinion on the merits of AAEC's intervention because Plaintiffs never challenged their intervention in that case, unlike here.  In the FIP case the Eighth Circuit merely issued an unpublished order with two sentences granting AAEC's intervention with a due date for their Intervenor brief, without expressing any opinion on the applicable intervention standards at all.  [Doc. 68-7].  As such, there is no precedential value to the Eight Circuit's order granting intervention in that case.  *See* Eighth Cir. Rule 32.1A ("Unpublished opinions are . . . not precedent."); *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144-45, 131 S. Ct. 1436, 179 L. Ed. 2d 523 (2011):

> When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.  *See*, *e.g.*, *Hagans v. Lavine*, 415 U.S. 528, 535, n.5, 94 S. Ct. 1372, 39 L. Ed. 2d 577 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38, 73 S.

Ct. 67, 97 L. Ed. 54 (1952) ("[…] this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*"); [Cite]. The Court would risk error if it relied on assumptions that have gone unstated and unexamined.

*See also King v. Briggs*, 83 F.3d 1384, 1387, 1389 (Fed. Cir. 1996) (unpublished order of Board denying agency statutory right to intervene that did not address the merits of any issue raised in its intervention brief was a "non-precedential final order").

The Eighth Circuit's grant of intervention to AAEC in the FIP case was unexamined, granted *sub silentio* in an unpublished order, and is therefore non-precedential.  Here, Neither CURAD nor AAEC meet the Intervention as of Right or Permissive Intervention standards, and the Court should deny them intervention in this case.  *See* [Doc. 35].

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny the motions to intervene, [Docs. 17, 18 and 26, 27], grant the motion to enter the Settlement Agreement, [Doc. 11], and ENTER the Settlement Agreement as a Consent Judgment.

Respectfully submitted this 1st of May, 2020,

s/George E. Hays
George E. Hays (WA Bar. No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com

Naomi Kim Melver (WA Bar No. 52463)
P.O. Box 25
Greenbank, WA 98253
Telephone: (425) 336-3757
Email: nmelver@gmail.com

Richard H. Mays (State Bar No. 61043)
Richard Mays Law Firm PLLC
2226 Cottondale Lane
Suite 100
Little Rock, AR 72202
Telephone: (501) 691-1106
Email: rmays@richmayslaw.com

*Counsel for Plaintiffs Sierra Club and*
*National Parks Conservation Association*

47