IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SIERRA CLUB, *et al.*,                                                      PLAINTIFFS

v.                                      Case No. 4:18-cv-00854

ENTERGY ARKANSAS LLC, *et al.*,                                            DEFENDANTS

<u>ORDER</u>

Before the Court are motions to intervene filed by prospective intervenors the State of

Arkansas (the "State"), ex rel. Arkansas Attorney General Leslie Rutledge ("Attorney General"),

by and through the Consumer Utilities Rate Advocacy Division ("CURAD"), and the Arkansas

Affordable Energy Coalition ("the Coalition") (Dkt. Nos. 17, 26).  Plaintiffs Sierra Club and the

National Parks Conservation Association ("NPCA") oppose CURAD and the Coalition's motions

to intervene (Dkt. No. 35).  Defendants Entergy Arkansas LLC ("Entergy Arkansas"), Entergy

Power LLC ("Entergy Power"), and Entergy Mississippi LLC ("Entergy Mississippi")

(collectively, "the Entergy Companies") also oppose CURAD and the Coalition's motions to

intervene (Dkt. Nos. 34, 36).  CURAD and the Coalition filed replies in further support of their

motions (Dkt. Nos. 41, 42).  Also before the Court are a motion to approve consent judgment filed

by plaintiffs, a motion for abeyance and leave to file response filed by CURAD, and a motion for

abeyance and for leave to file response to plaintiffs' motion to enter settlement agreement as a

consent judgment filed by the Coalition (Dkt. Nos. 44; 45; 46).

### I.      Background

Plaintiffs Sierra Club and the NPCA filed this action against Entergy Arkansas, Entergy

Power, and Entergy Mississippi under the citizens suit provisions of the Clean Air Act ("CAA"),

42 U.S.C. §§ 7401-7671q, to enforce the national ambient air quality standards ("NAAQS")

provisions of the CAA and its implementing regulations (Dkt. Nos. 1; 54).  Plaintiffs allege that defendants violated the CAA and its implementing regulations because power plants located in Independence County, Arkansas (the "Independence" plant), and Jefferson County, Arkansas (the "White Bluff" plant), underwent "major modifications" without obtaining prevention of significant deterioration ("PSD") permits or modified Part 70 permits for such major modifications (Dkt. No. 54, ¶¶ 71-89).  Plaintiffs assert that this Court has subject matter jurisdiction over the claims pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331 (Dkt. No. 54, ¶ 2).  Plaintiffs set forth their claims in a 59-page amended complaint, explaining the regulatory, legal, and factual basis for their claims.  They seek injunctive and declaratory relief and civil penalties, all of which plaintiffs claim are authorized pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 7413, 7604(a) (*Id.*).  Plaintiffs maintain that, to the extent required by 42 U.S.C. § 7604(b), plaintiffs sent notices of intent to sue for violations of the CAA on January 10, 2018, and February 8, 2018, to defendants and all government officers required to receive such notice by 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2 (*Id.*, ¶ 4).

## A. NAAQS Requirements

The NAAQS are regulated and enforced by a variety of federal and state statutes and regulations.  As relevant here, each state is required to classify areas within their boundaries as attainment, nonattainment, or unclassifiable with respect to certain pollutants, including $SO_2$ and $NO_2$.  Each state must adopt a state implementation plan ("SIP") that creates a prevention of significant deterioration program ("PSD program") and submit that SIP to the Environmental Protection Agency ("EPA") for approval; if the EPA does not approve the proposed SIP, then the EPA may propose a federal implementation plan ("FIP").  Under the CAA, PSD programs must prohibit the construction of a "major emitting facility" in attainment or unclassifiable areas unless

such a facility has been issued a PSD permit and employs the "Best Available Control Technology" ("BACT").

Separately, Title V of the CAA, 42 U.S.C. §§ 7661-7661f, established an operating permit program ("Part 70 Operating Permit program") for certain sources, including "major sources" and any source required to have a permit under a PSD program. 42 U.S.C. § 7661a(a). Title V is implemented primarily by the states under EPA oversight. *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1012 (8th Cir. 2010). "In states with EPA approved programs, Title V permits are issued by the state permitting authority but are subject to EPA review and veto." *Id.* The EPA has approved a SIP submitted by Arkansas containing a PSD program and a Part 70 Operating Permit program. 40 C.F.R. § 52.172.

### B.     Regional Haze Requirements

In 1999, the EPA promulgated the Regional Haze Rule, which calls for state and federal agencies to work together to improve visibility in national parks and wilderness areas. 40 C.F.R. pt. 51. To implement the Regional Haze Rule, the EPA directed the states to submit a Regional Haze SIP meeting the requirements of the Regional Haze Rule. 40 C.F.R. § 51.308(b). Arkansas submitted a Regional Haze SIP to the EPA on September 23, 2008, and August 3, 2010, along with supplementation on September 27, 2011. 40 C.F.R. § 52.173(a). In March 2012, the EPA partially approved and partially disapproved of the proposed Regional Haze SIP. *Id.* In response, the EPA then finalized a Regional Haze FIP for Arkansas. *Promulgation of Air Quality Implementation Plans; State of Arkansas; Regional Haze and Interstate Visibility Transport Federal Implementation Plan*, 81 FR 66332-01 (September 27, 2016). Public utilities filed a petition for review of the Regional Haze FIP at the Eighth Circuit Court of Appeals, where certain

portions of the Regional Haze FIP remain stayed. *State of Arkansas, et al. v. EPA, et al.*, No. 16-4270 (8th Cir. 2016).

The stakeholders—including plaintiffs and defendants—then began negotiating the content of a revised Regional Haze SIP that would replace the contested Regional Haze FIP. During this process, defendants filed comments indicating that they intend to cease combusting coal at White Bluff by the end of 2028 and that they "anticipated ceasing to combust coal at the Independence units by the end of 2030." (Dkt. No. 34-1, at 66, 68). The comments also explained that the "Lake Catherine Unit 4 will retire by the end of 2025 . . . ." (*Id.*, at 68).

As part of the Regional Haze SIP replacement process, Entergy Arkansas entered into an Administrative Order with the Arkansas Department of Environmental Quality ("ADEQ") in August 2018. This Order requires Entergy Arkansas to, among other things, permanently cease coal-fired operation at White Bluff no later than the end of 2028 (*Id.*, at 79). The Administrative Order also requires Entergy Arkansas to meet certain $SO_2$ emission requirements at Independence and White Bluff (*Id.*). On August 8, 2018, Governor Hutchinson transmitted a Revised Regional Haze SIP to the EPA, in which the SIP recognizes the "planned retirement of Entergy Lake Catherine, the planned cessation of coal-fired operations at Entergy White Bluff by the end of 2028, and the planned cessation of coal-fired operations at Entergy Independence by the end of 2030." (*Id.*, at 146).

According to the State:

Based on the State of Arkansas's decision to develop a new Regional Haze Rule State Implementation Plan to replace the Arkansas [Regional Haze Rule Federal Implementation Plan], the Eighth Circuit cases were stayed until the State of Arkansas developed its new plan. The State developed and submitted a new regional haze rule plan ("Revised RHR SIP") to EPA that did not require the installation of scrubbers at the White Bluff and Independence plants. This Revised RHR SIP became final and was approved by EPA effective October 28, 2019 (84 F.R. 51033), and the parts of the Arkansas RHR FIP relevant to the White Bluff

and Independence plants were withdrawn (84 F.R. 51056).  As a result, the issues
in the Eighth Circuit case relating to White Bluff and Independence have now been
dismissed as moot, including the Plaintiffs' separate petition for review in Eighth
Circuit Case No. 16-4309. . . .

(Dkt. No. 61, at 2).

The State also informs the Court that on March 25, 2019, plaintiffs filed an appeal of the

State's Revised RHR SIP in the Circuit Court of Pulaski County, Arkansas, *Sierra Club v.*

*Arkansas Pollution Control & Ecology Commission*, Case No. 60CV-19-1980, "seeking to

invalidate the Revised RHR SIP on state law procedural grounds." (Dkt. No. 61, at 3).  The State

and the Coalition were permitted to intervene in that state-court case, and the case was stayed until

July 20, 2020 (*Id.*).  *See* Arkansas Judiciary Website, Docket Search, http://caseinfo.arcourts.gov;

*Sierra Club v. Ark. Pollution Control & Ecology*, Case No. 60CV-19-1980, Order Granting

Consent Motion to Stay the Proceedings (June 10, 2019).  As of the date of this Order, the state-

court case remains stayed.  *Id.*

In addition, on November 25, 2019, plaintiffs filed a new petition for review in the Eighth

Circuit Court of Appeals challenging EPA's approval of the Revised RHR SIP, Case No. 19-3526

(Dkt. No. 61, at 3).  The State represents that Entergy, the State, and the Coalition are all parties

to that case (*Id.*).  The Eighth Circuit is holding that case in abeyance, pending this Court's decision

(*Id.*).  *See Sierra Club, et al. v. United States Environmental Protection Agency, et al.*, Case No.

19-3526, Clerk Order (8th Cir. Dec. 18, 2019).  On November 3, 2020, at the clerk's request, the

parties filed a joint status report requesting that the court continue to hold the case in abeyance.

*Id.* at Status Report (8th Cir. Nov. 3, 2020).

Also, plaintiffs filed in this case an amended complaint that adds allegations of opacity

exceedances at the White Bluff plant (Dkt. No. 54, ¶¶ 114-19).  These allegations involve the New

Source Performance Standards ("NSPS") under the CAA.  42 U.S.C. § 7411.  Plaintiffs allege

violations of the opacity standard in 40 C.F.R. § 60.42(a)(2) and of the opacity standard "in Sections 3(b) and 6 of the White Bluff Title V Permit, as renewed on January 22, 2015 (R8), September 25, 2015 (R9), May 10, 2016 (R10), and November 8, 2017 (R11) at least 323 times. . . ." (Dkt. No. 54, ¶¶ 115, 118).

### C.   Claims And Proposed Settlement Agreement

Plaintiffs allege that, at the times relevant to this amended complaint, Independence County and Jefferson County have both been classified as attainment or unclassifiable for $SO_2$ and $NO_2$ (Dkt. No. 54, ¶¶ 31-33).  Plaintiffs further allege that, from September 14, 2008, to November 4, 2008, and from February 28, 2009, to April 17, 2009, defendants made modifications to the Independence plant without obtaining a required PSD permit or a modified Part 70 permit (*Id.*, ¶¶ 75-84).  Plaintiffs also allege that from September 14, 2007, to November 18, 2007, Entergy Arkansas made modifications to the White Bluff plant without obtaining a required PSD permit or a modified Part 70 permit (*Id.*, ¶¶ 85-89).

In their amended complaint, with respect to the Independence plant, plaintiffs allege that physical changes and changes in the method of operation at Unit 1 of the Independence plant occurred during the 2009 Independence Unit 1 Outage (*Id.*, ¶¶ 75-76).  Plaintiffs maintain that these changes resulted in post-project significant emissions increases and significant net emissions increases for $SO_2$, a major modification occurred for that pollutant, that defendants did not obtain a PSD permit for that major modification, and that defendants are operating the Independence plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements (*Id.*, ¶¶ 77-78).  Plaintiffs also allege that defendants did not obtain a modified Part

6

70 permit prior to commencing work on the modification described, yet are still operating the Independence plant without that modified Part 70 permit, which plaintiffs allege would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements (*Id.*, ¶ 79). Plaintiffs make these same allegations with respect to a 2008 Independence Unit 2 Outage at the Independence plant with respect to a major modification for $SO_2$, a PSD permit for the major modification, and a modified Part 70 permit (*Id.*, ¶¶ 80-84).

With regard to the White Bluff plant, plaintiffs allege that changes occurring during the 2007 White Bluff Unit 2 Outage resulted in post-project significant emissions increases and significant net emissions increases for $NO_x$, a major modification occurred for that pollutant, that defendants did not obtain a PSD permit for that major modification, and that defendants are operating the White Bluff plant without completing a permit application for such permit, without the permit itself, and without complying with the conditions that would be imposed by such permit, including but not limited to emission limitations that would be imposed by that permit pursuant to BACT requirements (*Id.*, ¶¶ 85-88). Plaintiffs also allege that defendants did not obtain a modified Part 70 permit prior to commencing work on the modification described, yet are still operating the White Bluff plant without that modified Part 70 permit, which plaintiffs allege would have incorporated terms and conditions from a PSD permit, including emission limitations that would be imposed by a PSD permit pursuant to BACT requirements (*Id.*, ¶ 89). For relief, plaintiffs seek, in part, a declaration that defendants have violated the CAA and an injunction barring defendants from operating the Independence and White Bluff plants except in accordance with the CAA and the Arkansas SIP (*Id.*, ¶¶ 120-21).

On the face of their amended complaint, plaintiffs' set forth the relevant provisions of the CAA, Arkansas SIP, PSD program, and Title V program (*Id.*, ¶¶ 28-70).  As a result of the above allegations, plaintiffs assert eight claims against defendants for violating the CAA and its implementing regulations (*Id.*, ¶¶ 90-119).  First, plaintiffs allege that defendants modified and operated the Independence plant without obtaining a PSD permit for a major modification at Unit 1 (*Id.*, ¶¶ 90-93).  Second, plaintiffs allege that defendants modified and operated the Independence plant without obtaining a modified part 70 permit (*Id.*, ¶¶ 94-97).  Third, plaintiffs allege that defendants modified and operated the Independence plant without obtaining a PSD permit for a major modification at Unit 2 (*Id.*, ¶¶ 98-101).  Fourth, plaintiffs allege that defendants modified and operated the Independence plant without obtaining a modified Part 70 permit (*Id.*, ¶¶ 102-05).  Fifth, plaintiffs allege that defendants modified and operated the White Bluff plant without obtaining a PSD permit for a major modification at Unit 2 (*Id.*, ¶¶ 106-09).  Sixth, plaintiffs allege that defendants modified and operated the White Bluff plant without obtaining a modified Title V permit (*Id.*, ¶¶ 110-13).  Seventh, plaintiffs allege that defendants violated the opacity standard in 40 C.F.R. § 60.42(a)(2) at the White Bluff Plant (*Id.*, ¶¶ 114-16).  Eighth, plaintiffs allege that defendants violated the opacity standard in the White Bluff plant's Title V permit at least 323 times (*Id.*, ¶¶ 117-19).

The Eighth Circuit Court of Appeals examined the background of the CAA, its requirements, and the federal and Arkansas state laws that provide avenues for various challenges to the CAA's regulatory scheme in *Nucor Steel-Arkansas v. Big River Steel, LLC*, 825 F.3d 444 (8th Cir. 2016).  The Court notes that, here, plaintiffs allege ongoing violations by defendants under 42 U.S.C. § 7604(a)(1) at the Independence and White Bluff plants.  The Eighth Circuit recognizes

that § 7604(f), which defines "emissions standard or limitation," encompasses the provisions of the Arkansas SIP. *Nucor*, 825 F.3d at 449-50.

Defendants did not answer either the original complaint or the amended complaint. Instead, shortly after the original complaint was filed, the parties filed a proposed Settlement Agreement with the Court (Dkt. No. 11). The proposed Settlement Agreement includes the following commitments: (1) Entergy Arkansas shall permanently cease the combustion of coal at White Bluff by the end of 2028; (2) Entergy Arkansas shall permanently cease the combustion of coal at Independence by the end of 2030; (3) Entergy Arkansas shall permanently cease all operations of existing units at Lake Catherine; (4) defendants shall commence development of 800 megawatts of renewable energy projects by the end of 2027; (5) none of the parties shall challenge the provision of any Regional Haze plan regarding White Bluff, Independence, or Lake Catherine; (6) and Sierra Club shall voluntarily dismiss its administrative proceeding regarding Arkansas' Regional Haze SIP (*Id.*, ¶¶ 9, 12, 15-17, 21). Plaintiffs filed notice of a 45-day review and comment period (Dkt. No. 16). That notice also stipulated that, following the conclusion of the 45-day review and comment period, plaintiffs intended to work with defendants to review and take into account any comments submitted by the federal government and thereafter move the Court to enter the Settlement Agreement (*Id.*). Defendants then filed notice of a letter from the United States Department of Justice regarding the proposed Settlement Agreement (Dkt. No. 28). That letter notified the Court that the United States had reviewed the proposed Settlement Agreement and Consent Judgment in this action and did not object to its entry by this Court (*Id.*).

### D.    Proposed Intervenors

The State of Arkansas, by and through the CURAD, filed a motion to intervene in this action (Dkt. No. 17). The Coalition, which is made up of "electric consumers, and associations of

consumers, that receive electric power from the White Bluff and Independence plants," also moved to intervene (Dkt. No. 26, at 3). The Coalition also includes the Arkansas Natural Gas Consumers, Inc., "whose members are large, industrial consumers of natural gas in Arkansas." (*Id.*, at 4). According to the Coalition, its purpose "is to advocate for and take action to ensure an affordable and reliable energy supply in the State of Arkansas." (*Id.*, at 5). The proposed intervenors both move for intervention as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2). Both parties also seek permissive intervention pursuant to Federal Rule of Civil Procedure 24(b) (Dkt. Nos. 17, 26).

In its motion to intervene, CURAD states that it seeks "intervention in this matter (a) to correct misrepresentations present in the proposed Settlement Agreement; (b) to inform the Court how and why the Settlement Agreement usurps state regulatory authority over Entergy Arkansas, Inc. . . . including its assets, and its rates; and (c) to protect Arkansas utility ratepayers from the adverse effects of the Settlement Agreement." (Dkt. No. 17, at 3-4). In its motion to intervene, the Coalition also claims that "[t]he Settlement Agreement will result in significant economic harm to the members of the Coalition . . . ." (Dkt. No. 26, at 5). Specifically, the Coalition claims that "costs resulting from the early retirement or fuel conversion of White Bluff and Independence will be passed on directly to Arkansas ratepayers, including members of the Coalition," "[t]he Coalition's electric consumers would be harmed if the White Bluff and Independence plants are forced to cease operations or convert to another fuel source before the end of their effective operating life because electric service would become more expensive and less reliable," "[t]he Settlement Agreement would also reduce the demand for coal, and likely would increase the demand for natural gas, since natural gas currently is the least cost fuel to replace the firm generation capacity of White Bluff and Independence," and "large, industrial consumers of natural

gas in Arkansas" "would be harmed if White Bluff and Independence switched their fuel source to natural gas, because that would cause an increase in demand for natural gas and gas transmission capacity in the state, putting upward pressure on natural gas prices and transmission costs to deliver natural gas." (Dkt. No. 26, at 3-5).  In their replies, both CURAD and the Coalition assert that this Court's focus should be on the allegations in plaintiffs' complaint as it examines whether to permit intervention (Dkt. Nos. 41, at 3; 42, at 2).

CURAD and the Coalition seek to intervene not as plaintiffs but instead as defendants in this action.  Essentially, CURAD and the Coalition propose stepping into the shoes of defendants. "[T]he Attorney General in her proposed answer raises affirmative defenses to the Plaintiffs' CAA claims and seeks to prevent the Plaintiffs from obtaining the relief they seek (*i.e.*, imposition of additional controls at White Bluff and Independence based on BACT and the costs that will be incurred to install those controls)." (Dkt. No. 41, at 8).  Likewise, the Coalition seeks to raise issues, "including but not limited to[] whether this Court has subject matter jurisdiction over Plaintiffs [sic] claims, whether the Plaintiffs have standing, whether the Defendants have the authority to enter into the Settlement Agreement with the Plaintiffs without approval of other regulatory authorities, whether the Settlement Agreement is in the best interest of the Coalition members who obtain electric power from the White Bluff and Independence plants, and whether the Plaintiffs have a proper factual or legal basis for the claims asserted in the Complaint." (Dkt. No. 26, at 5-6).

### E.     Request For Case Specific Briefing

On September 30, 2019, the Court entered an Order directing the parties to brief further specific issues (Dkt. No. 53).  The Court welcomed further briefing on the following issues:  the Court's subject matter jurisdiction to hear plaintiffs' claims; the nature of the statute of limitations

in CAA cases such as the one filed by plaintiffs, including whether plaintiffs' claims may be time-barred under controlling Eighth Circuit case law and whether, even if so, defendants should be permitted to waive such a defense under the CAA when public interest is involved; plaintiffs' standing to bring these claims; the Court's subject matter jurisdiction to hear plaintiffs' claims to the extent any such claim may be construed as a collateral attack on the Title V permit or any other type of permit at issue; and whether CURAD or the Coalition are required to and can establish Article III standing sufficient to permit intervention as defendants in this litigation (*Id.*).

In the wake of the Court's Order, the parties filed status reports and proposed briefing schedules (Dkt. Nos. 60; 61; 62). The parties have since filed briefing responsive to the issues identified in the Court's September 30, 2019, Order (Dkt. Nos. 66; 67; 68; 69; 72; 73; 74; 75; 76; 77; 78; 79; 80). The Court has reviewed this briefing, the attached exhibits, and the underlying legal authorities.

## II.     Subject Matter Jurisdiction

The Court addresses first its subject matter jurisdiction over this dispute. "To reach the merits of a case, an Article III court must have jurisdiction." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). The term "subject-matter jurisdiction" is defined as "the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998). There is no "case or controversy," as required for the Court to have subject matter jurisdiction under Article III, unless the party initiating the action has standing to sue. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 966 (8th Cir. 2016).

Plaintiffs maintain that the Court has subject matter jurisdiction over this case (Dkt. No. 69, at 18-34). Plaintiffs and the Entergy Companies argue that defendants may under controlling

law deliberately waive the statute of limitations defense applicable to the claims at issue here and that it would be an abuse of discretion for the Court to take up the issue (Dkt. Nos. 67, at 11-14; 69, at 35-44).  Plaintiffs argue that the Court has subject matter jurisdiction over their opacity claims (*Id.*, at 18-20).  Plaintiffs argue that the Court has subject matter jurisdiction over plaintiffs' claims that the Entergy Companies illegally modified the Independence and White Bluff plants without a permit, particularly because:  (1) the Entergy Companies' alleged unpermitted modifications at White Bluff and Independence violated three different standards under the CAA; (2) *Otter Tail* and its progeny do not limit the Court's jurisdiction over plaintiffs' claims because the Entergy Companies never applied for a permit revision authorizing the plant modifications; and (3) even if *Otter Tail* deprived this Court of subject matter jurisdiction regardless of whether the modifications had been the subject of prior approval through a permitting process, the EPA's recent reinterpretation of the CAA has clarified that oversight of PSD permitting decisions will not take place under Title V (*Id.*, at 21-34).

Despite not being granted the right to intervene yet, the proposed intervenors advance several arguments against the Court's subject matter jurisdiction over plaintiffs' underlying claims in this matter.  The Coalition argues that the applicable statute of limitations, 28 U.S.C. § 2462, is jurisdictional, cannot be waived, goes to the Court's subject matter jurisdiction, and bars plaintiffs' claims (Dkt. Nos. 68, at 41-44; 78, at 15-23).  The Coalition argues that plaintiffs lack standing based on the allegations in their amended complaint (Dkt. No. 68, at 3-11).  Additionally, the Coalition asserts that the Court does not have subject matter jurisdiction over plaintiffs' PSD-based claims (Dkt. No. 73, at 1-6).  Specifically, the Coalition asserts that plaintiffs' alleged PSD claims are one-time events that are not continuing and will not repeat under § 7604(a) and that defendants have facially valid permits for White Bluff and Independence (*Id.*).  Further, the Coalition asserts

that that the Court lacks subject matter jurisdiction over plaintiffs' claims of opacity violations of the NSPS and that the Court lacks subject matter jurisdiction over plaintiffs' NSPS opacity claims because that would constitute a collateral attack on defendants' permits (*Id.*, at 6-8). The Court addresses only those issues necessary to satisfy itself with respect to subject matter jurisdiction.

### A.   Whether Plaintiffs' Action Is Barred By A Jurisdictional Statute Of Limitations

Generally, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations." Fed. R. Civ. P. 8(c); *see also Warner Bros. Entm't, Inc. v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016) ("Fed. R. Civ. P. 8(c) provides that a party must affirmatively plead affirmative defenses. While failure to plead an affirmative defense is not necessarily fatal in all circumstances, the affirmative defense must at least be raised before the trial court."). "Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto." *Day v. McDonough*, 547 U.S. 198, 202 (2006) (citing Fed. R. Civ. P. 8(c), 12(b), 15(a)). "[S]hould a [defendant] intelligently choose to waive a statute of limitations defense, a district court would not be at liberty to disregard that choice." *Id.* at 210, n.11. The Supreme Court considers it "an abuse of discretion to override a [defendant's] deliberate waiver of a limitation defense." *Id.* at 202.

However, "[s]tatutes of limitations generally fall into two broad categories: affirmative defenses that can be waived and so-called 'jurisdictional' statutes that are not subject to waiver or equitable tolling." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 140 (2008) (Stevens, J., dissenting). A "jurisdictional" statute of limitations is one that "deprives a court of adjudicatory authority over the case, necessitating dismissal," if a party fails to comply with it. *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017). A "jurisdictional" statute of limitations "is not subject to waiver or forfeiture and may be raised at any time in the court of first

instance and on direct appeal," including on the Court's own initiative.  *See id.* (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)).  A nonjurisdictional statute of limitations, by contrast, is "less stern," *Hamer* 138 S. Ct. at 17, seeks "to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011), and "may be waived or forfeited," *Hamer*, 138 S. Ct. at 17.

Over the past two decades, the Supreme Court has repeatedly examined the distinction between a jurisdictional statute of limitations and a nonjurisdictional statute of limitations. *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018); *Hamer*, 138 S.Ct. at 17; *Manrique v. United States*,  137 S.Ct. 1266, 1271–72 (2017); *United States v. Kwai Fun Wong*, 575 U.S. 402, 409–21 (2015); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153–55 (2013); *Gonzalez v. Thaler*, 565 U.S. 134, 141–43 (2012); *Henderson*, 562 U.S. at 434–36; *Dolan v. United States*, 560 U.S. 605, 610–11, (2010); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161–63 (2010); *Union Pac. R.R. Co. v. Bhd. of Locomotive Engs. & Trainmen*, 558 U.S. 67, 81–82 (2009); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008); *Bowles*, 551 U.S. at 209–12, 127 S.Ct. 2360; *Day v. McDonough*, 547 U.S. 198, 205–06 (2006); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511–12 (2006); *Eberhart v. United States*, 546 U.S. 12, 16–17 (2005); *Scarborough v. Principi*, 541 U.S. 401, 413–14 (2004); *Kontrick*, 540 U.S. at 454–56; *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171–72 (2003); *Steel Co.*, 523 U.S. at 90.  Through these cases, the Supreme Court has "made plain that most time bars are nonjurisdictional" and that parties "must clear a high bar to establish that a statute of limitations is jurisdictional."  *Kwai Fun Wong*, 575 U.S. at 409-10.

The Supreme Court has "repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d]' as much."  *Id.* at 409 (citations omitted). "[A]bsent such a clear statement, . . . 'courts should treat the restriction as nonjurisdictional.'"  *Id.*

at 409-10 (quoting *Sebelies v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)).  A time bar "framed in mandatory terms" and "'emphatically' expressed" is not, by reason of those factors, necessarily jurisdictional.  *Id.* at 410 (quoting *Henderson*, 562 U.S. at 439).  Instead, to be a jurisdictional limitation, though Congress need not use "magic words," *Henderson*, 562 U.S. at 436, traditional tools of statutory construction "must plainly show that Congress imbued a procedural bar with jurisdictional consequences," *Kwai Fun Wong*, 575 U.S. at 410.

For claims brought pursuant to the CAA like those asserted by plaintiffs, the following statute of limitations applies:  "[e]xcept as otherwise provided by an Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."  28 U.S.C. § 2462.  For purposes of the proposed Settlement Agreement only, the Entergy Companies agreed to "waive all objections and defenses that they may have to the Court's jurisdiction over this action, entry or enforcement of the Agreement, or venue in this judicial district" (Dkt. No. 11, at 6-7).[1]  Thus, to satisfy itself with respect to subject matter jurisdiction, the Court must determine whether this statute of limitations is jurisdictional—and, consequently, not waivable—or nonjurisdictional.

In *Kwai Fun Wong*, the Supreme Court determined the following statute of limitations is nonjurisdictional:  "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered

---

[1]   The Entergy Companies maintain that they have not waived the right to assert the statute of limitations defense, among other potential defenses, if forced to litigate this action against plaintiffs (Dkt. Nos. 67, at 14; 75, at 32-36).

16

mail, of notice of final denial of the claim by the agency to which it was presented."  575 U.S. at 405 (citing 28 U.S.C. § 2401(b)).  The Supreme Court explained that Congress "provided no clear statement" indicating that the law is the "rare statute of limitations that can deprive a court of jurisdiction."  *Id.* at 410.  The Supreme Court found that the text "speaks only to a claim's timeliness, not to a court's power," and uses "mundane statute-of-limitations language, saying only what every time bar, by definition must:  that after a certain time a claim is barred."  *Id.*

Furthermore, since the Supreme Court's decision in *Kwai Fun Wong*, at least two federal courts have determined that parties have failed to clear the requisite "high bar" to establish that § 2462 represents a jurisdictional statute of limitations, *see, e.g.*, *S.E.C. v. Amerindo Inv. Advisors*, 639 Fed. App'x 752, 754 (2d. Cir. 2016); *United States v. Hines*, No. 3:16-cv-1477-J-32PDB, 2017 WL 6536574, at *2 (M.D. Fla. Dec. 21, 2017), and the parties do not identify any case law to the contrary.  Moreover, the *Amerindo Investment Advisors* court approved the waiver of an affirmative statute of limitations defense under § 2462 in finding that the defendants in that case "waived their statute of limitations defense by not raising it in their motion to dismiss the amended complaint" despite the fact that defendants made the explicit argument that the § 2462 statute of limitations is jurisdictional.  639 Fed. App'x at 754.

By way of comparison, three years after *Kwai Fun Wong*, the Supreme Court in *Patchak* determined the following statute of limitations is jurisdictional:  "'No Claims.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the [land] shall not be filed or maintained in a Federal court and shall be promptly dismissed.'"  138 S. Ct. at 904 (quoting 128 Stat. 1913 § 2(b)).  The Supreme Court explained that the law used "jurisdictional language," including "action" and "shall not be filed or maintained in a Federal court"; imposed jurisdictional consequences, in that such a claim

"shall be promptly dismissed"; added the phrase, "notwithstanding any other provision of law," which includes the general grant of federal question jurisdiction under 28 U.S.C. § 1331; and used language similar to other statutes the Supreme Court has deemed jurisdictional, including examples such as "an appeal may not be taken," "no person shall file or prosecute," and "no action . . . shall be brought under 28 U.S.C. § 1331." *Id.* at 905.  In reaching this conclusion, the Supreme Court also highlighted cases featuring similar statutes that the Supreme Court had deemed jurisdictional, including *Gonzalez*, 565 U.S. at 142 ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . ." (quoting 28 U.S.C. § 2253(c)), *Keene Corporation v. United States*, 508 U.S. 200, 206-09 (1993) ("The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States." (quoting 28 U.S.C. § 1500)), and *Weinberger v. Salfi*, 422 U.S. 749, 756 (1975) ("No action against the United States, the Secretary, or any officer or employee thereof shall be brought under (s 1331 et seq.) of Title 28 to recover on any [claim] arising under (Title II of the Social Security Act)." (quoting 42 U.S.C. § 405(h))).  *See Patchak*, 138 S. Ct. at 905-06.

Having considered all arguments and applicable legal authorities,[2] the Court concludes that the applicable statute of limitations for plaintiffs' claims is nonjurisdictional.   The Court

---

[2]   The Court does not find it necessary to address each argument raised by the proposed intervenors, only those arguments the Court determines must be resolved to satisfy itself of subject matter jurisdiction over plaintiffs' claims.  The Court pauses briefly to address one argument raised by the Coalition.  Relying on *VanLandingham v. Grand Junction Regional Airport Authority*, 46 F. Supp. 3d 1119, 1125-26 (D. Colo. 2014), and *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945), the Coalition also maintains that the § 2462 statute of limitations may not be waived because it affects the public interest in this case, notwithstanding whether the statute of limitations

acknowledges that the Coalition argues that § 2462 "focuses on the court's power to 'entertain' a claim," rendering this provision jurisdictional "because it is directed at the court – not the plaintiff's claim – and prohibits a court from *entertaining* a case after five years has elapsed" (Dkt. No. 68, at 41-42).  Based on this reasoning, the Coalition maintains that "the applicable statute of limitations in this case is jurisdictional, it may not be waived, it may be asserted at any time, and it is incumbent on the Court to apply the statute *sua sponte* to determine whether the Court has subject matter jurisdiction of the Plaintiffs' claims" (*Id.*, at 42).  The Court again stresses that "most time bars are nonjurisdictional," and that parties "must clear a high bar to establish that a statute of limitations is jurisdictional." *Kwai Fun Wong*, 575 U.S. at 409-10.  The Court concludes that the high bar has not been cleared here for the reasons explained.

The Court notes that § 2462 appears to share some similarities with the statutes of limitations at issue in both *Kwai Fun Wong* and *Patchak*.  However, as in *Kwai Fun Wong*, the Court concludes that "[n]either the text nor the context nor the legislative history indicates (much less does so plainly) that Congress meant to enact something other than a standard time bar" in passing § 2462.  575 U.S. at 410.  Crucially, neither the statute of limitations in *Patchak* nor the statutes cited as examples by the Supreme Court in *Patchak* impose any kind of time bar, as these statutes focus strictly on the jurisdiction of courts to hear various claims.  By contrast, § 2462 imposes a clear time bar of five years.  Additionally, § 2462 does not "set forth 'an inflexible rule requiring dismissal whenever' its clock has run,'" *Holland v. Florida*, 560 U.S. 631, 645 (2010)

---

under § 2462 is jurisdictional (Dkt. No. 68, at 42-44).  Per the Supreme Court, "[w]here a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *O'Neil*, 324 U.S. at 704.  The Court does not find that the Entergy Companies' waiver of an affirmative statute of limitations defense to plaintiffs' claims represents waiver of a private right that would "thwart the legislative policy which" the CAA "was designed to effectuate." *Id.*

(quoting *Day*, 547 U.S. at 208), unlike the dictate in *Patchak* mandating that an untimely claim "shall be promptly dismissed," 138 S. Ct. at 904.  From a textual standpoint, the Court sees little effective difference between § 2462 dictating that a claim "shall not be entertained" if untimely brought, *see* 28 U.S.C. § 2462, and the statute of limitations applicable in *Kwai Fun Wong* dictating that a claim "shall be forever barred" if untimely brought, *see* 28 U.S.C. § 2401(b).  Additionally, the Court notes that numerous federal courts have permitted equitable tolling of actions subject to § 2462.  *See, e.g.*, *S.E.C. v. Koenig*, 557 F.3d 736, 739-40 (7th Cir. 2009); *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1523-24 (9th Cir. 1987); *U.S. S.E.C. v. Power*, 525 F. Supp. 2d 415, 424-26 (S.D.N.Y. 2007); *Atl. States Legal Found. v. Al Tech Specialty Steel Corp.*, 635 F. Supp. 284, 288 (N.D.N.Y. 1986).  The Supreme Court has ruled that nonjurisdictional federal statutes of limitations are subject to a presumption that equitable tolling is permitted, whereas jurisdictional federal statutes of limitations do not enjoy this presumption.  *See Holland*, 560 U.S. at 648 (2010); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990).  Thus, the decisions of other federal courts to permit equitable tolling under § 2462 further bolsters the conclusion that § 2462 is nonjurisdictional.  In addition, although not directly comparable, the Court notes that the government has regularly been allowed to bring equitable actions under the CAA and the Clean Water Act outside of § 2462's five-year window, further indicating a nonjurisdictional nature.  *See United States v. Telluride Co.*, 146 F.3d 1241, 1243 (10th Cir. 1998); *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997); *FEC v. Christian Coalition*, 965 F. Supp. 66, 70 (D.D.C. 1997).

Given the plain text of § 2462, the Court's review of the relevant legal authorities and precedents, and the dearth of case law supporting the proposed intervenors' position, the Court concludes that § 2462 is not a jurisdictional statute of limitations.  Accordingly, the Court considers § 2462 to be nonjurisdictional.  In other words, because the applicable statute of limitations is not

jurisdictional, the Court need not and does not resolve whether plaintiffs' claims are timely raised to satisfy itself with respect to its subject matter jurisdiction.

### B.      Plaintiffs' Standing

The jurisdiction of federal courts extends only to actual cases or controversies.  U.S. Const. art. III, § 2, cl. 1; *accord Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994).   To satisfy the case-or-controversy requirement of Article III, a plaintiff must establish standing as an "indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *accord Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012). As a jurisdictional prerequisite, standing must be established before reaching the merits of a lawsuit. *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007).  To satisfy standing requirements, plaintiffs must:   (1) have suffered an injury in fact, (2) establish a causal relationship between the contested conduct and the alleged injury, and (3) show that a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560-61; *accord Hargis*, 674 F.3d at 790.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).   At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. of Women v. Scheidler,* 510 U.S. 249, 256 (1994).  Standing must exist not only for each claim plaintiffs bring but also for each form of relief plaintiffs seek. *Town of Chester v. Laroe Estates, Inc.*, ––– U.S. ––––, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017).

The Coalition, even though it has not been granted permission to intervene yet, maintains in its briefing that the Court lacks subject matter jurisdiction over the allegations in plaintiffs' amended complaint because plaintiffs lack standing (Dkt. Nos. 68, at 3-11; 73, at 10-12; 78, at 3-11).  The Coalition asserts that plaintiffs assert only generalized grievances, that plaintiffs have not shown injury in fact, that plaintiffs' allegations do not demonstrate that the alleged injury is fairly traceable to the defendants' challenged conduct, that plaintiffs cannot demonstrate redressability, and that plaintiffs have not alleged injuries arising from PSD-based or NSPS-based violations (*Id.*).  Plaintiffs maintain that they do have Article III standing to assert the claims contained in their amended complaint (Dkt. Nos. 76, at 13-34; 80, at 20-21).  The Court will address this issue only to the extent necessary to satisfy itself of subject matter jurisdiction.

The standard this Court applies to a standing challenge depends upon whether the standing challenge is "facial" or "factual."  Standing is a matter of subject-matter jurisdiction.  *See Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 422 (8th Cir. 1999).  "In a facial attack, the court merely [needs] to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction."  *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015) (alteration in original) (internal quotation omitted).  "Conversely, in a factual attack, the existence of subject matter jurisdiction [is challenged] in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Id.* at 914-15 (alteration in original) (internal quotation omitted).  As a result, in a factual attack, the nonmoving party does "not enjoy the benefit of the allegations in its pleadings being accepted as true by the reviewing court."  *Id.* at 915.  In the context of a Federal Rule of Civil Procedure 12(b)(1) motion, the Eighth Circuit explained that a challenge to standing should be treated differently "than a 12(b)(6) motion, which is governed by Rule 56 when matters outside the pleadings are considered . . . ."  *Osborn v.*

*U.S.*, 918 F.2d 724, 729 (8th Cir. 1990).  Further, where the issue in dispute is the trial court's jurisdiction, "there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  The Court determines that the challenge to standing here is factual, given the type of materials all parties put before the Court in the limited record developed to date in this case.  Therefore, the Court will consider matters outside the pleadings when resolving the standing question.

The Court has examined the allegations in the amended complaint, briefing, and materials submitted by the parties.  The Court is satisfied at this stage of the litigation that plaintiffs have standing to assert their claims (Dkt. Nos. 54, ¶¶ 19-27; 76, at 14-59).  The Court also is satisfied that there is organizational standing for plaintiffs (Dkt. Nos. 54, ¶¶ 6-9; 76, at 31, Ex. 12-13).

### 1.    Plaintiffs' Alleged Injury-In-Fact

Plaintiffs allege injury-in-fact in their amended complaint (Dkt. No. 54, ¶¶ 19-27, 38-43, 45-46, 48-55; *see also* Dkt. No. 76, at 14-16; at 24-25; at 27-28; at 30; Ex. 1, 2, 5, 6, 7, 8, 9, 10, 14).  Plaintiffs provide affidavits of members who state their ability to enjoy recreational activity at several parks including Buffalo National River Park, Hot Springs National Park, Pinnacle Mountain State Park, and Two Rivers Park has been impaired by decreased visibility and haze at the parks due to air pollution (Dkt. No. 54, at 38-39, 42-44, 48-50, 54-55; Ex. 1, at 3-4; Ex. 2, at 3-4; Ex. 5, at 3-4; Ex. 6, at 3-4; Ex. 14, at 4).  Plaintiffs' members allege owning property or visiting property in proximity to the White Bluff and Independence plants and express concern about the inability of themselves and family members to breath clean air due to emissions from the White Bluff and Independence plants (Dkt. No. 54 at 40, 51; 76 at Ex. 5 at 4, Ex, 6, at 2-3, Ex. 7, at 2-3; Ex. 14, at 3-4).  Members also attest to concerns about worsening of physical conditions

such as asthma and allergies and the possibility of acquiring physical illnesses such as lung, respiratory, and cardiovascular problems due to the sulfur dioxide and nitrogen oxide pollution from the White Bluff and Independence plants (*Id.*, at 44-45, 51; 76, at Ex. 7, at 2-3, Ex. 14, at 3-4).   Plaintiffs' members also allege concern about decreased property value, harm to fish and wildlife in areas they routinely visit, and an inability eat fish because of contamination (*Id.* at 40, 45-46, 55; 76, at Ex. 5, at 3; Ex. 6, at 3-4).   The Court finds that the harms described establish injury-in-fact for plaintiffs' members.   *See Laidlaw*, 528 U.S. at 182 (sworn statements by members who could not enjoy activities such as hiking, picnicking, camping, fishing, swimming, and boating because of pollutant discharges adequately documented injury-in-fact); *Sierra Club v. Envt'l Prot. Agency*, 926 F.3d 844, 848-49 (D.C. Cir. 2019) (members' declarations established standing because members attested to regularly visiting parks where emissions contributed to haze); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (affidavits from the individual plaintiffs and its organizational members who reside in the area stating that they have suffered repeated exposure to sulfurous odors causing physical discomfort and impairing their enjoyment of their surroundings were sufficient to establish injury-in-fact).

### 2.    Plaintiffs' Allegations Of Traceability

Plaintiffs allege traceability in their amended complaint (Dkt. No. 54, ¶ 27).   Plaintiffs expand on this in response to the Coalition's assertions with respect to standing.   Plaintiffs allege that the injuries about which they complain "are traceable to Entergy's alleged violations in this case" and that "the object of Plaintiffs' action is to reduce emissions of $SO_2$ and $NO_x$ from the White Bluff and Independence" plants (Dkt. No. 76, at 16).   Plaintiffs support their claims with detailed analysis and additional argument (Dkt. Nos. 76, at 16-22, 25-26, 28-29; Ex. 3; Ex. 4; Ex.

11; Ex. 16).  As evidence of traceability, plaintiffs point to an Arkansas Department of Health brochure entitled "Mercury and Fish in Arkansas, What You Should Know" (Dkt. No. 76, at 28; Ex. 16).  The brochure states that, "[m]ercury is an element that occurs naturally in rock, but it also is thought to come from burning coal and trash, as well as from some industry." (*Id.* at 28-29, Ex. 16, at 1).  Plaintiffs further assert that on the EPA website on the topic of "Mercury and Air Toxics Standards" the EPA states that "[p]ower plants are the biggest source of mercury."  (Dkt. No. 76, at 29).  Plaintiffs also point to expert reports attached to their response that establish that emissions of $SO_2$ and $NO_x$ from the White Bluff and Independence plants can cause hazy conditions and impair visibility (Dkt. No. 76, at 18-22; Ex. 3; Ex. 4).  The Court is satisfied on the record before it that plaintiffs have established traceability in order to have standing.

### 3.    Plaintiffs' Allegations Of Redressability

Plaintiffs allege redressability in their amended complaint (Dkt. No. 54, ¶¶ 75-89, 61-70). Plaintiffs also expand on these assertions in their briefing (Dkt. No. 76, at 22-24; at 27; at 28-29, Ex. 16; at 30-31).   Again, "the object of Plaintiffs' action is to reduce emissions of $SO_2$ and $NO_x$ from the White Bluff and Independence" plants (Dkt. No. 76, at 16).  Plaintiffs attach to their briefing expert reports that indicate that closure of the White Bluff and Independence plants for a period of time to obtain the requisite permits will reduce $SO_2$ and $NO_x$ emissions (Dkt. No. 76, at Ex. 3, ¶ 24).  Further, plaintiffs' experts opine that after White Bluff obtains a PSD permit, $NO_x$ emissions will decrease by at least 26 percent and that this reduction will have a "linearly proportional impact on the ozone impacts.  In other words, if we know a change in emissions rates, we can roughly, but confidently, estimate the impacts on ozone formation, ozone impacts, and negative air quality impacts by scaling the results from our previous detailed air quality modeling

results."  (Dkt. No. 76, Ex.3, ¶ 24; Ex. 11, ¶ 11).  The Court is satisfied plaintiffs have established redressability in order to have standing.

### C.      Whether Plaintiffs' Claims Give Rise To Jurisdiction

For a variety of reasons, the Coalition asserts that the Court lacks subject matter jurisdiction over the specific claims plaintiffs allege pursuant to the CAA (Dkt. No. 73, at 1-10).  The Court examines plaintiffs' allegations and concludes that it has subject matter jurisdiction over plaintiffs' claims.

Section 7604(a)(1) of the CAA provides that "[e]xcept as provided in subsection (b) of this section, any person may commence a civil action on his own behalf . . . (1) against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter."  42 U.S.C. § 7604(a)(1).  "On its face, (a)(1) establishes two types of conduct animating a citizen suit."  *Nucor*, 825 F.3d at 449.  "First, a person may allegedly have violated an emission standard or limitation in the past, provided that evidence shows the violation was repeated."  *Id.*  "Alternatively, a person may allegedly be in ongoing violation of an emission standard or limitation."  *Id.*

The CAA further defines the phrase "emission standard or limitation under this chapter" as follows:

> (f) For purposes of this section, the term "emission standard or limitation under this chapter" means—
>
>> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,
>> . . .
>> (3) … any requirement under section 7411 or 7412 of this title without regard to whether such requirement is expressed as an emission standard or otherwise), or
>> (4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or

condition, and any requirement to obtain a permit as a condition of operations.

42 U.S.C. § 7604(f).  The CAA defines a "standard of performance" in part as "a requirement of continuous emission reduction."  42 U.S.C. § 7602(1).

The CAA's citizen suit provision also authorizes a suit "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality) . . . or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit."  42 U.S.C. § 7604(a)(1).

### 1.    PSD Claims

Plaintiffs maintain that this Court has subject matter jurisdiction over their PSD claims because the Entergy Companies' alleged unpermitted modifications constitute three different violations of the CAA and the Arkansas SIP and that this Court has subject matter jurisdiction in a citizen suit over all of those claims (Dkt. No. 69, at 21-34).  Plaintiffs assert that the Entergy Companies' alleged unpermitted modifications at the White Bluff and Independence plants violated three different standards under the CAA and that the *Otter Tail* line of cases does not limit the Court's jurisdiction over plaintiffs' PSD claims because, unlike the parties in those cases, the Entergy Companies never applied for a permit revision authorizing the plant modifications (*Id.*).  Plaintiffs stress that the Entergy Companies' alleged unpermitted modification violations have been repeated, making them actionable under 42 U.S.C. § 7604(a)(1) (Dkt. No. 80, at 12-14).  Plaintiffs argue that the Coalition's contention that this Court lacks jurisdiction under 42 U.S.C. § 7604(a)(3) is based upon a misreading of *Nucor Steel* (*Id.*, at 14-16).

The Coalition asserts that plaintiffs' PSD-based claims should be dismissed for lack of subject matter jurisdiction (Dkt. No. 73, at 1-6).  The Coalition maintains that plaintiffs' alleged

PSD claims are one-time events that are not continuing and will not repeat under § 7604(a) and that defendants have facially valid permits for White Bluff and Independence (*Id.*, at 2-6).

42 U.S.C. § 7604(a)(3) allows citizen suits "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality)." 42 U.S.C. § 7604(a)(1) allows citizen suits against corporations that are in violation of any emission standard or limitation if there is evidence that the alleged violation has been repeated. The Eighth Circuit in *Nucor Steel* recognized that § 7604(a)(1) includes jurisdiction over violations of the Arkansas SIP. *See Nucor Steel*, 825 F.3d at 449 ("Indeed, this and other circuits have held that § 7604(f)(4) contemplates state SIPs."). Section 7604(a)(1) separately confers citizen suit jurisdiction to enforce "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4). The CAA also prohibits major modifications without a PSD permit, including the "construction" of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of 42 U.S.C. § 7475. *See* 42 U.S.C. § 7475(a). "Construction" includes "the modification (as defined in [42 U.S.C. § 7411(a)]) of any source or facility." *See* 42 U.S.C. § 7479(2)(C); *see also Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 568 (2007).

A number of district courts have concluded that the CAA permits citizen suits based solely on past violations, so long as there is proof that the violations were repeated. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, No. H-10-4969, 2017 WL 2331679, at *12 (S.D. Tex. Apr. 26, 2017); *Patton v. General Signal Corp.*, 984 F. Supp. 666, 672 (W.D.N.Y. 1997); *Fried v. SunGard Recovery Servs., Inc.*, 916 F. Supp. 465, 467 (E.D. Pa. 1996); *Adair v. Troy State Univ.*, 892 F. Supp. 1401, 1409 (M.D. Ala. 1995). Other courts have found that standing to bring

a citizen suit under the CAA depends upon an allegation of ongoing violations at the time the complaint is filed. *See Families for Asbestos Compliance Testing & Safety v. City of St. Louis, Mo.*, 638 F. Supp. 2d 1117, 1125 (E.D. Mo. 2009); *Cambrians for Thoughtful Dev. v. Didion Milling, Inc.,* 571 F. Supp. 2d 972, 978 (W.D. Wis. 2008) (finding no standing where undisputed violations of the CAA all occurred before suit commenced); *Pub. Citizen v. Am. Elect. Power Co.,* No. 5:05-CV-39-DF, 2006 WL 3813766, at *6 (E.D. Tex. Dec. 27, 2006) (applying *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167 (2000), to CAA citizen suit and finding sufficient allegations of ongoing or potential future violations); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C.*, 354 F. Supp. 2d 697, 705 (E.D. La. 2005) (applying *Laidlaw* to determine that plaintiffs had standing where defendant continued to violate its permit after suit commenced); *Berry v. Farmland Indus., Inc.,* 114 F. Supp. 2d 1150, 1154 (D. Kan. 2000) (applying *Steel Co.* and *Laidlaw* to determine that plaintiffs lacked standing in the absence of facts that defendant was violating the Clean Air Act or that future violations were imminent when suit was filed); *Anderson v. Farmland Indus., Inc.,* 70 F. Supp. 2d 1218, 1227–28 (D. Kan. 1999) (evidence of continued violations sufficient to confer standing); *Local Envtl. Awareness Development (LEAD) v. Exide Corp.*, No. CIV. 96–3030, 1999 WL 124473, at *15 (E.D. Pa. Feb. 19, 1999) ("While the CAA concept of past violations is seemingly at tension with the constitutional standing requirement in *Steel* [*Co.*], . . . the two concepts can be reconciled[. P]ast violations may meet the redressability requirement of standing only if they have the possibility of being repeated in the future.  In other words, a plaintiff may assert random past violations of the CAA and satisfy the redressability requirement by a presumption that there is a potential ongoing compliance problem or a possibility that such violations may be repeated.").

In *Nucor Steel*, the Eighth Circuit clarified that "[t]he plain language of [§ 7604(a)(1)] nevertheless demands that any past violation animating a suit under (a)(1) must be repeated or ongoing—a one-time violation will not suffice." 825 F.3d at 450 (citing 42 U.S.C. § 7604(a)(1); *Save Our Health Org. v. Recomp of Minn., Inc.*, 37 F.3d 1334, 1337 (8th Cir. 1994)).  A recent opinion from the United States Court of Appeals for the Fifth Circuit helps clarify that a "repeated" violation "means a plaintiff must assert at least two violations of the same standard in order to allege a claim" and that such claims include "violations that were repeated in the past or ongoing at the time of the complaint." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F. 3d 357, 363 (5th Cir. 2020); *see also Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 519 (5th Cir. 2016) ("Plaintiffs concede that they had to prove by the preponderance of the evidence that violations of the *same*, *specific* conditions or limitations in Exxon's permits were 'repeated' in the past or occurred at least once before Plaintiffs filed suit and at least once after." (emphasis in original)).  Further, 42 U.S.C. § 7604(a)(3) allows citizen suits "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air qualify.)" *Nucor Steel*, 825 F.3d at 451.

At this stage of the litigation and on the record before it, the Court determines that plaintiffs' PSD claims allege repeated violations of the CAA in satisfaction of § 7604(a)(1). Plaintiffs allege that the Entergy Companies made three unpermitted major modifications, as of March 2010 at White Bluff Unit 2, then as of May 2010 at Independence Unit 2, and then as of March 2011 at Independence Unit 1 (Dkt. No. 80, at 13-14).  Plaintiffs allege that each modification violates 42 U.S.C. § 7475(a) and Arkansas Pollution Control and Ecology Commission Reg. 19 (Dkt. Nos. 54, ¶¶ 90-93, 98-101, 106-09; 80, at 14).  Plaintiffs also allege

that each modification violates Arkansas Pollution Control and Ecology Commission Regs. 26.301(A) and (C), which have been incorporated into the Arkansas SIP (Dkt. Nos. 54, ¶¶ 94-97, 102-05, 110-13; 80, at 14).  *See* 66 Fed. Reg. 51,312 (Oct. 9, 2001).  Accordingly, Counts One through Six of plaintiffs' amended complaint allege three unpermitted major modifications which represent repeat violations of the CAA.  Therefore, based on the face of plaintiffs' well-pleaded amended complaint, the Court concludes that it has jurisdiction over plaintiffs' PSD claims under 42 U.S.C. § 7604(a)(1) (Dkt. No. 54, ¶¶ 90-113).

The Court also concludes that is has jurisdiction under 42 U.S.C. § 7604(a)(3).  As plaintiffs argue, their claims are based on facts different from those presented in *Nucor Steel*.  *See generally* 825 F.3d at 444.  Plaintiffs here allege that the Entergy Companies made three unpermitted major modifications, without seeking at all the required permits prior to making such modifications to major emitting facilities.  The allegation in *Nucor Steel* was that the defendant made such modifications "without a permit that complies with the CAA," not wholly "without a permit."  825 F.3d at 451.  To the Court, that distinction matters.  Based on plaintiffs' allegations, the Court concludes it has subject matter jurisdiction under §7604(a)(3), as well.

## 2. Opacity Violations

Plaintiffs maintain that this Court has subject matter jurisdiction over Counts Seven and Eight of their amended complaint alleging that the Entergy Companies violated the opacity standard (Dkt. Nos. 54, ¶¶ 114-19; 69, at 18-20; 80, at 20-21).  Citing *Nucor Steel*, plaintiffs maintain that the 20-percent opacity standard at issue and contained in 40 C.F.R. § 60.42(a)(2) is an "emission standard or limitation" under the CAA for three reasons:  (1) this regulation requires the continuous reduction of opacity, making it a "standard of performance"; (2) this regulation is from the NSPS, Subpart D, which the EPA promulgated under the authority of 42 U.S.C. § 7411;

and (3) since the regulation as established by the EPA Administrator, the regulation is also an "emission limitation" as defined in 42 U.S.C. § 7602(k), making the regulation enforceable under subsection (f)(1) (Dkt. Nos. 54, ¶¶ 58-61; 69, at 19-20).  Plaintiffs also allege that the Entergy Companies violated the 20-percent opacity standard specified in the White Bluff Title V permit and that this standard is specifically referenced in 42 U.S.C. § 7604(f)(4) (Dkt. Nos. 54, ¶¶ 62-63; 69, at 20).  Plaintiffs assert that these opacity violations have been repeated at least 323 times, satisfying the jurisdictional requirement mentioned in *Nucor Steel* that a violation must have been "repeated" (Dkt. Nos. 54, ¶¶ 115, 118; 69, at 20).  Plaintiffs also argue that *Otter Tail* has no bearing on the Court's jurisdiction over plaintiffs' opacity claims (Dkt. No. 80, at 16-17).

The Coalition asserts that the Court lacks subject matter jurisdiction over plaintiffs' claims of opacity violations of the NSPS (Dkt. No. 73, at 6-7).  The Coalition asserts that the district court in *Otter Tail* rejected a similar claim asserted by Sierra Club because it was not a permissible claim under § 7604(a) (*Id.*, at 6).  *See Sierra Club v. Otter Tail Corp.*, 608 F. Supp. 2d 1120, 1131 (D.S.D. 2009).  Relying on this opinion, the Coalition states that citizen suits under § 7604(a) are limited to claims that a facility failed to get a permit or claims alleging a facility is violating a permit (*Id.*, at 7).  The Coalition states that the Court's subject matter jurisdiction under § 7604 is limited to claims that sources of pollution either failed to obtain a permit or are violating a permit and that, as a result, the Court lacks subject matter jurisdiction over plaintiffs' opacity claims (*Id.*).

Plaintiffs maintain that their opacity claims seek to enforce opacity standards incorporated into the White Bluff Title V permit (Dkt. Nos. 69, at 20; 80, at 7-8).  As the district court in *Otter Tail* recognized, § 7604(a) authorizes claims for "violating a permit."  *See* 608 F. Supp. 2d at 1131. The plaintiffs in *Otter Tail* sought to enforce requirements that had not been incorporated into the defendant's Title V permit, and the district court concluded correctly that such a claim was

improper under § 7604(a). *See id.* That is not the case here with respect to plaintiffs' opacity claims. Because plaintiffs' opacity claims seek to enforce permit conditions that plaintiffs allege the Entergy Companies are violating, this Court concludes that it has subject matter jurisdiction under 42 U.S.C. § 7604(a)(1).

### D.    Exhaustion Of Administrative Remedies

The Coalition asserts that, even if the Court has jurisdiction over plaintiffs' claims, plaintiffs have failed to exhaust the administrative remedies given to them under Arkansas law and the CAA (Dkt. Nos. 68, at 31-33; 78, at 11-13). The Coalition asserts that there is no record on the Arkansas Pollution Control and Ecology webpage that Sierra Club appealed the White Bluff and Independence air permits which were issued by ADEQ in 2012 and 2011, respectively, despite having the opportunity to appeal those permits under Arkansas law (Dkt. No. 68, at 32). *See* Ark. Code Ann. §§ 8-4-205, 8-4-222 to -227. Plaintiffs maintain that they were not bound to exhaust administrative remedies before bringing this action (Dkt. No. 76, at 34-38).

As an initial matter, the Court concludes that its subject matter jurisdiction is not implicated by this argument. Having made this determination, the Court's analysis on this issue is intentionally limited at this stage.

Under the doctrine of exhaustion, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed . . . remedy has been exhausted." *McKart v. United States,* 395 U.S. 185, 193 (1969). "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan,* 503 U.S. 140, 144 (1992).

This Court concludes that, under the specific circumstances alleged here, the CAA does not contain an express requirement that a plaintiff exhaust state remedies before bringing a citizen

33

suit.  *See* 42 U.S.C. § 7604; *see also Citizens for a Better Env't–Cal. v. Union Oil Co. of Cal.*, 83

F.3d 1111, 1119 (9th Cir. 1996); *Grand Canyon Trust v. Energy Fuels Res. (U.S.A.) Inc.*, 269 F.

Supp. 3d 1173, 1193 n.7 (D. Utah 2017); *Voigt v. Coyote Creek Mining Co., LLC*, No. 1:15-cv-

00109, 2016 WL 3920045, at *6 (D.N.D. July 15, 2016); *Nw. Envt'l Def. Ctr. v. Cascade Kelly

Holdings LLC*, 155 F. Supp. 3d 1100, 1118-19 (D. Or. 2015); *Citizens for Pennsylvania's Future

v. Ultra Res., Inc.*, 898 F. Supp. 2d 741, 748-49 (M.D. Pa. 2012); *Palm Beach Cty. Envt'l Coalition

v. Florida*, 651 F. Supp. 2d 1328, 1340 (S.D. Fla. 2009); *Ass'n of Irritated Residents v. Fred

Schakel Dairy*, No. 1:05-CV-00707 OWW SMS, 2008 WL 850136, at *8-10 (E.D. Cal. Mar. 28,

2008).  Congress declined to require exhaustion of administrative remedies under the citizen suit

act of the CAA and provided more than one avenue for citizens to challenge alleged violations

under the CAA.

The two cases cited by the Coalition for the proposition that plaintiffs must pursue their

administrative remedies under state law, *Action for Rational Transit v. W. Side Highway Project

by Bridwell*, 699 F.2d 614, 616-17 (2d Cir. 1983), and *League To Save Lake Tahoe, Inc. v.

Trounday*, 598 F.2d 1164 (9th Cir. 1979), are factually distinct from the circumstance presented

here and were decided prior to Congress's enacting the 1990 Amendments to the CAA, which

created the Title V program with its permit shield provision.  Neither case addressed the type of

permits at issue here (Dkt. No. 76, at 36-37).  For these reasons, the Court is unconvinced by the

Coalition's arguments.

Next, the Coalition argues that plaintiffs' amended complaint represents a collateral attack

on the White Bluff and Independence air permits and that this same tactic was rejected by the

Eighth Circuit in *Otter Tail* (Dkt. No. 68, at 32).  To the extent the Coalition attempts to rely on a

judicially-imposed exhaustion requirement, the Court determines that a judicially-imposed

exhaustion requirement is non-jurisdictional.  *See Sims v. Apfel*, 530 U.S. 103 n.1 (2000) ("We agree with the parties that, even were a court-imposed issue-exhaustion requirement proper, the Fifth Circuit erred in treating it as jurisdictional."); *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976) ("Implicit in *Salfi*. . . is the principle that this condition consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the Secretary in a particular case.  The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted."); *Yagman v. Pompeo*, 868 F.3d 1075, 1082-84 (9th Cir. 2017) ("[A]ny failure to exhaust does not bear on the district court's subject matter jurisdiction."); *Doe v. Constant*, 354 Fed. App'x. 543, 545 (2d Cir. 2009) (determining that defendant's argument that "Plaintiffs failed to exhaust other available remedies" did not implicate subject matter jurisdiction and was "merely [an] affirmative defense[]."); *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) ("[T]he exhaustion requirement pursuant to the TVPA is an affirmative defense.'").  As a result, to the extent the Coalition argues a judicially-imposed exhaustion requirement, the Court is not inclined to address the merits of this argument because the Court concludes that it does not bear on the Court's subject matter jurisdiction.

To the extent the Court is required to address this exhaustion argument to reach the limited issues presented by this case at this stage of the proceeding, the Court determines exhaustion is not required under the specific circumstance plaintiffs allege here.  The Coalition argues that, in *Otter Tail*, Sierra Club failed to raise its NSPS claims during the permitting process and that its failure to do so precluded obtaining judicial review under the citizens' suit provisions of the CAA (*Id.*, at 32-33).  The Coalition asserts that "Plaintiffs do not get to pick and choose whether to pursue a direct appeal of a permit or wait and file a citizen's suit years later as the Sierra Club tried to do in the *Otter Tail* case, and as the Plaintiffs attempt here" (*Id.*, at 33).

When the *Otter Tail* court rejected the Sierra Club's NSPS claim for not having first raised it before the state permitting agency, the Eighth Circuit expressly concluded that the Sierra Club "could have" pursued its NSPS claim there because the state permitting agency had given "public notice of the proposed amendment and had invited comment in accordance with South Dakota's SIP." *Otter Tail*, 615 F.2d at 1020. The *Otter Tail* court concluded that Congress had not intended to "allow plaintiffs to raise issues resolved during the permitting process long after that process is complete." *Id.* at 1022. Plaintiffs failed to object during the permitting process, and the Eighth Circuit concluded that this failure precluded plaintiffs' later objection because the Title V permitting process was the only way to obtain review of the EPA's failure to object. *See id.* at 1012-13, 1020; *see also* 42 U.S.C. § 7661d(b)(2).

In this case, plaintiffs maintain that, because the Entergy Companies never asked for an applicability determination, and no determination regarding the challenged projects was ever added to the permit shield in the operative Title V permits, federal and state law provides that there is no exhaustion of administrative remedies required before a citizen suit enforcement can commence under the circumstances (Dkt. No. 76, at 35). "Unless a source has obtained a Title V permit shield, or unless the unique *Otter Tail* situation exists, there is no other provision in the Clean Air Act requiring the exhaustion of administrative remedies prior to the instigation of a citizen suit" under 42 U.S.C. § 7604(a) (*Id.*). According to plaintiffs, under *Otter Tail*, section 307(b)(2) of the CAA, 42 U.S.C. § 7607(b)(2), only precludes an enforcement action when a defendant sought and obtained prior authorization for a modification through a Title V permitting process. Otherwise, the CAA's permit shield provision, 42 U.S.C. § 7661c(f)(2), governs. Arkansas included the option for Title V permits to contain permit shields, including findings of non-applicability. APC&EC Reg. 26.704. According to plaintiffs, under these provisions, a

finding of non-applicability with respect to a requirement, such as whether a source is subject to PSD because of a major modification, can only shield that source from enforcement if the applicability determination is included or alluded to in the permit itself (Dkt. No. 76, at 35).  As plaintiffs point out, in this case, the Entergy Companies never asked for an applicability determination, and therefore, plaintiffs maintain that no determination regarding these projects was ever added to the permit shield in the Title V permits.  As a result, plaintiffs maintain that their PSD claims are not subject to exhaustion and cannot be characterized as a collateral attack.

Further, with respect to their opacity claims, plaintiffs maintain that their opacity claims seek to enforce opacity standards incorporated into the White Bluff Title V permit (Dkt. Nos. 69, at 20; 80, at 7-8).  Because plaintiffs' opacity claims seek to enforce permit conditions that plaintiffs allege the Entergy Companies are violating, this Court has subject matter jurisdiction under 42 U.S.C. § 7604(a)(1) and *Otter Tail* does not apply.  *See* 608 F. Supp. 2d at 1131.

In addition, plaintiffs maintain that the EPA's interpretation of statutory language such that it will no longer oversee state Title I permit decisions through Title V petitions provides an additional basis upon which the Court should decline to find and impose an exhaustion requirement (Dkt. Nos. 69, at 20-23; 80, at 24-25).

The Court has examined the allegations in the amended complaint and the briefing with respect to the specific provisions of the CAA under which plaintiffs bring claims and the alleged requirements for bringing those claims in federal court.  The Court is satisfied at this stage of the litigation that the Court has subject matter jurisdiction over plaintiffs' claims in their amended complaint.

### III.     Intervention

Having concluded that the Court has subject matter jurisdiction over plaintiffs' claims, the Court turns to consider the pending motions to intervene (Dkt. Nos. 17, 26).  CURAD seeks to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) and, in the alternative, seeks permission intervention under Rule 24(b) without specifying the subsection but citing language taken from Rule 24(b)(2) (Dkt. No. 17, ¶¶ 5-6).  The Coalition moves to intervene as of right pursuant to Rule 24(a) and, in the alternative, seeks permission intervention pursuant to Rule 24(b) (Dkt. No. 26).

The Eighth Circuit has explained that, when ruling on a motion to intervene, the Court typically "must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor."  *Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014); *see also Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) (citing *A.C.L.U. of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1092 (8th Cir. 2011)).  "In the Eighth Circuit, a prospective intervenor must 'establish Article III standing in addition to the requirements of Rule 24.'"  *Nat'l Parks Conservation Ass'n*, 759 F.3d at 974 (quoting *U.S. v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009)).

Although the Eighth Circuit has not explicitly required that parties intervening under Rule 24(b) establish Article III standing, most district courts in this circuit to have considered the matter have done so.  *See Franconia Minerals (US) LLC v. United States*, 319 F.R.D. 261, 266 (D. Minn. 2017); *North Dakota v. Heydinger*, 288 F.R.D. 423, 427 (D. Minn. 2012) (collecting cases); *but cf. In re Baycol Prods. Litig.*, 214 F.R.D. 542, 544 (D. Minn. 2003) (declining to require Article III standing as prerequisite to Rule 24(b) intervention).

### A.     Standing Of Proposed Intervenors

The parties dispute the standing of the proposed intervenors.  As an initial matter, the Coalition asserts that it does not have to show Article III standing since it has not invoked the jurisdiction of the Court.  In the alternative, the Coalition argues that it satisfies the standing requirements.  Both CURAD and the Coalition maintain throughout their filings that they have standing to intervene based on alleged economic interest and injury and based on an interest in alleged usurpation of state regulatory authority.  Specifically, CURAD asserts that the State of Arkansas, which it is statutorily authorized to represent before the Arkansas Public Service Commission ("APSC"), "has a recognized interest in protecting consumers from unnecessary rate increases." (Dkt. No. 18, at 5).  CURAD further asserts that the "Settlement Agreement attempts to usurp the state regulatory authority of the APSC and vest such authority in the federal district court." (*Id.*, at 6).

To establish Article III standing, a plaintiff must satisfy three requirements:  "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotes and citations omitted).  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 180-81.

Standing is a matter of subject-matter jurisdiction, and standing is a prerequisite for intervention. *See Curry*, 167 F.3d at 422. As previously explained, the Court determines that the challenge to standing here is factual, given the type of materials all parties put before the Court in the limited record developed to date in this case. Therefore, the Court will consider matters outside the pleadings to the extent the parties submit them when resolving the standing question.

### 1.    Whether The Coalition Is Required To Demonstrate Standing To Intervene As A Defendant

The Coalition asserts that it does not have to show Article III standing to intervene because it has not invoked the jurisdiction of the Court and because it wishes to intervene on the side of the defendants (Dkt. No. 68, at 12-14). The Coalition highlights *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017), and *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), as two recent Supreme Court cases which "illustrate that a proposed intervenor must demonstrate standing only when the intervenor seeks to affirmatively invoke a court's jurisdiction or if the intervenor seeks to pursue relief not requested by a plaintiff" (Dkt. No. 68, at 13). Defendants maintain that the prospective intervenors still must demonstrate standing in the wake of these Supreme Court decisions (Dkt. No. 75, at 5-6). For the following reasons, the Court determines the proposed intervenors must demonstrate standing, even under the circumstances presented here.

In order to intervene as of right under Federal Rule of Civil Procedure 24(a), a party must show that "it claims an interest in the property or transaction which is the subject of the litigation, that disposition of the litigation in the party's absence may impede or impair its ability to protect its interest, and that the interest is not adequately represented by the current parties to the

suit." *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1023 (8th Cir. 2003) (citing Fed. R. Civ. P. 24(a)(2)). In the Eighth Circuit, "[a]n Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well." *Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 964 (8th Cir. 2018) (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996)).

In *Town of Chester*, the Supreme Court held that "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." 137 S. Ct. at 1651. The Coalition argues that this holding necessitates that an intervenor need not demonstrate Article III standing if an intervenor is not pursuing such relief (Dkt. No. 68, at 13). Because the Coalition is not affirmatively seeking relief from the Court, the Coalition maintains that it need not demonstrate Article III standing (*Id.*, at 13-14). The Court disagrees. The Supreme Court in *Town of Chester* did not consider whether all intervenors of right must demonstrate their own Article III standing, but instead the Supreme Court only considered whether an intervenor of right who seeks distinctive relief must demonstrate its own Article III standing. *See* 137 S. Ct. at 1651. Thus, the Court understands that *Town of Chester* "does not cast doubt upon, let alone eviscerate, [the Eighth Circuit's] settled precedent that all intervenors must demonstrate Article III standing." *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232-33 n.2 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 794 (2019). In *Liddell*, the Eighth Circuit reaffirmed its holding in *Mausolf* that "[a]n Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well," while citing explicitly to *Town of Chester*. 894 F.3d at 964. Thus, the Court sees no basis in *Town of Chester* to depart from Eighth Circuit precedent requiring the Coalition to

demonstrate its Article III standing without more explicit guidance from either the Supreme Court or the Eighth Circuit itself.

In *Bethune-Hill*, the Supreme Court considered whether the Virginia House of Delegates— a single chamber of Virginia's bicameral legislature—had standing to appeal the invalidation of a redistricting plan drawn by the General Assembly.  *See* 139 S. Ct. at 1951-56.  The House had participated as an intervenor in support of the defendants in the case at the trial level and as an appellee in a prior appeal to the Supreme Court.  *See id.* at 1951.  The Supreme Court noted that "[b]ecause neither role entailed invoking a court's jurisdiction, it was not previously incumbent on the House to demonstrate its standing."  *Id.*  Because the House was seeking to appeal a decision that the primary party did not challenge, the Court reiterated that "an intervenor must independently demonstrate standing."  *Id.* (citing *Wittman*, 136 S. Ct. 1732 (2016); *Diamond v. Charles*, 476 U.S. 54 (1986)).  Relying on this case language, the Coalition asserts that it need not demonstrate standing because it "has not invoked this Court's jurisdiction" and instead "seeks to intervene in support of the Defendants – in opposition to Plaintiffs' claims and their assertion that they have standing to assert them" (Dkt. No. 68, at 14).  However, the Court does not understand *Bethune-Hill* to overrule expressly the Eighth Circuit's requirement that *all* intervenors must demonstrate standing regardless of whether intervenors seek to invoke the Court's jurisdiction.  Though it was not incumbent upon the Virginia House to demonstrate its standing at the earlier stages of the case, it would have been incumbent upon it to do so had the case arisen within the Eighth Circuit.  Thus, the Court sees no basis in *Bethune-Hill* to depart from Eighth Circuit precedent requiring the Coalition to demonstrate its Article III standing without more explicit guidance from either the Supreme Court or the Eighth Circuit itself.

Accordingly, the Court concludes that the Coalition must demonstrate its Article III standing in order to intervene.[3]

### 2. Whether To Assess Standing On The Amended Complaint Or Proposed Settlement Agreement

Generally, "[w]hen the allegations in the underlying controversy are relevant . . . the court should focus its attention on the pleadings because 'standing is to be determined as of the commencement of the suit.'" *Nat'l Parks Conservation*, 759 F.3d at 973 (quoting *Lujan*, 504 U.S. at 570 n.5). The Court accepts "as true the movants' allegations of injury, causation, and redressability, unless the pleading reflects a 'sham' or 'frivolity.'" *Liddell*, 894 F.3d at 965 (citing *Kozak v. Wells*, 278 F.2d 104, 109 (8th Cir. 1960)).

The Entergy Companies assert that the Court should assess standing based on the effects of the proposed settlement agreement in this case, not the effects of the relief sought in the amended complaint (Dkt. No. 75, at 6-7). The Entergy Companies claim that, initially, the proposed intervenors recognized this and based their arguments in support of their intervention request on the proposed settlement agreement (Dkt. No. 75, at 6 n.3). Now, according to the Entergy Companies, the proposed intervenors have shifted their position and cite only cases where no proposed settlement agreement is pending in support of the standard they claim applies (*Id.*). In support of their argument that the Court should assess standing based on the effects of the proposed settlement agreement, the Entergy Companies cite this Court to several cases in which other courts examined intervenors' standing arguments in the light of the terms of proposed consent decrees and settlement agreements. *See, e.g., Defenders Of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323-

---

[3]   CURAD does not appear to argue in any of its briefing materials that it is exempt from a requirement to demonstrate Article III standing (Dkt. Nos. 66; 72; 77).

27, 1329 (D.C. Cir. 2013); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993); *Envt'l Def. v. Leavitt*, 329 F.Supp.2d 55, 68-69 (D.D.C. 2004).

Neither party cites this Court to controlling law on this question.  Both parties cite *National Parks Conversation Association v. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014), but the Eighth Circuit was not confronted with a proposed settlement agreement between the parties in that case.  Instead, the court was confronted with a complaint and arguments made at the motion to intervene hearing and in briefing that attempted to alter the scope of claims asserted in the complaint.  The Eighth Circuit determined that "[t]he court's decision to accept the Environmental Groups' tempered argument was improper" and directed that the district court should have examined allegations in the complaint to resolve issues of Article III standing and Federal Rule of Civil Procedure 24 requirements when resolving the motion to intervene.  759 F.3d at 973.

Despite making this argument, the Entergy Companies in their briefing address standing in the light of the effects of both the proposed settlement agreement and the amended complaint (Dkt. No. 75, at 7 n.4).  In its motion to intervene, CURAD cites to the proposed Settlement Agreement submitted by plaintiffs and defendants for the Court's consideration (Dkt. No. 17, at 1-2).  CURAD also argues, however, that the Court can consider only the complaint when assessing standing in this matter (Dkt. No. 41, at 3).  Further, the Coalition acknowledges the argument; takes the position that allegations of the amended complaint, not the proposed settlement agreement, control the standing inquiry; but then maintains that "the Coalition's Motion to Intervene is directed at both the effect of the Plaintiffs' Complaint and the parties' proposed settlement agreement" (Dkt. No. 78, at 26).  The Court determines that it need not resolve this issue to resolve the dispute before it because, whether the Court examines the amended complaint or the proposed settlement

agreement, the outcome of the Court's Article III standing inquiry for the proposed intervenors is the same.

### 3.       Standing Based on Alleged Economic Interest And Injury

CURAD and the Coalition argue alleged economic interest and injury as a basis for standing under Article III to intervene, claiming these interests satisfy the actual or imminent injury in fact requirement.   *See Nat'l Parks,* 759 F.3d at 975.   For the following reasons, the Court concludes that CURAD and the Coalition's allegations of alleged economic interest and injury are more like *Metropolitan St. Louis Sewer District,* 569 F.3d at 836, "where the potential intervenor's financial injury [is] contingent on several conditions."

According to *Spokeo, Inc. v. Robins*, Article III standing requires a "concrete" injury, rather than a "conjectural or hypothetical" one.  136 S. Ct. 1540, 1548 (2016) (citing *Lujan*, 504 U.S. at 560).  A plaintiff must establish that he has suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* (citing *Lujan*, 504 U.S. at 560).  An injury is "particularized" if it affects the plaintiff "in a personal and individual way," while "concreteness" requires that an injury be "de facto," or in other words, the injury must actually exist.  *Id.* (internal quotes and citations omitted).  The Supreme Court has acknowledged that not all violations of a statute constitute a "concrete" injury, as a "bare procedural violation, divorced from any concrete harm," is not a justiciable harm.  *Id.* at 1549.

The Eighth Circuit Court of Appeals held in *United States v. Metropolitan St. Louis Sewer District* that an association of sewer and wastewater utility ratepayers did not have standing because those ratepayers' interests in a utility system were not sufficiently concrete or particularized to establish an Article III injury-in-fact.  569 F.3d at 835.  In *Metropolitan St. Louis Sewer District*, an association of businesses moved to intervene in an enforcement action filed

against a sewer district by the United States and the State of Missouri under the Clean Water Act. *Id.* at 832.  The association's members "expressed concern that the [sewer district] would increase sewer rates" and "asserted interests in a reliable and viable sewer system and in the quality of the local environment."  *Id.* at 834.

As relevant here, the Eighth Circuit noted that the association was "properly situated to assert the utility related economic interests of its members" but agreed with the district court "that the possibility of increased sewer rates is not an imminent injury."  *Id.* at 835.  The Eighth Circuit also noted that the sewer district could not commit to raise rates "as part of any enforceable consent decree" because the sewer district "must propose a rate increase to the Board of Trustees and the Rate Commission," and those entities could reject the proposed rate increase.  *Id.*  Furthermore, the Court noted that the sewer district was pursuing indemnification against the State of Missouri for the entire cost of any judgment.  *Id.*  Based upon these facts, the Eighth Circuit found that "a rate increase is no more than a 'conjectural' or 'hypothetical' outcome of this lawsuit."  *Id*. at 836 (citing *Lujan*, 504 U.S. at 560).  Finally, the Eighth Circuit found that the requested relief and possibility of harm to the association were too contingent to confer standing because there was no evidence that a potential consent decree would affect the discharge permits of the association's members.  *Id.* at 837.

In *Burton v. Central Interstate Low-Level Radioactive Waste Compact Commission*, an elector and a ratepayer of Nebraskan utilities sued an interstate commission on the grounds that the commission unlawfully taxed public utilities and had adopted bylaws and rules that violated an interstate compact and the plaintiffs' constitutional rights.  23 F.3d 208, 209 (8th Cir. 1994). The elector and ratepayer alleged that they were injured because, as electors of the utilities, they had a "direct and vested interest in the economic well-being of those public power entities" and

that the "illegal taxes" imposed by the interstate commission "diminishe[d] the total revenues" of the utilities, which meant that the electors and ratepayers were "less well off." *Id.* (internal quotes and citations omitted).

The district court dismissed the complaint for lack of standing. The Eighth Circuit agreed. As to the appellants' allegation that the taxes imposed by the interstate commission affected the plaintiffs, the Eighth Circuit held that standing "requires more than Appellants' nebulous claims that they are less well off . . . ." *Id.* at 209 (internal quotation omitted). The Eighth Circuit also found that, to the extent appellants asserted that the commission's bylaws and rules caused them to sustain "real and direct economic injur[ies]," the appellants merely "alleged that the bylaws and rules affect some undefined interest of theirs in an uncertain way." *Id.* at 210 (alteration in original).

The Eighth Circuit reached the opposite conclusion regarding a utility's standing to intervene in a CAA action in *National Parks Conservation Association*. 759 F.3d at 975. There, environmental groups filed a citizen suit against the EPA to force the EPA to promulgate pollution control limits for the Sherburne County power plant, which was owned by North States Power Company ("NSP"). *Id.* at 972. NSP estimated that it would cost more than $280 million to install technology that would satisfy the pollution control limits sought by the environmental groups. *Id.* at 975. The district court denied NSP's motion to intervene. The Eighth Circuit reversed, finding that "if the court here grants the Environmental Groups' relief, then NSP would 'unavoidably be harmed economically.'" *Id.* (quoting *Metro. St. Louis Sewer Dist.*, 569 F.3d at 836).

In *Sierra Club v. McCarthy*, Judge Leon Holmes granted the State of Arkansas' motion to intervene and denied a motion to intervene filed by private parties. No. 4:14CV00643-JLH, 2015 WL 5006069 (E.D. Ark. Aug. 24, 2015). In that case, the Sierra Club sued the EPA to compel it

to issue a Regional Haze FIP for Arkansas. *Id.*, at *2. According to the Sierra Club, the State of Arkansas had failed to promulgate timely a Regional Haze SIP, and the EPA had failed to promulgate timely a Regional Haze FIP. *Id.*, at *1. The Sierra Club and the EPA submitted a proposed consent decree to the Court that provided that the EPA would either approve a Regional Haze SIP or promulgate a Regional Haze FIP by December 15, 2015. *Id.* The proposed consent decree was published in the Federal Register, and the State of Arkansas requested, and received, an extension of time to submit comments to the proposed consent decree. *Id.* After the EPA announced it could not meet the December 15, 2015, deadline, it informed the Court that it would enter into negotiations with the State of Arkansas and the Sierra Club regarding a new deadline for final action. *Id.* Judge Holmes permitted the State of Arkansas to intervene under Rule 24(b)(2) governing permissive intervention because "[t]he issue that ultimately will be decided in this litigation is the deadline by which the EPA must promulgate a federal implementation plan or approve a state implementation plan," and therefore the State of Arkansas' defense was based upon a statute that "is jointly administered by the State and the EPA." *Id.*, at *2. Further, Judge Holmes noted that the State of Arkansas has "an interest in assuring that the rule-making process is adequate" and in "protecting its ratepayers from unnecessary rate increases that may occur as a result of the proposed federal implementation plan." *Id.*, at *3.

The Court concludes that CURAD and the Coalition request that this Court stretch controlling Eighth Circuit precedent beyond its current reach. As a result, the Court determines that, under the circumstances presented, CURAD and the Coalition lack standing to intervene based on alleged economic interest and injury.

### a.     Alleged Injury-In-Fact

CURAD seeks to intervene on behalf of Arkansas ratepayers (Dkt. No. 66, at 5). CURAD asserts that the State of Arkansas has a "recognized interest in protecting consumers from unnecessary rate increases" and that the State of Arkansas has a duty to act on behalf of Arkansas consumers when utilities petition for increased rates (Dkt. No. 18, at 5).

The Coalition argues that its members have standing because they are "customers of the Entergy Defendants and of the other co-owners of the White Bluff and Independence plants," "members of the electric cooperatives that have an indirect ownership interest in the plants," and "natural gas consumers that would be adversely affected by the increased demand for natural gas and natural gas transmission in the State of Arkansas . . . ." (Dkt. No. 26, at 6). The Coalition also argues that its members "will suffer significant injury through unnecessary increased electric costs and decreased reliability, unnecessary increased natural gas costs and decreased reliability, and decreased demand for coal." (*Id.*, at 6-7). To the extent the Coalition relies on alleged "unnecessary increased electric costs," the Court understands that to refer to higher rates.

The Entergy Companies point out that most of the Coalition's members are not actually Entergy Arkansas customers (Dkt. No. 75, at 8 n.5).[4] Further, the Coalition includes only consumers of electricity, not generators of electricity; in other words, the Coalition does not include competitors of the Entergy Companies (Dkt. No. 79, at 5). The Entergy Companies also argue that the Coalition does not allege harms unique to its members sufficient to confer standing.

---

[4] One of the Coalition's members has its own members who are customers of Entergy Arkansas. According to the Coalition's Motion to Intervene, "[t]he Coalition's membership also includes Arkansas Electric Energy Consumers, Inc., whose members are large, industrial customers of EAL." (Dkt. No. 26, at 5).

In recent briefing, the Coalition reaffirms that "the Coalition and its members assert a specific interest in particular rates, terms and conditions of their electricity service." (Dkt. No. 78, at 27).  The Coalition explains:

> Several of the Coalition's members currently receive baseload electricity from the coal-fired power plants at issue in this suit.  Those power plants were constructed decades ago, and the Coalition's members have paid for the construction and operating costs of those plants over the ensuing decades through their electricity rates.  As a result, the electricity generated by those plants (for which the utility owners have already recovered most of their costs) is relatively cheap, especially compared to electricity generated by a newly constructed plant (for which the utility owners will not have already recovered most of their costs).  The Coalition's members include numerous manufacturers that consistently utilize high volumes of electricity on a daily basis through the year for operation purposes.  As a result, their electricity service requirements are well met by the large coal-fired plants at issue, insofar as those plants are baseload electricity resources.  Hence, the Coalition's members have a specific interest in cheap, baseload electricity generated by the particular power plants that are the subject of this lawsuit.

(Dkt. No. 78, at 27).

The Entergy Companies argue that, "[i]n an attempt to support their arguments, the Movant-Intervenors implicitly ask the Court to connect the outcome of this litigation to allegations of eventual higher rates through a long string of assumptions." (Dkt. No. 75, at 10).  According to the Entergy Companies, those assumptions are:  "(1) that some form of a court order might contain certain requirements, such as emission control technology installation or shutdown, and (2) that might lead to particular costs which Entergy Arkansas would recover through its rates."  (*Id.*).

With respect to the complaint, CURAD asserts:

> The Complaint seeks to enjoin Entergy from operating the White Bluff and Independence plants except in accordance with the CAA, which includes BACT, and asks the Court to order Entergy to obtain the required permits and to comply with the requirements of any permits obtained.  If the relief sought in the complaint is granted, the White Bluff and Independence plants will have to install control technology that meets the requirements of BACT.  The costs of that control technology will be passed directly to Arkansas' electric ratepayers that obtain power from those facilities.

(*Id.*, at 5).  With respect to the proposed Settlement Agreement, CURAD asserts that it "contains mutual promises by Sierra, NPCA, and Entergy which will result in the early closure of three of Entergy's electric generating assets" and that "[r]ate recovery for costs associated with such commitments is the exclusive jurisdiction of the APSC." (Dkt. No. 18, at 5-6).

According to the Coalition, "[i]n the Complaint and Amended Complaint, the relief sought by the Plaintiffs will require the utility owners of the power plants at issue to install controls, which will cause those utility owners to incur costs that they will in turn pass through to their customers via increased electricity rates." (Dkt. No. 78, at 28).

First, the Court examines what the amended complaint and the proposed settlement agreement request in the form of relief and require.  Despite the proposed intervenors' arguments centering around shutdown of the White Bluff and Independence plants, plaintiffs do not specifically request an immediate shutdown of the White Bluff or Independence plants (Dkt. Nos. 54, ¶¶ 27-31 (requesting, *inter alia*, that the Court "Permanently enjoin Defendants from operating the Independence and White Bluff plants except in accordance with the Clean Air Act, and the Arkansas SIP"); 66, at 7; 68, at 17).  Instead, as the Entergy Companies argue, the likely scenario that is consistent with Title V of the CAA is continued operation of a facility with a schedule for coming into compliance with relevant requirements (Dkt. No. 75, at 11-12).  42 U.S.C. § 7661c(a); *see also United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 824 (E.D. Mo. 2019) (CAA case); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (Clean Water Act case).  They maintain that such argument premised on shutdown of the White Bluff and Independence plants which "assumes without basis that the court will impose injunctive relief insensitive to the longer-term nature of the needed upgrades, rather than imposing a compliance schedule," *Metro. St. Louis*,

569 F.3d at 837, cannot support a finding of actual or imminent injury sufficient for standing to intervene (*Id*. at 12).

According to the Entergy Companies, nothing in the amended complaint or proposed settlement agreement "would result in Entergy Arkansas's ceasing to provide service to its customers" and that is the goal of case law on abandonment, according to the Entergy Companies – "preventing a public utility from depriving existing customers of service" (Dkt. No. 79, at 12 (citing *Interstate Commerce Commission v. Chi. & N.W. Transport. Co.*, 533 F.2d 1025, 1028 (8th Cir. 1976) ("'Abandonment'. . . is characterized by an intention of the carrier to cease permanently or indefinitely all. . . service."); *N. Little Rock Water Co. v. Waterworks Comm'n of City of Little Rock*, 136 S.W.2d 194, 199 (Ark. 1940) ("a city may not be deprived of an essential utility, such as water, through the action of the utility furnishing that service by selling its plant, or an essential portion thereof, without which the service cannot be furnished")).  According to the Entergy Companies, they are "not taking steps that would result in a deprivation of electric service" but instead "will replace that generating capacity and associated energy with alternatives if, when, as needed, as explained in Entergy Arkansas's 2018 Integrated Resource Plan." (Dkt. No. 79, at 13).

The Entergy Companies also argue that "[t]he Movant-Intervenors' assertions and related calculations regarding the costs of installing scrubbers and related replacement power purchases. . . are misleading." (Dkt. No. 7, at 14).  Specifically, plaintiffs' requested relief for the allege PSD violations includes the installation of BACT only for alleged excess $SO_2$ emissions at Independence Units 1 and 2 and for alleged excess $NO_x$ emissions at White Bluff Unit 2 (Dkt. Nos. 1, at 24-27; 54, 27-31).  "Because BACT for each unit has not yet been determined, neither the parties nor the Movant-Intervenors know what type of investment or duration of work potentially would be needed to incorporate BACT.  In the face of these unknowns, the Movant-

Intervenors simply guess at the Entergy Companies' business decisions in hypothetical scenarios and use their guesses to support their economic injury analysis." (Dkt. No. 75, at 14).  Neither CURAD nor the Coalition refute these representations.

Early in this proceeding, the proposed cessation of coal use at White Bluff and Independence was a harm the Coalition focused on with respect to alleged economic injury (Dkt. No. 27, at 2-4, 7, 9).  Although the Coalition makes arguments centered around decrease in coal consumption and conversion to natural gas, neither plaintiffs' amended complaint nor the proposed Settlement Agreement say anything about converting the White Bluff or Independence power plants to use natural gas, so any conjecture regarding the effect of plaintiffs' amended complaint or the proposed Settlement Agreement on natural gas prices seems speculative to the Court, as well.  The same holds true for any assertion by the Coalition that plaintiffs' amended complaint or the proposed Settlement Agreement will affect electrical service reliability or demand for coal; any such outcome is contingent upon a myriad of factors that do not appear to be controlled by the relief plaintiffs seek in their amended complaint and that may change over the decade-long scope of the proposed Settlement Agreement.  Furthermore, the Court questions why such injuries, even if they were not speculative, are not of the type shared by the general public, which means that the alleged injuries to the Coalition's members may not be sufficiently particularized to establish an injury-in-fact.

Having considered what the amended complaint and the proposed settlement agreement request for relief and require, the Court next turns to examine the proposed intervenors' arguments regarding rates.  In its prior Order, the Court set out its understanding of CURAD's initial argument with respect to rates (Dkt. No. 53, at 13-20).  CURAD appears to agree with this Court's initial assessment (Dkt. No. 66, at 5-6).  All parties appear to agree that, under Arkansas law, generally,

the APSC has authority to approve or deny certain types of rate proposals.  The APSC has general

jurisdiction over utility rates, and "[e]very public utility shall notify the secretary of the Arkansas

Public Service Commission in writing of its intention to file an application for a general change or

modification in its rates," Ark. Code Ann. § 23-4-401(a), and "no public utility shall place any rate

increase into effect until a final decision and order is made by the commission,"  Ark. Code Ann.

§ 23-4-409.  The APSC must approve any rate increase proposed by a utility in Arkansas (Decl.

of Kurtis W. Castleberry, Dkt. No. 34-1, ¶ 33).  *See* Ark. Code Ann. § 23-4-409 ("[N]o public

utility shall place any rate increase into effect until a final decision and order is made by the

commission.").

In support of its argument regarding increased rates resulting from this lawsuit or the

proposed Settlement Agreement, CURAD initially cited the Court to Arkansas Code Annotated

§§ 23-4-501, 23-4-504 (Dkt. No. 41, at 13-15).  The law CURAD cites is part of an overall process

for rate setting under Arkansas law.  Arkansas Code Annotated § 23-4-501 provides, in relevant

part:

> (a)(1) Upon a proper filing with the Arkansas Public Service Commission, a public
> utility shall be permitted to recover in a prompt and timely manner all investments
> and expenses through an interim surcharge, if the investments or expenses:
>
> (A) Are not currently being recovered in existing rates;
>
> (B) Are reasonably incurred;
>
> (C) Were not reasonably known and measurable at a time that allowed for
> a reasonable opportunity for the inclusion and consideration of the
> investments or expenses for recovery in the public utility's last general
> rate case;
>
> (D) Are incurred by the public utility to comply with legislative or
> administrative rules or requirements;
>
> (E) Relate to the protection of the public health, safety, or the environment;

(F) Cannot otherwise be recovered in a prompt and timely manner; and

(G) Are any of the following:

    (i) Mandatory;

    (ii) A condition of continued operation of a utility facility; or

    (iii) Previously approved by the commission.

(2) The interim surcharge shall be effective until the implementation of new rate schedules in connection with the next general rate filing of the public utility in which such investments or expenses can be included in the public utility's base rate schedule.

Ark. Code Ann. § 23-4-501(a)(1)-(2). This statute appears to allow a utility like Entergy to cause a rate increase by imposing an immediate surcharge on consumers to recover costs that meet each of the requirements above. *See* Ark. Code Ann. § 23-4-504 ("The surcharge shall become effective immediately upon filing."). The Court notes that the requirements for a surcharge under § 23-4-501(a) are cumulative—all of them must be met. *See McDaniel v. Ark. Public Serv. Comm'n*, 2014 Ark. App. 529 (2014) (examining this statute in an appeal taken by the Attorney General with respect to an energy company's temporary rate surcharge).

Later sections of the same subchapter make plain that the APSC retains authority even over this surcharge. The APSC "shall enter upon an investigation concerning the reasonableness of the surcharge within thirty (30) days after filing and upon reasonable notice to the utility." Ark. Code Ann. § 23-4-505. Further, after its investigation and a hearing, "the Arkansas Public Service Commission may modify or disapprove all or any portion of the surcharge" by making findings that any of the requirements set forth in Arkansas Code Annotated § 23-4-501 are not met. Ark. Code Ann. § 23-4-507. During its investigation, the APSC "may require reasonable security to assure the prompt payment of any refunds that may be ordered." Ark. Code Ann. § 23-4-506. As a result, the APSC retains ultimate decision-making authority to decide if any surcharge under this

subchapter is imposed or refunded.  Even after the APSC rules, that determination is subject to challenge in Arkansas state courts.  *See, e.g., McDaniel*, 2014 Ark. App. 529 (Attorney General appealed orders of the APSC approving energy company's temporary rate surcharge and approving resulting rate schedule).

For certain types of rate increases to occur as a result of plaintiffs' lawsuit or the proposed Settlement Agreement, it appears to the Court that at least the following would need to happen: (1) plaintiffs' lawsuit or the proposed Settlement Agreement would have to cause a need for a rate increase, which is assumed by the proposed intervenors but is not guaranteed or conclusively established by the record before the Court; (2) Entergy would have to either submit an application for a rate increase to the APSC or impose an immediate surcharge; (3) Entergy would have to seek APSC approval for the rate increase or immediate surcharge; (4) the APSC would have to approve the rate increase or immediate surcharge; and (5) the APSC's determination then would be subject to review in Arkansas state courts.  CURAD does not appear to dispute these determinations (Dkt. No. 66, at 6).

Instead of arguing to the Court that this is sufficient for standing in the light of *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009), or controlling law, CURAD argues for the first time in recent briefing that another type of rate recovery would flow from the amended complaint and the proposed settlement agreement between plaintiffs and the Entergy Companies (Dkt. No. 66, at 6-10).

CURAD submits that a tariff, officially titled the "Energy Cost Recovery Rider" or "ECR," the Entergy Companies have on file at the APSC "will operate to automatically flow through to its customers any economic impact from the shutdown of the two plants at issue in the Complaint, White Bluff and Independence." (Dkt. No. 66, at 7).  According to CURAD:

> The ECR is updated once a year and a rate is set which recovers the cost of fuel for the prior year.  Every April, the ECR is automatically updated to include costs from the previous year.  This update, which could be an increase or a decrease in bills, is not approved by the Commission before it appears on bills.  [The Entergy Companies] will not submit an application to the APSC seeking approval to include these costs in rates because such cost is already contemplated in current rates through ECR tariff.  Likewise, it is not subject to a review by Arkansas appellate courts as would be the case in a general base rate increase.

(Dkt. No. 66, at 8).  The Court understands that the ECR is directed at the potential to recover costs for replacement power and natural gas (Dkt. No. 75, at 15).

The Entergy Companies point out that the APSC has discretion regarding the ECR (Dkt. Nos. 75, at 10 n.8; 68, at 17-18; 66, at 8).  According to the Entergy Companies, "the actual Rider ECR rate redetermination process is dictated by a filed rate (Rider ECR) approved by the APSC, which rate includes detailed formulas that direct the various inputs into developing the redetermined rate." (Dkt. No. 75, at 16).  The Entergy Companies point out that "the APSC-approved Rider ECR, and all fuel rates, are redetermined pursuant to the APSC-approved Rider ECR filed rate formulas. . . ." (Dkt. No. 75, at 16).  Further, "if there is any question about whether just and reasonable rates result from a particular Rider ECR rate redetermination filed by Entergy Arkansas, then the State can challenge Entergy Arkansas's proposed cost recovery before the APSC, as it has done in the past, and the Coalition can move to participate in that APSC proceeding provided that it can meet the APSC requirements for intervenors." (Dkt. No. 75, at 17).  The Entergy Companies assert that "[t]he APSC has authority to order an investigation of the rates resulting from a Rider ECR redetermination." (Dkt. No. 75, at 17).  CURAD does not refute the Entergy Companies' representations regarding the Rider ECR process.  As a result, from considering all briefing before it, the Court understands that Rider ECR rate increases are not certain to result from the allegations in the amended complaint or the proposed Settlement

Agreement and that the APSC, CURAD, and the Coalition have avenues available to address Rider ECR rate increases, even if such increases were to occur.

The Coalition seems to acknowledge the reality of ratemaking and the APSC's involvement in that process (Dkt. No. 78, at 29-32). Recognizing this, the Coalition further argues "[t]he likelihood of a rate increase resulting from the relief sought by the Plaintiffs is not speculative or hypothetical; it is definite and real." (Dkt. No. 78, at 29). To support this assertion, given what is in the record before the Court, the Coalition essentially argues that the Court should ignore any gaps in the evidence or argument that may exist in reaching this result because "[s]uch a business decision [not to seek higher rates] would be adverse to the interests of the Entergy Companies' shareholders, and the Entergy Companies offer no realistic reason for this Court to believe a rational economic entity making sound business decisions would forego the opportunity to recover compliance costs (and a return on investment) resulting from the Complaint or Amended Complaint (or settlement agreement)," citing primarily *City of Kennett v. E.P.A.*, 887 F.3d 424 (8th Cir. 2018), in support of this argument (Dkt. No. 78, at 29). The Court is not convinced that the facts, circumstances, and argument presented, given the authorities cited, permit the Court to reach the result the proposed intervenors seek.

Based upon its review of all briefings and the record before it, the Court concludes that the sequence of future hypothetical events is not sufficient to confer standing based on alleged economic interest and injury under existing controlling precedent. *See Metro. St. Louis*, 569 F.3d at 834 (sequence of events too speculative to create standing, even if not impossible); *see also Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013); *City of Kennett*, 887 F.3d at 431. "[T]he fear of possible injury . . . [is] insufficient to satisfy the requirement of the standing doctrine that plaintiffs," including organizations, "demonstrate a judicially cognizable injury." *Minn. Fed'n of*

*Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir. 1989).  "'[C]onclusory allegations' about an injury are insufficient to establish standing." *NHH Investor Grp. v. DFH Watford, LLC*, No. 4:15-CV-027, 2015 WL 12867309, at *2 (D.N.D. Oct. 8, 2015) (quoting *Assoc. Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 685, 687 (8th Cir. 1979)).

### b.      Traceability

The also Court determines that neither CURAD nor the Coalition can establish traceability based on alleged economic injuries.  Traceability requires:  (1) a causal connection between the injury and the defendant's conduct, and (2) that the alleged injury is not the result of independent action of some third party.  *Lujan*, 504 U.S. at 560.  Further, in *Clapper v. Amnesty International USA*, the Supreme Court explained that plaintiffs could not establish standing from a requirement that "does not regulate, constrain, or compel any action on their part."  568 U.S. at 419.  An Order from this Court would neither mandate any particular rate increase or costs to be imposed on customers nor direct the APSC to exercise its discretion in reviewing rates in any particular way.  Further, for the reasons explained in its prior Orders and this Order, the Court determines that there is no chain of causation between an Order from this proceeding and natural gas or coal demand, as demand for those commodities and their market value is set by global market forces, not an Order from this Court in this proceeding.

### c.      Redressability

To the extent the relief sought by the proposed intervenors is intended to prevent an increase in electricity rates and natural gas prices or a decrease in coal demand or grid reliability, as already discussed, electricity rates are set by the APSC.  Natural gas and coal prices are set by a complex world-wide commodities market, and grid reliability is affected by technological advances that are difficult to predict.

Whether or how the potential costs associated with BACT installation, temporary or permanent shutdowns, replacement power purchases, and capital cost recovery are passed on to customers under relevant law is subject to business decisions in the first instance and then squarely falls under the province of the APSC.  The APSC defines the avenues for addressing how and what costs can be recovered from retail customers, including when or how CURAD or the Coalition might participate.  An Order from this Court would not address the alleged economic injuries that might result, ultimately, from the APSC's independent exercise of its discretion in rate-setting.

For all of these reasons, on the record and briefing before it, given the Eighth Circuit precedent that guides this Court's analysis, the Court concludes that CURAD and the Coalition request that this Court stretch controlling Eighth Circuit precedent beyond its current reach.  As a result, the Court determines that under the circumstances presented CURAD and the Coalition lack standing to intervene based on alleged economic interest and injury.

### 4. Standing Based On Alleged Usurpation Of State Regulatory Authority

According to plaintiffs, the proposed intervenors' argument that this action usurps the state regulatory authority of the APSC and vests such authority in the federal district court should have been raised during rulemaking and not in this enforcement action, citing 42 U.S.C. § 7607(b)(2) (Dkt. No. 76, at 38-40).  Plaintiffs claim that, "if AECC has a problem with a Clean Air Act rule that can require major sources of air pollution controls, and thereby potentially impact electricity rates or the Public Service Commission's jurisdiction, it should have, and could have raised those issues in the Court of Appeals." (Dkt. No. 76, at 40).  As a result, plaintiffs argue AECC cannot raise those issues here.

In response, the Coalition makes clear that it contends "that court approval of the Settlement not only usurps the APSC's authority, but also the authority of the ADEQ and the

Arkansas Pollution Control and Ecology Commission" (Dkt. No. 78, at 14).   The Coalition maintains that Arkansas law "mandates that ADEQ and the PC&E take into account the social and economic value of the White Bluff and Independence plants and other factors that they may find applicable during permitting, enforcement and rule-making actions." (Dkt. No. 78, at 15 (citing Ark. Code Ann. § 8-4-312 (14), (16)).   Further, it argues that "[b]ecause the Arkansas SIP allows consideration off these factors, there was no need for comment during rule-making to approve the SIP" and that these issues are not barred now (Dkt. No. 78, at 15).

When asserting usurpation of state regulatory authority, CURAD appears to focus only on "regulatory authority of the APSC" (Dkt. No. 66, at 13).   CURAD first argues that, by virtue of the amended complaint and proposed settlement agreement, the Entergy Companies have "made a business decision to capitulate to plaintiffs' demands, and instead of defending the allegations on behalf of ratepayers, ha[ve] decided to cease production of electricity at the plants" (Dkt. No. 66, at 13).   In support of this assertion, CURAD cites case law prohibiting a public entity from abandoning any part of its property devoted to public service without the consent of the State (Dkt. No. 66, at 14).   CURAD argues "[s]huttering two viable facilities which currently provide necessary baseload electric generation to Arkansas ratepayers is analogous to abandonment." (Dkt. Nos. 66, at 14; 77, at 6).   For the reasons explained previously in this Order, the Court determines that neither the amended complaint nor the proposed settlement agreement seek shut down of the White Bluff or Independence plants.   Further, the Entergy Companies cite authority to this Court that calls into question CURAD's interpretation of the abandonment doctrine.

As this Court has observed, plaintiffs' requested relief for the allege PSD violations includes the installation of BACT only for alleged excess $SO_2$ emissions at Independence Units 1 and 2 and for alleged excess $NO_x$ emissions at White Bluff Unit 2 (Dkt. Nos. 1, at 24-27; 54, 27-

31).   According to the Entergy Companies, "[b]ecause BACT for each unit has not yet been determined, neither the parties nor the Movant-Intervenors know what type of investment or duration of work potentially would be needed to incorporate BACT.  In the face of these unknowns, the Movant-Intervenors simply guess at the Entergy Companies' business decisions in hypothetical scenarios and use their guesses to support their economic injury analysis." (Dkt. No. 75, at 14).

Neither CURAD nor the Coalition refute these representations.  Instead, the Coalition in its briefing seemingly acknowledges that the BACT plaintiffs seek will be determined by ADEQ, not this Court (Dkt. No. 78, at 30 ("Further, even if ADEQ were to determine that the utility owners could comply by installing a less-costly technology, or imposed another emissions limit that the utility owners could meet without installing scrubbers, any new emissions limit, or any mandate to install certain technology, would immediately authorize [the Entergy Companies] (and the other utility owners) to file with the APSC an interim surcharge for the recovery of environmentally-mandated costs pursuant to previously cited Arkansas law.")).

CURAD focuses on APSC authority, and the Court has satisfied itself that economic injury is not a sufficient basis on which to confer standing to intervene for either CURAD or the Coalition as explained elsewhere in this Order.  To the extent the Coalition attempts to expand the argument on alleged usurpation of state regulatory authority now and to assert arguments regarding the authority of ADEQ and the PC&E, the Court observes that even the State and CURAD do not advance these arguments before the Court.  The Coalition provides no explanation for why the Coalition is the appropriate party to make such arguments.  Further, given what the Court understands from the circumstances presented here, the Court is not persuaded by these arguments regarding alleged usurpation of regulatory authority.

For all of these reasons, on the record and briefing before it, given the Eighth Circuit precedent that guides this Court's analysis, the Court concludes that CURAD and the Coalition lack standing to intervene based on alleged usurpation of state regulatory authority.

### B.  Requirements Of Rule 24(a) And Rule 24(b)

Because the Court determines that CURAD and the Coalition are required to demonstrate Article III standing to intervene under Rule 24(a) and Rule 24(b) based on Eighth Circuit precedent, and because the Court determines that neither CURAD nor the Coalition have demonstrated standing based on their assertions here given the Eighth Circuit precedent that guides this Court's analysis, the Court denies CURAD and the Coalition's motions to intervene without reaching the merits of the requirements of Rule 24(a) and Rule 24(b).

### IV.  Conclusion

The Court concludes that it has subject matter jurisdiction over plaintiffs' claims and that plaintiffs have Article III standing to bring their claims.  As a result, plaintiffs' motion to enter settlement agreement as a consent judgment remains pending (Dkt. No. 44).  The Court determines CURAD and the Coalition lack Article III standing as required to intervene under Federal Rule of Civil Procedure 24(a) and 24(b).  Therefore, the Court denies CURAD and the Coalition's motions to intervene without reaching the merits of the requirements of Rule 24(a) and Rule 24(b) (Dkt. Nos. 17, 26).  The Court denies as moot CURAD's motion for abeyance and leave to file response and the Coalition's motion for abeyance and leave to file response to plaintiffs' motion to enter settlement agreement as a consent judgment (Dkt. Nos. 45, 46).

It is so ordered this 30th day of November, 2020.

_____
Kristine G. Baker
United States District Judge